UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO: 20-55** |
| v. | * | **SECTION: "F" (4)** |
| **JASON R. WILLIAMS** | * | |
| **NICOLE E. BURDETT** | | |
| | * * * | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
FOR SELECTIVE AND VINDICTIVE PROSECUTION AND
DUE PROCESS VIOLATIONS, AND REQUEST FOR EVIDENTIARY HEARING**

The Court is well aware of the government's troubling decision to indict declared district attorney candidate Jason Williams on the eve of qualifications for the November 2020 election *and* during a historic pandemic that will prevent a timely trial on the merits. In addition, Mr. Williams has apparently been under investigation by the federal government since at least 2016 for various non-tax matters that proved to be meritless, and the government rushed to indict him on tax charges approved by the Department of Justice at the eleventh hour before Mr. Williams qualified as a candidate for district attorney.[1]

The government's recently-produced discovery has shed light on this ugly situation and leads to one of two conclusions, both bad for the prosecution. Either Mr. Williams, an African American politician, has been singled out for selective and vindictive prosecution on a tax case in which his actions were no different from that of hundreds of other clients of tax preparer Henry J. Timothy; or the government has blatantly violated the defendants' due process rights by knowingly accepting false testimony about Mr. Williams and Ms. Burdett from Mr. Timothy, its star witness. Either way, the indictment must be dismissed.

---

[1] As is reflected in the Grand Jury materials recently produced, the Government opted to present its case to a mere quorum of only 16 grand jurors out of 23 in the midst of the COVID-19 pandemic.

1

## FACTS

**I.     The indictment.**

The defendants met with the Department of Justice Tax Division in January 2020 to discuss the allegation that Mr. Williams filed fraudulent tax returns. Mr. Williams and Ms. Burdett both informed DOJ tax that Henry Timothy made all tax decisions after reviewing Mr. Williams' QuickBooks information. They also informed the government that, during an interview with counsel, Mr. Timothy confirmed that he made all the tax decisions, that he believed Mr. Williams' returns were appropriate, and that **he treated Mr. Williams the same as all of his other clients**.

The government responded that, contrary to what Mr. Timothy told the defendants, Mr. Timothy told the *government* that Ms. Burdett pressured him to take improper deductions. The defendants warned the government to carefully evaluate this changed story, because Mr. Timothy was the subject of a separate criminal tax investigation. The defendants also urged the government to investigate how Mr. Timothy handled his other clients' tax returns in order to confirm which of Mr. Timothy's statements were true: that he treated Mr. Williams like all of this other clients, or that Mr. Williams and Ms. Burdett pressured him into taking improper deductions.

As is discussed below, the government ignored that advice and selectively charged Mr. Williams and Ms. Burdett, despite glaring evidence contradicting its theory.

**II.     The FBI pursues a fruitless investigation into Mr. Williams.**

The government's motivation for this selective and vindictive prosecution is apparent from its grand jury subpoenas for bank records, which reveal that, for the past four years, the FBI has been investigating a person, and trying to find a crime.

The first bank subpoenas were issued between November 2016 and July 2017 at the request of prosecutors from the Eastern District of Louisiana and agents from the New Orleans Division

of the FBI.² Ex. "A."  In addition to seeking Mr. Williams' bank records, those subpoenas seek records of a college acquaintance of Mr. Williams who received contracts from the City of New Orleans (with no involvement from Mr. Williams) and a business that performed repairs on Mr. Williams' home.  No tax agents are listed on those subpoenas, and the investigation into those particular issues appears to have been abandoned.

In July 2018, prosecutors from the Western District of Louisiana, working with the same FBI agents, took over the investigation for reasons unknown to the defendants.  Ex. "B."  An IRS agent first appears on a subpoena in May 2019, shortly after Mr. Williams was visited by FBI and IRS agents on April 23, 2019.  Ex. "C."  As is explained below, the tax case arose after the government hit dead ends on its previous, non-tax investigations and stumbled upon Mr. Timothy, a tax preparer who misrepresented himself as a CPA, who was under investigation for underreporting his own income, and who prepared Mr. Williams' returns for several years.

## III.   The government discovers Henry Timothy.

The government first approached Henry Timothy on May 15, 2018.  Mr. Timothy was under investigation for failing to report more than $300,000 of his own income.  Significantly, on October 22, 2018, IRS Agent Lori Marable attempted to interview Mr. Williams as a *witness* in that investigation, inquiring how long Mr. Timothy had been handling Williams' taxes and how much Mr. Timothy charged.  Mr. Williams could not meet on October 22 because he was in trial in federal court.  After the trial, he contacted Agent Marable several times about rescheduling, but she responded that the Timothy case was not pressing and that she would be in touch when she started working on it again.  Mr. Williams has not heard from Agent Marable since.

---

² According to the government's numbering system, it appears that the Eastern District issued at least 20 other subpoenas during this time period, and possibly as many as 41 total subpoenas, indicating that the fruitless investigation was wide-ranging.

A few months later, the government turned its investigation into Mr. Timothy upside down. On April 23, 2019, instead of interviewing Mr. Williams about Mr. Timothy, FBI Agent Todd Goodson and IRS Agent Timothy Moore **interviewed Mr. Timothy about Mr. Williams**.

Mr. Timothy told the agents that he used spreadsheets and backup documents provided by Ms. Burdett to prepare Mr. Williams' taxes. Ex. "D," p. 1. He stated that he would provide a filing authorization to Ms. Burdett, that she would return the authorization signed by Mr. Williams, and that he would then file the returns. *Id.* at p. 2. **Significantly, Mr. Timothy did *not* say that Ms. Burdett would pressure him to take improper deductions.** *See* Rec. Doc. 1 at ¶ 18.

The agents also questioned Mr. Timothy about a number of specific items on Mr. Williams' tax returns from 2012 through 2017. At no time did Mr. Timothy say that Ms. Burdett instructed him to take any of these deductions. *See* Ex. "D" at p. 2-3.

Mr. Timothy made similar statements to undersigned counsel on April 26, 2019. Specifically, Mr. Timothy stated that Ms. Burdett would bring him Mr. Williams' QuickBooks and other records, that he would prepare the tax returns and send a filing authorization to Ms. Burdett, and that he would file Mr. Williams' tax returns upon receipt of the authorization. Mr. Timothy further stated that he made the decisions about what deductions should be taken, that he would ask Ms. Burdett for clarifications if necessary, and that he believed he did everything appropriately. Mr. Timothy stated that there was nothing unusual about Mr. Williams' taxes and that the last thing he wanted to do was to get Mr. Williams in trouble.

Mr. Timothy had a second interview with the U.S. Attorney, FBI Agent Goodson, and IRS Agent Moore on November 5, 2019. Initially, Mr. Timothy repeated substantially the same thing he told the FBI and undersigned counsel in April 2019—that he reviewed Mr. Williams' records and determined what expenses could be deducted:

> BURDETT was an attorney but was also the office administrator for WILLIAMS. BURDETT communicated with TIMOTHY by telephone and brought the QuickBooks details to TIMOTHY. The QuickBooks details were paper copies that included profit and loss statements, balance sheets, general ledger, and financials. If TIMOTHY had any questions, TIMOTHY called BURDETT and BURDETT would relay the questions to WILLIAMS. TIMOTHY also prepared BURDETT's personal taxes for tax years 2013 through 2017.
>
> BURDETT retrieved the tax preparations from TIMOTHY including the tax forms 8879. BURDETT provided the items to WILLIAMS who then signed the tax forms 8879. BURDETT then returned the signed forms to TIMOTHY and TIMOTHY electronically filed the tax returns. TIMOTHY stated that there were no questions about the completed returns.

Ex. "E," p. 2. But then Timothy took a break, had a private conversation with his lawyer, and his story immediately took a 180-degree turn:

> [At this point during the interview, TIMOTHY and his attorney London met privately in another room for a period of time before continuing the interview.]
>
> **TIMOTHY stated that BURDETT asked TIMOTHY to lower the amounts owed on the tax returns.**

*Id.* at p. 3 (emphasis added). For the first time—contradicting his previous interviews with the IRS, the FBI, and undersigned counsel—Mr. Timothy abruptly changed his story and told the government that he "did things he should not have done" on Mr. Williams' tax return because Ms. Burdett asked him to. *Id*.

### IV. The government accepts Timothy's changed story without verification and contrary to the evidence.

The government is well aware of Mr. Timothy's previous interviews in which he did not even acknowledge taking bad deductions for Mr. Williams, much less blame Ms. Burdett for it. However, the government enthusiastically accepted Mr. Timothy's new story, despite glaring contradictions and mountains of contrary evidence.

First, the government has turned a blind eye to Mr. Timothy's many inconsistencies. As is set forth above, in his April 2019 interview with the government, Mr. Timothy identified no

5

problems with Mr. Williams' tax returns, and certainly did not accuse Mr. Williams or Ms. Burdett of wrongdoing. Timothy's story changed in November 2019, and he then told the FBI that (1) "BURDETT asked TIMOTHY to lower the amounts owed on the tax returns"; (2) "TIMOTHY felt like he had a personal relationship with BURDETT and he needed to make WILLIAMS and BURDETT happy"; and (3) "TIMOTHY did things he should not have done." Ex. "E" at p. 3. However, just last week, Mr. Timothy reverted to his original story and stated, through his counsel, that he believed Mr. Williams' returns were appropriate when he filed them:

> REQUEST FOR ADMISSION NO. 14:
>
> Please admit that at the time you prepared each tax return for filing by Jason Rogers Williams, you believed that the deductions claimed on the return were appropriate and consistent with law
>
> RESPONSE TO REQUEST FOR ADMISSION NO. 14:
>
> **It is admitted** that at the time Defendant Timothy prepared each tax return for filing by Jason Rogers Williams, you [sic] believed that the deductions Defendant Timothy claimed on the return were appropriate and consistent with law.

Ex. "F" (emphasis added).

Second, although the government knew that Mr. Timothy prepared Mr. Williams' tax returns with Intuit Pro Series tax software, the government did not even ask Timothy to produce his electronic records. Had it done so (as the defendants have), the government would have discovered (1) that there were no draft tax returns for Mr. Williams, (2) that there were no alterations to the deductions on Mr. Williams' return, and (3) that Mr. Timothy simply prepared a final return shortly before the tax deadline every year. Ex. "G."

Third, there is not a single document corroborating Mr. Timothy's allegation. Mr. Timothy has produced no communications with Ms. Burdett at all. Ms. Burdett, however, provided the government with all of her communications with Mr. Timothy, and those materials refute Mr.

Timothy's changed story. Indeed, Ms. Burdett's materials are consistent with Timothy's original statement—that he prepared the returns on his own. Specifically, the communications show that Ms. Burdett hounded Mr. Timothy to prepare the returns before the tax deadline. *See, e.g.,* Ex. "H" (On March 7, 2016, Ms. Burdett texts Mr. Timothy that "my employees are starting to panic because I have not yet given them a 1099. Do you need me to resend you the information that I previously emailed?"; April 11, 2018, "Everyone is harassing me to see if taxes are done"). Not only was there no discussion about the content of the returns, there was no time to do so because Mr. Timothy would not send the returns until the last minute.

Fourth, in his November 2019 interview with the government, **before** he changed his story, Mr. Timothy "acknowledged his handwriting on the P&L statement copies" that he received from Ms. Burdett. Ex. "E" at 3. These documents show that Mr. Timothy personally reviewed and approved every deduction listed on Mr. Williams' tax return. Ex. "I." Significantly, this corroborates Mr. Timothy's original statement—that he made all tax decisions—and contradicts his changed story.

Fifth, although Mr. Timothy now claims that he "did things he should not have done" on Mr. Williams' tax returns, all of the deductions are plainly listed on Mr. Williams' returns. There is nothing hidden or misleading. For example, on Mr. Williams' 2013 Schedule C expenses, Mr. Timothy listed $8,046.99 in "political" contributions. Ex. "J." If Mr. Timothy believed this was something "he should not have done," why did he disclose that the expenses were for political contributions and not characterize it as something else? In its single-minded pursuit of Mr. Williams, the government failed to ask. The obvious answer—that Timothy listed the deduction because he thought it was appropriate—corroborates Mr. Timothy's original statement and undermines his story that he "did things he should not have done" at the request of Ms. Burdett.

7

Sixth, the government failed to investigate Mr. Timothy's misrepresenting himself as a CPA, even though Mr. Timothy admitted to the government that he is not and has never been a CPA. *See* Ex. "K." Similarly, the government failed to investigate Mr. Timothy's false claim that he earned a Master of Business Administration. *Compare* Ex. "L" (Timothy claiming he obtained an MBA from the University of New Orleans in 1978) *with* Ex. "M" (Timothy's UNO transcript indicating that he enrolled in graduate school in 1991 and only took one course).

Seventh, the government ignored the testimony of anyone who contradicted Mr. Timothy's changed story. For example, on June 5, 2020, the government interviewed J.B., a former contractual employee of Mr. Williams who also used Mr. Timothy for his taxes. When the government pointed out that Mr. Timothy deducted "$22,000 for supplies, $4,000 for meals and entertainment, $1,700 for utilities, in addition to deductions for uniforms and membership fees" on J.B.'s tax return, J.B. responded "that's insane" and stated that he had not noticed those deductions before. Ex. "N." The government did not challenge that assertion. In other words, the government accepts J.B.'s statement that Mr. Timothy took those deductions on his own, without J.B.'s participation or knowledge. However, the government contends that Mr. Timothy did the same thing for Mr. Williams only because Ms. Burdett demanded it. Even worse, when J.B.'s interview contradicted the government's theory of the prosecution, the government just stopped asking questions—the government has not produced any other interviews of Mr. Timothy's clients.

This seventh contradiction—grossly amplified by the facts set forth below—is the reason for Mr. Williams' motion to dismiss. After it had investigated Mr. Williams for several years for non-tax related matters, unsuccessfully trying to find a crime, the government willingly turned a blind eye to all of these problems and (1) indicted Mr. Williams (and Ms. Burdett as collateral damage), (2) let Mr. Timothy off the hook completely for his handling of Mr. Williams' returns,

and (3) failed even to look into Mr. Timothy's other clients.  Simply put, **Mr. Timothy treated Mr. Williams exactly the same way he treated all of his clients, yet Mr. Williams and Ms. Burdett are the only ones who have been prosecuted.**  The government ignored all evidence that contradicted its theory in its haste to indict an African American candidate for political office in New Orleans on the eve of qualifying.

### V.     The government selectively prosecuted Jason Williams and deliberately ignored Mr. Timothy's other clients.

The defendants urged the government to carefully evaluate Mr. Timothy's changed statement, in particular by investigating how Mr. Timothy treated his other clients.  In other words, if Mr. Timothy took aggressive or improper deductions for all of his clients, it would undermine his changed story that he took aggressive or improper deductions for Mr. Williams only because Ms. Burdett pressured him.  Not only did the government fail to look into that question, it ignored a mountain of evidence sitting in its own files.

The government recently produced an analysis of all of the tax returns filed by Mr. Timothy from 2013 through 2016.  The results are staggering.  Across the board, Mr. Timothy made deductions that virtually eliminated all of his clients' income.  It is impossible to look at this information and not realize that Mr. Timothy's changed story is false and that Ms. Burdett clearly did not pressure him to take deductions for Mr. Williams.  The only explanation for the government's deliberate ignorance of this obvious fact is its years-long pursuit of Mr. Williams and its selective decision to prosecute him.

**A.   In general, Henry Timothy was deducting virtually all of his clients' income.**

From 2013 through 2016, Mr. Timothy's clients reported a **total** of $71,982,007 in Schedule C income.[3]  Ex. "O."[4]  Mr. Timothy deducted a **total** of $62,146,980 from those returns, leaving taxable income of only $9,835,027.  As a whole, Mr. Timothy's Schedule C clients paid virtually no taxes, and the government has not even looked into them.  Even worse, despite this mountain of contrary evidence, the government has accepted Mr. Timothy's story that he only made aggressive deductions for Mr. Williams because Ms. Burdett pressured him to do so.

A comparison of just a few Timothy clients for tax year 2013 makes it clear that he was treating Mr. Williams just like everyone else:

| Name | Business | SchC: Gross Income | SchC: Deductions | SchC: Profit/Loss |
|---|---|---|---|---|
| J. BROW. | CONSTRUCTION SERVICE | $985,614 | $978,170 | $7,444 |
| H. LA. | SEAFOOD PROCESSING | $867,596 | $827,159 | $40,437 |
| DOU. | HOME HEALTH | $798,891 | $771,211 | $27,680 |
| H. CO. | RESTAURANT & LOUNGE | $617,891 | $590,430 | $27,461 |
| WILLIAMS | ATTORNEY | $578,569 | $493,334 | $85,225 |
| L. KI. | AUTO BODY AND POWDER | $435,705 | $421,470 | $14,235 |
| DUP. | RENOVATIONS | $371,912 | $345,145 | $26,767 |

*See* Ex. "O."  In fact, as the above chart makes clear, Mr. Timothy took **more** deductions for many of his other clients than for Mr. Williams, and the government has confirmed that it has not looked into any of them.  Ex. "P."

**B.   The government <u>declined</u> to prosecute C.D., a similarly situated individual, in 2017.**

Several years ago—before the government discovered the connection between Mr. Timothy and Mr. Williams—Timothy client C.D. was investigated and **not** charged.  In 2013,

---

[3] The defendants focus on Schedule C income and deductions because that is the focus of the indictment.  However, Mr. Timothy's treatment of itemized personal deductions is similar.  His clients reported a total of $294,660,168 in W-2 income, and after deductions paid a total of $24,669,869 in taxes—less than a 10% overall tax rate.
[4] Exhibit "O" has been prepared by counsel from a much larger spreadsheet provided by the government.

10

C.D.'s home health care company reported $798,891 in gross income, deducted $771,211, and paid taxes on only $27,680.  Ex. "O."  In 2014, C.D.'s company reported $942,475 in gross income, deducted $921,294, and paid taxes on only $21,181.  *Id*.  In 2015, C.D.'s company reported $888,158 in gross income, deducted $866,934, and paid taxes on only $21,224.  *Id*.  In 2016, C.D.'s company reported $907,753 in gross income, deducted $866,238, and paid taxes on only $21,515.  *Id*.  In total, during the four years that Mr. Timothy prepared C.D.'s taxes, C.D. paid approximately $35,000 on $3,537,277 in income.

The IRS found that many of C.D.'s "deductions" from the business's gross earnings were for personal expenses, that C.D. "regularly withdraws cash, issues a check to herself, or transfers money from the business account into her personal account on a bi-weekly basis," and that the "business account does contain personal expenses such as [C.D's] children's tuition for school."  Ex. "Q."  However, without articulating a dollar amount, the IRS concluded that the "tax harm discovered is de minimis for criminal tax proceedings" and closed its case.  *Id*.

### C.  The government ignored J.B.

As is described above, Timothy client J.B. admitted to the government that Timothy included $27,700 in improper deductions on his tax return.  The government has not taken any further action towards J.B. and has apparently accepted his explanation that Mr. Timothy took those deductions on his own.

### D.  The government has not even bothered to look into many more similarly situated individuals.

Even more shocking are the many other clients of Henry Timothy whom the government has wholly ignored, despite the defendants' specific request that the government consider Timothy's treatment of his other clients before charging Mr. Williams and Ms. Burdett.

1.     **J. Brow.**

For example, the government has produced the tax returns of J. Brow., who hired Mr. Timothy to handle his taxes for 2011, 2012, and 2013. Ex. "O." During those years, J. Brow.'s tax returns reported the following:

| Year | SchC: Gross Income | SchC: Deductions | SchC: Profit/Loss |
|---|---|---|---|
| 2011 | $498,952 | $487,606 | $11,346 |
| 2012 | $985,614 | $978,170 | $20,800 |
| 2013 | $1,383,967 | $1,321,932 | $62,035 |

After Mr. Timothy regularly deducted **at least 95%** of J. Brow.'s income for several years, J. Brow. switched to a licensed CPA in 2016. Ex. "R." Suddenly, J. Brow. reported **$420,000** in taxable income. *Id*. Unsurprisingly, the government has not questioned J. Brow.

2.     **It is clear that Mr. Timothy was taking aggressive deductions for all of his clients.**

And J. Brow. is not an isolated example. Regardless of the type of business, the tax liability for all of Mr. Timothy's clients is regularly, repeatedly, and drastically reduced by Schedule C deductions. The information below **was provided by the government**, yet the government has neither interviewed Mr. Timothy nor a single one of these business owners about their taxes, much less charged them with multiple felony counts.

| Name | Business | Year | SchC: Gross Income | SchC: Profit/Loss |
|---|---|---|---|---|
| VI. | CONSTRUCTION | 2013 | $201,347 | $7,696 |
| | | 2014 | $201,302 | $20,105 |
| | | 2015 | $246,673 | $1,241 |
| | | 2016 | $315,233 | $8,681 |

| Name  | Business | Year | SchC: Gross Income | SchC: Profit/Loss |
|-------|----------|------|--------------------|-------------------|
| E. SM.| TRUCKING | 2013 | $215,309           | $19,042           |
|       |          | 2014 | $549,749           | $16,194           |
|       |          | 2015 | $516,979           | $55,247           |

| Name  | Business   | Year | SchC: Gross Income | SchC: Profit/Loss |
|-------|------------|------|--------------------|-------------------|
| ROSI. | CONTRACTOR | 2013 | $263,151           | $12,421           |
|       |            | 2014 | $335,527           | $11,830           |
|       |            | 2016 | $628,954           | ($752)            |

| Name | Business | Year | SchC: Gross Income | SchC: Profit/Loss |
|------|----------|------|--------------------|-------------------|
| S. J.| DAYCARE  | 2015 | $315,532           | $11,346           |
|      |          | 2016 | $311,714           | $40,231           |

| Name   | Business    | Year | SchC: Gross Income | SchC: Profit/Loss |
|--------|-------------|------|--------------------|-------------------|
| A. SCO.| COFFEE SHOP | 2013 | $295,780           | $13,671           |
|        |             | 2014 | $337,127           | $8,835            |
|        |             | 2015 | $399,430           | $7,519            |
|        |             | 2016 | $348,939           | $27,967           |

*See* Ex. "O."

All of this points to two possible conclusions, both bad for the government. Either the government genuinely believes that Mr. Timothy conspired with his clients to take improper deductions and selected only Jason Williams and Nicole Burdett for prosecution. Or the government knows that, like Williams and Burdett, Timothy's hundreds of other clients had nothing to do with his improper deductions, and the government has decided to prosecute Mr. Williams with false evidence. Either way, the indictment must be dismissed.

## **LAW AND ARGUMENT**

**I.     Selective and Vindictive Prosecution.**

Mr. Williams—and as collateral damage Ms. Burdett—have been singled out for prosecution from hundreds of Henry Timothy's clients who, like the defendants, turned over their records to Timothy and relied upon him to identify and take appropriate deductions. The government has *ignored* Timothy's many other clients whose tax returns included even greater deductions than Mr. Williams' returns. The difference is that Mr. Williams is an African American public official and announced candidate for New Orleans district attorney.

In order to make out a claim of selective prosecution, a defendant must "make a *prima facie* showing that he has been singled out for prosecution while others similarly situated and committing the same acts have not." *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984) (quoting *United States v. Greene*, 697 F.2d 1229, 1234 (5th Cir. 1983)). The defendant "must then demonstrate that the government's discriminatory selection of him for prosecution has been invidious or in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Id.* If a defendant meets these requirements, then the burden shifts to the government to demonstrate a legitimate basis for selecting the defendant for prosecution. *Id.* (citing *Greene*, 697 F.2d at 1235).

As the Court has recognized,

> Through broad, prosecutorial discretion is not 'completely unfettered[; s]electivity in the enforcement of criminal laws is … subject to constitutional constraints.' *Wayte*, 470 U.S. at 608 (citing *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). When presented with a selective or vindictive prosecution challenge, the Court may review decisions to prosecute in limited circumstances to ensure that the decision is not the product of individual or institutional abuse or 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights.' *Id.* (citing *Bordenkircher*, 434 U.S. at 364-65)); *Armstrong*, 517 U.S. at 464-65 (the equal protection clause of the Fifth Amendment forbids (selective)

>   prosecution based upon race, religion, or other arbitrary factor); *United States v. Goodwin*, 457 U.S. 368, 373 (1982) (prosecutorial vindictiveness is a due process violation for it 'punish[es] a person because he has done what the law plainly allows him to do[,]' but it is difficult to prove considering that the '[m]otives are complex and difficult to prove' and '[t]he imposition of punishment is the very purpose of virtually all criminal proceedings.'). To succeed on a selective prosecution claim, the defendant must demonstrate that the prosecution had both a discriminatory effect and that it was motivated by a discriminatory purpose . . . .

Rec. Doc. 42 at 9-10.

For a vindictive prosecution claim, a defendant must present objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights. *United States v. Saltzman*, 537 F.3d 353, 359 (5th Cir. 2008). In addition, even without evidence of actual vindictiveness, a defendant may "show sufficient facts to give rise to a presumption of vindictiveness" in certain circumstances. *Id*.

Selective prosecution may exist when the government charges a defendant because of the "exercise of constitutional rights," *United States v. Johnson*, 577 F.2d 1304, 1307 (5th Cir. 1978), and courts have found selective prosecution against defendants singled out for exercising such constitutional rights as holding a positions in a labor union and soliciting support for political ideas. *See United States v. McDonald*, 553 F.Supp. 1003, 1008 (S.D.Tex. 1983) (dismissing an indictment for selective prosecution of a union president); *Nichols v. Vill. of Pelham Manor*, 974 F. Supp. 243, 256 (S.D.N.Y. 1997) (denying summary judgment in a civil selective enforcement claim in which plaintiff alleged he was improperly arrested because he was recruiting membership for a particular political party).

Not a single client of Mr. Timothy's other than Mr. Williams and Ms. Burdett have been prosecuted or referred for prosecution. *See* Ex. "P." The government has declined even to investigate any of the similarly-situated individuals described above—including those whose underpayment of taxes as a result of Timothy's incompetence, mistakes, or misconduct far

15

exceeded Mr. Williams'.

The government knew that Mr. Williams, who is African American, was a declared candidate for district attorney and was to formally qualify less than three weeks after he was indicted. The timing of the indictment—after months of discussions in which the defense pointed out both the flaws in the government's theory *and* the upcoming election—violates the Department of Justice's own policy on "Election Year Sensitivities," which provides that

> [P]olitics must play no role in the decisions of federal investigators or prosecutors regarding any investigations or criminal charges. Law enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party.

*See* Attorney General Memorandum for All Department of Justice Employees Concerning Election Year Sensitivities (March 9, 2012). The "government's failure to follow its normal prosecutorial procedures mandates stricter judicial scrutiny" over claims of selective prosecution. *United States v. Haggerty*, 528 F. Supp. 1286, 1293 (D. Colo. 1981).

## II.     Due Process.

Henry Timothy is a liar and the government knows it. As the Court noted in its prior ruling, the defendants "invoke broad principles concerning their suspicion of outrageous government conduct and their constitutional right to due process." *See* Order and Reasons (Doc. 42) at 11. The discovery produced by the government confirms those suspicions.

The shoddiness of the government's case—the fact that it relies upon the false testimony of Henry Timothy—underscores the injustice of Mr. Williams' and Ms. Burdett's inability to bring this case to trial quickly and put this misguided case behind them. *See Moore v. Arizona*, 414 U.S. 25, 38 (1973) (anxiety and concern suffered by the accused by unresolved criminal charges constitutes prejudice in the constitutional speedy trial analysis).

"To be sure, the Court is tasked with ensuring that all defendants' due process rights are respected, no matter their station in life." *See* Order and Reasons (Doc. 42) at 11.  When the government engages in conduct that is so fundamentally unfair that it violates the requirements of due process, dismissal is warranted.  *United States v. Mauskar*, 557 F.3d 219, 231 (5th Cir. 2009).  The "standards of justice" that are inherent to the due process clause "are not authoritatively formulated anywhere as though they were specifics."  *Rochin v. California*, 342 U.S. 165, 169 (1952).  Dismissal of the indictment is an "extreme step" that is warranted under "rare[] circumstances" that are case and fact specific.  *Mauskar*, 557 F.3d at 231 (declining to find outrageous government conduct where government failed to disclose that its case rested upon forged documents until trial, but noting that the outcome would likely have been different had the government also "suborned perjury" about the authenticity of the documents).

Such circumstances, to be further developed during an evidentiary hearing, are present here.  The government knows at the outset that its case is based upon lies: the evidence is conclusive that (1) Timothy did not revise Mr. Williams' draft tax returns at Ms. Burdett's direction because Timothy did not prepare any drafts at all; (2) Timothy decided what deductions to take on Mr. Williams' returns, as he said during his first interview with the government, during his interview with undersigned counsel, as reflected by his handwritten notations on the P&L statements provided by Ms. Burdett to him, and consistent with the same process he used for the other clients of his that the government interviewed; (3) there are no text messages, emails, or other documentation that corroborate Timothy's false claim that Ms. Burdett pressured him to change Mr. Williams' deductions; and (4) Timothy accurately labeled expenses that were not deductible (i.e., "political contributions") but through either Timothy's willfulness or incompetence took deductions on Mr. Williams' returns for those expenses.

17

The government knows that Timothy changed his version of events entirely only after his attorney interrupted his original narrative and met with him privately. And the government knows that this second version of events is contradicted by all of the available objective evidence—including records of more than a thousand tax returns with Schedule C's that Timothy prepared for hundreds of other clients that establish that Timothy made the same mistakes on all of them. But the only people charged are Mr. Williams, an African American candidate for public office, and Ms. Burdett as collateral damage.

### III.   Request for Evidentiary Hearing.

Mr. Williams and Ms. Burdett ask that the Court dismiss the indictment against them based upon the evidentiary showing made with this motion or, in the alternative, set the matter for evidentiary hearing. *See United States v. Young*, Case No. 3:16-cr-45, Order [Doc. 14] (M.D. La. June 27, 2016) (deGravelles, J.) (setting motion to dismiss for vindictive and selective prosecution for evidentiary hearing).

Respectfully submitted,

| | |
|---|---|
| *s/Michael W. Magner* | */s/ William P. Gibbens* |
| MICHAEL W. MAGNER (#1206) | William P. Gibbens, 27225 |
| AVERY B. PARDEE (#31280) | SCHONEKAS, EVANS, MCGOEY |
| Jones Walker LLP | & MCEACHIN, L.L.C. |
| 201 St. Charles Ave., Suite 5100 | 909 Poydras Street, Suite 1600 |
| New Orleans, LA 70170 | New Orleans, Louisiana 70112 |
| Telephone (504) 582-8316 | |
| apardee@joneswalker.com | (504) 680-6065 |
| mmagner@joneswalker.com | billy@semmlaw.com |
| *Attorneys for Nicole E. Burdett* | *Attorney for Jason R. Williams* |