Case 2:20-cr-00055-MLCF-KWR   Document 51-6   Filed 09/01/20   Page 1 of 7

FD-302 (Rev. 5-8-10)

- 1 of 7 -

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a certified FBI information system.

Date of entry    11/18/2019

HENRY TIMOTHY, date of birth (DOB) [Redacted], 1950, telephone number [Redacted], was interviewed at the Federal Bureau of Investigation (FBI) office located at 2901 Leon C. Simon Boulevard, New Orleans, Louisiana. Also present during the interview was Assistant United States Attorney, Western District of Louisiana, Kelly Uebinger, Attorney Stephen London, and FBI Financial Analyst Jill Zeringue. After being advised of the identities of the interviewing Agents and the nature of the interview, TIMOTHY provided the following information:

TIMOTHY first met JASON ROGERS WILLIAMS through NICOLE BURDETT. BURDETT was a friend of TIMOTHY's father-in-law EUNICE TRENTACOSTA. TRENTACOSTA knew BURDETT's family. TRENTACOSTA was a former accountant. BURDETT asked TRENTACOSTA about amending tax returns. TRENTACOSTA referred BURDETT to TIMOTHY. In or around 2012, TIMOTHY met with WILLIAMS and BURDETT at TRENTACOSTA's residence. WILLIAMS wanted his 2008, 2009, 2010, and 2011 tax returns amended because the returns had been done incorrectly. WILLIAMS owed money to the Internal Revenue Service (IRS). Ultimately, TIMOTHY reviewed the tax returns and changes were made and accepted by the IRS. TIMOTHY noted that some of the tax returns had been done incorrectly previously, but not all of the returns. Some of the returns did not have all of the expenses listed and some expenses were on the wrong schedules.

TIMOTHY worked as an accountant for various companies and retired in or around 2015. TIMOTHY last worked for ROBINSON LUMBER COMPANY. TIMOTHY has conducted accounting work for his entire professional life.

TIMOTHY conducted tax preparation work for WILLIAMS and BURDETT from 2012 through 2017. During that period, TIMOTHY did not routinely interact with WILLIAMS and BURDETT.

TIMOTHY has had no contact with WILLIAMS or BURDETT, or their attorneys,

Investigation on  11/05/2019  at  New Orleans, Louisiana, United States (In Person)

File #  194B-NO-2085105                                                    Date drafted  11/06/2019

by  Todd A. Goodson, Timothy L. Moore

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

EXHIBIT E

FD-302a (Rev. 5-8-10)

194B-NO-2085105

Continuation of FD-302 of (U) Interview of HENRY TIMOTHY , On 11/05/2019 , Page 2 of 7

since TIMOTHY was initially interviewed by the FBI in April 2019.

TIMOTHY did not know why WILLIAMS and BURDETT stopped using TIMOTHY as a their tax preparer. TIMOTHY did not believe they were disastisfied with TIMOTHY's work. TIMOTHY thought that WILLIAMS and BURDETT received a large settlement through their law practice and was advised to utilize another tax preparer. BURDETT told TIMOTHY that WILLIAMS and BURDETT were referred to another tax preparer.

In or around 2012, after TIMOTHY initially met with WILLIAMS and BURDETT at TRENTACOSTA's residence, TIMOTHY met with WILLIAMS at WILLIAMS' office where they reviewed WILLIAMS' amended tax returns Form 1040. WILLIAMS approved and signed the amended returns. WILLIAMS told TIMOTHY that WILLIAMS amended the returns because he did not feel like he owed that much money to the IRS. This was the last meeting that TIMOTHY had with WILLIAMS. Thereafter, TIMOTHY interacted exclusively with BURDETT.

BURDETT was an attorney but was also the office administrator for WILLIAMS. BURDETT communicated with TIMOTHY by telephone and brought the QuickBooks details to TIMOTHY. The QuickBooks details were paper copies that included profit and loss statements, balance sheets, general ledger, and financials. If TIMOTHY had any questions, TIMOTHY called BURDETT and BURDETT would relay the questions to WILLIAMS. TIMOTHY also prepared BURDETT's personal taxes for tax years 2013 through 2017.

BURDETT retrieved the tax preparations from TIMOTHY including the tax forms 8879. BURDETT provided the items to WILLIAMS who then signed the tax forms 8879. BURDETT then returned the signed forms to TIMOTHY and TIMOTHY electronically filed the tax returns. TIMOTHY stated that there were no questions about the completed returns.

TIMOTHY believed that BURDETT prepared the QuickBooks documents, but was not sure that she prepared them or just printed them to provide to TIMOTHY. BURDETT never mentioned anyone else performing the accounting for WILLIAMS and BURDETT.

TIMOTHY prepared and filed the forms 1099 for WILLIAMS and BURDETT. BURDETT provided TIMOTHY a list and individuals and the amounts they were paid. TIMOTHY gave BURDETT the completed forms 1099 copies for the individuals and filed the 1099s along with form 1096. TIMOTHY did not

FD-302a (Rev. 5-8-10)

194B-NO-2085105

Continuation of FD-302 of (U) Interview of HENRY TIMOTHY , On 11/05/2019 , Page 3 of 7

prepare forms W2. TIMOTHY only encountered forms W2 that were issued to WILLIAMS from his employment with the City of New Orleans. TIMOTHY stated that it was not unusual that a law firm did not have employees.

[TIMOTHY was provided a copy of the 2013 Profit & Loss (P&L) statement and 2013 Schedule C for WILLIAMS by IRS Criminal Investigations Special Agent (SA) Timothy Moore.] TIMOTHY acknowledged his handwriting on the P&L statement copies. TIMOTHY noted that the contract labor amount in line 11 of the Schedule C was different than contract labor amount on the P&L statement. TIMOTHY indicated that the discrepancy must have been an error. TIMOTHY stated that the last line for the contract services matched the amount on page 2 of the P&L. TIMOTHY stated it was an error by TIMOTHY. No one, including BURDETT, told TIMOTHY to enter the amount. TIMOTHY stated that the life insurance expense listed on page 2 of the P&L was listed as a office liability expense on the Schedule C by TIMOTHY because that was how the item was provided to TIMOTHY by WILLIAMS and BURDETT. TIMOTHY stated that he reviewed the tax returns with BURDETT. TIMOTHY sated he knew how to prepare tax returns. TIMOTHY did not know if he had made mistakes or if WILLIAMS and BURDETT told TIMOTHY to use the numbers provided. TIMOTHY stated that it was not his idea. TIMOTHY stated he charges a fee from $300 to $500 to prepare tax returns. TIMOTHY stated that he prepared the tax returns for WILLIAMS and BURDETT and provided the returns for them to review.

[At this point during the interview, TIMOTHY and his attorney London met privately in another room for a period of time before continuing the interview.]

TIMOTHY stated that BURDETT asked TIMOTHY to lower the amounts owed on the tax returns. During TIMOTHY's first meeting with WILLIAMS in 2012, WILLIAMS told TIMOTHY that WILLIAMS had a lot of money owed to the IRS. WILLIAMS assured TIMOTHY that WILLIAMS' returns had been prepared wrong and that WILLIAMS should have had more expenses. WILLIAMS wanted his returns reviewed. WILLIAMS asked if there was anything TIMOTHY could do to reduce WILLIAMS' tax burden. TIMOTHY felt he had a personal relationship with BURDETT and he needed to make WILLIAMS and BURDETT happy. WILLIAMS' income had varied over the years. NICOLE told TIMOTHY it was okay to use the provided information to reduce the tax burden. TIMOTHY did things he should not have done. TMOTHY took numbers from the QuickBooks information, that

G0009701

had not been used in the previously filed tax returns, and used the numbers to lower the tax burden. For example, TIMOTHY used numbers from the P&L statement (including personal expenses) to expense as contract labor. TIMOTHY also used amounts from the general ledger to expense on the tax returns although the information that TIMOTHY obtained from WILLIAMS and BURDETT did not provide detailed descriptions for the expenses. Some of the QuickBooks information was mislabeled in their reports. WILLIAMS recalled that he was told that one of the expenses was for paying witnesses to testify.

TIMOTHY and BURDETT discussed the tax returns via telephone. TIMOTHY told BURDETT what numbers he would be using as expenses. BURDETT either approved of the TIMOTHY's work or requested that TIMOTHY further lower the taxes using deductions. TIMOTHY would then utilize more items from the P&L statement as deductions. TIMOTHY took the numbers that were not utilized and plugged them in on the tax return as various expenses. BURDETT told TIMOTHY that she was not an accountant so there were probably items on the P&L that should not have been there. BURDETT told TIMOTHY to use all the numbers provided if TIMOTHY needed them to further reduce the tax liability. TIMOTHY would have to talk to BURDETT a few times before he finalized the tax returns. After discussing with BURDETT, BURDETT would tell TIMOTHY that she needed to discuss the amounts with WILLIAMS and that she would get back to TIMOTHY. This back and forth with BURDETT would continue until BURDETT was satisfied with the numbers. TIMOTHY believed that BURDETT was just a go between because she always had to discuss with WILLIAMS before any approval of TIMOTHY's work.

Regarding WILLIAMS' 2013 tax return: TIMOTHY did know that he used a life insurance expense as a business expense to lower WILLIAMS' tax liability. TIMOTHY did not remember where he got the amount he utilized for the contract labor expense on WILLIAMS' tax return. The amount used for office building expense was obtained from BURDETT. The office building expense amount was the mortgage payment for WILLIAMS' personal residence located on General Pershing Street. TIMOTHY knew that mortgage payment for a personal residence could not be deducted as a business expense, but TIMOTHY deducted it anyway. Regarding the deduction for legal and professional services, TIMOTHY did not know that WILLIAMS' mother was being paid professional fees. Regarding the taxes and licenses deduction, TIMOTHY just accepted the

FD-302a (Rev. 5-8-10)

194B-NO-2085105

Continuation of FD-302 of (U) Interview of HENRY TIMOTHY , On 11/05/2019 , Page 5 of 7

amount provided by BURDETT. TIMOTHY did not know that the amount was personal taxes owed by WILLIAMS. Regarding the deduction for repairs and maintenance, TIMOTHY did not know that the amount was for repairs of a personal residence owned by WILLIAMS located on Marengo Street. TIMOTHY knew that WILLIAMS' office was located on Saint Charles Avenue, not Marengo Street. BURDETT did tell TIMOTHY that WILLIAMS did work from his personal residence, but the Marengo Street deduction should have not been included on WILLIAMS' 2013 tax return. Additionally, cash withdrawals from Automatic Teller Machines (ATMs) were also not legitimate business expenses, but were included on WILLIAMS' 2013 tax return. The continuing education expense amount on the 2013 return was derived from the P&L statement for WILLIAMS' personal expenses. TIMOTHY stated that BURDETT (and WILLIAMS) told TIMOTHY that the continuing education amount was for professional school training, not for gym membership. BURDETT also asked TIMOTHY to expense clothing and dry cleaning for WILLIAMS. TIMOTHY knew that charitable contributions were not business expenses, thus were not legitimate deduction amounts on WILLIAMS' 2013 tax return.

TIMOTHY stated that WILLIAMS and BURDETT would have stopped using TIMOTHY to prepare their taxes if TIMOTHY did not prepare the taxes the way WILLIAMS and BURDETT wanted. TIMOTHY did tax preparation for a source of additional income that he used to pay for his children's college education. TIMOTHY prepared approximately 100 tax returns per year. Initially, preparing taxes for BURDETT was "more like a friendship thing." After continuing to prepare BURDETT's and WILLIAMS' taxes the way they wanted, TIMOTHY became numb to their demands. TIMOTHY did not consistently scrutinize the information they provided. Some of the tax deduction amounts were mistakes made by TIMOTHY, but some were numbers that TIMOTHY concocted after being asked to change amounts by BURDETT and WILLIAMS. BURDETT never asked TIMOTHY to do the tax returns correctly.

Regarding WILLIAMS' 2014 tax return: None of the numbers used for "cost of goods sold" should have been used for a law practice. The insurance deduction, which was automobile insurance, should not have been included. TIMOTHY deducted the automobile expenses because he was told that WILLIAMS was driven around in WILLIAMS' personal vehicle by WILLIAMS' cousin. TIMOTHY did not know that the law office rent expense was actually $10,000 that WILLIAMS paid in rent for an apartment. TIMOTHY knew that the $5,000

deduction for "Mardi Gras" was not a legitimate expense.

Regarding WILLIAMS' 2015 tax return: The amount for "cost of goods sold" was derived from $17,000 of WILLIAMS' personal expenses that TIMOTHY used to reduce tax liability. The "contract labor" deduction was $94,000 in excess and should not have been used. The student loans and payments to WILLIAMS' mother should also not have been used as an expense, but TIMOTHY plugged the numbers into the return anyway. Other illegitimate expenses that TIMOTHY listed on WILLIAMS' 2015 return included ATM withdrawals, dry cleaning, cellular phones, iTune charges, clothing, campaign contributions and gifts.

Regarding WILLIAMS' 2016 tax return: The amount for "contract labor" was $93,000 in excess and should not have been used. The automobile insurance should not have been deducted after already taking the standard mileage deduction. The $1,700 rent for the Baronne Street residence should not have been deducted. BURDETT did not tell TIMOTHY that the Baronne Street rent payments were made to WILLIAMS' current spouse, ELIZABETH MARCELL. TIMOTHY did not know where WILLIAMS resided after WILLIAMS' divorce. TIMOTHY utilized utility expenses from a variety of addresses as a business deduction although TIMOTHY knew that WILLIAMS' only business office was located on Saint Charles Avenue. Again, claimed expenses for Mardi Gras, iTunes, clothing, and dry cleaning were not legitimate business expenses. TIMOTHY did not know that the memberships deduction was actually for WILLIAMS' gym membership. TIMOTHY stated that anything that WILLIAMS purchased, TIMOTHY found a place to plug that number into WILLIAMS' tax return.

Regarding WILLIAMS' 2017 tax return: Many of the deductions on the Schedule C were not legitimate business expenses. The advertising expense deduction was actually political polling expense for WILLIAMS' political campaign. Other improper or inflated deductions included the amounts for contract labor, insurance, WILLIAMS' mother's dental insurance, Mardi Gras, charitable contributions, gym membership, and funds paid to MARCELL for rent. TIMOTHY reiterated that TIMOTHY was never told that WILLIAMS was residing at the residence owned by MARCELL.

TIMOTHY stated that he attempted to contact BURDETT after initially receiving a subpoena from the FBI, but BURDETT would not return TIMOTHY's call. BURDETT's attorney, MIKE MAGNER, eventually sent a text message to

FD-302a (Rev. 5-8-10)

194B-NO-2085105

Continuation of FD-302 of (U) Interview of HENRY TIMOTHY , On 11/05/2019 , Page 7 of 7

TIMOTHY telling TIMOTHY not to contact BURDETT.

TIMOTHY stated that he was known as "Bubby" to his friends, including BURDETT.

TIMOTHY stated that he discussed 2015 Schedule K1 issues with BURDETT, but BURDETT never sent any information to TIMOTHY regarding the Schedule K1.

TIMOTHY remembered having a conversation with BURDETT about her tax liability. TIMOTHY and BURDETT had the same back and forth discussions about BURDETT's tax returns as they had about WILLIAMS' returns. Discussions continued until BURDETT agreed to the amount of her tax liability. TIMOTHY stated that he only prepared taxes in this manner for BURDETT and WILLIAMS. TIMOTHY considered WILLIAMS' tax return to be a "high profile" tax return.

TIMOTHY prepared the tax forms 1099 and wrote off the expenses for BOBBY HJORTSBERG for the 2013 and 2014 tax years. TIMOTHY stated that the numbers provided by HJORTSBERG appeared to be accurate. There was no back and forth discussions with HJORTSBERG.

There were no discussions with WILLIAMS, BURDETT or HJORTSBERG about cash income.

TIMOTHY's home telephone number was [Redacted]9460 and service provider was Cox. TIMOTHY's cellular telephone number was [Redacted]-3385 and service provider was Verizon.

G0009705