UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                    CRIMINAL  ACTION

v.                                          NO. 20-55

JASON WILLIAMS AND NICOLE BURDETT           SECTION "F"


<u>ORDER AND REASONS</u>

Before the Court is Jason Williams's and Nicole Burdett's motion to dismiss the indictment for selective and vindictive prosecution and due process violations, and their request for an evidentiary hearing. For the reasons that follow, the request for an evidentiary hearing is GRANTED, and the motion to dismiss the indictment is DENIED without prejudice.

**Background**

New Orleans City Council President and candidate for Orleans Parish District Attorney, Jason Williams is an African American public official and criminal defense attorney who runs his own law firm.  Nicole Burdett, who is white, is Williams's law partner; she also handles administrative duties for Jason Rogers Williams

1

& Associates.  After a several years-long (and apparently ongoing and wide-ranging) non-tax-related federal criminal investigation into Mr. Williams, both he and Ms. Burdett were indicted on tax fraud charges.  Independent of the defenses the defendants indicate they will advance to refute the substantive charges, Williams and Burdett claim that the decision to prosecute them is unduly selective and vindictive in violation of their constitutional rights to equal protection and due process.  These are not defenses to the merits of the charges, but, rather, independent assertions that the federal tax fraud charges are being pursued for unconstitutional reasons.

### Pre-Indictment/Federal Investigations

Jason R. Williams is an attorney and public official who presently serves as a Councilmember-At-Large for New Orleans City Council, the legislative branch of New Orleans City government.  Councilman Williams recently qualified to run, and formally entered the race, for the office of District Attorney for Orleans Parish; the election is November 3, 2020.  Councilman Williams heads his law firm, Jason Rogers Williams & Associates LLC, which focuses on criminal defense.  Nicole E. Burdett is one of Mr. Williams's law partners.  She also performs certain administrative functions for the firm.

Distinct federal investigations and their chronology are pertinent to the issues before the Court.  Councilman Williams publicly declared his intent to run for District Attorney in approximately 2017-2018.[1]  Since 2016, Mr. Williams has been -- and still is -- the target of what the prosecutors confirm is an "open and ongoing" federal investigation by the FBI into wide-ranging and undisclosed non-tax matters.[2]  At least at its inception, the ongoing FBI investigation was overseen by prosecutors at the U.S. Attorney's Office for the Eastern District of Louisiana.  At some point before July 24, 2018, prosecutors at the Western District of Louisiana became involved in the FBI investigation.

The IRS did not target Mr. Williams for criminal investigation until it attempted to interview him as a witness-client of another

---

[1] Grand jury subpoenas to Mr. Williams bear a grand jury number of 2017R00460-97, indicating to counsel for Mr. Williams that the government has been using the grand jury to investigate Williams since 2017.

[2] The first bank subpoenas were issued between November 2016 and July 2017 at the request of prosecutors from the Eastern District of Louisiana and agents from the New Orleans Division of the FBI. The numbering system indicates that the Eastern District issued at least 20 and as many as 41 total subpoenas during this time period. In addition to bank records, the subpoenas sought records from: one of Mr. Williams's college acquaintances, a man whom had received contracts from the City of New Orleans (with no involvement from Mr. Williams); and a business that performed repairs on Mr. Williams's house.

IRS target, Henry Timothy.  The IRS investigation of Henry Timothy began as a result of an IRS criminal investigation of one of Timothy's other clients, C.D., who owned a home health company. IRS Special Agent Lori Marable investigated C.D. (and then Timothy).  As for C.D., whom the government represents is "a black female," the IRS declined prosecution after SA Marable corroborated that the company paid its employment taxes, the company's gross income was correctly accounted for and accurately reported on its tax returns, and the amount of personal expenses in the business account was *de minimis* and did not meet prosecution guidelines.

So, although SA Marable declined to prosecute C.D., she decided to pursue charges against Timothy when she established that Timothy failed to declare all of his income from his tax preparation business for tax years 2013 through 2016.[3]  The government first approached Timothy as a target on May 15, 2018. While investigating Timothy, SA Marable contacted several of his clients to verify their identities and to verify that Timothy was their tax preparer.  Jason Williams was one of Timothy's clients

---

[3] According to prosecutors for the Western District, "Henry Timothy is being charged for this conduct" and "the admission of this income resulted in an additional tax liability of approximately $88,593."

whom SA Marable contacted in October 2018.  She initially stopped by unannounced at his house; he asked her to contact his assistant and make an appointment, which she did.  SA Marable went to Mr. Williams's office at the scheduled time on October 22, 2018.  Mr. Williams not only kept her waiting, the government suggests, he failed to show up.[4]  SA Marable left after waiting for two hours. Mr. Williams tried to contact SA Marable to reschedule, but, strangely, he has not heard from her since.  Instead, SA Marable's supervisor brought in another criminal tax investigator who set his investigatory sights on Mr. Williams as a target.

As the prosecutors tell it, "[b]ecause Williams failed to meet with SA Marable and due to the fact that he was a public official, SA Marable's supervisor required that IRS Special Agent Tim Moore get involved."  SA Moore is also assigned to the FBI's public corruption squad and was aware that the FBI had an open investigation underway into Mr. Williams.

---

[4] Mr. Williams says he was at a City Council meeting.  There was some dispute at the oral hearing concerning whether SA Marable was advised of this particular fact: the AUSA suggested that she was not sure whether SA Marable knew that Mr. Williams was a councilman before he was allegedly a no-show.  These sorts of hearsay speculations indicate that perhaps an evidentiary hearing would allow the record to be clear and correct on these sorts of factual issues capable of discernment.

In December 2018, the prosecutors disclose, SA Moore conducted a preliminary tax investigation on Mr. Williams. He determined that a more extensive investigation was needed "due to the fact that he saw glaring irregularities on Williams' returns" and when he "learned of Williams' long history of tax liens for not paying his taxes."[5] According to the prosecutors, one of the issues that SA Moore initially noticed was that, from 2013 through 2017, Williams's tax returns indicated that he made very little profit from his law firm and in 2017, his law firm reported a loss of $29,927. SA Moore also noticed that Mr. Williams's Schedule C (Profit and Loss from a Business) section of the return included expenses SA Moore deemed "excessive," and that Mr. Williams took deductions exceeding $100,000 for costs of goods sold; a deduction category typically reserved for businesses that manufacture goods or provide retail services.

According to discovery produced by the government, an IRS agent first appears on a subpoena in May 2019, shortly after Mr. Williams was visited by FBI and IRS agents on April 23, 2019. That same day, on April 23, 2019, FBI Agent Todd Goodson and IRS Agent Timothy Moore interviewed Henry Timothy about Jason Williams.

---

[5] Of course, here the Court uses quotations to indicate what the government attorneys argue in their opposition papers. The Court does not have SA Moore's own testimony on these background issues.

According to the FBI 302[6] for the April 23 interview, Timothy told the agents that he used spreadsheets and backup documents provided by Nicole Burdett to prepare Jason Williams's taxes.  Timothy stated that he would provide a filing authorization to Ms. Burdett, she would return the authorization signed by Mr. Williams, and then he (Timothy) would file the returns.  Nowhere in the FBI 302 does it indicate that Timothy said that Ms. Burdett would pressure him to take improper deductions.  When the agents questioned Timothy about specific items on Mr. Williams's 2012-2107 tax returns, at no time did Timothy say that Ms. Burdett instructed him to take any of these deductions.

Three days after Timothy was interviewed by federal agents, Mr. Williams's attorney met with Timothy.[7]  Timothy made statements

---

[6] "The term '302' refers to an FBI form bearing that number, which serves as an 'official interview memorandum.'"  United States v. Beaulieu, --- F.3d ---, 2020 WL 5103863, at *2 n.1 (5th Cir. Aug. 31, 2020)(quoting United States v. Davis, 971 F.3d 524, 533 (5th Cir. 2020)).

[7] The government takes issue with consideration of unrecorded statements by Timothy to defense counsel, suggesting or anticipating that such statements may not be used at trial unless defense counsel withdraws from the representation and prepares to be called as a witness.  There is nothing before the Court on this particular issue.  In any event, the Court need not (and would not) advise defense counsel on their obligations or any limitations concerning the informal Timothy interview.  And the government, which has expressly stated that "Henry Timothy is being charged for [his own] conduct" is clearly well aware that Timothy's credibility as the star government witness will be challenged at trial, and the source of this challenge appears to extend beyond

similar to those made to the agents on April 23, 2019: he stated that Ms. Burdett would bring him Mr. Williams's QuickBooks and other records, that he would prepare the tax returns and send a filing authorization to Ms. Burdett, and then he would file Mr. Williams's tax returns upon receipt of the authorization.  Mr. Timothy stated that he (Timothy) made the decisions about what deductions should be taken, that he would ask Ms. Burdett for clarification if necessary, and that he did everything appropriately.  Timothy stated that there was nothing unusual about Mr. Williams's taxes and the last thing he wanted to do was to get Mr. Williams in trouble.

During a second interview with federal agents along with the U.S. Attorney on November 5, 2019, Timothy initially repeated similar statements he made to the FBI in April 2019 -- that he reviewed Mr. Williams's records and determined what expenses could be deducted:

> BURDETT was an attorney but was also the office administrator for WILLIAMS. BURDETT communicated with

---

statements Timothy apparently made to defense counsel pre-indictment.  It is the government's conduct that the defense targets now and certainly any inconsistencies in Timothy's statements, insofar as they serve as a predicate to the government's prosecution theory, are presented by the defendants in an attempt to make out a *prima facie* case of selective or vindictive prosecution.  The Court considers both sides' submissions on this limited issue.

TIMOTHY by telephone and brought the QuickBooks details to TIMOTHY. The QuickBooks details were paper copies that included profit and loss statements, balance sheets, general ledger, and financials. If TIMOTHY had any questions, TIMOTHY called BURDETT and BURDETT would relay the questions to WILLIAMS. TIMOTHY also prepared BURDETT's personal taxes for tax years 2013 through 2017.

BURDETT retrieved the tax preparations from TIMOTHY including the tax forms 8879. BURDETT provided the items to WILLIAMS who then signed the tax forms 8879. BURDETT then returned the signed forms to TIMOTHY and TIMOTHY electronically filed the tax returns. TIMOTHY stated that there were no questions about the completed returns.

See Defense Ex. E, p. 2.[8] During this 11/5/19 interview, Timothy took a break and, for some unexplained reason, met with his attorney in a private room. Once the interview resumes, Timothy changes his story.

When the interview resumes, the FBI 302 indicates:

TIMOTHY stated that BURDETT asked TIMOTHY to lower the amounts owed on the tax returns.

...

TIMOTHY felt he had a personal relationship with BURDETT and he needed to make WILLIAMS and BURDETT happy.

...

TIMOTHY did things he should not have done.

---

[8] Exhibit E is the FBI 302 from the government's 11/5/19 interview of Timothy; the form indicates that it was drafted on 11/6/19 and "entered" on 11/18/19.

According to the defendants, the statements made by Timothy after meeting privately with his attorney during the 11/5/19 interview serve as the predicate for the prosecution theory. That the prosecution accepted Timothy's changed story "without verification" and contrary to the evidence indicates an improper prosecutorial motive. The defendants point to evidence that contradicts Timothy's changed story (thereby undermining the prosecution's theory). For example, post-indictment, in response to requests for production and admission sent to Timothy by defense counsel, Timothy through his counsel:

> admitted that at the time Defendant Timothy prepared each tax return for filing by Jason Rogers Williams, [Timothy] believed that the deductions...Timothy claimed on the return were appropriate and consistent with law.

And, the government knew that Timothy prepared Mr. Williams's tax returns with Inuit Pro Series tax software, but it failed to ask Timothy to produce electronic records. In response to the defendants' request for production, the defendants discovered evidence indicating that there were no draft tax returns for Mr. Williams, there were no alterations to the deductions on Mr. Williams's return, and that Timothy simply prepared a final return shortly before the deadline each year. According to the defendants, not a single document corroborates Timothy's claim that Ms. Burdett asked him to lower the amounts owed on Mr.

Williams's taxes.  And the defendants submit that Ms. Burdett's
records (which the government did not request) are consistent with
Timothy's original statement that he prepared the returns on his
own.  The Timothy-Burdett communications indicate that Ms. Burdett
had to badger Timothy simply to get the returns sent to her at the
last minute; there are no documents supporting the theory that
Timothy prepared draft returns and then Burdett told him to lower
the amounts owed on those drafts.  There are no draft returns.
That Timothy made the tax decisions for Mr. Williams's returns
(consistent with Timothy's original statement to federal agents)
is also corroborated, the defendants submit, by documents with
Timothy's handwriting on the P&L statement copies.[9]

More closely scrutinizing the government's conduct, the
defendants submit that the government during its investigation

_____

[9] The defendants also point to other examples which they suggest
show that Timothy's original statements are supported by the
documentary evidence.  For example, although Timothy most recently
indicated to federal agents that he did things he should not have
done, the deductions plainly list such things as "political"
contributions, which Timothy only recently suggests he knew was
improper.  Why, the defendants ask, if Timothy actually believed
that including "political" contributions was something he should
not have done, did Timothy disclose the expense for political
contributions and not characterize it as something else?  And the
defendants point out that the government failed to investigate:
Timothy's misrepresentation to his clients (that he was a CPA) and
his false claim that he earned a Master of Business Administration;
both investigated by the defendants and shown to be absolutely
false.

ignored the testimony of Timothy's other tax clients who stated that Timothy took deductions on his own without that client's participation or knowledge.  On June 5, 2020, the government interviewed J.B., a former employee of Mr. Williams who also was a tax client of Timothy.  When the government pointed out that Timothy deducted $22,000 for supplies, $4,000 for meals and entertainment, $1,700 for utilities, in addition to deductions for uniforms and membership fees" on J.B.'s tax return, J.B. stated "that's insane" and that he had not previously noticed those deductions.  The government did not challenge J.B.'s assertion or its implication (that Timothy took the deductions on his own, without J.B.'s participation or knowledge), stopped asking questions of J.B., and apparently also ceased interviewing other Timothy clients altogether.

Three weeks after the government interviewed J.B., and three weeks before Jason Williams formally announced his candidacy for District Attorney, Jason Williams and Nicole Burdett were indicted on federal tax charges.

*Federal Tax Prosecutions*

The Internal Revenue Service is an agency of the United States Department of the Treasury responsible for enforcing and

administering the federal tax laws and collecting taxes owed to the United States.  See United States v. Harris, 628 F.2d 875, 879 (5th Cir. 1980)("The IRS is duty bound to inquire after persons who may be liable for the payment of taxes.")(citations omitted). "The IRS splits the responsibility for enforcing the nation's tax laws between its two investigative divisions[,]" one criminal and one civil.  See United States v. Peters, 153 F.3d 445, 447 (7th Cir. 1998).  The Examination Division is responsible for conducting civil tax audits[10] through revenue agents, whereas the Criminal Investigative Division investigates alleged criminal violations of the tax code and related federal statutes through special agents.[11]

Rather than a civil audit conducted by a revenue agent tasked with determining if an individual has underpaid his taxes, a criminal tax fraud investigation is conducted by the Criminal Division's special agents, whom must administer warnings before

---

[10] "An IRS audit is a review/examination of an ... individual's accounts and financial information to ensure the information is reported correctly according to the tax laws and to verify the reported amount of tax is correct." https://www.irs.gov/businesses/small-businesses-self-employed/irs-audits

[11] "The Internal Revenue Service Criminal Investigation Division conducts criminal investigations regarding alleged violations of the Internal Revenue Code [and related federal] statutes.  The findings of these investigations are referred to the Department of Justice for recommended prosecution." https://www.irs.gov/compliance/criminal-investigation/how-criminal-investigations-are-initiated

seeking information from taxpayers they investigate.  It is apparently not uncommon for either an audit or tax fraud investigation to be prompted by an informant, such as an ex-spouse calling the IRS to report allegedly improper tax reporting practices by a former spouse.  See, e.g., United States v. Peters, 153 F.3d 445, 447 (7th Cir. 1998)(former husband of defendant Dr. Peters called the IRS to report that he had information indicating that his former wife had cheated on her taxes); see also https://www.irs.gov/compliance/criminal-investigation/how-criminal-investigations-are-initiated ("Information is . . . routinely received from the public as well as from ongoing investigations underway by other law enforcement agencies[.]").

Unlike most federal criminal prosecutions, the United States Attorney's Office lacks the authority to decide whether to prosecute an individual for tax fraud.  Instead, the Tax Division of the U.S. Department of Justice is vested with the authority to refer alleged violations of IRS tax laws for prosecution. According to the government, the Tax Division approved Counts 1 through 6 of the pending indictment on April 27, 2020 and Counts 7 through 11 were approved on June 18, 2020.  Once all charges were approved for prosecution, the government indicates, the charges were presented to the next available grand jury meeting in the Eastern District of Louisiana; this occurred on June 26, 2020.

14

According to the Prosecution Guidelines for the Western District of Louisiana, "[t]ax cases authorized by the Tax Division must be prosecuted as authorized[; n]o tax case can be declined without Tax Division approval."

*Indictment*

In the midst of the COVID-19 pandemic, when jury trials and grand jury proceedings have been suspended, on June 26, 2020 -- just three weeks before qualification deadline for the November 3, 2020 election for Orleans Parish District Attorney -- a specially-convened federal grand jury[12] returned an 11-count indictment, charging Jason R. Williams and Nicole E. Burdett with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 1); five counts of aiding and assisting in the preparation and presentation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2) (Counts 2, 3, 4, 5, and 6);[13]

---

[12] Given the Court's COVID-19 then-governing General Order suspending grand jury proceedings until August 1, 2020, the government requested and received special dispensation to convene the grand jury. <u>See</u> COVID-19 GENERAL ORDER NO. 20-6 (April 24, 2020)(ordering that, "[f]or the reasons given above and below, all grand jury proceedings in this District are suspended until August 1, 2020, subject to change upon motion from the government and further orders of the Court."). The quorum (16 out of 23) of grand jurors that returned the 11-count indictment was originally empaneled in August of 2019.

[13] Each charged § 7206(2) violation concerns an allegedly inflated Schedule C business expense in the amount of: $200,000 (tax year

and five counts of failing to file IRS Forms 8300 relating to cash received in trade or business, in violation of 31 U.S.C. §§ 5331 and 5322 (Counts 7, 8, 9, 10, and 11).[14]

### Post-Indictment/Pre-Trial

This case is being prosecuted by the U.S. Attorney's Office for the Western District of Louisiana; sometime in 2018, the U.S. Attorney's Office for the Eastern District of Louisiana recused itself.  The 11-count indictment charges Mr. Williams and Ms. Burdett with conspiracy to defraud the United States, income tax fraud, and failure to file forms relating to cash received in trade or business.  Meanwhile, Mr. Williams and Ms. Burdett initially appeared and have pled not guilty to the charges; a September 14, 2020 jury trial date was initially scheduled consistent with the mandate of the Speedy Trial Act, but due to the Court's COVID-19

---

2013; Count 2); $90,000 (tax year 2014; Count 3); $170,000 (tax year 2015; Count 4); $140,000 (tax year 2016; Count 5); $120,000 (tax year 2017; Count 6).  The government alleges that the defendants misclassified personal expenses as business expenses and provided this false information to the tax preparer for inclusion on the Schedule C (profit and loss from a business) portion of Williams' tax returns; and that these allegedly fraudulent tax returns reduced Williams' tax liability in excess of $200,000.

[14] Each charged §§ 5331 and 5322 violation concerns an occasion in which Williams and Burdett allegedly failed to report cash payments in excess of $10,000 from clients for legal services; five occasions between June 2017 and August 2018, for a total of $66,516.

General Order suspending trials, the trial has been rescheduled for January 11, 2021.  A few months after Mr. Williams and Ms. Burdett were indicted, the government filed a four-count bill of information charging Timothy with making and subscribing a false return, statement, or other document, in violation of 26 U.S.C. § 7206(1).

The Court has granted several unopposed Rule 17(c) motions by Mr. Williams and Ms. Burdett seeking permission to serve subpoenas on various individuals and entities, including on tax preparer Timothy and B&B Accounting Services, LLC.  And the defendants have received and reviewed discovery from the government.

Separate and apart from defenses they will advance to the substantive charges, the defendants previously challenged the government's motivation concerning the timing of the indictment and they requested discovery from the government and the Clerk of Court into matters of grand jury composition.[15]   On August 10, 2020, the Court granted the motion requesting discovery and denied without prejudice the other relief requested.

---

[15] They vigorously asserted that the investigation was prompted by a political rival, the charges are politically-motivated, concocted by Mr. Timothy, and brought at a time (i) to maximize interference with the upcoming DA election; (ii) when there could not possibly be a fair cross-section of grand jurors to return an indictment; and (iii) when obtaining a speedy trial is impossible.

The government recently produced an analysis of all tax returns filed by Timothy (on behalf of his clients) from 2013 through 2016. This production shows, the defendants submit, that Timothy consistently took aggressive deductions for all clients: across the board, Timothy made deductions that virtually eliminated his clients' income. Spreadsheets compiled by the government or by defense counsel based on the government's document production indicate the following. From 2013 through 2016, Timothy's clients reported a total of $71,982,007 in Schedule C income. A total of $62,146,980 was deducted from those returns (with Timothy at the helm as tax preparer), leaving taxable income of $9,835,027. The defendants' appreciation of the evidence regarding Timothy's other clients is that Timothy took the same or more deductions for other clients, and the government is not prosecuting any of them.[16] It is impossible, the defendants conclude, to consider this information and not determine that Timothy's changed story is fabricated, and (it follows) that Ms. Burdett did not pressure Timothy to take deductions for Williams.

---

[16] Ms. Burdett is the exception. In addition to being indicted along with Mr. Williams regarding Mr. Williams's taxes, the government has confirmed that Ms. Burdett is the target of a criminal investigation into her own taxes and that she has been "referred for prosecution[.]" Mr. Williams and Ms. Burdett are apparently the only Timothy clients being prosecuted or investigated; the government only investigated (but declined to prosecute) C.B.

The only explanation for the government's deliberate ignorance of this fact, the defendants suggest, is its years-long pursuit of Mr. Williams and its selective and vindictive decision to prosecute him (and Ms. Burdett as collateral damage).

The defendants now move to dismiss the indictment on the grounds that the government has violated their constitutional rights to equal protection and due process by selectively and vindictively prosecuting them; alternatively, the defendants request an evidentiary hearing for them to further develop their claims of selective and vindictive prosecution.[17]

I.

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. (b)(1). A party "must" raise by pretrial

---

[17] Just hours before the Court heard oral argument on the defendants' motion -- as if on cue -- SA Moore dropped by unannounced to visit (or drop off papers to) various members of Ms. Burdett's family, including her daughter. Or so the Court was advised by counsel during the hearing. (Again, absent an evidentiary hearing where those with personal knowledge may testify, the Court can only glean purported facts on certain incidents from counsel's representations). Suggesting that no negative intent should be inferred from the timing of the agents' actions, the government insists that SA Moore doing so was in the normal course of the prosecution the government is pursuing based on Ms. Burdett's personal taxes. Obviously, Ms. Burdett and her attorney have a different take, given the timing of this hearing on vindictive prosecution.

motion "a defect in instituting the prosecution, including ... (iv) selective or vindictive prosecution[.]" Fed. R. Crim. P. (b)(3)(iv).

Claims of selective or vindictive prosecution are "not ... defense[s] on the merits to the criminal charge itself, but ... independent assertion[s] that the prosecutor has [either] brought the charge [or used the charging process in retaliation] for reasons forbidden by the Constitution." United States v. Armstrong, 517 U.S. 456, 463 (1996)(selective prosecution); Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)(vindictive prosecution). When asked to exercise judicial oversight over a "special province" of another branch of government, the Court is mindful of its limitations, deference, and duty to indulge a presumption "that [prosecutors] have properly discharged their official duties." Armstrong, 517 U.S. at 464 (citations omitted). To be sure, in limited circumstances, the presumption may be dispelled. Whether such rare circumstances are clearly presented here is placed at issue in the pending motion. The Court addressed the vast breadth of prosecutorial discretion in its August 20, 2020 Order and Reasons; these principles undergirding the presumption of regularity applicable to prosecutorial decisions are directly implicated here and, thus, bear repeating.

20

*A.*

*Prosecutorial Discretion*

In our federal criminal justice system, "[t]he Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." United States v. Armstrong, 517 U.S. 456, 464 (1996)(citing Wayte v. United States, 470 U.S. 598, 607 (1985)). The breadth of this discretion finds its source in statute and constitutional separation-of-powers doctrine. See id. ("[t]hey have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed.")(citations omitted). To be sure, "the decision to prosecute is particularly ill-suited to judicial review." Wayte, 470 U.S. at 607. A "'presumption of regularity' [attaches to] prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" Armstrong, 517 U.S. at 464 ("A selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive."). Thus, ordinarily, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute and what charge to file

21

or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). For good reason, as the Supreme Court observed in Armstrong:

> Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."

> It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy."

Armstrong, 517 U.S. at 465 (citing Wayte, 470 U.S. at 607).

Though broad, prosecutorial discretion is not completely "unfettered[; s]electivity in the enforcement of criminal laws is ... subject to constitutional constraints." Wayte, 470 U.S. at 608 (citing United States v. Batchelder, 442 U.S. 114, 125 (1979)). When presented with a selective or vindictive prosecution challenge, the Court may review decisions to prosecute in limited circumstances to ensure that the decision is not the product of individual or institutional abuse or "deliberately based upon an

unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." Id. (citing Bordenkircher, 434 U.S. at 364-65)); Armstrong, 517 U.S. at 464-65 (the equal protection clause of the Fifth Amendment forbids (selective) prosecution based upon race, religion, or other arbitrary factor); United States v. Goodwin, 457 U.S. 368, 373 (1982)(prosecutorial vindictiveness is a due process violation for it "punish[es] a person because he has done what the law plainly allows him to do[,]" but it is difficult to prove considering that "[m]otives are complex" and "[t]he imposition of punishment is the very purpose of virtually all criminal proceedings.").

*B.*

*Selective Prosecution*

A selective prosecution claim puts at issue whether "the prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Due Process Clause of the Fifth Amendment. Armstrong, 517 U.S. at 463. The Fifth Amendment's equal protection component[18] forbids the prosecution from pursuing

---

[18] Unlike the Fourteenth Amendment, the Fifth Amendment does not contain an equal protection clause, but it contains an equal protection component. Wayte v. United States, 470 U.S. 598, 609 n.9. Regardless, the Supreme Court's equal protection approach is the same. Id.

a particular criminal case based upon an "unjustifiable" factor such as race, religion, or some other arbitrary classification. See id. at 464. Of course, "the mere exercise of some selectivity by the government in instituting prosecutions is not itself a constitutional violation." United States v. Greene, 697 F.2d 1229, 1234 (5th Cir. 1983).

Armstrong supplies the test applicable for substantive selective prosecution claims and corresponding requests for discovery. And it erects quite a hurdle. See Armstrong, 517 U.S. at 463-65 (describing the standard as "demanding" and "rigorous" and a "significant barrier" and demanding "clear evidence" from the defendant). The burden is on the defendant to present clear evidence; "making ... a prima facie showing of selective prosecution is a difficult task" -- "few parties have succeeded in shifting the burden of proof to the government." Greene, 697 F.2d at 1235.

To succeed on a selective prosecution claim, the defendant must demonstrate, first, that the prosecution had a discriminatory effect and, second, that it was motivated by a discriminatory purpose. Armstrong, 517 U.S. at 463-65. To make a prima facie showing of discriminatory effect, "in a race case," for example, Armstrong instructs, "the claimant must show that similarly

24

situated individuals of different races were not prosecuted." <u>Id.</u> at 465; <u>United States v. Bass</u>, 536 U.S. 862, 863-64 (2002)("raw statistics regarding overall charges say nothing about charges brought against similarly situated individuals").

As for the second -- discriminatory purpose -- component, the defendant must show that the government prosecuted him "because of, not merely in spite of" the unjustifiable factor or arbitrary classification such as race or the desire to prevent exercise of his constitutional rights. <u>See</u> <u>Wayte v. United States</u>, 470 U.S. 598, 610 (1985)("[D]iscriminatory purpose ... implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.")(internal citations, quotations omitted). If the defendant satisfies this tall-order *prima facie* effects-and-purpose test, "then the burden shifts to the government to demonstrate a legitimate basis for selecting the defendant for prosecution." <u>United States v. Hoover</u>, 727 F.2d 387, 389 (5th Cir. 1984)(citing <u>Greene</u>, 697 F.2d at 1235)).

The standard applicable to a request by a defendant seeking discovery from the government in aid of a selective prosecution claim is "correspondingly rigorous." <u>See</u> <u>Armstrong</u>, 517 U.S. at

463, 465-66, 468 (observing that Rule 16 of the Federal Rules of Criminal Procedure is inapplicable to selective prosecution claims, which are distinct from defenses to the substantive charges).  "[A] credible showing of different treatment of similarly situated persons" must be made by defendants seeking discovery in aid of a selective prosecution claim.  Id. at 470 (observing that this threshold "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution.").

Defendants face an uphill battle: like most defendants, the Armstrong defendants failed to meet the rigorous standard.  The study they submitted fell short of "*some evidence* tending to show the existence of elements of" a selective prosecution claim.  Id. (emphasis added)(noting that the study failed to identify individuals who were not black and who could have been (but were not) prosecuted for the offenses for which the defendants were charged); but see United States v. Hoover, 727 F.2d 387, 389 (5th Cir. 1984)(first part of the substantive selective prosecution test met where Hoover was one of three air traffic controllers prosecuted out of over 300 whom failed to report to work in the Houston area in violation of a federal statute prohibiting U.S. government employees from participating in a strike against the government).

*C.*

*Vindictive Prosecution*

"To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" United States v. Goodwin, 457 U.S. 368, 372 (1982)(quoting Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)).  A prosecutor's use of the charging process solely as a penalty for exercising a constitutional or statutory right, such as pursuing an appeal, violates due process.  United States v. Saltzman, 537 F.3d 353, 359 (5th Cir. 2008)(citation omitted); North Carolina v. Pearce, 395 U.S. 711, 725 (1969)(the Due Process Clause of the Fourteenth Amendment "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial.").  Prosecutorial vindictiveness must be proved by the defendant by a preponderance of the evidence.  Saltzman, 537 F.3d at 359.  The defendant may do so in one of two ways:  (1) present objective evidence that a prosecutor's actions were designed to punish him or her for asserting his or her legal rights, which is proof of actual vindictiveness; or (2) show sufficient facts to give rise to a presumption of vindictiveness, which may be overcome by objective evidence justifying the prosecutor's actions.  Id. (because a presumption of vindictiveness may apply even absent

27

proof of improper motive, such a presumption only applies "where there exists a realistic likelihood of vindictiveness."). Success on either course is rare, particularly in the pre-trial context. See Goodwin, 457 U.S. at 381 ("There is good reason to be cautions before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting[:] the prosecutor's assessment of the proper extent of prosecution may not have crystallized[; t]hus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.").

A presumption of vindictiveness may arise if a defendant is re-indicted especially if the prosecutor increases the number or severity of the charges after the defendant appealed his conviction. For a defendant to make a showing of vindictiveness is rare indeed. As for when a defendant might be entitled to discovery or an evidentiary hearing in aid of such a claim, the parties appear to assume that satisfying the Armstrong standard applicable to selective prosecution would suffice here, given that both claims (particularly the ones advanced in this case) inquire into prosecutorial malintent.

28

II.

The defendants seek dismissal of the indictment or, alternatively, an evidentiary hearing in aid of their claims of selective and vindictive prosecution.  To obtain either, the defendants must carry a heavy burden, which is why most such claims rarely succeed.  See, e.g., Chris Zimmerman, Prosecutorial Discretion, 89 Geo. L.J. 1229, 1233 (2001)(citing Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 488-89 (1999)).  Like most defendants before them, on this record, the Court finds that Mr. Williams and Ms. Burdett have thus far failed to satisfy the demanding *substantive* standard applicable to their request for dismissal.  However, because they have presented "some credible" evidence supporting both components of their selective prosecution or enforcement theory, they satisfy the standard Armstrong propounded to obtain discovery.  And because the proffered intent evidence and the government's own admissions are probative of malintent, the defendants are likewise entitled to some limited development of the facts supporting their vindictive prosecution claim.

*A.*

First, the Court takes up selective prosecution.  Dismissal of the indictment on this ground is premature.  However, the defendants have offered "some evidence" on both the effect and purpose prongs of the Armstrong test, warranting an evidentiary hearing limited in scope.

In selecting Mr. Williams and Ms. Burdett for prosecution, the defendants submit, the government has deliberately ignored Timothy's other clients, notwithstanding substantially similar alleged conduct: aggressive deductions which are the cornerstone of the government's prosecution of Mr. Williams and Ms. Burdett. From the government's document production, the defendants identify evidence pointing out that Timothy took aggressive deductions that eliminated virtually all of his clients' income.  This evidence undermines the prosecution's theory predicated on Timothy's changed story that Ms. Burdett pressured him to take deductions for Mr. Williams.  The government counters that the defendants fail to rebut the presumption that they acted in good faith in pursuing this prosecution because they fail to show either that there has been a discriminatory effect or malintent on the government's part, let alone both.  The government submits that the defendants have not shown that they were singled out for

prosecution based upon their race or desire to exercise a constitutional right, that they have not established that Timothy's other clients are similarly situated in respects material to prosecution, and that both are being prosecuted for legitimate reasons; thus, the defendants are entitled to neither dismissal of the indictment nor an evidentiary hearing. As to dismissal, the Court agrees. But Mr. Williams and Ms. Burdett have submitted "some evidence" warranting a limited evidentiary hearing: on the effects front, the defendants may probe the similarities between them and other Timothy clients proffered as comparators; on the intent front, the defendants may probe those incidences surrounding SA Marable and her supervisor's decision to target Mr. Williams for his "failure to meet" Marable for a voluntary interview and SA Moore's conduct in pursuing an investigation of Mr. Williams because he is a public official.

    1.  Different Treatment/Effect

In support of the disparate treatment (effect) prong of Armstrong, the defendants submit "some evidence" showing different treatment of purportedly similarly situated persons. The proffered universe of comparators is Timothy's other clients. The government disputes whether the universe of Timothy clients have been shown to be relevantly similarly situated to Williams and

Burdett.   True, Mr. Williams and Ms. Burdett (and perhaps Timothy, who has been charged by bill of information) themselves are dissimilar in terms of race, gender, and public official status. And certain characteristics of the universe of Timothy clients are absent from the record, which hinders the Court's task in determining ther they are sufficient comparators in relevant and material respects for prosecution.[19]   Just like raw statistics are relatively unhelpful in surmounting the burden to show discriminatory effect, so, too, would be aggregate data, depending on the circumstances and discernible characteristics of comparators.[20]   But the defendants offer a bit more than raw data.

From the government's document production, the defendants proffer an analysis of the tax returns filed by Mr. Timothy on behalf of his many clients from 2013 through 2016.   The evidence shows, the defendants submit, that Timothy treated Mr. Williams the same why he (Timothy) treated all of his clients.   Mr. Williams

---

[19] Mr. Williams and Ms. Burdett focus on the tax fraud conduct (26 U.S.C. § 7206(2)) to the exclusion of the additional charges that they face (31 U.S.C. §§ 5331, 5332).

[20] In United States v. Hoover, 727 F.2d 387, 389 (5th Cir. 1984), the court found the first prong of the selective prosecution test satisfied because only three from among 300 persons failing to report to work as air traffic controllers were prosecuted under 18 U.S.C. 1918(3).   All of those who potentially could have been prosecuted fell into a readily discernible category as those who were prosecuted: air traffic controllers in the Houston area who failed to report to work on a particular day.

and the rest of Timothy's clients are small business owners who hired Timothy to prepare their taxes and that Timothy took aggressive Schedule C deductions for all of them.[21]  Yet Mr. Williams, a black sitting public official and declared candidate for a different public office, and his law partner Ms. Burdett are the only Timothy clients being prosecuted.

The defendants proffer these aggregate numbers for comparison's sake: from 2013 through 2016, Timothy's clients reported a total of $71,982,007 in Schedule C income.  With Timothy as tax preparer, the clients deducted a total of $62,146,980 from these returns, leaving $9,835,027 in taxable income.  (The defendants created and attached a 38-page spreadsheet as Exhibit O to their motion.)  This evidence, the defendants contend, indicates that the government has blindly accepted Timothy's changed story that he only made aggressive deductions for Mr. Williams because Ms. Burdett pressured him to do so.

The defendants offer this chart for comparison and in support of their discriminatory effect theory:

---

[21] This fact, it is submitted, undermines Timothy's changed story (and the prosecution's theory) that Timothy took aggressive deductions for Mr. Williams only because Ms. Burdett pressured him to do so.

| Name | Business | SchC:<br><br>Gross Income | SchC:<br><br>Deductions | SchC:<br><br>Profit/Loss |
|---|---|---|---|---|
| J.BROW. | Construction service | $985,614 | $978,170 | $7,444 |
| H.LA. | Seafood processing | $867,596 | $827,159 | $40,437 |
| DOU. | Home health | $798,891 | $771,211 | $27,680 |
| H. CO. | Restaurant & lounge | $617,891 | $590,430 | $27,461 |
| WILLIAMS | Attorney | $578,569 | $493,334 | $85,225 |
| L.KI. | Auto body and powder | $435,705 | $421,470 | $14,235 |
| DUP. | Renovations | $371,912 | $345,145 | $26,767 |

This chart exemplifies Timothy's across-the-board deductions for his clients.  Yet the government confirms that it has not investigated any of them.

In some detail, the defendants proffer as a similarly situated Timothy client, C.D., who was investigated for tax irregularities but not charged.  Because C.D. was investigated, more information

is known about her.[22]  During the four years that Timothy prepared
the taxes for C.D.'s home health company, C.D. paid $35,000 on
$3,537,277 in income.  The government says that "SA Marable
declined prosecution on C.D." for several reasons including that
SA Marable "determined that the [personal expenses in the business
account] were *de minimis* and did not meet prosecution
guidelines."[23]  Prosecution was declined, the defendants point out,
despite the fact that the IRS found that many of C.D.'s deductions
from the business's gross earnings were for personal expenses,
that C.D. "regularly withdraws cash, issues a check to herself, or
transfers money from the business account into her personal account
on a bi-weekly basis," and that the "business account does contain
personal expenses such as [C.D.'s] children's tuition for school."

The only other Timothy client interviewed by the government
was J.B.   Stating that Timothy was solely responsible for
determining which deductions to take, J.B. admitted after being
shown the deductions during his interview with the government that
$27,700 in improper deductions were included on his tax return.

---

[22] During oral argument, the government indicated that C.D. is a
black woman.  There has been no mention of whether she (or any
other comparator) held public office when she was investigated for
tax fraud.
[23] The government's characterization that SA Marable herself
"declined prosecution" appears to belie any prosecution-versus-
enforcement dichotomy in the selective or vindictive prosecution
realm, absent additional briefing on the matter.

The government did not challenge J.B.'s assertion that Timothy took the deductions (for supplies, meals, entertainment, utilities, uniforms, and membership fees) without J.B.'s participation or advance express consent.  J.B.'s situation is like the defendants' yet, the defendants submit, the government persists with its prosecution theory directed only at Mr. Williams and Ms. Burdett and supported only by Timothy's changed story (that Ms. Burdett pressured him to take deductions).

For its part, the government observes that tax cases are time and resource consuming to develop and that SA Moore has been the case agent on tax prosecutions involving white public officials or attorneys prosecuted for tax violations in Orleans, Jefferson, and St. Tammany Parish areas from 2005 through 2019, including Chris Roberts (Councilman – Jefferson Parish); Craig Tafaro (Deputy Chief – Jefferson Parish Sheriff's Office); Walter Reed (District Attorney – St. Tammany Parish); Greg Meffert (Chief Technology Officer – City of New Orleans); Eddie Price (Mayor – Mandeville); Joe Impasato (Councilman – St. Tammany Parish); James Perdigo (Attorney).[24]   Particularly given the government's wholesale dismissal of Timothy clients as comparators, this information

---

[24] It is unclear if this roster of convicted (with the exception of Chris Roberts, who committed suicide before trial) public officials the government submits are proffered as similarly situated comparators for the effect analysis.

appears anecdotal and of little help in advancing analysis of Armstrong's effect component.

To be sure, the spreadsheet and analysis identified by the defendants supports the defendants' selective prosecution theory in its aggregate suggestion that all of Timothy's clients took aggressive deductions (with Timothy, the tax preparer, as the common denominator); yet, only Jason Williams, Nicole Burdett, and Timothy himself are or "will be" prosecuted.  Given the circumstances and prosecution theory, considering Exhibit O and the pool of Timothy clients whom are not being investigated nor prosecuted, the Court finds that the defendants have submitted "some evidence" supporting Armstrong's effect component sufficient to warrant development during a limited evidentiary hearing. Perhaps the record can also be clarified as to whether any of the Timothy client comparators are black sitting public officials and declared candidates for public office.

2.  Discriminatory Purpose

Turning to discriminatory purpose: have the defendants shown that the government prosecuted them "because of, not merely in spite of" the unjustifiable factor or arbitrary classification such as race or the desire to prevent the exercise of constitutional rights?  See Wayte v. United States, 470 U.S. 598,

610 (1985). On this record, the defendants have not made this showing sufficient to warrant dismissal.[25] But they have offered some evidence, which persuades the Court on this developing record that it may not simply accept the government's purportedly legitimate reasons and characterizations of the agents' motivations or knowledge to the exclusion of "some evidence" offered by the defendants and including the government's admissions regarding the agents' intent. The shifting explanations from the prosecution coupled with the circumstantial evidence submitted by the defendants is sufficient to permit the defendants

---

[25] Of course, the defendants' selective prosecution theory must be viewed through the lens of tax prosecutions generally:

> [K]nown tax reporting violations are not ignored and are, in fact, prosecuted to such an extent as prosecutorial resources allow.... The decision whether to proceed by civil or criminal means is made on the basis of several factors: the flagrancy of the violation, the amount involved, the special status of the taxpayer such as CPA or attorney, the availability of limited investigative personnel, and other factors unique to a given case.

United States v. Johnson, 577 F.2d 1304, 1308-09 (5th Cir. 1978)(noting that "tax protestors are vigorously prosecuted for violation of the tax laws [which] demonstrates nothing more than a legitimate interest in punishing flagrant violators and deterring violations by others."); United States v. Tibbetts, 646 F.2d 193, 195-96 (5th Cir. 1981)("Due to limited resources of the government, there will always be some tax evaders and tax protestors who elude prosecution by the government. This factor is not sufficient to show selective prosecution. The evidence is clear that the government did not prosecute Tibbets while ignoring others similarly situated.").

to probe the prosecution's intent during an evidentiary hearing, limited in scope.

The WDLA prosecuting attorneys candidly write in their opposition papers: "Because Williams failed to meet with SA Marable and due to the fact that he was a public official, SA Marable's supervisor requested that IRS Special Agent Tim Moore get involved." Given the government's admission, the investigation chronology, and other circumstantial evidence submitted by the defendants,[26] during a limited evidentiary hearing, the defendants may probe government purpose, in particular: the circumstances surrounding SA Marable's knowledge and motive concerning her initial attempts to meet with Mr. Williams as a witness and, having failed, the knowledge and purpose on the part of SA Marable and her supervisor in getting SA Moore involved, along with SA Moore's

---

[26] For example, Mr. Williams argues that the government accepted a changed story by Timothy that is demonstrably false and contradicted by all objective evidence. That the government has accepted the changed and false aspects of Timothy's story to support the prosecution theory and to indict Mr. Williams without even looking at Timothy's other clients in an attempt to corroborate it (i.e., to determine whether each of the clients for whom aggressive deductions were taken pressured Timothy to do so), the defendants argue, invites further inquiry. Of some interest, as the government mentions, Timothy himself has been charged by bill of information with four counts of making and subscribing a false income tax return for including false information on his Schedule C form. There is nothing in the charges to suggest that anyone pressured Timothy to falsify his own taxes.

knowledge and motive in pursuing witness-turned-target Mr. Williams because "he was a public official."

To be sure, a prosecution cannot be motivated by a suspect's exercise of constitutional rights through participation in political activity. United States v. Hastings, 126 F.3d 310, 313 (4th Cir. 1997)(citations omitted). On the current record, the defendants have offered "some evidence" of improper motive worthy of an evidentiary hearing. Although the defendants have not dispelled the presumption of regularity, nor may the Court simply assume that the government's prosecutorial motivation was legitimate and proceeded in the ordinary course. In fact, the defendants point to admissions by the government that it opened up a criminal tax investigation into Mr. Williams because he failed to meet with SA Marable and because he is a public official; both issues to develop during an evidentiary hearing: the circumstances surrounding SA Marable's decision along with her supervisor to target Mr. Williams for investigation into his taxes and the circumstances surrounding SA Moore's decision to pursue a tax prosecution against Mr. Williams.[27]

---

[27] The government insists that the decision to prosecute Mr. Williams's is anchored to his long history of tax issues with the civil division. And that SA Moore's "preliminary" tax investigation -- in which he reviewed Mr. Williams's returns and other documents -- showed "glaring irregularities" on the face of

*B.*

At this stage of the proceedings, the defendants' vindictive prosecution claim as a ground for dismissal fails as a matter of law.  The defendants have not satisfied their preponderance burden.  They have not presented sufficient objective evidence establishing a realistic likelihood of vindictiveness.  Nor have they established actual vindictiveness.  Nevertheless, the defendants will have an opportunity to probe prosecutorial malintent during a limited evidentiary hearing for overlapping reasons articulated in addressing Armstrong's intent component.

Mr. Williams's vindictive prosecution claim is framed similarly to his selective prosecution theory: he submits that he is being punished with a criminal tax indictment because, as the government explicitly stated, he "failed to meet" with SA Marable and because, as SA Moore knew, he "was a public official."  Mr. Williams contends that he had a constitutional right to refuse to speak to SA Marable.  See Kentucky v. King, 563 U.S. 452, 469

---

the documents.  For the purposes of the intent inquiry placed at issue by the defendants' motion, there is nothing in the record to suggest that what SA Moore observed during a cursory review of Mr. Williams's tax returns at any point previously incited the civil tax division to turn over for criminal investigation these "glaring" issues notwithstanding the long history of tax issues purportedly well known to the civil division.

(2011).  And, he was targeted by law enforcement investigators because he was a public official and, when he was indicted, the government knew he was a declared candidate for District Attorney.[28]  For the reasons indicated respecting the intent component of the selective prosecution theory, these incidents could be the subject of greater inquiry.

By indicting her in this case and taking steps to indict her for Timothy's preparation of her own personal tax returns, Nicole Burdett submits, the government is retaliating against her for pleading not guilty, failing to cooperate in the way the government wanted (submitting to a proffers session), and filing pretrial motions.  Challenging the government's motivation and suggesting that its prosecutorial tactics have crossed the line, Ms. Burdett points out that the government produced in discovery numerous Burdett family photographs, which defense counsel suggests are irrelevant to any criminal charges.  Ms. Burdett's counsel indicated during oral argument and then again in a sur-reply that SA Moore visited the homes of Ms. Burdett's family members, including her daughter and her brother, just a few hours before the oral hearing on her motion to dismiss the indictment.  A couple

---

[28] This, Mr. Williams argues, implicates an activity protected by the First Amendment and also violates the Department of Justice policy on political sensitivities during an election year.

days after the hearing, the government sought to serve a grand jury subpoena for the personal appearance of Ms. Burdett's mother, who is in poor health.

The government concedes that it is actively seeking to prosecute Nicole Burdett for tax fraud related to her own personal taxes.[29]  The government waved away any impropriety in the timing of the agents' visits to Ms. Burdett's family, suggesting that they were merely serving papers they should have served weeks ago. The government goes on to suggest in its post-hearing supplemental paper that "[t]he October 2 hearing did not involve any witness testimony[30] and it was not the intention of the Government to cause

---

[29] Ms. Burdett submits that "[i]t is plainly unconstitutional for the government to retaliate against Ms. Burdett by seeking additional charges against her based on evidence known to the government at the time of the first indictment, and to attempt to forum-shop within this district by seeking a 'separate' indictment rather than superseding the indictment before this Court, for Ms. Burdett's exercise of her constitutional rights to file motions challenging the validity of the prosecution against her."  The government counters that it advised Ms. Burdett through her counsel almost a year ago that it was pursuing a second matter against her when the government initiated discussions in an attempt to get her to cooperate and minimize her criminal exposure, that she nevertheless opted not to meet with the government, "which resulted in the Government following through on its obligation to prosecute offenses where there is probable cause to do so."  If a second indictment is returned, the government contends, it "has no say regarding which judge will be assigned to that case" and if instead the government "were to supersede the instant indictment, it would certainly be subject to a motion to sever and the Government would likely be accused of 'piling on.'"

[30] That there was no witness testimony at the hearing was evident and, at times, a hindrance to resolving the issues presented.

43

any additional stress on anyone, as the agents were simply doing their jobs."  The government's conduct, Ms. Burdett contends, is vindictive because the government is prohibited from retaliating against her by threatening or bringing additional charges out of a desire to prevent the defendant's exercise of her constitutional rights.  See United States v. Hoover, 727 F.2d 397, 389 (5th Cir. 1984).

The Court must consider this "threat" or possibility of additional charges in the context of the entire proceedings as part of the vindictiveness inquiry.  As the Fifth Circuit reiterated:

> There is no presumption of vindictiveness if in the context of the entire proceedings "any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision ... was motivated by some purpose other than a vindictive desire to deter or punish[.]"

Saltzman, 537 F.3d at 360 (citation omitted).  Examining the prosecutor's actions in the context of the entire (or here, nascent) proceedings compels a conclusion that no presumption of

---

Whether there should be testimony to develop the facts on these issues is squarely at issue.  Instead of resorting to reliance on counsel's characterizations of potential witnesses' testimony concerning matters of government intent or purpose, the government's conduct might be worthy of an evidentiary hearing.

vindictiveness applies on this record at this stage of these *pretrial* proceedings.  That is, a reasonable person could view the prosecutor's conduct as "motivated by some other purpose other than a vindictive desire to deter or punish" Ms. Burdett's exercise of her asserted rights to plead not-guilty, decline a proffer session, and file pretrial motions seeking dismissal of the indictment.   To be sure:

> [b]ecause the prosecution has a constitutionally legitimate interest in persuading the defendant not to exercise [her] right to plead not guilty, the presumption of vindictiveness [i]s not warranted where the prosecution had done no more than "openly present [] the defendant with the unpleasant alternatives of forgoing trial or facing charges on which [s]he was plainly subject to prosecution.

Saltzman, 537 F.3d at 360 (citing Bordenkircher, 434 U.S. at 365); see also United States v. Paguio, 114 F.3d 928, 930 (9th Cir. 1997)("It is a nasty business to indict two people, in order to use the pressure to make one of them talk [even] about an entirely different matter.  But it is not what the precedents call 'vindictive prosecution.'").

The burden on defendants to obtain dismissal of charges due to vindictiveness, pretrial, is nearly insurmountable. Nevertheless, the defendants have a right to fair treatment and here have offered some evidence that invites a reason to doubt

that the government is acting properly in seeking the(se) indictment(s); additional inquiry into prosecutorial motivation or vindictiveness is warranted simultaneously with the inquiry into discriminatory intent for the selective prosecution claim.  In other words, the defendants may probe during an evidentiary hearing whether the prosecution is unduly selective or in retaliation for the exercise of their statutory or constitutional rights.

The Court does not conclude that prosecutorial animus or vindictiveness exists, only that the circumstantial evidence offered, the timing of the indictment, the timing of other government conduct in relation to the defendants' motions, and the government's own admissions concerning the investigating agents' motivations counsel against prematurely stifling the development of the defendants' claims that their prosecution crosses Constitutional boundaries.   Contrary to the government's suggestion in its supplemental paper that the pending motion is an abusive discovery tactic in which the defendants "only" seek to examine Timothy, the defendants have expressly stated that they intend to call the investigating agents during any limited evidentiary hearing.[31]  Finally, more than once in its papers, the

---

[31] In addition to calling SA Marable, SA Marable's supervisor, and SA Moore, the defendants suggest that they would also like to call Timothy.   The Court is not persuaded that Timothy's testimony during a pretrial hearing could "prove" that the government

government invokes <u>United States v. Young</u>, 231 F. Supp. 3d 33 (M.D. La. 2017) in which Judge deGravelles issued a lengthy opinion denying a defendant's motion to dismiss for selective and vindictive prosecution.  What the government fails to mention is that Judge deGravelles did so following two evidentiary hearings and multiple rounds of briefing.  Like Young, the defendants have demonstrated entitlement to a limited evidentiary hearing to develop a factual record concerning incidents with the investigatory agents that bear on prosecutorial motive.[32]

_____

deliberately ignored objective evidence in support of their selective and vindictive prosecution theories.  Insofar as the prosecution rests its theory of the case on Timothy's narrative, this is an issue directed to the substantive criminal charges; and Timothy's ostensibly shifting stories will be fodder for cross-examination at any trial.  Additionally respecting Timothy, the defendants indicate that the government "refuses to turn over the transcript of Henry Timothy's grand jury testimony to allow the defense and the Court to evaluate the extent to which the government has allowed false testimony to go uncorrected before the grand jury."  And Ms. Burdett asks the Court to "order the government to turn over the transcript of Timothy's grand jury testimony and all evidence inconsistent with Timothy's grand jury testimony for the Court's consideration in connection with this motion to dismiss."  At this time, there is nothing before the Court to place this squarely at issue for resolution.

[32] As for the supplemental papers and new (and developing) evidence submitted by Ms. Burdett -- including that on the day of the hearing on the motion to dismiss the indictment for vindictive prosecution the government through SA Moore visited the homes of Ms. Burdett's brother, her daughter, her estranged father, and a couple days later attempted to serve a grand jury subpoena seeking the appearance of Ms. Burdett's ill mother -- these incidents might be worthy of some limited development or clarification during the evidentiary hearing.

*C.*

Finally, the defendants advance a more generalized due process challenge to their prosecution: the shoddiness of the government's case; the fact that the charges are predicated on false and shifting self-serving testimony by its star witness, Henry Timothy, who is a liar; and the injustice attendant to the defendants' inability to bring this case to trial quickly due to being indicted during a pandemic when jury trials are suspended. The defendants submit that the government has engaged in conduct that is so fundamentally unfair that it violates due process and dismissal is warranted. They suggest this theory of dismissal will be further developed during an evidentiary hearing. The government counters that the defendants cannot obtain dismissal of an indictment simply because Henry Timothy may have credibility issues. The Court agrees.

To be sure, the defendants have identified problems the government will face in proving its case beyond a reasonable doubt. But the broad due process principles invoked by the defendants are predicated on the outrageous government conduct defense, which is narrowly confined: "[g]overnment misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principle of 'fundamental fairness' under the due

process clause of the Fifth Amendment." United States v. Mauskar, 557 F.3d 219, 231-32 (5th Cir. 2009)(citations omitted)("We are deeply concerned by the government's failure to disclose [the witness's] forgery of Mauskar's signature on documents relating to charges against him."). Such violations are found only "in the rarest of circumstances. Id. (citations omitted)("Had the government suborned perjury regarding the authenticity of signatures on the forged documents relating to the charges against Mauskar, the outcome of this appeal may have been different."); United States v. Sullivan, 578 F.2d 121, 124 (5th Cir. 1978)("But we refuse to adopt the proposition that, absent perjury or government misconduct, an indictment is flawed simply because it is based on testimony that later may prove to be questionable.").

The defendants have not identified those rarest of circumstances warranting dismissal of the indictment. At any trial, the defendants will be permitted to cross-examine Timothy and otherwise challenge the government's evidence on the substantive criminal charges. At this juncture, there is insufficient evidence to support dismissal based on the outrageous government conduct doctrine.

\*\*\*

Accordingly, IT IS ORDERED: that the defendants' motion to dismiss the indictment for selective and vindictive prosecution and due process violations is DENIED without prejudice, and their request for an evidentiary hearing is GRANTED.  IT IS FURTHER ORDERED: that an evidentiary hearing limited in scope consistent with this Order and Reasons shall take place starting at 1:30 p.m. on Thursday, October 22, 2020, unless otherwise ordered.[33] Finally, no later than three days before the hearing, counsel shall provide the Court with an order of presentation.

New Orleans, Louisiana, October 8, 2020

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[33] Counsel shall attempt to resolve any disputes concerning the date and scope of the hearing before seeking Court intervention.