UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | Docket 20-CR-055 |
| | * | |
| versus | * | Section F |
| | * | |
| JASON R. WILLIAMS | * | October 2, 2020 |
| NICOLE E. BURDETT | * | |

* * * * * * * * * * * * * * * *

ORAL ARGUMENT BEFORE
THE HONORABLE MARTIN L.C. FELDMAN
UNITED STATES DISTRICT JUDGE

Appearances:

| | |
|---|---|
| For the United States: | U.S. Attorney's Office |
| | Western District of Louisiana |
| | BY:  KELLY P. UEBINGER, ESQ. |
| |      DAVID J. AYO, ESQ. |
| | 800 Lafayette Street, Suite 2200 |
| | Lafayette, Louisiana 70501 |
| | |
| For Jason R. Williams: | Schonekas Evans McGoey |
| |   & McEachin, LLC |
| | BY:  WILLIAM P. GIBBENS, ESQ. |
| | 909 Poydras Street, Suite 1600 |
| | New Orleans, Louisiana 70112 |
| | |
| For Nicole E. Burdett: | Jones Walker, LLP |
| | BY:  MICHAEL W. MAGNER, ESQ. |
| |      AVERY B. PARDEE, ESQ. |
| | 201 St. Charles Avenue, Suite 5100 |
| | New Orleans, Louisiana 70170 |
| | |
| Official Court Reporter: | Toni Doyle Tusa, CCR, FCRR |
| | 500 Poydras Street, B-275 |
| | New Orleans, Louisiana 70130 |
| | (504) 589-7778 |

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

# INDEX

Page

Oral Argument

William Gibbens, Esq.                4

Michael W. Magner, Esq.              15

Kelly P. Uebinger, Esq.              21

Michael W. Magner, Esq.              34

William Gibbens, Esq.                35

Kelly P. Uebinger, Esq.              36

Michael W. Magner, Esq.              37

Kelly P. Uebinger, Esq.              37

<u>**PROCEEDINGS**</u>

**(October 2, 2020)**

**THE COURT:**  Good afternoon everybody.

Call the case, please.

**THE DEPUTY CLERK:**  Criminal Action 20-55, *United States of America v. Jason R. Williams and Nicole E. Burdett.*

**THE COURT:**  Enter your appearances, Counsel.

**MS. UEBINGER:**  Your Honor, good afternoon. Kelly Uebinger and --

**MR. AYO:**  David Ayo.

**MS. UEBINGER:**  -- for the government.

**MR. GIBBENS:**  Good afternoon, Judge.  Billy Gibbens for Jason Williams, who is present on the call.

**MR. MAGNER:**  Good afternoon, Judge.  Mike Magner for Nicole Burdett, who likewise is present on the call.

**MS. PARDEE:**  Avery Pardee also on behalf of Nicole Burdett.

**THE COURT:**  Thank you all for being -- I started to say thank you for being here, but you are not here; you are there.  I apologize for this Zoom stuff again, but I guess we don't have any alternative for right now.

We are here on the defense request for an evidentiary hearing regarding a motion to dismiss the indictment.  Let me hear from --

1          Mr. Gibbens, are you going first?

2          **MR. GIBBENS:**  Yes, sir.  Judge, based on the

3   government's opposition, we know for certain now that there was

4   no legitimate basis for this case.  When the government began

5   its criminal tax prosecution of Mr. Williams in October of

6   2018, Mr. Williams was a declared progressive candidate for

7   district attorney with a public platform of running against the

8   established law enforcement.  He is a sitting city councilman

9   and, of course, he is African American.  The government cannot

10  decide to prosecute somebody just for these reasons, but that's

11  exactly what they did.

12          By its own admission, the government started its

13  criminal tax case, started the criminal prosecution because,

14  number one, Mr. Williams made IRS Agent Lori Marable wait and,

15  number two, because he was a public official.  That's what they

16  say.  We know there's more to it than that.  But even if that

17  were the end of the story, that's disturbing because the

18  government is admitting that it opened a criminal tax

19  prosecution into somebody for reasons totally unrelated to his

20  taxes.

21          But that's not the end of the story and from

22  here it just gets worse because the government, through

23  Agent Marable, first visited Mr. Williams as a witness in a tax

24  investigation of Timothy Henry, who was the target.  But as

25  soon as the government found out who Mr. Williams was, that he

01:36

1    was a progressive candidate for public office and a sitting

2    public official, they turned the case on its head, and all of a

3    sudden Mr. Williams becomes the target and Mr. Timothy becomes

4    the witness.  By its own admission, the government did this

5    without knowing a single thing about Jason Williams' taxes.

6                So we have a criminal tax prosecution simply

7    because Mr. Williams exercised his First Amendment right to run

8    for office, for no reason related to taxes, and that's why we

9    know that the case started without a legitimate basis, and

10   really that alone is bad enough to dismiss it.

11          **THE COURT:**  Correct me if I'm wrong, but I believe

12   the government urges or argues that he was off and on the

13   subject of tax issues for, I think, some 19 -- many years.  I

14   forget how many.  How does that play into your argument that

15   there were no tax reasons for them to look into Mr. Williams?

16          **MR. GIBBENS:**  Because, Judge, they didn't know about

17   those reasons.  When the government began the tax

18   investigation, it didn't know any of those reasons, and they

19   admit as much in their opposition.  They say specifically, "We

20   opened a tax investigation because he made Agent Marable wait

21   and because he was a public official."

22          **THE COURT:**  I'm sorry to interrupt.  I am very

23   concerned about that, and it will be interesting to hear from

24   the government.  What is it that you specifically want by way

25   of an evidentiary hearing that does not relate merely to your

01:38

1  defense at trial?

2       **MR. GIBBENS:** Let me say two things on that, Judge.

3  First off, I do think that there is enough here just with the

4  record as it stands to support our motion to dismiss.  I think

5  that, in my view, there's enough for the Court to grant it.

6       But with respect to an evidentiary hearing, what

7  we would request to go into would be just what you said, Judge,

8  the reasons for initiating this prosecution.  We have what the

9  government has stated in its pleading, which appear to be no

10  reasons related to taxes whatsoever, and we have what I believe

11  is an after-the-fact justification based on our motion to go

12  back and say, "Oh, no, we are prosecuting this because of his

13  tax history."  But when you look at the tax history, even the

14  tax history that the government is proposing, it's -- well,

15  it's four things, and none of them seem to be plausible on

16  their face.

17       First, they cite some tax liens, which by their

18  admission were resolved and lifted in 2015, almost five years

19  ago -- or more than five years ago, January of 2015.  There's

20  nothing to suggest that the government knew about those when it

21  initiated this investigation.

22       Number two, they are claiming that there's

23  $16,000 in taxes owed from 2015, again no indication that they

24  knew about that when they initiated this, and 2015 is one of

25  the tax years at issue in the indictment.  They can't really

01:40

1    have it both ways, to say that's both a past history plus the

2    basis of the current indictment.

3         THE COURT:  Well, is 2015 the tax year that they

4    claim was about to prescribe?

5         MR. GIBBENS:  Well, I think, Judge, that relates to

6    one of the Form 8300 counts and that would have been -- I think

7    that was actually a little bit later because I think --

8         THE COURT:  Right.

9         MR. GIBBENS:  I would have to refresh myself, but I

10   think that those counts have a little bit of a shorter

11   limitations period.

12        They also claim, Judge, that -- you know, their

13   third and fourth reasons really are that he is a sophisticated

14   lawyer and expert in taxes, and that really falls flat on its

15   face.  We submitted that, the exhibit that they are relying on,

16   in our opposition.  It's one sentence on Mr. Williams' website

17   that talks generally about --

18        THE COURT:  Tax evasion.

19        MR. GIBBENS:  -- if you are accused of tax evasion.

20   I mean, the government knows that Mr. Williams has never -- he

21   doesn't handle taxes.  He has never defended a tax case.

22   That's why, Judge, it seems so obvious that these are

23   after-the-fact justifications to now try to say, "Oh, we are

24   doing this because he is a tax expert."

25        THE COURT:  Excuse me.  Talk to me more about two

01:41

things that I'm curious about.  One is this person Agent -- is it Marable?

        **MR. GIBBENS:**  Yes, sir.

        **THE COURT:**  And the other is the issue of you are talking about some of Henry Timothy's other clients or Timothy Henry's other clients.  Talk to me about those two issues.

        **MR. GIBBENS:**  Yes, sir.  So with respect to Agent Marable, Agent Marable showed up at Jason's house on October 22, 2018.  It was in the morning.  He was in trial.  It was the first day of a trial in this Court before Judge Lemelle.

        **THE COURT:**  It was without notice; is that correct?

        **MR. GIBBENS:**  Yes, sir, without notice, but he did talk to her and they made an appointment to meet later.  That was October 22, 2018.  Well, the very next day, October 23, 2018, Jason announced that he was running for DA.  This is the headline of an article that was published October 23, 2018, in *The Advocate*.  It says:  "New Orleans council president Jason Williams 'absolutely' running for DA in 2020, he says."

        Within days the criminal tax investigation was opened.  We know from the government's pleading that some kind of way -- we don't know how or why, but Agent Moore was brought in to look at his return.

        **THE COURT:**  Was brought in by Marable?

        **MR. GIBBENS:**  Well, I think it says by Marable's

01:43

1 supervisor, but that would be an issue that I think we would

2 want to delve into more at an evidentiary hearing. What we

3 would envision would be calling Agent Marable, Agent Moore, and

4 whoever the supervisor is to find out about that. When you

5 look at the timing and you look at the proffered justifications

6 for why they initiated this and it just happens to be that

7 there's this switch from becoming a witness to a target and the

8 intervening factor is that he makes this announcement to run

9 for district attorney, that's very concerning especially in

10 light of what the government has said, which is, "We didn't

11 even have a tax reason to investigate him."

12         To go to your second question, Judge, about

13 these other clients, that goes to the heart of this case. I

14 want to say, Judge, that I think there is a difference here

15 between trial and trial evidence -- what we are here for today

16 is trying to show the evidence of improper motive by the

17 government in bringing this prosecution.

18         **THE COURT:** Let me interrupt -- I'm sorry -- for a

19 second.

20         **MR. GIBBENS:** Yes, sir.

21         **THE COURT:** Of course, *Armstrong* says that I have to

22 show some deference to what the government has done, but what

23 keeps coming back to me is how does the issue of Timothy Henry

24 or Henry Timothy, whatever this guy's name is -- how does that

25 issue separate out from defense at trial as opposed to an

01:45

1   evidentiary hearing now?

2          **MR. GIBBENS:**  Because it shows the government's

3   improper motivation.  At this point what we are looking at is

4   why is the government bringing this case against Mr. Williams,

5   and we believe it's an improper motive.  What they are relying

6   on is Mr. Timothy's statements, which are blatantly not

7   credible in light of all the objective evidence.

8                  So what we are asking for the Court to do at

9   this phase is to take the government's -- we think we have made

10  a prime facie case of selective and vindictive prosecution.

11  The government has offered a justification which we don't

12  believe is plausible.  I think the Court at this stage can make

13  a determination whether their explanation is plausible.  Part

14  of that is going to be evaluating what they are pointing to,

15  which is Timothy, and the allegation, which is that

16  Mr. Williams instructed and directed Mr. Timothy to take these

17  improper deductions on his tax returns.

18                  When you look at the objective evidence that's

19  out there, that story is totally implausible because you

20  have -- Mr. Timothy has told the government that he only had a

21  few business clients for his taxes.  We know that's not true.

22  That's why we attached as Exhibit O to our motion a list of the

23  Schedule C returns that he filed just from 2014 to 2016 and

24  it's 38 pages long, a 38-page list.

25          **THE COURT:**  I have that.

01:47

1    **MR. GIBBENS:**  When you look at that, all those

2    clients have enormous Schedule C deductions.  We did the math.

3    You start out at about $71 million of income and he deducted

4    almost $62 million in business expenses.  So that's close to a

5    90 percent across-the-board deduction, which by the way is much

6    higher than what they have alleged the deductions from

7    Mr. Williams have been, and yet they haven't talked to any of

8    these people.  They haven't even looked at any of these tax

9    returns.

10             So that issue in itself goes to the government's

11    motive.  We think that's evidence of an improper motive because

12    they have chosen Jason, out of all of these hundreds of tax

13    returns, to prosecute when we have all of these other issues

14    out there and when they have admitted that it started because

15    of nothing connected to his taxes.

16             **THE COURT:**  One point that makes me hesitate with

17    regard to selective prosecution and equating that with his

18    statement that he is going to run for DA, I could see how that

19    might have more strength if he was being prosecuted by the

20    Eastern District of Louisiana.  One never knows what kind of

21    enmity exists between public officials and local U.S.

22    attorneys.  As a matter of fact, we know that there are indeed

23    instances in which public officials refuse to pay large amounts

24    of income taxes, but they are not treated criminally.  But in

25    this case the Western District is in the prosecution because

01:49

1  the Eastern District has recused.  I'm just wondering if that

2  doesn't weaken your argument about the coincidence between the

3  day that the criminal people were brought in and his

4  announcement to run for DA.  What's your reaction to that?

5          **MR. GIBBENS:**  That's a good question, Judge, but I

6  think what's important on that is that the agents are the same.

7  That October 22, October 23, 2018 [audio distortion] happened

8  in the Eastern District.  They say that it was Agent Tim Moore,

9  who is an IRS agent assigned to the New Orleans division of the

10 FBI --

11         **THE COURT:**  He is on the criminal side.

12         **MR. GIBBENS:**  Yes, sir, on the criminal side.  So

13 that's New Orleans right there.  This case was a train that

14 started going then and it continued.  I don't think the

15 government -- I know that that's exactly what the Western

16 District is going to say, "No, we made our own independent

17 decision two years later and decided to go forward on this,"

18 but I don't think you can separate out everything that -- it's

19 all the government.

20         It started for an illegitimate, invalid reason

21 by local law enforcement here and it has continued to the point

22 it has now.  That's why we think it's important to look at the

23 context of what the theory evolved to and how it really doesn't

24 make any sense because that's going to go -- when you are

25 evaluating, Judge, the excuse or explanation, "No, we are

Western District.  We made this decision independently years
later and we weren't influenced by anything else," that can't
be separated from the clear and obvious facts which are in the
record now about how believable is that.

That's also part of an evidentiary hearing in
this case because we know that there's influence by agents
involved in prosecutorial decisions and so it can't be
separated by individual.  It's all the government.  They are
all taking part of this.  That's why I would say that it really
is not a cure or a shield or a wall that a different office
other than the Eastern District took this over because it's all
the government.  Many of the same players are involved
regardless of whether or not it was the Western District,
somebody from DC, or the Eastern District doing this.  It
started off for an invalid reason, and it clearly appears to
have continued for those invalid reasons up until the point we
are at today.

I mentioned and you brought up this tax history
of Mr. Henry, of Mr. Timothy, and that the government has
ignored this long history of taking very large deductions for
lots of clients, just focused on Mr. Williams, but -- and I
think, Judge, this does get a little bit closer to your
question of the Western District's involvement because as this
case proceeded, clearly by the time the Western District was
involved at least one other client was interviewed and that was

01:53 1  JB.  We have addressed him in our brief.  JB was interviewed by

2  the government.  He also had his tax returns done by

3  Mr. Timothy.

4        **THE COURT:**  Well, there's two people, JB and CD, I

5  think.  Is that correct?

6        **MR. GIBBENS:**  Yes, sir.  Well, CD was investigated in

7  2017.  We think that's significant because that was a year

8  before all this started for Mr. Williams.  She was

9  investigated.  She paid approximately $35,000 on about

10  3 1/2 million dollars of income, and the government determined

11  that that was not a case worth prosecuting, but somehow this

12  one is.

13        **THE COURT:**  She had a pretty damn good tax lawyer, I

14  would think.

15        **MR. GIBBENS:**  I don't think she had any lawyer and

16  that's why that's concerning.  But then they did interview JB,

17  who was a client of Mr. Timothy.  They showed him his returns.

18  There were deductions that JB did not know about.  His reaction

19  to the government was, "That's crazy.  That shouldn't be on

20  there," and that was very recent.  That definitely was at the

21  time that the Western District was involved in the case, and

22  since he said that they stopped talking to him.  That's again

23  deliberately ignoring anything that contradicts this theory,

24  and that supports our argument, Judge, that there's an improper

25  motive here for why they have done what they have done.

01:55

1    THE COURT:  I believe there's a case pending in the
2  Western District in which the court has authorized, I think, an
3  evidentiary hearing.  Do you know about that case?  There's
4  been some mention of it somewhere in this mass of pages.  I
5  think there's a vindictiveness issue and the court has allowed
6  some relief.  I'm not sure what.  Do you know about that case?

7    MR. GIBBENS:  I do, Judge.  I was the lawyer on that
8  case.  It was in the Middle District.  It's *U.S. v. Young*,
9  Judge deGravelles.  We had an evidentiary hearing on that
10  motion.  We called the case agent, I think two of the agents
11  that were on the case, and did a lot of what we are talking
12  about here today, which was questioning the agents about what
13  they did, why they did it to try to demonstrate the
14  government's motivation for the prosecution and for doing what
15  they did.

16    THE COURT:  That was by way of an evidentiary
17  hearing?

18    MR. GIBBENS:  Yes, sir, that was an evidentiary
19  hearing.

20    THE COURT:  Thank you.  Anything else?

21    MR. GIBBENS:  No, Judge.  I think that's it for me.
22  I know Mr. Magner had some comments as well.

23    MR. MAGNER:  Good afternoon, Judge.

24    THE COURT:  Good afternoon.

25    MR. MAGNER:  I would probably be much more inclined

01:57

1    to give the government the benefit of the doubt if Special

2    Agent Moore didn't show up on Nicole's daughter's doorstep this

3    morning, didn't go to her brother and sister-in-law's house

4    this morning --

5            THE COURT:  This morning?

6            MR. MAGNER:  This morning, Judge.

7            THE COURT:  Unannounced this morning?

8            MR. MAGNER:  Yes.

9            THE COURT:  Unannounced this morning even though they

10    had to know that this hearing was pending?

11            MR. MAGNER:  I'm certain they did, Judge, and I can't

12    imagine if I were the agent --

13            THE COURT:  What did they go there for?

14            MR. MAGNER:  They were there to question them.  I

15    believe they were there to intimidate them.  I think for the

16    same reason the government has said that they are going to

17    bring charges against Ms. Burdett, we think that's further

18    evidence of vindictiveness.  When they provided discovery --

19    because there's an issue of whether Ms. Burdett and her

20    husband, you know, filed married but filing separately or who

21    is the head of household.  They have produced in discovery --

22    and the effect on Ms. Burdett was immeasurable.  They have

23    produced pictures of her wedding, of her Facebook postings with

24    her husband and her family.  This is the kind of overreaching,

25    overzealousness that these types of motions are intended to

ferret out.

Judge, prosecutors bring meritless cases.  I
mean, that happens, but we have constitutional restraints on
those, and those have sort of fallen by the wayside here.
Those checks and balances are just not here.

Besides the vindictiveness, we have an
indictment during COVID when grand juries were suspended.  They
had to get special permission.  We had a grand jury with a bare
minimum quorum of 16.  We have a violation of DOJ policy of
interfering with ongoing campaigns.  We have an African
American candidate who is a progressive candidate.  He is a
former public defender.  He is a defense attorney.  He has
questioned the current district attorney's use of fake
subpoenas to get people into the DA's office.  He has worked
with the Innocence Project to exonerate wrongly convicted
people.  He is not law enforcement's type of candidate.  All
these, I think, can go into your calculus of the government's
improper motive.

We also have, I think, a walking, talking
Brady/*Giglio* violation at this very moment.  We have provided
you with what we thought was a very fair analysis of all of
Timothy's inconsistent statements not because we are trying to
litigate the case in advance, but we are trying to show that no
rational prosecutor could prosecute a case like this where
their star witness is just completely all over the place and

02:00

1   where in the civil litigation that we instituted he is telling

2   yet a different story, where he is saying, "All the deductions

3   that I took for Mr. Williams were legitimate.  I thought they

4   were appropriate."  The Brady/*Giglio* violation is that we have

5   repeatedly asked for Mr. Timothy's grand jury testimony

6   because, by its very nature, whatever he said had to have been

7   also inconsistent with all these many accounts that he has

8   given.

9          We think that the threats to charge

10  Ms. Burdett -- who I promise you the government would never

11  have shown the slightest interest in if she had not been

12  Mr. Williams' law partner.  There's no compelling justification

13  to investigate her and to threaten to charge her but for her

14  relationship with Mr. Williams.

15         **THE COURT:**  What time did the agents show up this

16  morning?

17         **MR. MAGNER:**  I came into the office at quarter to

18  9:00, and Ms. Burdett was calling me and texting me at 8:30,

19  quarter to 9:00.  I was going up the elevator when I learned of

20  this.

21         The effect of this type of overzealousness of

22  the government on just a plain old human being -- she may be a

23  lawyer, but it's just unconscionable, Judge.

24         **THE COURT:**  Let me interrupt for a second,

25  Mr. Magner.  Do you know the names of the agents involved in

02:02   1    the incident this morning?

2           **MR. MAGNER:**  Yes.  It was Special Agent Tim Moore.

3    He left his cards at the home --

4           **THE COURT:**  He is the same one who is on the case,

5    right?

6           **MR. MAGNER:**  Yes.  He is the same case agent as in

7    the *Taffaro* case.

8           **THE COURT:**  Right.  Who is the other one?

9           **MR. MAGNER:**  He visited Brandi and Bradley Burdett.

10   That's the brother and sister-in-law of Ms. Burdett.  He

11   visited her daughter, Taylor Waguespack, who is a recent

12   graduate from pharmacy school, and her daughter's fiancé,

13   Jacob Harrington.  That was just this morning.

14          Ms. Burdett is a tough lady.  She practices at

15   Tulane and Broad.  She has been through her paces.  But when

16   the government provides her in discovery, right on the same day

17   as we filed our motion, her wedding pictures, her Facebook

18   pictures of her and her three young children and her husband,

19   this is the kind of unbridled power that our Constitution and

20   our due process requirements, you know, are supposed to protect

21   against.  There's no more chilling power in this country than

22   the IRS.  That's just a simple, plain fact.  I just think it

23   bears mentioning.  I don't want to take any more time.

24          **THE COURT:**  Thank you.

25          **MR. MAGNER:**  I don't want to take the Court's time,

20

but please look in particular at page 2 and 3 of our
demonstrative chart, which shows the evolution of Timothy's
stories; not because we are trying to litigate our case in
advance, but because we are showing that no rational prosecutor
could rely on such a witness.

Not only are they relying on him, but it appears
that they have given him immunity for his crimes.  He has been
charged in a bill of indictment with his own personal tax
evasion.  But because what he told the government was under a
proffer agreement, you know, a "queen for a day" agreement,
they can't use his statements against him in connection with
his wrongdoing in this case.  You've dealt with those issues in
the past, Rule 11, you know, Rule 410, you know, immunity
given, and there would be no case but for this scoundrel's
completely inconsistent statements over time.  That's the point
of that.

We genuinely, sincerely feel that on this record
you can dismiss this indictment and we ask you to do that.
Alternatively, we would ask for an evidentiary hearing.

One last thing is we have set out what
Mr. Timothy told Mr. Gibbens and myself and now, based on that,
in their pleadings the government is raising the specter of
disqualifying one or both of us because of that.  If we were to
have an evidentiary hearing, we need to see if Mr. Timothy will
honor the truth of what he told Mr. Gibbens and I -- which we

02:05

believe was truthful then, we believe it's truthful now -- that he was the decision maker on these business deductions. Thank you for your patience.

THE COURT: Thank you, Mr. Magner.

Let me hear from the government.

MS. UEBINGER: Thank you, Your Honor. As you stated earlier, the government does have broad discretion in determining who we prosecute. That is a job for the executive branch, and there is a presumption --

THE COURT: Yes, but it's not unfettered.

MS. UEBINGER: That is correct, Your Honor, but there is a presumption of regularity in the process, and prosecutors are assumed to act in good faith. In order to rebut that, it's up to the defense to come forward with some evidence that there is a constitutional problem.

I would like to point out to the Court -- you made a very good and important point that this is part of the reason the case was recused and sent over here to the Western District. In addition to that, the initial decision to go forward with the case wasn't made by the agents or myself or Mr. Ayo, the line AUSAs. It was made and evaluated objectively by DOJ tax, and a principal deputy attorney general signed off on this case. They made that determination. They are not involved in any vindictiveness --

THE COURT: Excuse me. Tell me about Agent Marable,

02:07

1    and also help me understand why Agent Moore apparently appeared
2    at Ms. Burdett's relatives' residences the morning that this
3    hearing was going to take place.

4           **MS. UEBINGER:**  Your Honor, I would love to discuss
5    that with you and defense counsel in chambers.  I really don't
6    want to get into any Rule 6(e) violations.  It is about a
7    separate matter, and that's pretty much what I can say about
8    that.

9           I know this much.  They were supposed to do what
10   they were getting ready to do on Wednesday and they weren't
11   able to complete the task, and so they said they would try to
12   get to it by the end of the week.  They did call me later this
13   morning to tell me that they did make an attempt to do what
14   they were supposed to do, but I can't talk about the nature of
15   what they were doing because it's a 6(e) matter.

16          **THE COURT:**  Well, I wouldn't dismiss it merely as a
17   Rule 16 matter.  There's a question of vindictiveness that's at
18   issue in this case.  I must tell you I am immensely concerned
19   about the conduct of these two agents.

20          **MS. UEBINGER:**  Your Honor, I'm sorry.  If I misspoke,
21   I apologize.  I said 6(e).  It's a 6(e) issue.

22          **THE COURT:**  Well, whatever it is, I don't think you
23   can dismiss the seriousness of what the defense has raised.

24          **MS. UEBINGER:**  Well, the agents were merely doing
25   their job relating to another matter.  I would be happy to

02:08

1   elaborate if you would like to go off air with the defense

2   counsel.  I don't know how we do ex parte things on this Zoom.

3       **THE COURT:**  Counsel, we don't do secret proceedings.

4   Why don't you go ahead and continue with your argument.

5       **MS. UEBINGER:**  Your Honor, I would be happy to tell

6   you about Special Agent Marable and how all of this began.  I

7   know Mr. Gibbens alleges and he said here today that the

8   government has admitted to all sorts of things, but I can only

9   relate to you how the case started based on what the facts are.

10      So Agent Marable is another special agent who is

11  on the criminal side of things.  She was investigating a lady

12  and a company owned by this lady and her family.  This is CD

13  that's referenced in the pleadings.  She was investigating CD.

14  CD has a business.  She received some complaints from

15  individuals about this business, some employees, that they were

16  not doing things properly.

17      She fully vetted the case, and I have provided

18  all this to defense out of an abundance of caution, the

19  investigative part of the report.  She subpoenaed records, she

20  did a thorough investigation, and she determined that, in fact,

21  they were doing things the way they were supposed to do except

22  she did notice that in their business account there were some

23  minor personal expenses being written from the business

24  account.

25      Long story short, she decided to not pursue

criminal charges against CD based on her extensive investigation. That's her job and that's what she decided. I would also like to point out that CD is a black female. That case was declined by Agent Marable.

So in the midst of that she found out, of course, that Mr. Timothy was CD's tax preparer. Whenever she is looking at a case, she realizes this person is the tax preparer, so she started looking at Mr. Timothy. She pulled his information because, of course, she realizes that CD might blame Mr. Timothy and Mr. Timothy might blame the client, and so she tries to sort it out.

In doing so she sees that Mr. Timothy has a lot of clients that he does tax preparation for. She looks at his tax returns and she says, "Wait a minute. Something isn't adding up," so she then decides to open up a case on the white tax preparer, Mr. Timothy. At that point she decided to seek out some of his clients merely for the purpose of establishing that they were, in fact, clients of Mr. Timothy, that the people actually existed, he wasn't just writing down names and making up stuff -- because that does happen sometimes -- and she did. She contacted several of his clients.

One of whom she picked to contact was Mr. Williams. She did show up at his house unannounced. She did speak with him face to face at the front door, I believe. He was busy at the time and told her, you know, that he

couldn't meet with her.  She said, "Okay.  No problem."  He said, "I will have my assistant call you.  We will do it another time.  Thank you."

They set up another meeting.  The assistant called her and gave her a time and a place and said could you come meet with Mr. Williams at his office on such and such a date, and she did that.  She sat for two hours.  She said the assistant kept checking on her, and then finally Mr. Williams didn't show up so she left.

Now, in her personal life what was going on was she was getting ready to be transferred to another office.  She got back to her office that day after sitting for two hours. She mentioned it to her supervisor, you know, basically, "I wasted lot of time on this and Mr. Williams didn't even show up."  The supervisor said something to the effect of -- and don't quote me on this -- "Since you are moving anyway, we are going to turn this over to Special Agent Tim Moore."

**THE COURT:**  Excuse me.  Was she told that Mr. Williams apparently took the position that the reason he couldn't see her that day is because he was in a council meeting?

**MS. UEBINGER:**  I do not recall her saying that, Your Honor.  I do not recall.  I asked her that question, and I do not believe she was told that because she was kind of amiss as to why he set the date and the time --

02:13

1    **THE COURT:**  Well, that's the issue.  The issue that
2    impacts vindictiveness is what exactly was she told.  If she
3    was told that he was a councilman and he was president of the
4    city council and that he was in a meeting and that he couldn't
5    be there, that's one thing.  If he just let her stew for
6    two hours and ignored her, that's another thing.  Don't slough
7    over the fact that one of the issues in this case is
8    vindictiveness and that's --

9    **MS. UEBINGER:**  So, Your Honor --

10   **THE COURT:**  Excuse me.

11   **MS. UEBINGER:**  I'm sorry.

12   **THE COURT:**  That's what I'm interested in about these
13   two agents.

14   **MS. UEBINGER:**  So Agent Marable related to me that
15   when she got back to the office and mentioned this to her
16   supervisor, she knew he was an attorney because on the
17   paperwork from Mr. Timothy it said attorney.  She did not know
18   he was a city councilman.  So I'm assuming she was not told he
19   was in -- although other people go to city council meetings.
20   She told me when she was waiting there, the legal assistant
21   kept saying, "He is on his way," "He is coming," and then he
22   never showed up.  What she related to me is she found that odd
23   because he set the date and the time, not her.  He did.  It was
24   at his convenience.

25           She goes back to the office.  The supervisor

02:14

says, "Well, he is a city councilman," or another agent
mentioned that he is a councilman.  She said, "I didn't know
that," talked to the supervisor.  The supervisor said, "You're
moving.  You're leaving anyway.  He's a city councilman.  We
are going to give this matter" -- not a case.  "We are going to
give this matter to Special Agent Tim Moore."  He is at the
FBI.  He does the same job she does, but he --

        **THE COURT:**  They were both on the criminal side of
the tax investigation world, right?

        **MS. UEBINGER:**  That's correct.  So they were just
transferring it to him because she was moving.  So what happens
is he gets the case, and the truth is he knew at that time that
there was already an open FBI investigation on Mr. Williams
because he is in that task force.  I asked him, "Why weren't
you on that case?"  He said, "Because I'm not on every single
case.  There's too many.  There has to be a reason."

        **THE COURT:**  Did he try to contact Mr. Williams to
find out why he hadn't shown up for the appointment with
Agent Marable?

        **MS. UEBINGER:**  No.  Your Honor, at that time -- I can
tell you what he told me is that the first thing he did was --
so when he is given a matter to look into, he -- before they
open a full-scale investigation, they do a very preliminary,
cursory review because they get these kind of referrals all the
time or people will call.  So they come in all the time and

02:15

1    they can't investigate every case.

2              So I asked him.  I said, "So when this name came

3    to you, what did you decide to do?"  He said, "The first thing

4    we do is we look at that person's history with the IRS.  We

5    look to see if there's been any problems, is it a minor

6    problem, was it a one-time thing."  So he did that on this

7    particular case, and what he saw was that extensive history.

8    The way he described it to me was that was flag number one.

9              **THE COURT:**  Did any of the agents ever go to the

10   civil side or the civil agents who had been involved with

11   Mr. Williams for some years to discuss with them -- when I

12   practiced law, unfortunately for you, Counsel, I defended

13   income tax fraud cases.  I happen to know that there was a

14   civil agent as well as a criminal agent on every investigation.

15   Did these agents ever go talk to the civil agents to see what

16   was going on with this guy Williams?

17             **MS. UEBINGER:**  He requested that information later.

18   They don't even go that far in the beginning.  All he did is

19   take a little look to see if this is something should I close

20   now or should I move on.

21             As I have already represented to the Court, he

22   knew that there was a case open on Jason Williams, so again

23   there was another flag that was raised, prior 10 years of

24   problems with the IRS and failure to pay; number two, ongoing

25   FBI investigation.

02:17

1      He doesn't even open a full-scale investigation

2  yet.  Before he talks to people, before he goes and gets a

3  bunch of documents, the third thing he does is he pulls the tax

4  returns, and he looked at those returns for the pertinent

5  years.  What was represented to me is that on the face of the

6  tax returns, he saw the problems.  When he saw those problems

7  that were glaring, he decided to request from his supervisor,

8  "Now I'm ready to open a case."

9      **THE COURT:**  Did he ever speak to the agents on the

10 civil side who had been looking into Mr. Williams' tax issues?

11     **MS. UEBINGER:**  So the way that that works,

12 Your Honor, as you know because you defended cases, he has

13 reached out to individuals.  I cannot tell you their names or

14 who they are, but we have those documents.  He has provided

15 them to me and I have provided them to the defense.  I don't

16 want to misrepresent that he talked to John Smith because I'm

17 not sure.  The names are in the file, and all of that has been

18 turned over to the defense.

19     But he did collect all of that information on

20 the prior tax liens.  We have a transcript of contact that

21 Mr. Williams had with the IRS over the years.  You know, they

22 record all of that, and you get that transcript when he called

23 and they responded.  All of that has been done.  That's why the

24 discovery in this case, part of it, is so voluminous.  We did

25 request all of that and we have it, and we have turned it over.

02:18

1    So that's how the case was started. When he
2    looked at the returns, he decided this is something that I have
3    to go forward with or I should request to open a case on, and
4    he does that. He writes it up and then he sends it to DOJ and
5    they stamp it. He, of course, calls the U.S. Attorney's Office
6    and says, "Hey, I'm looking into this. I'm going to need some
7    subpoenas." After that's completed, it goes to DOJ and they
8    make that decision, and then it comes to me.

9         THE COURT: And then the morning that this hearing
10   was to take place he appears at Ms. Burdett's family's front
11   door.

12        MS. UEBINGER: As I said, Your Honor, they were not
13   there to interview people. I can tell you that. They were
14   there to leave paperwork only.

15        THE COURT: Well, but counsel for the defendants
16   don't know that. I don't know that.

17        MS. UEBINGER: Well, I understand that, Judge, but
18   there's something coming up in a few weeks and we had to serve
19   the appropriate paperwork. Again, they were supposed to do it
20   earlier in the week and whatever happened happened and they
21   couldn't. They promised me they would do it. It was supposed
22   to be a couple of weeks ago, then it was this week, and so it
23   just happened. But they weren't doing anything untoward other
24   than what they were supposed to have gotten done several weeks
25   ago and they didn't. That's all I can tell you.

02:20

1    THE COURT:  Do you have anything else?

2    MR. MAGNER:  Judge, may I speak to that issue just

3    very briefly?

4    THE COURT:  Wait.  No.  I'll get back to you-all, but

5    I want to hear if the government has anything else before I

6    turn to you two.  Anything else?

7    MS. UEBINGER:  I would like to address the selective

8    prosecution case law and the burden that's on the defense.  So

9    it's up to them to put forth evidence, not the government, for

10   them to say that Mr. Williams has been singled out.

11   THE COURT:  I agree.  I couldn't agree more.  I think

12   you're absolutely right.  Like I said, I owe deference to the

13   government, but it's not unfettered.  That's what *Armstrong*

14   teaches.

15   MS. UEBINGER:  I'm sorry, Your Honor.  It's up to

16   them to come forward and say that the government has not

17   prosecuted other similarly situated individuals who committed

18   the same offenses, but they haven't --

19   THE COURT:  I quite agree, and maybe that's why they

20   are asking for an evidentiary hearing.

21   MS. UEBINGER:  But, Your Honor, they haven't answered

22   your question.  So the question is:  Who are they going to put

23   forward to say that there was some other white individuals who

24   were similarly situated to Mr. Williams that we haven't

25   prosecuted?  They haven't been able to do that, and the

02:21

1  government provided to you in its brief the list of other

2  public officials, you know, New Orleans, Orleans and

3  Jefferson -- there's no shortage of people who have been

4  prosecuted for tax violations.

5          THE COURT:  Well, there might be some shortage.

6  Counsel, don't try to approach me with a halo over your head.

7  There are cases in which prominent public officials do not pay

8  taxes and are not treated criminally.  Everybody knows about

9  them.  I respect your argument and I understand your position,

10 but don't try to put sugar on a cesspool of water.

11          Are you finished?  If so, I want to hear from

12 Mr. Gibbens and Mr. Magner.

13         MS. UEBINGER:  Your Honor, I just have a few other

14 quick points that I would like to make.  They have to clear

15 that hurdle before they are entitled to a hearing, and they

16 haven't done that.

17         THE COURT:  I agree they have to clear a hurdle.

18 Like I said, I understand, and I understand what my

19 responsibility is under *Armstrong*.

20         MS. UEBINGER:  The only other thing I would like to

21 point out -- and this is concerning to the government.  You

22 allowed their last-minute filing to be filed of the summary of

23 Mr. Timothy's statements to the government, and one of the

24 things that Mr. Magner mentioned here today which I find to

25 be -- it's not truthful.  On page 5 of their exhibit they made

02:23

1   a comment -- basically they want to say that everything

2   Mr. Timothy has ever said is a bunch of lies, but they quote

3   him on that page.  Mr. Gibbens reiterated that quote in his

4   argument to you saying that Mr. Timothy is a liar because he

5   said he had only a few clients that had businesses.

6            I have the report in front of me.  That is not

7   what the man said.  They put a period and they ended the quote

8   before the quote was actually finished.  He said businesses

9   like Mr. Williams and CD, which has a completely different

10   meaning.  Because I was sitting in that interview, and what I

11   took him to mean was he meant people who made a lot of money.

12   He had some other businesses who did less, but those were like

13   close to the million-dollar mark.  That was my impression.

14            I'm just saying if we are going to allow

15   exhibits and if we are going to argue before the Court -- he

16   said today, "Oh, Timothy is a liar.  He said he only had a few

17   business clients when he had hundreds of them."  Well, that's

18   not what he said, and we should be exact.

19       **THE COURT:**  I understand.  Thank you for setting us

20   all straight.

21            Mr. Magner, since you've been called a liar, I

22   will let you go first because Mr. Gibbens has not yet been

23   called a liar.

24       **MR. MAGNER:**  I'm sorry.  You said me?

25       **THE COURT:**  I said since you have been called a liar

02:24

1    and Mr. Gibbens hasn't yet been called a liar, I will let you

2    respond first.

3            **MR. MAGNER:**  He has a much more honest face than I

4    do, just looking at him, but the point I wanted to make --

5            **THE COURT:**  I know both of you, so I'm not going to

6    vouch for either one.  Go ahead.

7            **MR. MAGNER:**  The point I wanted to make is counsel

8    says that she somehow is bound by Rule 6(e).  I'm not.  What

9    that's all about is they are getting ready to -- they want to

10   charge Ms. Burdett separately with her income tax returns by

11   the same scoundrel tax preparer.

12           They subpoenaed her husband and went to visit

13   him.  They subpoenaed her mother, who had COVID at the time and

14   is also suffering from cancer.  I suspect what they were doing

15   this morning, as part of sort of their continued shock-and-awe

16   campaign, was to go to her daughter, her brother, her

17   sister-in-law, her daughter's fiancé.  To me that's textbook

18   vindictiveness.  I can't even imagine a clearer example of it.

19           What's really been denied us here, certainly

20   through no fault of the Court, is that we don't have an

21   opportunity for a speedy and public trial within the Speedy

22   Trial Act because of how and when they chose to go forward.

23           **THE COURT:**  Mr. Magner, I've already spoken to that

24   issue.  I understand how strongly y'all feel about it, but I

25   just don't think that the law is on your side on the speedy

02:26

1    trial issue.  I understand what you are arguing.  That may be a

2    valid argument for another day.  I don't know.  I understand

3    your position.

4                    Let me hear from Mr. Gibbens.

5            **MR. GIBBENS:**  Judge, I just really want to address

6    one point, which is that the government is trying to make it

7    appear as if what they did and the way that this case came

8    about was normal.  What they said was that when Agent Moore got

9    it, he just pulled Jason's tax returns to look at them just

10   like he does for every witness.  Well, that cannot be possibly

11   true because Agent Marable didn't do it and she went to him as

12   a witness.

13                   So what was happening here is that as soon as

14   Agent Moore got it -- and again we have this issue that it was

15   within days of him announcing his candidacy -- they pulled his

16   tax returns and looked at them for no reason whatsoever.

17   That's why this case got started.  That's how it got started.

18   It's not legitimate.

19                   It's really chilling and it's very disturbing

20   that a criminal tax agent will just pull somebody's returns and

21   look at them for no stated reason, and we have never gotten

22   one.  We have not gotten one today of why they pulled his

23   returns in the first place.

24           **THE COURT:**  Well, I want to thank you-all.  Unless

25   either side wants to submit additional briefing -- I don't

02:27

believe I need additional briefs unless somebody wants to
submit something.  It's up to you-all.

        **MR. MAGNER:**  Judge, the only --

        **MS. UEBINGER:**  Your Honor --

        **MR. MAGNER:**  -- other thing I would add is that --

        **THE COURT:**  Wait, wait, wait, Mike.  Let's hear from
the government.

        **MR. MAGNER:**  Sure.

        **MS. UEBINGER:**  I'm sorry, Your Honor.  I didn't mean
to interrupt.  I was wondering if I could make one final point
just to respond to what you let Mr. Magner say towards the end.
I didn't get a chance to respond to that.  It won't take long.

        **THE COURT:**  Well, you're the one who called him a
liar.  I will give you 30 seconds.

        **MS. UEBINGER:**  Your Honor, I'm sorry.  I should say
it was mischaracterized.  I don't know if they intentionally --
I don't know.  The period is out of place is my point.

        As to Ms. Burdett, Mr. Magner is well aware that
since November --

        **THE COURT:**  Well, Counsel, excuse me.  Thank you for
straightening out the record, but your use of the word *truthful*
about a member of the bar in very good standing and someone who
is highly respected was out of bounds and unfortunate.  Now, go
ahead.  Don't ever do that again in my courtroom.

        **MS. UEBINGER:**  Yes, Your Honor, but I also believe

02:29

1   the government does have an obligation to correct the record.

2   It could have been a mistake, but I wanted the Court to know

3   that that's not what the witness said because he did repeat

4   that to you.  It makes it sounds like he said he didn't have

5   any other business clients.  He said, "I don't have any other

6   clients like those two."  It's completely different.

7         **THE COURT:**  Well, you both might be dancing on the

8   head of the proverbial pin.  Anything else?

9         **MR. MAGNER:**  Judge, on that specific point, this

10   June 25, 2020, IRS interview that's referenced on page 5, I

11   believe it's in the record.  I don't think we took liberties in

12   our quote.  If I'm incorrect about it not being in the record,

13   I will let Your Honor's law clerk know with copies to

14   Ms. Uebinger.

15         **THE COURT:**  Well, if you have any other submissions,

16   make them within the next five days.

17         I think I interrupted the government.  Did you

18   still have something you wanted to add?

19         **MS. UEBINGER:**  I promise, Your Honor, very briefly

20   just in response to the vindictiveness claim against

21   Ms. Burdett.  Mr. Magner is well aware that he and I have been

22   talking since November of 2019, and we have correspondence to

23   and from each other.  We have repeatedly asked Ms. Burdett to

24   come in to speak with us, to have use immunity, to be a "queen

25   for a day" and to tell her side of the story.  It's her

02:30

1   absolute right to not have to come in and to meet with the
2   government, but I did tell Mr. Magner that there were two
3   separate cases against her that we were looking at and if she
4   wanted an opportunity to mitigate, she should do that.
5           This isn't about being vindictive at all.  It's
6   about we told her up front what could happen.  She has her
7   right to say, "I don't want to meet with you," and here we are.
8   It's not vindictive.  All the cases cited by the defense,
9   frankly, and the case in the Middle District basically say the
10  government has the right to do that.  Plea negotiations are
11  condoned by the court, the bar, and everyone else.  Thank you,
12  Your Honor.
13          THE COURT:  The agents didn't know that this hearing
14  was going to take place this afternoon?  Is that your point?
15          MS. UEBINGER:  No, that's a separate issue,
16  Your Honor.  They did absolutely know and --
17          THE COURT:  All right.  I understand.
18          Counsel, I'm going to take this matter under
19  submission.  I don't believe I need any additional briefing.
20  It's going to be a little while because there's a lot to chew
21  on in this case.
22          Let me say this.  As I am thinking about the
23  opinion and writing it, if something comes up that I need
24  additional briefing on, I will get in touch with you-all and
25  give you plenty of advance notice.

02:32

1            **MS. UEBINGER:**  Thank you, Your Honor.

2            **MR. GIBBENS:**  Thank you, Judge.

3            **THE COURT:**  Anything else?  Thank you.  Y'all have a

4    good weekend.

5            **MR. MAGNER:**  Thank you, Judge.

6            **THE COURT:**  Thank you.  Court is adjourned.  Thank

7    you all.

8            **MS. UEBINGER:**  You too, Your Honor.

9            (Proceedings adjourned.)

10                                  * * *

11                            <u>**CERTIFICATE**</u>

12           I, Toni Doyle Tusa, CCR, FCRR, Official Court

13   Reporter for the United States District Court, Eastern District

14   of Louisiana, certify that the foregoing is a true and correct

15   transcript, to the best of my ability and understanding, from

16   the record of proceedings in the above-entitled matter.

17

18

19                          */s/ Toni Doyle Tusa*
                             Toni Doyle Tusa, CCR, FCRR
20                           Official Court Reporter

21

22

23

24

25