1               UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3

UNITED STATES OF AMERICA     *      Docket 20-CR-055

4                        *

versus                 *      Section F

5                        *

JASON R. WILLIAMS         *      October 22, 2020

6  NICOLE E. BURDETT        *

    * * * * * * * * * * * * * * *

7

8             EVIDENTIARY HEARING BEFORE
          THE HONORABLE MARTIN L.C. FELDMAN

9          UNITED STATES DISTRICT JUDGE

10

  Appearances:

11

12  For the United States:     U.S. Attorney's Office
                        Western District of Louisiana

13                    BY:  KELLY P. UEBINGER, ESQ.
                          DAVID J. AYO, ESQ.

14                    800 Lafayette Street, Suite 2200
                    Lafayette, Louisiana 70501

15

For Jason R. Williams:    Schonekas Evans McGoey

16                      & McEachin, LLC
                    BY:  WILLIAM P. GIBBENS, ESQ.

17                    909 Poydras Street, Suite 1600
                    New Orleans, Louisiana 70112

18

For Nicole E. Burdett:    Jones Walker, LLP

19                    BY:  MICHAEL W. MAGNER, ESQ.
                          AVERY B. PARDEE, ESQ.

20                    201 St. Charles Avenue, Suite 5100
                    New Orleans, Louisiana 70170

21

Official Court Reporter:  Toni Doyle Tusa, CCR, FCRR

22                    500 Poydras Street, B-275
                    New Orleans, Louisiana 70130

23                    (504) 589-7778

24

Proceedings recorded by mechanical stenography using

25  computer-aided transcription software.

1                          <u>**INDEX**</u>

2                                                              <u>Page</u>

3   Kristie Gregoire
        Direct Examination By Mr. Magner              6
4       Cross-Examination By Ms. Uebinger            47
        Redirect Examination By Mr. Magner           57
5

6   Lori Marable
        Direct Examination By Mr. Gibbens            60
7       Cross-Examination By Ms. Uebinger            80
        Redirect Examination By Mr. Gibbens          87
8

9   Timothy Moore
        Direct Examination By Mr. Magner             89
10      Cross-Examination By Ms. Uebinger           113
        Redirect Examination By Mr. Magner          124
11

12  Jennifer Lopez-Martinez
        Direct Examination By Mr. Gibbens           128
13      Cross-Examination By Ms. Uebinger           135

14
    Harold Asher
15      Voir Dire By Mr. Gibbens                    137
        Direct Examination By Mr. Gibbens           140
16      Cross-Examination By Ms. Uebinger           147

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

**(October 22, 2020)**

**THE COURT:**  Good afternoon, Counsel.

**MR. MAGNER:**  Good afternoon, Judge.

**MS. UEBINGER:**  Good afternoon, Your Honor.

**MR. GIBBENS:**  Good afternoon, Judge.

**THE COURT:**  Call the case, please.

**THE DEPUTY CLERK:**  Criminal Action 20-055, *United States of America v. Jason R. Williams and Nicole E. Burdett*.

**THE COURT:**  Enter your appearances.

**MS. UEBINGER:**  Your Honor, Kelly Uebinger and David Ayo for the government.

**MR. GIBBENS:**  Good afternoon, Judge.  Billy Gibbens for Jason Williams, who is also on the call.

**MR. MAGNER:**  Good afternoon, Judge.  Mike Magner and Avery Pardee for Nicole Burdett, who is also on the call.

**THE COURT:**  Thank you.  Before we begin, I'm reminded to make a public announcement as a result of the COVID-19 issue:

Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and broadcasting of court proceedings.  A violation of these prohibitions may result in sanctions, including removal of Court-issued media credentials, restricted entry to

01:31

1   future hearings, denial of entry to future hearings, or any

2   other sanctions deemed necessary by the Court.

3             Now, we are getting some kind of feedback.  Does

4   anybody know what that's about?

5             **THE DEPUTY CLERK:**  Judge, we just muted the defense

6   audio, so hopefully that won't give feedback.

7             **THE COURT:**  Okay.  Can everybody hear me?

8             **MS. UEBINGER:**  Yes, Your Honor.

9             **THE DEPUTY CLERK:**  Judge, I can hear you.

10            **THE COURT:**  I apologize.

11            Mr. Gibbens, are you going first?  Mr. Gibbens?

12            **THE DEPUTY CLERK:**  Mr. Gibbens, can you unmute your

13   audio.

14            **MR. GIBBENS:**  Yes, sir.

15            **THE DEPUTY CLERK:**  There you go.

16            **MR. GIBBENS:**  Can you hear me?  I'm sorry.

17            **THE COURT:**  Yes.  Who is going first?  Mr. Gibbens?

18            **MR. GIBBENS:**  No, sir.  Our first witness is going to

19   be Kristie Gregoire, and Mr. Magner is going to be handling her

20   testimony.

21            **THE COURT:**  All right.  Thank you.

22            Mr. Magner.

23            **MR. MAGNER:**  Thank you, Judge.

24            **MS. UEBINGER:**  Your Honor --

25            **THE COURT:**  Yes.

01:32

1       **MS. UEBINGER:** -- I'm sorry to interrupt, but
2   Ms. Miller reminded us before we start -- I'm just reading her
3   email -- to put a couple of things on the record.  She said to
4   do that before we started, just about that you overruled the
5   government's objection to the defendants calling an expert,
6   Mr. Asher, and the motion to compel the government to produce
7   the grand jury testimony of Special Agent Moore.
8           **THE COURT:**  All right.  Thank you.
9               If you-all don't mind, I can't tell who is
10  talking unless you tell me who is talking.  From now on,
11  announce yourself before you say anything.
12          **MR. EDWARDS:**  Your Honor, this is Jerry Edwards.
13          **THE COURT:**  All right.
14          **MR. EDWARDS:**  Hi, Your Honor.  I wanted to make you
15  aware of my presence regarding the *Touhy* issue if the Court
16  should need any input from me.
17          **THE COURT:**  Thank you very much.
18          **MR. EDWARDS:**  Thank you, Your Honor.
19          **THE DEPUTY CLERK:**  Judge, I am going to admit
20  Ms. Gregoire, if that's okay.  This is Cherie, Judge.
21          **THE COURT:**  Where is she?
22          **THE DEPUTY CLERK:**  I don't have video in the
23  courtroom.  I'm just on the screen, but in a black box.  Let me
24  get her real quick.  She is coming on right now.
25          **THE COURT:**  Where are we?

KRISTIE GREGOIRE - DIRECT

01:34

1    THE DEPUTY CLERK:  Judge, I'm trying to get
2  Ms. Gregoire to join the meeting.
3         Ms. Gregoire, can you please unmute.
4    MR. MAGNER:  May I begin, Judge?
5    THE COURT:  Well, if this mysterious witness is here,
6  you may begin.
7    MR. MAGNER:  I think we have got her, Judge.  Thank
8  you.
9    THE COURT:  I can't tell.  Go ahead, Mr. Magner.
10    THE DEPUTY CLERK:  Judge, I need to swear in the
11  witness.
12    THE COURT:  Thank you.
13                 KRISTIE GREGOIRE,
14  having been duly sworn, testified as follows:
15    THE DEPUTY CLERK:  Thank you.  Please state and spell
16  your full name for the record.
17    THE WITNESS:  My name is Kristie LeBeau Gregoire,
18  K-R-I-S-T-I-E, L-E-B-E-A-U, G-R-E-G-O-I-R-E.
19                DIRECT EXAMINATION
20  BY MR. MAGNER:
21  Q.    Thank you, Ms. Gregoire.  I'm Mike Magner.  I don't
22  believe we have met.  If we have, forgive me.
23         You are a supervisory special agent with the Internal
24  Revenue Service?
25  A.    Yes.

**KRISTIE GREGOIRE - DIRECT**

01:36

1   **Q.**   How long have you been with the IRS?

2   **A.**   I have been with the IRS for 20 years.

3   **Q.**   How long have you been a supervisor?

4   **A.**   It's 6 1/2 years.

5   **Q.**   You were the supervisor of Special Agent Marable in her

6   investigation of Henry Timothy?

7   **A.**   No, I was not.

8   **Q.**   Did you have any supervisory responsibilities over

9   Agent Marable?

10   **A.**   No.  She used to be in my group, and she is no longer in

11   my group.

12   **Q.**   When did she leave your group?

13   **A.**   I'm sorry?

14   **Q.**   When did she leave your group?

15   **A.**   I believe it was in 2017.

16         **THE COURT:**  Counsel, I can't hear anything.

17         **MR. MAGNER:**  Can you hear me now, Judge?  I haven't

18   been speaking for the last couple of minutes.

19         **THE WITNESS:**  I can hear you, but I can't see the

20   witness.

21         **MR. MAGNER:**  Okay.  Why don't we take a moment to see

22   if we can remedy that.

23         **THE COURT:**  Go ahead, Counsel.  Sorry.

24         **MR. MAGNER:**  Thank you.

25

## KRISTIE GREGOIRE - DIRECT

**BY MR. MAGNER:**

**Q.**   So you were just telling us, Agent Gregoire, that Agent Marable left your group in 2017, but you were the supervisor of Special Agent Tim Moore, correct?

**A.**   Correct.

**Q.**   You were aware that Special Agent Marable was investigating Henry Timothy, though, even though she had left your group?

**A.**   No, I was not.

**Q.**   When did you first learn of that?

**A.**   I guess after I received a call from my employee Jennifer Lopez-Martinez.

**Q.**   Is Special Agent Lopez-Martinez in your group?

**A.**   Correct.

**Q.**   All right.  Then you became aware that Agent Marable was investigating Henry Timothy?

**A.**   I don't know that I knew exactly who the subject of the investigation was.  I just know she was accompanying Special Agent Marable on a witness interview.

          **MR. MAGNER:**  I'm sorry, Judge?

          **THE COURT:**  No, that's all right.  Go ahead.

          **MR. MAGNER:**  Okay.

**BY MR. MAGNER:**

**Q.**   So when was that, as best you can give us the timing of when you became aware of that?

## KRISTIE GREGOIRE - DIRECT

01:39

1  **A.**   Aware of when --

2  **Q.**   Agent Marable was investigating a tax preparer.

3  **A.**   Like I said, I knew it was a tax preparer.  I don't know

4  exactly when I became aware that it was Henry Timothy.

5  **Q.**   All right.  When did you become aware that she was

6  investigating a tax preparer?  Was it in October of '18?

7  **A.**   No, no, it was not in October of '18.  Like I said, it was

8  when I received a call from my employee Special Agent

9  Lopez-Martinez, which was approximately, I guess, the first

10 week of November of 2018.

11 **Q.**   Okay.  Now, as the supervisor of Agent Moore, you have

12 been his supervisor in connection with his investigation of

13 Jason Williams and Nicole Burdett?

14 **A.**   Correct.

15 **Q.**   You have never recused yourself from that supervisory

16 responsibility, have you?

17 **A.**   No, I have not.

18 **Q.**   You became aware from Agent Martinez-Lopez [sic] that they

19 had tried to interview Jason Williams in early November of

20 2018, correct?

21 **A.**   Correct.

22        **MS. UEBINGER:**  This is Kelly Uebinger.  Objection.

23 I'm going to ask that he not lead the witness.

24        **MR. MAGNER:**  She is an adverse --

25        **THE COURT:**  Overruled.

01:41

1          MR. MAGNER:  Thank you.

2     BY MR. MAGNER:

3     Q.    She told you that she was supposed to meet with

4     Jason Williams on November 5, 2018, correct?

5     A.    November 5 sounds about right.

6     Q.    All right.  But that they were unable to meet and that the

7     meeting did not occur as scheduled, correct?

8     A.    Correct.

9     Q.    Then you transferred the Williams matter to Special

10    Agent Moore within the next day or two, correct?

11    A.    I would not classify it as a transfer.

12    Q.    How would you describe it?

13    A.    I only asked Mr. Moore, Special Agent Moore, to just take

14    a look at it.  It was not a transfer.

15    Q.    Take a look at what?

16    A.    Take a look into Mr. Williams' tax matters.

17    Q.    All right.  How soon was that after you had heard about

18    this meeting that did not occur?  Within a day or two?

19    A.    Yes, approximately.

20    Q.    Agent Moore was assigned or seconded to the FBI's public

21    corruption squad, correct?

22    A.    Yes.  He is embedded with the public corruption task force

23    at FBI.

24    Q.    All right.  Then he submitted what's known as an

25    IDRS Request on November 7, correct?

01:42

1 **A.** Yes, that sounds right.

2 **Q.** He requested Mr. Williams' tax returns?

3 **A.** I'm sure he requested tax return information.

4 **Q.** Then you agreed to this the following day, on November 8,

5 2018, correct?

6 **A.** Yes.

7 **Q.** You were aware that Mr. Williams had announced he was

8 running for district attorney, correct?

9 **A.** I don't remember when I became aware of Mr. Williams

10 running for district attorney. I can't say for sure.

11 **MR. MAGNER:** Could we please pull up Exhibit 2,

12 Defense Exhibit 2, which is the October 24 news article.

13 **MS. PARDEE:** Yes. Are you able to see it?

14 **THE WITNESS:** Yes, I am.

15 BY MR. MAGNER:

16 **Q.** All right. This news article became part of Agent Moore's

17 request for a grand jury investigation of Mr. Williams. True?

18 **A.** Yes.

19 **Q.** All right. You knew Mr. Williams and you knew who he was,

20 correct?

21 **A.** Correct.

22 **Q.** Then this article formed part of that request for a grand

23 jury investigation on the IRS form 9131, correct?

24 **A.** Correct.

25 **Q.** All right. So you were aware that Mr. Williams was a city

01:44

1  councilman, correct?

2  A.   Yes.

3  Q.   Then you became aware that he was running for district

4  attorney certainly by the time the request for a grand jury

5  investigation was made, right?

6  A.   Yes.  By that time, yes.

7  Q.   You knew Mr. Williams personally, did you not?

8  A.   Yes.  I would consider him an acquaintance, yes.

9  Q.   All right.  You knew his ex-wife, Bridget Barthelemy, too?

10 A.   Yes.

11 Q.   In fact, you are friends with Bridget Barthelemy, correct?

12 A.   I don't think I would classify it as friends.  We went to

13 school together.

14 Q.   All right.  Did you go to elementary school with

15 Bridget Barthelemy?

16 A.   Yes, I did.

17 Q.   You graduated from Ursuline together in 1991, correct?

18 A.   Correct.

19 Q.   You attended Xavier University with Bridget Barthelemy as

20 well, correct?

21 A.   Yes, but I never saw her there.

22 Q.   Okay.  I assume you were an accounting major while

23 Ms. Barthelemy was pre-med?

24 A.   Right.

25 Q.   All right.  This relationship with Ms. Barthelemy, your

01:45

1  going back to grade school with her, did that ever cause you to

2  seek a recusal of your role in the investigation of

3  Mr. Williams?

4  **A.**   No, sir.

5  **Q.**   Okay.  You were Facebook friends with Ms. Barthelemy?

6  **A.**   It's very possible, but I am very rarely on Facebook.

7  **Q.**   Okay.  You have hundreds of friends on Facebook, do you

8  not?

9  **A.**   Mr. Magner, I couldn't tell you how many friends I have on

10  Facebook.  It's something that I don't go on very often and

11  probably should just delete because it's just nothing that I am

12  ever on.

13  **Q.**   Okay.

14  **A.**   I had it for school purposes for my son.

15  **Q.**   All right.  Was there anyone else in your Ursuline class

16  of 1991 that was of relevance in this case?

17  **A.**   Not that I know of.

18  **Q.**   Wasn't Keva Landrum in your class at Ursuline?

19  **A.**   No, she was not.

20  **Q.**   What class was she in?

21  **A.**   She was, I believe, one year ahead of me.

22  **Q.**   Okay.

23  **A.**   One or two years.

24  **Q.**   So she was in the class of '90?

25  **A.**   Yes.  '90 or '89.  I cannot remember for sure.

01:46

1   **Q.**   All right.  You were aware that Ms. Barthelemy and

2   Mr. Williams had gone through a very bitter and acrimonious

3   divorce, correct?

4   **A.**   I knew they divorced.

5   **Q.**   You knew that it was a very bitter and ugly divorce,

6   correct?

7   **A.**   Mr. Magner, it wasn't my business, so I really don't know

8   much about the divorce.

9   **Q.**   Well, Ms. Barthelemy is listed as a government witness in

10   the special agent's report, is she not?

11   **A.**   Yes, she is.

12   **Q.**   All right.  You knew that the agents interviewed her and

13   that she had some very unflattering things to say about her

14   ex-husband, correct?

15   **A.**   I read the memo.

16   **Q.**   You are aware that Keva Landrum is one of Mr. Williams'

17   opponents in the district attorney's race, correct?

18   **A.**   I am.

19   **Q.**   All right.  Again, this did not cause you to seek a

20   recusal based upon a conflict of interest or an appearance of

21   conflict?

22   **A.**   No, Mr. Magner.

23   **Q.**   You travel in the same social circles as Ms. Barthelemy,

24   do you not?

25   **A.**   No, I do not.

01:48

1  **Q.**   All right.  Well, let's talk about that a little bit.  Are
2  you Facebook friends with Aziza Landrum?
3  **A.**   It's possible.
4  **Q.**   You know that that is Keva Landrum's sister, correct?
5  **A.**   Yes.
6  **Q.**   You are aware of that?
7  **A.**   Yes, I am.
8  **Q.**   Okay.  You're Facebook friends with Darlene Carter?
9  **A.**   Yes, I assume so.
10 **Q.**   She is a very good friend of Ms. Barthelemy and with
11 Ms. Barthelemy's parents, Sidney Barthelemy and his wife?
12 **A.**   I really could not tell you who Darlene is friends with.
13 **Q.**   All right.  You're aware that Jessica Jones Whitley is a
14 Facebook friend of yours?
15 **A.**   I'm sure that's possible, yes.
16 **Q.**   Well, you were in school together with them for at least
17 eight years, were you not?
18 **A.**   Mr. Magner, I am not friends with anyone from Ursuline
19 other than one person, and she has nothing to do with this
20 case.
21       **MR. MAGNER:**  All right.  Let's pull up, please, if we
22 could, the list of Facebook friends.
23       **MS. PARDEE:**  Are you able to see it?
24       **MR. MAGNER:**  I can.  Let's go to the fifth page.
25       **MS. UEBINGER:**  Your Honor, at this point --

## KRISTIE GREGOIRE - DIRECT

01:49

1   Kelly Uebinger -- I would like to object.  The government has

2   not been provided with this exhibit, and we were told that the

3   defense sent us all of the exhibits they intended to use.  I

4   have not seen this.

5           THE COURT:  Mr. Magner.

6           MR. MAGNER:  This is impeachment evidence, Judge.

7           THE COURT:  The objection is overruled.

8   BY MR. MAGNER:

9   Q.   You are Facebook friends with Marc Labat, upper right-hand

10  corner?

11  A.   Okay.  That's what it says, yes.

12  Q.   You know that she is a family friend of the Barthelemys,

13  correct?

14  A.   I don't know, Mr. Magner.

15          MR. MAGNER:  All right.  Please go to the bottom of

16  that page.

17  BY MR. MAGNER:

18  Q.   Kelder Summers-Jones, you are aware that she has hosted a

19  Keva Landrum campaign event?

20  A.   No, I was not aware of that.

21          MR. MAGNER:  Please go to the next page.

22  BY MR. MAGNER:

23  Q.   You are Facebook friends with Ingrid Labat?  Do you see

24  that?

25  A.   Okay.

01:50

**Q.**   You are aware that she is a family friend of
Ms. Barthelemy, correct?

**A.**   No, Mr. Magner, I'm not aware of that.

       **MR. MAGNER:**  Please go to the next page.

**BY MR. MAGNER:**

**Q.**   Would it be fair to say that you travel in the same social
circles as the Barthelemys?

**A.**   I responded to that earlier and it's the same answer.  I
am not.  I am not a very social person.  I don't go out.  I
have not been going out since before my son was born, and he is
seven years old.  I do not travel in the same circles.  Even
prior to his birth, I did not travel in the same circles as
Bridget or Mr. Williams.

       **MR. MAGNER:**  All right.  Please go to the next page.

**BY MR. MAGNER:**

**Q.**   There's a reference there to Kenneth Johnston.  You're
aware that he is a friend of Ms. Barthelemy's as well as you on
Facebook, correct?

**A.**   Yes.  I did not know that they were friends, but I believe
you.

**Q.**   All right.  Leslie Smith Walker, a little bit lower on
that page, she likewise is a friend of Bridget Barthelemy?  You
are aware of that, are you not?

**A.**   No, I'm not aware of that.  I don't know all of Bridget's
friends.

01:52

1          MR. MAGNER:  All right.  Well, let's go to the next

2    page, then, at the very bottom.

3    BY MR. MAGNER:

4    Q.   You see Ms. Barthelemy there.  Is that a picture of

5    Ms. Barthelemy?

6    A.   Yes.

7    Q.   That's who you went to school with at Cabrini, Ursuline,

8    and Xavier, correct?

9    A.   Yes.

10   Q.   All right.  Was this ever disclosed to your investigators?

11   A.   To whom?

12   Q.   Did you disclose this in any of the paperwork that was

13   prepared, say, for example, the special agent report that you

14   approved of Mr. Moore?

15   A.   No, it was not disclosed in the paperwork.

16   Q.   This didn't cause you any concern, this relationship you

17   had with Ms. Barthelemy, in terms of your fairness and

18   objectivity in this investigation?

19   A.   No, Mr. Magner.  I am from New Orleans.  As you know,

20   being from New Orleans, it's a very small city.  If I would

21   recuse myself from every case where I knew someone or I knew a

22   witness, I could never work a case.

23   Q.   Well, this is more than where you just knew somebody.

24   This is where a key government witness was a small-time school

25   friend of yours, correct?

01:53

1    **A.**    I would not classify her as a friend.  I said that

2    earlier.  She was a classmate, and we were never good friends.

3    **Q.**    Okay.  Gregoire is your married name?

4    **A.**    Yes.  I am divorced now.

5    **Q.**    All right.  Your ex-husband is Brandon Gregoire?

6    **A.**    That's correct.

7    **Q.**    In fact, he ran for the Orleans Parish Democratic

8    Executive Committee, which just recently endorsed Ms. Landrum

9    for district attorney.  Are you aware of that?

10   **A.**    No, I was not.

11   **Q.**    Okay.  You knew he ran for that office, did you not?

12   **A.**    Yes, I did.

13   **Q.**    He also ran for the state senate?

14   **A.**    I was aware of that.

15   **Q.**    All right.  When the report came back from Agent Moore and

16   Agent Goodson that they had interviewed Bridget Barthelemy and

17   she was very hostile to her ex-husband, did that cause you to

18   reexamine your position as to whether you should recuse in this

19   matter?

20   **A.**    No, it did not.

21   **Q.**    Should you have?

22   **A.**    No.

23   **Q.**    You are aware of the evidence that has been submitted in

24   this case showing that Billy Schultz had threatened

25   Mr. Williams?

01:55

1  A.   I am not -- I don't recall that right now.

2  Q.   All right.  If I refresh your recollection there was a

3  text message from Mr. Schultz to Mr. Williams saying that they

4  were going to go to war, and there's a picture of a little bomb

5  and a little gun and all that kind of stuff, does this refresh

6  your recollection?

7  A.   Somewhat.  I just don't remember the context or when it

8  happened or anything like that.

9  Q.   All right.  But you understand --

10        THE COURT:  I lost her face again.

11        MR. MAGNER:  I'm sorry, Judge?

12        THE WITNESS:  I'm sorry?

13        THE COURT:  No, we are struggling with this idiot

14  machine here and I can't see the witness.  Go ahead,

15  Mr. Magner.  I apologize.  Go ahead.

16        MR. MAGNER:  Thank you, Judge.  No problem.

17  BY MR. MAGNER:

18  Q.   So even though Special Agent Moore and Special Agent

19  Martinez-Lopez are on your squad -- you're aware that

20  Special Agent Moore works regularly with the FBI public

21  corruption squad, correct?

22  A.   Yes.

23  Q.   You are aware that he was working with Special Agent Todd

24  Goodson on the Jason Williams investigation going back to 2017?

25  A.   No, sir.  No.

01:56

1  **Q.**   He didn't have any involvement in that?

2  **A.**   None that I'm aware of, no.

3  **Q.**   All right.  Were you aware that there was an investigation

4  of Jason Williams?

5  **A.**   No, I was not.

6  **Q.**   When did you become aware of that?

7  **A.**   I became aware that there was, I guess, somewhat of an

8  investigation after I asked Mr. Moore, Special Agent Moore, to

9  look into the tax matters and after he requested IDRS.

10  **Q.**   Okay.  Which would have been early November, correct?

11  **A.**   Of 2018.

12  **Q.**   As we saw, that would have been about two weeks after

13  Mr. Williams had announced that he was running for district

14  attorney, correct?

15  **A.**   Yes.

16  **Q.**   What did Agent Moore tell you about that FBI

17  investigation?

18          **MS. UEBINGER:**  Your Honor, objection.  Hearsay.

19          **THE COURT:**  Overruled.

20          **MS. UEBINGER:**  He can ask Agent Moore that.

21  Your Honor, Agent Moore is going to be a witness.  He can

22  testify to what he told her.

23          **THE COURT:**  The objection is overruled.  Thank you,

24  Counsel.

25

## KRISTIE GREGOIRE - DIRECT

01:57

**BY MR. MAGNER:**

**Q.**   What did Agent Moore tell you about the investigation of Mr. Williams?

**A.**   I believe what he told me were there were possible allegations of kickbacks.

**Q.**   All right.

**A.**   I don't really remember anything beyond that.

**Q.**   Did you familiarize yourself with the status of the investigation, then, in early November of '18?

**A.**   What do you mean, "familiarize" myself?

**Q.**   Become familiar with the nature of the investigation that your agent, Agent Goodson, was assisting the FBI with?

**A.**   No.  Mr. Goodson is not my agent, and there was no need for me to involve myself in what the FBI was investigating.  We were just focused on what IRS-CI was doing.

**Q.**   I misspoke.  Did you become aware of what Special Agent Moore was involved with in terms of the FBI's investigation of Mr. Williams?

**A.**   Well, I was aware of what Mr. Moore was doing.

**Q.**   Right.  He was working in conjunction with the FBI squad, right?

**A.**   Yes, but Mr. Moore is a very senior agent.  I don't know what he does on a daily basis.  He keeps me apprised of activities.  Once I gave him the information, I just let him do what he needed to do.

01:59

**Q.** You would have to sign off on his reports, correct?

**A.** Correct.

**Q.** You signed off on his original preliminary investigation, correct?

**A.** Primary investigation, yes.

**Q.** Then you signed off on his grand jury investigation in January of 2019, right?

**A.** Correct.

**Q.** You would monitor his work and review his special agent reports as the investigation continued, correct?

**A.** Yes, that's correct.

**Q.** By the time Agent Moore became involved in this Title 26 tax investigation of Mr. Williams, you were aware that the matter had been transferred to AUSA Uebinger that previous summer, correct?

**A.** Yes.

**Q.** All right. You were aware that AUSA Uebinger had told you that the Title 18 violations, the FBI violations, were not going to be prosecuted, correct?

**A.** I never had a conversation with AUSA Uebinger at that time, no.

**Q.** Well, didn't Agent Moore tell you that the FBI investigation had stalled and was not going to result in any FBI violations?

**A.** I believe at some point he told me they didn't have

02:01

1  anything, but I cannot recall when exactly that was.

2  **Q.**   All right.  So they told you that there had been

3  allegations about Mr. Williams, that the FBI didn't have

4  anything, that the investigation hadn't panned out, and then

5  the IRS became involved in its tax investigation of

6  Mr. Williams?

7  **A.**   No, no, no, no.  No, that's not correct, Mr. Magner.

8  **Q.**   When did you learn that?

9  **A.**   Mr. Moore was always following any tax-related

10  allegations.  So from the very beginning Mr. Moore was looking

11  at tax-related allegations.

12  **Q.**   I understand that, but when did Agent Moore tell you that

13  the FBI didn't have anything, to use your words?

14  **A.**   That I can't recall.

15  **Q.**   All right.  Isn't it true that this pursuit of this tax

16  investigation of Mr. Williams was just pretextual to be able to

17  reopen a cold and stale investigation?

18  **A.**   What cold and stale investigation?

19  **Q.**   The FBI investigation where, as you just told us, the FBI

20  didn't have anything?

21  **A.**   No, sir.  We were not even aware that Mr. Williams was

22  being investigated by FBI when I gave Mr. Moore the

23  information.

24  **Q.**   Well, Special Agent Moore was certainly aware that the FBI

25  had been investigating Mr. Williams and had come up short,

02:02

1    right?

2    A.   I don't think he was aware of -- I don't know for sure,

3    but I don't think he was aware that FBI had an investigation

4    when I first gave that to him.

5    Q.   You understand that Special Agent Moore has a cubicle at

6    the FBI office on Leon C. Simon, correct?

7    A.   That is correct.

8    Q.   You understand that he sits within feet of Special Agent

9    Goodson of the FBI, correct?

10   A.   I don't know exactly where they sit, you know, in

11   comparison to one another.

12   Q.   You know that they are in the same bullpen, for lack of a

13   better word, right?

14   A.   Yes, I'm sure that's correct.

15   Q.   He has worked over the last 10 years regularly with all

16   those FBI corruption agents, correct?

17   A.   That is correct.  Mr. Magner, they do not talk about

18   investigations with each other unless they are working together

19   on it.

20   Q.   All right.  We will get to that in just a moment.

21        You later became aware that the FBI with the original

22   AUSA, Mr. Menon, and then with the later AUSA, Ms. Uebinger,

23   had subpoenaed all of or most of Mr. Williams' bank statements,

24   credit card records, credit history, and so forth, right?

25   A.   I don't get that involved in that part of the

02:04

1    investigation.  That is what we usually do.  That would make

2    sense, but I don't get involved in subpoenas.

3    **Q.**   Give me your best estimate of when Special Agent Moore

4    told you that the FBI didn't have anything.

5    **A.**   I would assume that had to be well into 2019.  I don't

6    know.  I really don't feel comfortable saying exactly when

7    because I don't recall.

8    **Q.**   All right.  Have you spoken with Special Agent Moore since

9    that time to determine what, if any, work he had done or

10   knowledge he had about the investigation of Mr. Williams before

11   November 7, 2018?  Have you since discussed that with him?

12   **A.**   Of any knowledge he had before then?

13   **Q.**   Yes.

14   **A.**   I'm not aware that Mr. Moore had any knowledge of the

15   investigation before then.  Are you still speaking about the

16   FBI investigation?

17   **Q.**   Yes, ma'am.  When can you place that?

18   **A.**   I'm sorry?

19   **Q.**   As best you can, what have you discussed with Agent Moore

20   related to what he told you, that the FBI didn't have anything

21   on Mr. Williams?

22   **A.**   That was never really a conversation, Mr. Magner, because

23   it wasn't really a concern of ours.  I was just focused on IRS

24   violations.

25   **Q.**   All right.

02:06

1          **THE COURT:**  What's your next question, Mr. Magner?

2          **MR. MAGNER:**  Yes, Judge.

3  **BY MR. MAGNER:**

4  **Q.**    What did Agent Martinez-Lopez tell you about the attempt

5  to interview Mr. Williams on or about November 5, 2018?

6  **A.**    She told me they had tried to conduct or attempt to

7  conduct a witness interview for one of Special Agent Marable's

8  cases.  She was just trying to keep me abreast of where she was

9  because she was out in the field.  During the conversation she

10  mentioned that it was Jason Williams, and that's how I found

11  out.

12  **Q.**    What did she tell you, though, about this attempt to

13  interview Mr. Williams?

14  **A.**    That they had been unsuccessful.

15  **Q.**    Okay.  Did she tell you why?

16  **A.**    She just said they tried to locate him, I believe, at his

17  house and at his office, and they had not been able to meet

18  with him.

19  **Q.**    All right.  Did she tell you that the first time that they

20  went to speak with Mr. Williams they cold-called him first

21  thing in the morning?

22  **A.**    No, I don't know all of that.

23  **Q.**    All right.  Did she tell you that they had set up an

24  interview but that Mr. Williams was unable to attend?

25  **A.**    I believe she did mention something about setting up an

02:08

1  appointment, but he never showed.

2  **Q.**   Okay.  Did she tell you that they had scheduled the

3  appointment, then, for the next day, November 6?

4  **A.**   I don't recall that part of the conversation, no.

5  **Q.**   Are you aware that, in fact, Special Agent Marable

6  canceled that follow-up interview of November 6 due to an

7  emergency?

8  **A.**   I was only aware of that looking at your exhibits.

9  **Q.**   Okay.  Were you aware that Marable and Martinez-Lopez were

10  attempting to interview Mr. Williams because he was a client of

11  a tax preparer that they were investigating?

12  **A.**   Yes.

13  **Q.**   Okay.  Do you know of any other clients that they

14  attempted to interview who were clients of the same tax

15  preparer?

16  **A.**   No.

17  **Q.**   To your knowledge, did they attempt to interview any other

18  clients of the tax preparer in the fall of 2018?

19  **A.**   No, I would not be aware of that because, like I said,

20  Ms. Marable is not my employee.

21  **Q.**   Okay.  Lopez-Martinez was in your group, correct?

22  **A.**   Correct.

23  **Q.**   All right.  Did you ask her what it was that they were

24  trying to interview Jason Williams about?

25  **A.**   She just said he was a witness in one of Special Agent

02:09 1    Marable's cases.

2    **Q.**    All right.  How soon after Martinez-Lopez told you that

3    they were unable to meet did you suggest that this be lateraled

4    over to Tim Moore?

5    **A.**    I never made that suggestion to Special Agent

6    Lopez-Martinez.

7    **Q.**    You just made it to Special Agent Moore?

8    **A.**    I just spoke with him after I spoke with Special Agent

9    Martinez and asked him to just look into it.

10    **Q.**    All right.  You did that because Mr. Williams was a public

11    official?

12    **A.**    Not at all.

13    **Q.**    Why would you ask your special agent who is assigned to

14    the public corruption squad to look at it?  Why him of any

15    other agent?

16    **A.**    Well, because he was a public official, Mr. Moore is in

17    the public corruption task force, but I wasn't asking him to

18    look into him just because he was a public official.

19    **Q.**    Okay.  So maybe we are, like, tripping over each other.

20    You hear they attempted to interview Mr. Williams, it was

21    unsuccessful, and so you asked Special Agent Moore to look into

22    the matter further because he was a public official?

23    **A.**    Because Mr. Moore is on the public corruption task force.

24    **Q.**    Right.  That investigates public officials, correct?

25    **A.**    Correct.

02:11 1    Q.   All right.

2            THE COURT:  Excuse me.  Ms. Gregoire, I'm unclear

3    about something.  If Agent Moore deals with public corruption,

4    why would the fact that Mr. Williams had not been able to be

5    interviewed suggest to you that there was public corruption

6    involved?

7            THE WITNESS:  It did not.  It did not, Judge.

8            THE COURT:  Well, then why would you refer this to

9    Agent Moore?

10            THE WITNESS:  Well, because Agent Moore -- it's

11    called the public corruption task force, but public corruption

12    can be just public officials, and Mr. Moore is accustomed to

13    dealing with sensitive individuals.

14    BY MR. MAGNER:

15    Q.   What did you want Special Agent Moore to look into?

16    A.   If there was anything in regards to tax allegations.

17    Q.   Okay.  All you knew at this point was that he was a client

18    of a tax preparer that Special Agent Marable and Lopez-Martinez

19    were investigating, right?

20    A.   Correct.

21    Q.   Based on what?

22    A.   I'm sorry?

23    Q.   Why did you suggest this to Moore, that he look into it?

24    What was that based on other than he was a public official and

25    Moore investigates public officials?

02:13

1  A.   Because one of the comments that Special Agent

2  Lopez-Martinez made to me was that his tax return appeared to

3  be egregious.

4  Q.   Okay.  Did you look at any of these tax returns?

5  A.   No, I did not.

6  Q.   Did she tell you that it was actually less egregious than

7  hundreds of other clients of that same tax preparer?

8  A.   No.  She only called me about Mr. Williams.

9  Q.   Okay.  Did she actually talk numbers, you know, of what

10 was on the Schedule C or anything like that?

11 A.   No, she did not.

12 Q.   Did Martinez-Lopez say why they had singled Jason Williams

13 out of all the other clients?

14 A.   I am sure they did not single him out.  Our customary

15 procedure is to interview numerous witnesses in a tax

16 preparation investigation, not just one.

17 Q.   Right.  I would think that would be so, but are you aware

18 of the fact that, at least from the records that have been

19 produced to date, he is the only client that was interviewed by

20 Marable and Martinez-Lopez in the fall of 2018?  Were you aware

21 of that?

22 A.   No, I was not.

23 Q.   Okay.  Did this cause you any concern that they were

24 focusing on a public official simply because he was a public

25 official?

02:14

1  A.    Well, that is not what I believe they were doing.

2  Q.    What did you think they were doing?

3  A.    Going out to interview a witness that was part of an

4  investigation.

5  Q.    All right.  They don't meet on the 5th.  Did you suggest

6  that they try again the next morning?

7  A.    No.

8  Q.    Did you become aware that, in fact, an appointment had

9  been set up for the next morning?

10  A.    I don't recall if I knew there was an appointment already

11  set up or not.

12  Q.    Do you know who, if anybody, suggested that Special Agent

13  Marable cancel that appointment?

14  A.    I suggested to Special Agent Lopez-Martinez -- that was

15  the only person that I spoke to.  I did not speak to

16  Special Agent Marable -- that they not go and attempt another

17  interview with Mr. Williams.

18  Q.    I'm sorry.  You suggested that they not attempt to

19  interview him again?

20  A.    Yes.

21  Q.    Okay.  Why?

22  A.    As a courtesy.

23  Q.    To whom?

24  A.    Mr. Williams.

25  Q.    Okay.  I'm not understanding.  So they attempt to

02:16   1    interview Mr. Williams on the 5th.  As we have since

2    discovered, he was at the urgent care that afternoon.  Then

3    another interview is set up the following morning or the

4    following day --

5              **MS. UEBINGER:**  Your Honor, I'm going to object.  I'm

6    going to object -- this is Kelly Uebinger -- to Mr. Magner

7    stating facts not in evidence about him at the urgent care.

8              **THE COURT:**  The objection is sustained.

9    **BY MR. MAGNER:**

10   **Q.**   All right.  So what I'm trying to understand is so another

11   meeting is scheduled for November 6, but you suggest that it be

12   canceled as a courtesy to Mr. Williams?

13   **A.**   I did not say that it should be canceled because I didn't

14   know the ins and outs of whatever they had set up.  I just said

15   do not make another attempt to interview Mr. Williams.

16   **Q.**   You said that that was as a courtesy to Mr. Williams?

17   **A.**   Yes.

18   **Q.**   Okay.  How would that have been a courtesy to

19   Mr. Williams?

20   **A.**   Because he is a sitting councilman for New Orleans.

21   **Q.**   So you suggested they not meet with him the next day, you

22   referred to a public corruption IRS agent, and you're saying

23   this was all as a courtesy to Mr. Williams as a city

24   councilman?

25   **A.**   It wasn't simultaneously --

02:17

1    **Q.**   That's what you said, didn't you?

2    **A.**   It wasn't simultaneously as you're stating it, though,

3    Mr. Magner.

4    **Q.**   All right.  Well, what lapse of time was there?

5    **A.**   Perhaps a day or so.

6    **Q.**   All right.  So was that missed meeting on November 5 the

7    sole basis for referring Mr. Williams to the special agent?

8    Was there any other factor?

9    **A.**   No.

10           **MR. MAGNER:**  Okay.  Let's please pull up Defense

11   Exhibit 10.

12           **MS. PARDEE:**  Are you able to see it?

13           **MR. MAGNER:**  No.

14           **MS. PARDEE:**  Are y'all able to see?

15           **MR. MAGNER:**  We've got it now.  Thank you.

16   BY MR. MAGNER:

17   **Q.**   All right.  This is the IDRS Request Form that Agent Moore

18   prepared, correct?

19   **A.**   Correct.

20   **Q.**   What does that stand for, IDRS?

21   **A.**   I'm sorry?

22   **Q.**   Excuse me.  What does IDRS stand for?

23   **A.**   Oh, Mr. Magner, you are going to get me right now.  We use

24   acronyms so often.  Information --

25   **Q.**   Well, I don't want you to guess.  I don't want you to

02:19

1    guess.

2    A.    Yeah.  Information, and S is for system.

3         MR. MAGNER:  Okay.  If you could just scroll to the

4    bottom for just a moment.

5    BY MR. MAGNER:

6    Q.    That is your e-signature there approving this IDRS form,

7    right?

8    A.    Correct.

9         MR. MAGNER:  All right.  Now go back up to the top.

10   BY MR. MAGNER:

11   Q.    There's a reference there to "Subject/Primary Name:

12   Information Item."  Do you see that?

13   A.    Yes.

14   Q.    An information item is a term of art at the IRS, is it

15   not?

16   A.    It's a term -- I'm sorry?

17   Q.    It's a term of art at the IRS?

18   A.    Meaning?

19   Q.    What does it mean?

20   A.    It's just exactly what it says.  It's an information item

21   that we don't have a case on yet.

22        MR. MAGNER:  All right.  I'm going to introduce this

23   into evidence.  This is our Exhibit 10.

24        THE COURT:  So ordered.

25        MS. UEBINGER:  No objection from the government.

KRISTIE GREGOIRE - DIRECT

02:20

1      **THE COURT:**  So ordered.

2      **MR. MAGNER:**  Thank you.

3      **THE COURT:**  Mr. Magner, let me remind counsel that

4    you-all have until 5:00.

5      **MR. MAGNER:**  Yes, sir.

6           Could you please pull up Exhibit 15.

7    BY MR. MAGNER:

8    **Q.**   This is an Information Referral, correct?

9    **A.**   Yes, that's correct.

10   **Q.**   So this is basically a paper trail for when you receive a

11   tip or you receive information to start a preliminary

12   investigation of somebody, right?

13   **A.**   No, that's not how it's handled.

14   **Q.**   How is it handled?

15   **A.**   Information Referral items usually -- this is typically --

16   they come from the civil side and are sent to criminal

17   investigation, our division, or they could be completed by the

18   public and then sent to us.

19   **Q.**   Right.

20   **A.**   That is not a form that CI uses, criminal investigation

21   uses for our own purposes to fill out something to give to

22   ourselves.  We don't fill it out to give it to ourselves.

23   **Q.**   So other than the IDRS form that we just looked at,

24   Exhibit 10, was there any written document other than that

25   which authorized Agent Moore to pull Mr. Williams' tax returns?

02:22

1   A.   No, sir.

2   Q.   Okay.  The reason why you would want it documented why

3   there has been the opening of this preliminary matter is to

4   avoid any abuses by IRS personnel, correct?

5   A.   Right.  We always have to have an IDRS form because we

6   have professional staff who pull the IDRS information, the

7   taxpayer information for us, and all of that has to be

8   documented and saved.

9   Q.   All right.  So just so we are clear, this Exhibit 15 here,

10  the 3949-A form, this was never completed in connection with

11  the referral to Agent Moore, was it?

12  A.   No, sir.

13         MR. MAGNER:  All right.  Please go back to

14  Exhibit 10, the IDRS form.

15  BY MR. MAGNER:

16  Q.   Okay.  So this was the sole paperwork that allowed

17  Agent Moore to obtain Mr. Williams' and Bridget Barthelemy's

18  tax returns?

19  A.   Yes, sir.

20  Q.   There's no justifications on this form for pulling those

21  tax returns, are there?

22  A.   Well, it's telling you exactly what it is.  It's an

23  information item.  So that is the --

24  Q.   Right.

25  A.   Right.

02:23

1  Q.    Right.  There is no information item reflected in this
2  form, is there?
3  A.    No, other than where you see the "Subject/Primary Name."
4  Q.    So this is the sole IRS paperwork that allowed Agent Moore
5  to pull Mr. Williams' and Ms. Barthelemy's tax returns for an
6  extended period of time, 2012 to 2017, correct?
7  A.    That's correct.
8  Q.    Right.  Shouldn't there be documentation of why such a
9  request is made to avoid questioning later on that somebody is
10 doing this for improper motives or on a whim or with a lack of
11 supervision?  Shouldn't there be some documentation?
12 A.    Per IRS policy, sir, an IDRS Request Form and if you label
13 it "information item," it's signed by the supervisor, and then
14 it's sent to, as you will see if you scroll down -- if you can
15 scroll down for me, please.
16 Q.    Yes.
17 A.    There's an IDRS operator that actually pulls it, and that
18 is saved and filed.  So if there is any issue that comes up
19 later, that information is there.  It's saved.  It's
20 documented.  There is no other document that is needed per IRS
21 policies or procedures on an information item.  There is
22 additional documentation that is needed if you were to open an
23 investigation.
24 Q.    Okay.  Again, I don't want to belabor the point, but this
25 is the only paperwork that Agent Moore needed to prepare in

02:25

1  order to obtain Jason Williams' tax returns at your suggestion,

2  correct?

3  **A.**    Correct.

4  **Q.**    Did you pull any other IDRS Request Forms for any of the

5  tax preparer's other clients?

6  **A.**    I would not be aware of that, sir.  That would have been

7  signed by Special Agent Marable's supervisor.

8  **Q.**    Have any other IDRS forms come to your attention?

9  **A.**    I am not aware because I am not Special Agent Marable's

10  supervisor.

11  **Q.**    All right.  What happened to Special Agent Marable's

12  investigation of Henry Timothy, to your knowledge?

13  **A.**    From my knowledge, I believe she recommended a prosecution

14  for Mr. Timothy.  I am unsure as to where that is.

15  **Q.**    Was her investigation put on hold while the Jason Williams

16  investigation went forward?

17  **A.**    Not that I'm aware of, sir, no.

18  **Q.**    Do you know why there does not appear to be any continued

19  investigation of the tax preparer, as tax preparer, after you

20  made the referral to Agent Moore?

21  **A.**    I would not know because, again, I'm not Special Agent

22  Marable's supervisor.

23  **Q.**    Did you discuss putting the Henry Timothy investigation on

24  hold with Marable's supervisor?

25  **A.**    No, I did not.

02:26

1   **Q.**   Who is her supervisor?

2   **A.**   Justin Benson.

3   **Q.**   Is he in New Orleans or Baton Rouge?

4   **A.**   In Baton Rouge.

5   **Q.**   I'm sorry.  Did you say that the other supervisor is in

6   Baton Rouge?

7   **A.**   Correct.

8   **Q.**   All right.  Have you had any discussions with him about

9   these issues?

10  **A.**   Not at all.

11  **Q.**   When you signed off on the preliminary investigation of

12  Williams -- I'm sorry.  Strike that.

13          When you signed off on the special agent's report

14  authorizing a prosecution of Mr. Williams and Ms. Burdett, did

15  you review the Memorandum of Interview of Mr. Timothy?

16  **A.**   I don't think I did.

17  **Q.**   So, then, you weren't aware that this government

18  witness -- Mr. Timothy, who is also a witness now in the

19  Jason Williams case, you were not even aware that he had lied

20  about his bank accounts?

21  **A.**   No.

22  **Q.**   You were not aware that he lied about his gambling habits?

23  **A.**   No.

24  **Q.**   Were you aware that in his initial interview with agents

25  Moore and Goodson, he said nothing about Ms. Burdett prevailing

02:28

1    upon him to change the Schedule C deductions?

2    **A.**    I'm sorry.  Can you repeat the question, Mr. Magner?

3    **Q.**    Sure.  It wasn't a very good question.

4          You did become aware that when Moore and Goodson

5    first interviewed Timothy in April of 2019 that he did not say

6    anything about Ms. Burdett pressuring him to change deductions?

7    **A.**    I didn't get into Mr. Timothy's interview in detail.  I

8    don't know the ins and outs of that.

9    **Q.**    Well, you understand that in Agent Moore's report, the

10   gist of it is that he says that Ms. Burdett intimidated him and

11   made him change the deductions to lower Williams' and Burdett's

12   income tax?  You are aware that that's the allegation, right?

13   **A.**    Wait.  I'm sorry.  Repeat that again.

14   **Q.**    Yes.  You're aware that in Moore's special agent report --

15   **A.**    Yes.

16   **Q.**    -- he says that Timothy told him that Burdett urged him to

17   change the business deductions?

18   **A.**    Yes.  I am aware of that, yes.

19   **Q.**    All right.  Were you aware that when they first

20   interviewed Timothy, he said nothing of that kind, nothing of

21   that sort?

22   **A.**    I can't say that I recall that.

23   **Q.**    Is there any mention in the text of the special agent

24   report about Timothy's false statements?

25   **A.**    I don't recall.

02:30

1  **Q.**   Okay.  Weren't you charged with reviewing the special
2  agent report to determine whether or not the government can
3  prove its case beyond a reasonable doubt?
4  **A.**   Yes.
5  **Q.**   Okay.  Were you aware that when Moore and Goodson
6  interviewed Timothy the second time, in November of 2019, that
7  he initially did not say anything about Burdett urging him to
8  change the deduction?
9  **A.**   Wait.  Mr. Magner, you're saying the second time?  I
10  thought you just said that's when -- repeat the question,
11  please.
12  **Q.**   I will.  You were aware that Moore and Goodson interviewed
13  Timothy again in November of 2019, correct?
14  **A.**   I can't say that I recall the date.  I don't know.
15  **Q.**   Well, are you aware that there was a second interview?
16  **A.**   Yes, that sounds familiar.
17  **Q.**   Okay.  And that at the first part of that interview,
18  Timothy said nothing about Burdett urging him to change the
19  business deductions, correct?
20  **A.**   I would have to look at the Memorandum of Interview to
21  refresh my memory.
22  **Q.**   All right.  Sitting here today, you weren't aware that at
23  least at the first part of that November '19 interview, there
24  was nothing that was inculpatory of Ms. Burdett or
25  Mr. Williams?

02:32

1   A.   Mr. Magner, I have many employees and they conduct a lot

2   of interviews.  I cannot remember every single detail of all of

3   their interviews.

4   Q.   All right.  So you just don't remember?

5   A.   Exactly, and that's what I'm saying.  I just don't recall.

6   Q.   Okay.  You understand that that is the defense's primary

7   defense was that Timothy completely changed his story, right?

8           THE COURT:  Well, Mr. Magner, the issues that we are

9   here about today deal with selective and vindictive

10  prosecution, not guilt or innocence, so I'm going to ask you to

11  move on to something else.

12          MR. MAGNER:  I will.  I will.

13  BY MR. MAGNER:

14  Q.   Were you aware that Timothy falsely claimed to be a CPA

15  when he wasn't?

16  A.   I know there were some issues surrounding that.

17  Q.   Were you aware that he falsely claimed to have an MBA when

18  he didn't?

19  A.   I don't recall that.

20  Q.   All right.  So getting down into the weeds and the details

21  of the facts of this case, that's not anything you were

22  involved in?

23  A.   I'm involved to the extent that I review my special

24  agents' reports, any written products that they send to me, to

25  ensure that we have proven the case beyond a reasonable doubt,

02:33

1  and then it goes on to further reviewers.  I cannot keep track
2  of every single detail of every case.
3  **Q.**  Would any of those --
4  **A.**  I have over 200 cases that I have to keep track of for my
5  group.  I cannot keep track of every single detail.
6  **Q.**  All right.  So I take it, then, you rely on your agents,
7  on your field agents, to be truthful and accurate in their
8  reports?
9  **A.**  Well, that's what they took an oath to do, to be truthful,
10  all of us.
11  **Q.**  Right.  The special agent report, would you expect that
12  that would be a fair and accurate analysis of the evidence for
13  and against a prosecution?
14  **A.**  Yes.
15  **Q.**  Okay.  It's supposed to contain not just the stuff that's
16  favorable for the government, but any weak points in the case
17  that need to be considered, right?
18  **A.**  Any possible rebuttals, yes.
19  **Q.**  Okay.  You relied on Mr. Moore to be fair and accurate in
20  his rendition of those facts, correct?
21  **A.**  Yes.
22  **Q.**  All right.  Were you aware that Special Agent Moore
23  subpoenaed Ms. Burdett's family members on the day of our last
24  hearing in this matter?
25  **A.**  I don't know that I knew it was the same day as the

02:35

1   hearing, but I knew they were subpoenaed.

2   **Q.**   All right.  Did he discuss that with you, that he was

3   going to go subpoena all these family members on the day of the

4   last hearing?

5   **A.**   I knew he was going to subpoena the family members.

6   **Q.**   Were you aware that the previous subpoenas in this case

7   had all been accepted by counsel?

8   **A.**   No, I can't say that I recall that.

9   **Q.**   All right.  Were you aware that within the last week

10   Agent Moore has attempted to -- well, strike that.

11          Were you aware that Agent Moore interviewed

12   Ms. Burdett's hairdresser?

13   **A.**   Yes, I think he said he was going out to interview a

14   hairdresser.

15   **Q.**   Okay.  Were you aware that when he did that, he discussed

16   whether people were having affairs, romantic affairs?

17   **A.**   I think he mentioned something about that.

18   **Q.**   Okay.  Were you aware that within the last week or so,

19   Agent Moore subpoenaed Ms. Burdett's cleaning lady?

20   **A.**   No, I don't know that.

21   **Q.**   You signed off on a special agent report that allowed for

22   prosecution of Mr. Williams and Ms. Moore [sic] for Title 31

23   violations.  Are you aware of that?

24   **A.**   Yes.

25   **Q.**   Are you aware of any other instances for people in the

02:37

1  Eastern District of Louisiana who have been prosecuted for

2  those statutory violations?

3  A.   You mean anyone in the Eastern District?

4  Q.   Yes.

5  A.   I would not know that information.

6        MR. MAGNER:  Okay.  Would you please pull up

7  Exhibit 4.

8  BY MR. MAGNER:

9  Q.   If I represented to you that nobody, as long as we have

10 been able to determine on PACER, has ever been prosecuted in

11 this district for a violation of Title 31, § 5331 and § 5332,

12 would that surprise you?

13        MS. PARDEE:  I'm having trouble with the screen

14 share.  Are y'all able to see that?

15 BY MR. MAGNER:

16 Q.   I don't want to waste any of the --

17 A.   I'm sorry.  Can you repeat that, Mr. Magner.

18 Q.   Sure.  Are you aware of anybody in the Eastern District of

19 Louisiana ever being prosecuted for violations of Title 31,

20 § 5331 or § 5332?

21 A.   I know we have investigated those, but I can't say for

22 sure that someone has been prosecuted or a case has been

23 adjudicated.

24 Q.   You can't think of anybody else --

25 A.   It's an investigation into violations that obviously we

02:38

1    can investigate and we do look at it, but I couldn't tell you

2    if someone has been prosecuted, successfully prosecuted with

3    it.

4                MR. MAGNER:  Just one moment, Your Honor.

5                MS. PARDEE:  I can't get it to work.

6                MR. MAGNER:  I'll tender the witness, Your Honor.

7                THE COURT:  Thank you.

8                Any examination from the government?

9                MS. UEBINGER:  Yes, Your Honor.  Thank you.

10                        CROSS-EXAMINATION

11   BY MS. UEBINGER:

12   Q.   Agent Gregoire, Mr. Magner asked you numerous questions

13   about Agent Moore's finalized report on the Jason Williams and

14   Nicole Burdett case, about what you can and can't remember.  Is

15   it fair to say that at the time you reviewed his report, before

16   you signed off on it you would have read the report in its

17   entirety?

18                THE COURT:  I can't see.  It's frozen.

19                THE WITNESS:  Yes, that's correct.

20                THE COURT:  Next question.

21   BY MS. UEBINGER:

22   Q.   I'm sorry.  I couldn't hear your response.  Would you have

23   read the report --

24   A.   I said yes, that's correct, I would have read it in its

25   entirety.

02:39

1  **Q.**  Once that report is submitted to you -- and I'm talking
2  about the finalized report.  Can you explain to us what the
3  chain of command would have been for that particular report
4  authorizing the prosecution of the case.  Can you authorize
5  that?
6  **A.**  No, definitely not.  No, I cannot authorize it.  So once I
7  sign it, then it actually goes to our internal criminal tax
8  division.  Our criminal tax division -- actually, I'm sorry.
9  Before criminal tax, we also have centralized case review.
10  Criminal tax reviews it.  Centralized case review reviews it.
11  Then if they concur that the evidence is there and everything
12  is okay, then it's sent to my ASAC, assistant special agent in
13  charge.  He reviews it.  Then after he reviews it, it's sent to
14  the special agent in charge, who has the authority to approve
15  it prior to it going to DOJ tax, who then has to actually
16  authorize the charges, the violations.
17  **Q.**  Okay.  The assistant special agent in charge, is he
18  someone who is in New Orleans?
19  **A.**  Yes, he is.
20  **Q.**  What about the special agent in charge?  Is he in Atlanta?
21  **A.**  Yes, he is.
22  **Q.**  So once it gets past that level, is it your testimony that
23  it then goes to DOJ tax for approval before it can be presented
24  to the grand jury?
25  **A.**  Correct.

02:41

1   **Q.**   Before that happens, are you aware that it has to be
2   approved by my U.S. attorney, my first assistant, and
3   supervisors within the U.S. Attorney's Office?
4   **A.**   That's correct, yes, I'm aware.
5   **Q.**   Were all of those steps taken in this case in getting the
6   authorization to present the case against Jason Williams and
7   Nicole Burdett?
8   **A.**   Yes, that's correct.
9   **Q.**   All right.  I want to quickly go back to your conversation
10  with Special Agent Lopez-Martinez.  You recall that you spoke
11  with her during the first week of November of 2018; is that
12  correct?
13  **A.**   Yes.
14  **Q.**   Would that conversation have taken place soon after she
15  left Mr. Williams' office?
16  **A.**   I believe so.
17  **Q.**   Was it your understanding that they had a meeting set, but
18  for whatever reason Mr. Williams didn't show up, so they left
19  his office?  Is that correct?
20  **A.**   Yes.  I believe they waited for a while.
21  **Q.**   After you spoke with Agent Martinez, what action did you
22  decide to take?
23  **A.**   At that point I decided to talk to another one of my
24  agents, Timothy Moore, and ask him to just see if there was
25  anything in respect to possible tax violations with

02:42

1    Mr. Williams.

2    **Q.**    Did you do that because Agent Lopez-Martinez mentioned to

3    you that Jason Williams' tax returns looked egregious?

4    **A.**    Correct.

5    **Q.**    So as a supervisory agent, when an agent under you tells

6    you that someone's tax returns look egregious, do you have an

7    obligation to then take some action at that point?

8    **A.**    I do.

9    **Q.**    You also testified that you told Agent Martinez not to try

10   to interview Mr. Williams again, correct?

11   **A.**    That's correct.

12   **Q.**    Did you ever tell Agent Martinez or Agent Marable or

13   Agent Moore, "Oh, he wants to talk.  Go ahead and keep calling

14   until you can get another interview.  Try to pin him down," or

15   anything to that effect?

16   **A.**    Definitely not.

17   **Q.**    Why not?

18   **A.**    Because I didn't want to harass him.  As I said before, he

19   is a sitting councilman.  I wanted to extend him some courtesy.

20   I did not want to harass him.

21   **Q.**    Mr. Magner asked you numerous questions about another

22   meeting set on November 6, 2018, but it's your testimony that

23   you told those agents to stand down and not to go meet with

24   him; is that correct?

25   **A.**    That's correct.

02:43

1  **Q.**   When you spoke with Agent Moore, did you tell him that he

2  should look into this and make this a top priority?

3  **A.**   I just asked him to look into it, and that's what we do.

4  **Q.**   What specifically did you want him to look into?

5  **A.**   If what Special Agent Lopez-Martinez said, if there was

6  anything egregious on his tax returns; if not, then no worries.

7  **Q.**   If he had not have found anything, what would have

8  happened with the matter?

9  **A.**   Nothing.  It wouldn't have gone anywhere.

10  **Q.**   Did you ask Agent Moore to look into this matter because

11  you and the other agents were angry because Jason Williams

12  didn't show up for the meeting on November 5?

13  **A.**   Definitely not.

14  **Q.**   Did Agent Marable appear, when you spoke with her, or did

15  she sound like she was irate or angry because he didn't meet

16  with her?

17  **A.**   No.  I actually never even spoke to Special Agent Marable.

18  **Q.**   What about Agent Lopez-Martinez?

19  **A.**   No, she did not appear or sound to be angry.  No.

20  **Q.**   Were you a field agent before you were a supervisor?

21  **A.**   I was.

22  **Q.**   Is it common for people not to want to talk to the IRS?

23  **A.**   Very common.

24  **Q.**   Did you ask Agent Moore to look into this matter because

25  Mr. Williams is a black person?

02:45

1   **A.**    No.  I'm black, so I would not have anyone look into

2   someone because they are black.

3   **Q.**    Did you ask Agent Moore to look into this matter because

4   he was a sitting city councilman for the City of New Orleans?

5   **A.**    No.  Again, it was because of the "egregious" comment.

6   **Q.**    Did it have anything to do with the fact that he had

7   declared in October of 2018 that he was considering running for

8   district attorney?

9   **A.**    Definitely not.

10  **Q.**    Now, Mr. Magner asked you numerous questions about your

11  relationship with Mr. Williams and his ex-wife.  When is the

12  last time you have seen Mr. Williams in a social capacity?

13  Other than on TV or in the newspaper, when is the last time you

14  have seen him in person?

15  **A.**    It's been so many years, I can't even recall.  It's a

16  very, very, very long time.

17  **Q.**    Would you say it's been over 10 years?

18  **A.**    I guess it could be around 10 years.

19  **Q.**    Okay.  In the past when you have spoken to Mr. Williams,

20  have you had any arguments or disagreements with Mr. Williams?

21  **A.**    Never.  We always had pleasant conversation.

22  **Q.**    What about his ex-wife, Ms. Barthelemy?  When is the last

23  time you have seen her on a personal basis?

24  **A.**    It's a very, very long time again.  I would say well over

25  five years.

02:46

1  **Q.**   Did you take any action or inaction in this case because

2  of any relationship with Mr. Williams and/or his ex-wife?

3  **A.**   No.

4  **Q.**   Did you have any participation in their divorce?

5  **A.**   Not at all.

6  **Q.**   Do you know any of the specifics of their divorce?

7  **A.**   No.

8  **Q.**   What about Ms. Keva Landrum?  Are you personal friends

9  with her?

10  **A.**   No.

11  **Q.**   When is the last time you would have had any in-person

12  contact with Ms. Landrum?

13  **A.**   Again, a very long time, very long time.  I would say, you

14  know, probably again over five, more than five or seven years,

15  even more maybe.

16  **Q.**   Mr. Magner pulled up your Facebook listing and listed some

17  of your friends on Facebook.  Can you tell us, of the people

18  that he mentioned, who are you personal friends with from that

19  listing?

20  **A.**   Nobody.

21  **Q.**   Do you know Nicole Burdett?

22  **A.**   No.

23  **Q.**   Other than what you have described with Mr. Williams, the

24  pleasant encounters a very long time ago, have you had any past

25  dealings with Mr. Williams or Ms. Burdett?

02:48

1    **A.**    No.

2    **Q.**    Any past cases involving them --

3    **A.**    No.

4    **Q.**    -- other than what we have discussed here today?

5    **A.**    No.

6    **Q.**    Mr. Magner mentioned your -- is it your ex-husband,

7    Mr. Brandon Gregoire?

8    **A.**    Yes, yes.

9    **Q.**    How long have you been divorced?

10    **A.**    Approximately six years.

11    **Q.**    So do you have any involvement with, in the last

12    six years, his day-to-day activities and/or him running for any

13    elections?

14    **A.**    We have day-to-day interactions as much as it concerns our

15    son.

16    **Q.**    Are you involved with his campaigns in any way?

17    **A.**    Not at all.

18    **Q.**    Have you been involved in the last six years?

19    **A.**    No.

20         **MS. UEBINGER:**   One second, Your Honor.

21    **BY MS. UEBINGER:**

22    **Q.**    Agent, you told us that in addition to being a supervisor,

23    you were a field agent.  For how many years were you a field

24    agent?

25    **A.**    Approximately 13 1/2 years before I became a supervisor.

02:49

1  Q.   So I would assume, during the course of 13 years, you have

2  had the opportunity to interview numerous witnesses; is that

3  correct?

4  A.   That's correct.

5  Q.   Is it a common theme -- and you tell me in your

6  experience -- for witnesses who do have potential tax problems

7  to not be forthcoming during the first interview?

8  A.   Definitely.

9  Q.   Is that why you sometimes interview people multiple times

10  and ask them --

11  A.   That's correct.

12  Q.   -- different questions?

13  A.   That's correct.

14  Q.   Mr. Magner asked you numerous questions about the serving

15  of the subpoenas.  Are you aware that Agent Moore is working a

16  completely separate investigation into Nicole Burdett's tax

17  returns?

18  A.   Yes.

19  Q.   You're aware that he was serving those subpoenas in

20  relation to that investigation?

21  A.   Correct.

22  Q.   Are you aware because those subpoenas could not be served

23  that that matter had to be moved because of the fact that they

24  weren't served?

25  A.   Yes.

02:50

1    **MS. UEBINGER:**  I have nothing further, Your Honor.

2    **THE COURT:**  Thank you.

3         Mr. Magner, anything briefly?  Counsel, it's

4    been an hour and 20 minutes --

5    **MR. MAGNER:**  Yes.  Very briefly, Judge.

6    **THE COURT:**  Excuse me.  I'm not finished.

7    **MR. MAGNER:**  Oh, I'm sorry, Judge.

8    **THE COURT:**  Wait.  Mr. Magner, I'm speaking.

9    **MR. MAGNER:**  I'm sorry, Judge.

10   **THE COURT:**  It's been an hour and 20 minutes since we

11   began with this witness, and you have six witnesses listed.

12   You-all have until 5:00 this evening.  I have other engagements

13   and commitments after that.  So a word of advice:  Be efficient

14   and don't belabor things like you have been doing.

15   **MR. MAGNER:**  Yes, Judge.

16   **THE COURT:**  This evidentiary hearing deals strictly

17   with the narrow issue of vindictive and selective prosecution,

18   period.

19   **MR. MAGNER:**  Thank you, Judge.  I can take a hint.  I

20   will pass.  I'm through with this witness, Judge.  Thank you.

21   **THE COURT:**  Well, I don't want you to be through, but

22   I just want you to be more efficient.  If you have any other

23   questions, ask her.

24   **MR. MAGNER:**  Well, I do have a couple, Judge, if you

25   will forbear.

02:52

1          REDIRECT EXAMINATION

2    BY MR. MAGNER:

3    Q.    You mentioned just a moment ago that the investigation of

4    Ms. Burdett was -- I think Ms. Uebinger's word -- entirely

5    "separate" from Mr. Williams.  Was that your testimony?

6    A.    With respect to the investigation for her tax matters.

7    Q.    Right.  You understand her taxes were being handled by the

8    same tax preparer, correct?

9    A.    Yes.

10   Q.    All right.  Have you reviewed Agent Moore's grand jury

11   testimony?

12   A.    No.

13   Q.    You rely, do you not, on the honesty and the accuracy of

14   what Agent Moore tells you in terms of his investigations,

15   correct?

16   A.    That's correct.

17   Q.    Would it surprise you to learn that there's not a word in

18   Agent Moore's grand jury testimony about Timothy falsely

19   claiming to be a CPA?

20   A.    It doesn't surprise me.  It depends on what questions were

21   asked.

22   Q.    All right.  Would it surprise you to learn that there's no

23   mention whatsoever about all of the different inconsistent

24   statements that Henry Timothy made during the course of this

25   investigation?

02:53

1  **A.**   Again, his answers would be based on the questions he was

2  asked.

3  **Q.**   Would it surprise you to learn that there's nothing in the

4  grand jury testimony to suggest that Timothy himself was under

5  investigation by the IRS?

6  **A.**   Again, he would answer based on the questions he was

7  asked.

8  **Q.**   All right.  I understand that, but in the special agent

9  report -- there is nothing in Agent Moore's SAR about the tax

10  preparer falsely claiming to be a CPA, is there?

11  **A.**   It's not pertinent to the elements of the crime.

12  **Q.**   Okay.  Are you aware that there's nothing in the special

13  agent report about all of the different inconsistent statements

14  that the tax preparer made in the course of this investigation?

15  **A.**   But, again, it's not pertinent to the elements of the

16  crime for Mr. Williams.

17  **Q.**   But you told us a little while ago that if there is

18  negative evidence or exculpatory evidence, that that has to at

19  least be addressed in the special agent report, correct?

20  **A.**   I said in regards to rebuttals.

21  **Q.**   All right.  The reason for that is that that chain of

22  command that you just described to Ms. Uebinger, in the DOJ

23  chain of command and the IRS and Treasury chain of command,

24  they all rely on the truthfulness and the accuracy of the

25  special agent who prepares that report, correct?

02:55    1    **A.**    Yes.

2              **MR. MAGNER:**  All right.  No further questions.

3              **THE COURT:**  All right.  Thank you, Ms. Gregoire.  I

4    think we are finished with you.

5              **THE WITNESS:**  Thank you.

6              **THE COURT:**  The next witness is Mr. Moore?

7              **MR. MAGNER:**  I think we are going to call Special

8    Agent Marable, Judge.  I have not had a chance yet to review

9    Moore's grand jury.  It was not provided until we were in the

10   hearing.  Mr. Gibbens is going to question Special Agent

11   Marable.

12             **THE COURT:**  All right.  Again, Counsel, let me remind

13   you of the time constraints.

14             **MR. GIBBENS:**  Yes, sir.

15             **MS. PARDEE:**  Your Honor, this is Avery Pardee.  May I

16   use this break to try to resolve the screen sharing issue I was

17   having?

18             **THE COURT:**  I'm sorry.  The what issue?

19             **MS. PARDEE:**  The screen sharing issue, Your Honor.

20   With the last witness, I was unable to pull up an exhibit.  I

21   have tech support with me.

22             **THE COURT:**  Sure.  Go ahead.  I hope you can improve

23   mine as well because it stinks.  I'm close to requiring

24   everybody to be in my courtroom tomorrow morning.

25             **MR. GIBBENS:**  We would love that, Judge.

02:56

1      THE COURT:  I would too.

2      THE DEPUTY CLERK:  Special Agent Marable is on the

3  line.

4      THE COURT:  Swear the witness.

5                    LORI MARABLE,

6  having been duly sworn, testified as follows:

7      THE DEPUTY CLERK:  Thank you.  Please state and spell

8  your name for the record.

9      THE WITNESS:  It's Lori, L-O-R-I, Marable,

10  M-A-R-A-B-L-E.

11      THE DEPUTY CLERK:  Thank you.

12                 DIRECT EXAMINATION

13  BY MR. GIBBENS:

14  Q.   Good afternoon, Agent Marable.  My name is Billy Gibbens.

15  There's a lot of us on the screen up here.  I'm up on the top

16  of mine.  I represent Jason Williams.

17       You were the case agent for the investigation of

18  Henry J. Timothy; is that correct?

19  A.   That's correct.

20  Q.   That investigation arose out of another investigation of a

21  client of Mr. Timothy's; is that right?

22  A.   That is correct.

23  Q.   Okay.  You were investigating him initially as a tax

24  preparer, correct?

25  A.   I'm sorry.  Can you repeat that?

03:00

1  **Q.**   Well, the original investigation that this arose out of

2  was an investigation of one of Mr. Timothy's clients, and that

3  client had taken some very large deductions on her tax return;

4  is that right?

5  **A.**   Initially when I investigated that client that you're

6  speaking of -- and I believe her initials are CD --

7  **Q.**   Yes.

8  **A.**   -- I investigated her based upon her employment taxes.

9  **Q.**   Okay.  But you saw her tax return and you saw that

10 Mr. Timothy had prepared it, and that led you to begin

11 investigating Mr. Timothy, right?

12 **A.**   Well, no.  I mean, the reason why I investigated

13 Mr. Timothy was because I saw her tax returns, but initially he

14 was not being investigated along with Cortnae Douglas.

15 **Q.**   Right.  Exactly.  You began investigating him because you

16 saw that he had prepared a tax return that had some suspicious

17 deductions on it, correct?

18 **A.**   No, that's not the reason why I started investigating

19 Henry Timothy.

20 **Q.**   Why did you start investigating him?

21 **A.**   I started investigating Henry Timothy because when you do

22 an initial investigation such as a subject investigation, I

23 usually pull whoever prepared her tax return, and then I speak

24 to the subjects of that investigation.  Since Mr. Timothy is a

25 tax preparer, what happens is that we get background

03:01

1  information on Mr. Timothy, and it is submitted from the scheme

2  development center of the IRS.

3       So what happened was that when I saw his interview

4  and how many clients he was preparing -- because his

5  information is pulled also -- that is the reason why I

6  initially opened up that investigation on Henry Timothy,

7  because it did not match up on his tax return and his amount of

8  clients that he was saying that he prepared.

9  Q.  Okay.  As part of that investigation, you decided to

10 interview some of Mr. Timothy's clients; is that right?

11 A.  Well, after I closed out -- well, CD's case, I opened an

12 investigation on Henry Timothy.  At that time, you know, in

13 order to start my investigation, after I had did his subject

14 interview, I contacted some of his clients.

15 Q.  Okay.  How did you decide who to contact?

16 A.  Like I said before, the SDC, which is -- I'm sorry, the

17 scheme development center from the IRS, they develop a

18 spreadsheet, basically, that lists all of his clients.  That

19 spreadsheet contains like all the information that a tax return

20 would have on it.

21      When they submitted that to me, I just basically did

22 a data sort and pooled, you know, who had higher expenses or

23 higher income and whose income and expenses did not -- well,

24 they looked like they were falsified.

25 Q.  Okay.  So you decided to interview clients of Timothy's

03:03

1    who you thought had falsified expenses on their returns?  Is

2    that what you are saying?

3    A.    Yes.  I mean, when I look at a tax return -- being, you

4    know, I've been working for the IRS for, you know, over

5    10 years, so I can look at a spreadsheet and basically say,

6    okay, well, this does not look right or this does not add up to

7    what a tax return should look like, especially if it looks like

8    it has false information on it.

9    Q.    So you selected certain people to interview, and Jason

10   Williams was one of those people; is that right?

11   A.    That is correct.

12   Q.    You were interviewing all of those people, including

13   Mr. Williams, as witnesses in your investigation of

14   Mr. Timothy; is that right?

15   A.    That is correct.

16   Q.    Okay.  So at the time you got this spreadsheet, you saw

17   these people's tax returns, you didn't think they did anything

18   wrong; you thought Mr. Timothy had done something wrong.  Is

19   that right?

20   A.    I was interviewing those people based upon -- just to

21   verify the tax return information, and I was also interviewing

22   them based upon the fact that Mr. Timothy prepared their

23   return.

24   Q.    Right, but you were not interviewing them as subjects or

25   targets of your investigation, were you?

03:05

1  **A.**   No.

2  **Q.**   So, in other words, when you interviewed Mr. Williams, you

3  did not go to that interview with Mr. Williams thinking that

4  Mr. Williams had done anything wrong; is that right?

5  **A.**   I didn't interview Mr. Williams.  I attempted to interview

6  him.

7  **Q.**   Right.  When you attempted that interview, you did not go

8  into that interview thinking that Mr. Williams was a subject or

9  a target of your investigation, correct?

10  **A.**   No, because I didn't have an investigation on

11  Mr. Williams.

12  **Q.**   Right.  But you had seen his tax information at that time;

13  isn't that right?  That's what you just told us.

14  **A.**   Yes, that is correct.  I saw his tax information, and his

15  tax information -- his tax return looked like they had -- I

16  mean, well, false items on it.

17  **Q.**   Okay.  He was a witness in the Timothy investigation?

18  **A.**   Yes, when I initially -- I mean, when I went out there to

19  see him.

20  **Q.**   Well, for you, did he ever become anything other than a

21  witness in the Timothy investigation?

22  **A.**   No.  I only have an investigation on Henry Timothy.

23  **Q.**   When you saw Mr. Williams' tax information for the first

24  time, you did not refer him out for a separate investigation

25  into Mr. Williams' own tax returns, did you?

03:06

1   **A.**   No, I did not refer it.

2   **Q.**   You mentioned that you picked other people whose tax

3   information looked suspicious; is that right?

4   **A.**   That is correct.

5   **Q.**   Okay.  Did you refer any of those people out for a

6   separate criminal investigation?

7   **A.**   No, I did not refer anyone.

8   **Q.**   Okay.  But apparently you were working with an agent named

9   Jennifer Lopez-Martinez?  Was she helping you?

10  **A.**   That is correct.  She was my secondary.

11  **Q.**   Did Ms. Lopez-Martinez refer anybody out for a separate

12  investigation?

13  **A.**   I do not recall.  Not that I know of.  She is not in my

14  group.

15  **Q.**   You first attempted to interview -- actually, I'm sorry.

16  Did you say you never interviewed Mr. Williams?

17  **A.**   Jason Williams?

18  **Q.**   Yes.

19  **A.**   No, I never -- I mean, I met him, but I didn't

20  interview -- I didn't conduct an interview with him.

21  **Q.**   Okay.  Because you went to his house unannounced on

22  October 22, 2018.  Do you recall that?

23  **A.**   I recall going to his house, yes.

24  **Q.**   Do you recall him coming to the door in a towel, just

25  getting out of the shower?  Do you remember that?

03:08

1  **A.**   Yeah, I believe he was in a robe.  Yeah, I remember him
2  coming to the door.
3  **Q.**   You did speak with him about Mr. Timothy, correct?
4  **A.**   I'm not quite sure what I spoke to him about.  All I know
5  is what I usually say to witnesses when they ask me what this
6  is about.
7  **Q.**   He told you that he was about to go to court, couldn't
8  meet with you, and y'all made arrangements to meet later?
9  **A.**   I'm not sure.  I do not recall what was said in that
10  conversation.  I knew that he said that he had to be somewhere.
11  I'm not sure where he had to be.  I do not recall who made the
12  arrangements, if it was his assistant or was it him.  I just
13  know that there was an appointment scheduled.
14  **Q.**   Okay.  What information did you want to get from
15  Mr. Williams at this appointment?
16  **A.**   During that appointment I go over the tax return.  I ask
17  them questions just like I would ask anybody going over their
18  tax liability.  So I would ask him questions concerning his tax
19  return, who prepared it, the items on the tax return.  That's
20  what I would ask him.
21  **Q.**   Okay.  What you wanted to find out was whether Mr. Timothy
22  did something wrong in putting together Mr. Williams' return;
23  is that right?
24  **A.**   Yes.  I have to determine who put the numbers, who was
25  doing this information, whether he looked at his own return,

03:09 1   things like that.

2   **Q.**   Based on your investigation, you found that Mr. Timothy

3   had taken unusual or suspicious deductions on lots of returns,

4   didn't you?

5   **A.**   During my investigation, because I could not speak to any

6   witnesses -- because like I said, I was having trouble locating

7   the witnesses and speaking with them -- I ended up doing an

8   indirect method, which does not have anything with me verifying

9   what's on a tax return for his clients.

10   **Q.**   Okay.  So are you telling me that you didn't interview

11   anybody aside from attempting to interview Mr. Williams, any

12   other Timothy clients?

13   **A.**   I didn't interview anybody from Mr. Timothy.  The only

14   thing I did was summonsed.  I summonsed clients' information

15   and that was about it.  If I spoke with them, I asked them to

16   send me their invoices and things like that.

17   **Q.**   Okay.  So did you change your investigation from looking

18   at Mr. Timothy's activities as a tax preparer and whether or

19   not he was taking improper deductions to whether or not

20   Mr. Timothy was actually reporting all of his own income on his

21   own tax returns?  Is that what happened?

22   **A.**   Well, no.  My investigation started off as verifying what

23   Mr. Timothy was reporting on his own tax returns.

24   **Q.**   Okay.  But you just said that you wanted to interview

25   Mr. Williams to go over Mr. Williams' tax returns as a witness

03:11

1  in Mr. Timothy's investigation.  Why would you want to do that

2  if all you were looking at was whether Mr. Timothy reported his

3  own income?

4  **A.**   Well, when you go and speak to witnesses, I have to verify

5  your tax return.  I can't just go out there and verify that,

6  okay, this is the person that prepared it and that's it.  Once

7  we have a tax return and we go out, we verify the tax return

8  information.  Now, whether I was going to use it to pursue what

9  type of case I was going after, that could have been

10  established later.

11  **Q.**   Okay.  Did you pull Mr. Williams' tax returns before you

12  met with him, before you tried to meet with him?

13  **A.**   Yes.

14  **Q.**   Did you make that part of your file on Henry Timothy?

15  **A.**   Mr. Williams' tax returns?

16  **Q.**   Yes, ma'am.

17  **A.**   Usually when I do not -- I will keep -- I usually don't

18  keep -- like if I don't speak to the witnesses, I don't make it

19  a habit to keep their information.

20  **Q.**   Okay.  You tried to speak with Mr. Williams.  He couldn't

21  meet with you that day.  You made an appointment to meet with

22  him later.  That meeting ended up getting canceled; is that

23  right?

24  **A.**   I don't recall.  I mean, after that meeting --

25          **THE COURT:**  Excuse me.  Excuse me.  This is

03:13

1   Judge Feldman.  Did you tell Mr. Williams at the time that you

2   met him that you were looking at his tax returns?

3          **THE WITNESS:**  Yes.  At the time I told him that I was

4   here to discuss his tax liability, which is concerning his tax

5   returns.  I do usually mention that when I interview somebody.

6          **THE COURT:**  Did you tell him that you were looking at

7   Mr. Timothy's conduct?

8          **THE WITNESS:**  Usually I say -- I'm pretty sure I

9   perhaps might have mentioned Timothy, but like I said, I don't

10  quite --

11         **THE COURT:**  I don't want to know what you are pretty

12  sure about.  I want to know what your testimony is.

13         **THE WITNESS:**  Okay.  Well, my testimony is that I am

14  sure that I said that I was looking into -- I had to speak to

15  him concerning his tax liability.

16         **THE COURT:**  And not that you were looking at

17  Mr. Timothy?

18         **THE WITNESS:**  If he asked me what was this about, I

19  would say that I need to speak with you in regards to your tax

20  liability.  I am pretty sure that -- I usually tell them that

21  they are not under investigation; I just need to speak to him

22  in a witness capacity.

23         **THE COURT:**  All right.  Go ahead, Mr. Gibbens.

24  **BY MR. GIBBENS:**

25  **Q.**   Because the subject was Mr. Timothy, not Mr. Williams,

03:14   1   correct?

2   **A.**   That is correct.

3   **Q.**   Okay.  Then for whatever reason you were unable to meet

4   with Mr. Williams.  Well, let me just ask you this.  Do you

5   remember canceling an appointment with Mr. Williams on

6   November 6, 2018?

7   **A.**   I don't recall that.  I mean, I could have.  I just don't

8   remember that.

9   **Q.**   Okay.  Let me show you what we have marked as Defense

10   Exhibit 22.  See if it can refresh your recollection.  Is that

11   your phone number there, that 225 phone number?

12   **A.**   Yes.

13   **Q.**   Yes?

14   **A.**   Yes, that is.

15          **MR. GIBBENS:**  Can you scroll down a little bit,

16   please.  Keep going down.

17   **BY MR. GIBBENS:**

18   **Q.**   "November 6, 2018:  The IRS canceled.  Lori has an

19   emergency."

20          Do you remember having an emergency that caused you

21   to cancel your meeting with Mr. Williams?

22   **A.**   No, but this is not a text from me.  No, I don't remember

23   that.

24   **Q.**   Do you remember having an emergency on November 6, 2018?

25   **A.**   No, I do not.

03:16

**Q.** Okay. Let me show you what we have marked as Exhibit 25. This is your calendar that the government produced.

**A.** Uh-huh.

**Q.** I don't want to pry into anything personal, but on November 7 it says something about somebody's MRI. Would that have been related to some kind of emergency that caused you to cancel?

**A.** No. My son plays football on the weekend. He had got a prior concussion and so -- and that was the weekend. That was just a scheduled appointment he had to see his concussion specialist.

**Q.** In any event, the November 6 interview never happened because you never did sit down with Mr. Williams, correct?

**A.** That's correct.

**Q.** Your interview of Mr. Williams actually got transferred to another agent, Agent Moore; is that right?

**A.** Not that I recall. I mean, like I said, we are in two different groups, so nothing that I had would ever get transferred to him.

**Q.** Okay. Do you know who Agent Kristie Gregoire is?

**A.** Yes.

**Q.** Did you ever have any conversations with her about interviewing Mr. Williams?

**A.** No, I never had any conversations with her.

**Q.** Okay. So you never had a conversation where

03:17

1    Agent Gregoire said, "Oh, you are moving to Baton Rouge.  Just
2    go ahead and transfer this to Agent Moore"?
3    A.    No.
4    Q.    At this time were you moving from New Orleans to
5    Baton Rouge?
6    A.    At that time I had already moved to the Baton Rouge group.
7    Q.    Okay.  Was your interview of Mr. Williams transferred to
8    anyone, as far as you know?
9    A.    Not that I know of.
10   Q.    Okay.  So if anybody from the government has said that
11   your interview of Mr. Williams was transferred, that is not
12   correct?
13   A.    No.  I mean, we don't transfer witness interviews, so no.
14   Q.    Okay.  So do you know any reason why Agent Tim Moore would
15   have interviewed Mr. Williams after November 6?
16   A.    Like I said, I'm not in that group.  I'm in the
17   Baton Rouge group.
18   Q.    When did you pull Mr. Williams' tax returns?  Do you know?
19   A.    No, I do not recall that date.
20   Q.    Would it have been around the same time that you decided
21   to interview him?
22   A.    Perhaps.
23   Q.    When you decided to interview Mr. Williams, did you know
24   that he was a New Orleans city councilman?
25   A.    No.  I do not know Mr. Williams.

03:19

1    **Q.**   So the reason that you decided to interview him, you said,
2    was because of his level of income?
3    **A.**   I interviewed him based upon his level of income and the
4    expenses, just looking at the Schedule C part.
5    **Q.**   Okay.  Who else did you want to interview based on looking
6    at those expenses in the Schedule C part?  Do you have any
7    names?
8    **A.**   No, I don't have any names, but I do know that I went out
9    to interview a number of people that day, and Mr. Williams just
10   happened to be one of those people.
11   **Q.**   Okay.  You weren't able to interview anybody else besides
12   him?
13   **A.**   Like I said, I did not interview him.  I just met him.  I
14   couldn't get in contact with anyone else.
15   **Q.**   Okay.  So he is the only Timothy client that you have ever
16   spoken to?
17   **A.**   I perhaps spoke to a lady that I was trying to interview,
18   but I don't recall what happened.  I just know that I didn't
19   get to interview her either.
20           **MR. GIBBENS:**  Let's pull up Defense Exhibit 5-B.
21   **BY MR. GIBBENS:**
22   **Q.**   Did you create a spreadsheet of all of the tax returns
23   that Mr. Timothy prepared for all of his clients?
24   **A.**   This is very tiny, but I did not create a spreadsheet.
25   This is the spreadsheet that I was referring to came from the

03:21  1    scheme development center.

2    **Q.**    Okay.  But you pulled this spreadsheet?

3    **A.**    Yes, they gave me this spreadsheet.

4    **Q.**    Okay.  That had all of Mr. Timothy's clients, all of the

5    income they reported, and all of the deductions that they took,

6    correct?

7    **A.**    Yes.

8    **Q.**    There were probably hundreds of clients, correct?

9    **A.**    Exactly.

10   **Q.**    Mr. Williams did not have the most deductions of any of

11   these people, did he?

12   **A.**    I'm not sure.  I know that he might not have had the most

13   deductions or, you know, the most income, but there's a number

14   of things that, you know, you look at when you are pulling

15   witnesses.  You look at the area.  You look at the fact that

16   whether their expenses and the information looks false, if they

17   are repeat clients.  You take all of that into effect also.

18   **Q.**    Right.  But there were many repeat clients of Mr. Timothy

19   who had very large deductions on their Schedule C's; is that

20   right?

21   **A.**    I suppose so.  It could have been.  But sometimes even if

22   they are doing different type of businesses such as -- well,

23   the lady, CD, she had a home health company, so she has more

24   employees, more expenses.  A restaurant, they have more

25   employees, more expenses.  So you have to take those things

03:23

1  into account too.

2         **MR. GIBBENS:**  Okay.  Well, let's pull up Defense

3  Exhibit 6.

4         **THE WITNESS:**  Okay.

5  **BY MR. GIBBENS:**

6  **Q.**  Is this the tax return you pulled?

7  **A.**  Yes.

8  **Q.**  Okay.  If we can go down to page 4, Mr. Timothy was the

9  filer, correct?  Do you see that in the middle of the screen?

10  **A.**  Yes.

11  **Q.**  Okay.  Then let's go to page 20.  I want you to take a

12  look at the Schedule C on this return.  You see here we are on

13  a Schedule C for what's called Brownlow Plastering?

14  **A.**  Uh-huh.

15  **Q.**  The gross receipts were $1,337,295.  Can you see there?

16  **A.**  That is correct.

17  **Q.**  Okay.  Then if we go down to the net profits on the top of

18  the next page, the net profits are $7,444.  Can you see that at

19  line 31?

20  **A.**  Hold on one second.  I think I need to move this screen

21  around.  Hold on a second.

22         Okay.  Yes, I see the net profit.

23  **Q.**  So this is a Timothy return, and it started at

24  $1.3 million in income and ended at $7,444 in profit.  You're

25  not saying that Mr. Williams' returns had larger deductions

03:24  1    than that, are you?

2    **A.**    I don't recall Mr. Williams' return, but this is also a

3    construction company.  A construction company has a lot more

4    employees than an attorney would have.  So, I mean, you have to

5    count that they would have more expenses, such as building

6    supplies, just more things to pay for than just an attorney.

7    **Q.**    Did you try to interview the Brownlows?

8    **A.**    I don't recall.

9    **Q.**    The point is, Agent Marable, when you look at

10   Mr. Timothy's returns as a whole, of all the clients that he

11   filed returns for, across the board there were very large

12   Schedule C deductions for almost all of them, weren't there?

13   **A.**    No, not almost all of them.  I mean, some of them did seem

14   that they were prepared correctly.  I can't say that most or

15   all of his returns.  I mean, he prepared over 1,500 returns.

16   Not all of them were incorrect.

17   **Q.**    But you were investigating him for preparing fraudulent

18   returns, weren't you?

19   **A.**    I was investigating him preparing -- not reporting his

20   income.

21   **Q.**    Okay.  This is what I don't understand, Agent Marable.

22   **A.**    Uh-huh.

23   **Q.**    If you were investigating him for not reporting his

24   income, why did you need to interview Mr. Williams about what

25   is on Mr. Williams' tax returns?

03:26

1   **A.**   When you start an investigation into a preparer, you have

2   the option in order to prepare them based upon fraudulent items

3   on a tax return or his own personal tax return, and that's for

4   anybody.  So at that time when I opened the investigation, I

5   can't particularly tell you whether I was preparing -- I mean,

6   going to charge Mr. Williams with false items on his return or

7   false items on his clients' returns.

8   **Q.**   Mr. Timothy, you mean.

9   **A.**   As a tax preparer, with him preparing tax returns, my

10  first thing is to go out and seek out witnesses.  When I seek

11  out witnesses, I seek out witnesses to go over their tax

12  return, see who prepared their tax return.  Basically, I

13  interview them based upon their tax liability, who put this on

14  your return and everything, things like that.

15          So at the time when I could not find any witnesses

16  that were cooperating, I decided that I had to work my case

17  differently, and so I changed and worked it in an indirect

18  method.  That way I didn't need to speak to witnesses.

19  **Q.**   Okay.  In your investigation Mr. Williams never became

20  anything more than a witness?

21  **A.**   That is correct.

22  **Q.**   You never referred him for investigation to anybody,

23  correct?

24  **A.**   No.

25  **Q.**   Now, eventually you did refer Mr. Timothy for prosecution;

03:28  1  is that right?

2  **A.**    That is correct.

3  **Q.**    When did you refer Mr. Timothy for prosecution?

4  **A.**    I referred Mr. Timothy --

5           I'm sorry.  Did somebody say something?  I'm sorry.

6  It was breaking up.

7  **Q.**    When did you refer --

8           **THE COURT:**  It's breaking up here too, Counsel.

9           **THE WITNESS:**  It's breaking up.  I'm sorry.

10          **THE COURT:**  No, that's all right, Ms. Marable.

11  Excuse me.  It's breaking up here, too, with me.

12          **THE WITNESS:**  Okay.

13          **MR. GIBBENS:**  Sorry, Judge.  Is it any better now?

14          **THE COURT:**  Repeat your question, Mr. Gibbens.

15  Maybe.

16          **MR. GIBBENS:**  Yes, sir.

17  **BY MR. GIBBENS:**

18  **Q.**    When did you refer Mr Timothy --

19          **THE COURT:**  Well, it's in and out.

20          **THE WITNESS:**  Yeah, it's going in and out.

21          **MR. GIBBENS:**  I'm sorry, Judge.

22  **BY MR. GIBBENS:**

23  **Q.**    When did you refer Mr. Timothy for prosecution?

24          **THE COURT:**  That's all right.  Ask it again.

25

03:29

**BY MR. GIBBENS:**

Q.   When did you refer Mr. Timothy for prosecution?

A.   I opened Mr. Timothy's case in -- I interviewed him in 2018.  I referred him for investigation in 2019 or -- yeah, in 2019.

Q.   What part of 2019?

A.   It would have been the latter part of 2019.

Q.   Okay.  Who did you send that to?

A.   I sent it to my SSA, which is my supervisory special agent.

Q.   When did it get approved for prosecution?

A.   Are you speaking when did it get approved for prosecution from like going through DOJ tax or --

Q.   Well, by whatever prosecutors -- well, he has been charged; is that right?

A.   That is correct.

Q.   Right.  When was he charged?

A.   I believe he was recently indicted, probably in the last month or so.

Q.   During all of your time with the Henry Timothy investigation, other than your one attempt to interview Mr. Williams, you never heard Mr. Williams' name again, did you?

A.   I didn't hear Mr. Williams' name again until I spoke to Mr. Timothy again and he told me that he had got subpoenaed.

03:30

1    That's when I found out that somebody was working one of his

2    clients.

3    **Q.**    Okay.  So you didn't even know that Mr. Williams had come

4    under investigation, had been referred for investigation?

5    **A.**    No.  I don't live in New Orleans, so I don't know

6    New Orleans news and stuff like that.

7    **Q.**    Again, you saw Mr. Williams' returns, and you never

8    referred him for investigation, correct?

9    **A.**    I never referred Mr. Williams for investigation.

10            **MR. GIBBENS:**  Okay.  Thank you.  That's all I have,

11    Judge.

12            **THE COURT:**  Anything from the government?

13            **MS. UEBINGER:**  Yes, Your Honor.  Thank you.

14                        **CROSS-EXAMINATION**

15    BY MS. UEBINGER:

16    **Q.**    So, Agent Marable, it's your testimony here today that you

17    did attempt to contact other Henry Timothy clients in addition

18    to Mr. Williams?

19    **A.**    That is correct.

20    **Q.**    You recall speaking to a lady, but you weren't able to

21    interview her?  Is that your testimony?

22    **A.**    That's correct.

23    **Q.**    Is it fair to say that since you did try to interview

24    other clients that you didn't single out just Mr. Williams to

25    interview?

03:32

1    A.    No.

2    Q.    So when you couldn't interview this lady and Mr. Williams,

3    you said you took an indirect method.  What does that mean?

4    A.    That means I had to take a different approach on how I

5    worked the case.  Either you can work a case like with specific

6    items, which means that I have testimony from witnesses and

7    things like that, or you can use an approach where you look at

8    it as an indirect method just by using and matching it up

9    through the bank and the invoices and items like that in order

10   to work the case.

11   Q.    So is it fair to say that after you took this indirect

12   method that you proceeded investigating Mr. Timothy, and he was

13   eventually approved for prosecution?

14   A.    That is correct.

15   Q.    Now, Mr. Timothy, is he a white male?

16   A.    Yes, he is.

17   Q.    What about the person you mentioned earlier, CD, is she a

18   black female?

19   A.    Yes, she is.

20   Q.    Is it fair to say that you did not move forward, at some

21   point you decided to not present that case for prosecution?  Is

22   that correct?

23   A.    That is correct.

24   Q.    Why did you do that?

25   A.    Based upon that I couldn't pin down the responsibility of

03:33

1    the party.  Even though there were a lot of expenses, there

2    were a number of family members that were involved in the

3    business.  There was also -- so it would have been de mininis

4    tax.  So when you can't pinpoint and show who is responsible or

5    the amount of tax wouldn't have been anything, then that's the

6    reason why we decided to close the case.

7    Q.    Is it fair to say that Schedule C investigations are

8    fairly complicated and time-consuming?

9    A.    Yes.

10   Q.    Why is that?

11   A.    You have to interview numerous people.  You have to

12   interview not only the subjects, you have to interview who paid

13   the subjects.  You have to interview -- it's very consuming

14   because of the amount of people that go into interviewing and

15   putting together the spreadsheets, analyzing the bank

16   statements and tax returns and things like that.

17   Q.    You have to subpoena a lot of records, including bank

18   records and other records.  Is that fair?

19   A.    Yes, ma'am.

20   Q.    Mr. Gibbens asked you about your encounter with

21   Mr. Williams back in October of 2018.  Do you recall that

22   taking place on October 26, 2018?

23   A.    I have it down as an interview, so I know it happened

24   during that time, in October.

25   Q.    You provided that calendar to myself and Mr. Gibbens,

03:35

1 correct?

2 **A.**    That is correct.

3 **Q.**    You do believe that you told Mr. Williams that you only

4 wanted to speak with him at that time in a witness capacity.

5 Is that accurate?

6 **A.**    That's accurate.

7 **Q.**    Okay.  So after you spoke to Mr. Williams and he had

8 someplace to be so you didn't talk to him, was another meeting

9 arranged with him?

10 **A.**    Yes.

11 **Q.**    How did that meeting come about?  Did you contact him or

12 did his office contact you?

13 **A.**    I believe his office contacted me and set up the

14 appointment.

15 **Q.**    Was that appointment set up for November 5, 2018?

16 **A.**    That is correct.

17 **Q.**    Did you go to his office on that date?

18 **A.**    Yes.

19 **Q.**    Who were you with on that day?

20 **A.**    I was with Special Agent Jennifer Lopez-Martinez.

21 **Q.**    Did you speak with Mr. Williams or interview him on that

22 date?

23 **A.**    No, I did not.

24 **Q.**    What happened?

25 **A.**    We went there for an interview.  We sat in a conference

03:36

1  room for approximately two hours and nobody told us anything.

2  They just, like, kind of brought us water.  After that we just

3  decided to leave.  At that time, because they didn't say

4  anything, we just -- because he lived somewhere down, I don't

5  know, off of St. Charles, we decided to go by the house, knock

6  on the door.  He was not there, so we went back to the office.

7  I sat in the office with one of the supervisory special agents

8  that has since retired.

9  **Q.**    Who was that person?  What is her name?

10  **A.**    Her name is Marilyn Cherie.

11  **Q.**    At the time that you went to Mr. Williams' office on

12  November 5, 2018, did you know that he was a city councilman?

13  **A.**    No.

14  **Q.**    Did you know that he had declared that he was running for

15  district attorney?

16  **A.**    No.

17  **Q.**    Did you know at the time, though, that he was an attorney?

18  **A.**    I knew that he was an attorney because it was listed on

19  the spreadsheet.

20  **Q.**    When you spoke to Ms. Marilyn -- I'm sorry.  What's her

21  last name?

22  **A.**    Ms. Cherie.

23  **Q.**    Ms. Cherie.  When you spoke to Ms. Cherie, did she inform

24  you that he was a city councilman?

25  **A.**    Yes, ma'am.

03:37

1    **Q.**    Now, you said you went back to the office.  You are

2    referring to the IRS office?

3    **A.**    Yes.

4    **Q.**    At some point later that day, did you head back to

5    Baton Rouge?

6    **A.**    Yes.

7    **Q.**    Did you then have a conversation with your assistant

8    special agent in charge, one of the higher-ups --

9    **A.**    Yes, I did.

10    **Q.**    -- about this attempted interview?

11    **A.**    Yes.

12    **Q.**    What is his name?

13    **A.**    His name is Demetrius Hardeman.

14    **Q.**    When Mr. Williams failed to show up, did they give you any

15    reason why he couldn't attend?

16    **A.**    No.

17    **Q.**    Were you angry or irate that the meeting did not occur?

18    **A.**    No.

19    **Q.**    Why not?

20    **A.**    People always don't show up for appointments and things

21    like that.  So I just figured, you know, I'm not going to run

22    behind all my witnesses.  Witnesses, they do have a habit of

23    me, if I don't catch them at that time, that they won't show up

24    for their appointments and things like that.

25    **Q.**    So once that meeting didn't occur, did you make any

03:39

1  decisions as to what you were going to do with that witness

2  interview of Mr. Williams or any of the other witnesses in the

3  Henry Timothy case?  Had you made any decisions?

4  **A.**    No.  Basically, when it came to Mr. Williams, I just

5  decided, okay, well, I guess he doesn't want to meet, and that

6  was the end of it.

7  **Q.**    Okay.  Did you discuss this fact with your supervisor,

8  Mr. Hardeman?

9  **A.**    Yeah.  When he called me questioning, asking me about him,

10 I told him -- I said, "It's fine.  I don't need to speak with

11 him."

12 **Q.**    Did he ask you if you wanted to pursue the matter --

13 **A.**    Yes.

14 **Q.**    -- with Mr. Williams?

15 **A.**    Yes.

16 **Q.**    What did you tell him?

17 **A.**    I told him I was not taking on another case out of my

18 area.  Like I said, I'm closer to Baton Rouge, so it's an hour

19 or so difference from there.

20 **Q.**    Did you seek to interview Mr. Williams because he is a

21 black man?

22 **A.**    No.

23 **Q.**    Did you seek to interview him or make a case against him

24 because he is running for district attorney?

25 **A.**    No.

03:40

1   Q.   Did you seek to interview him or pursue a case against him
2   because he is a sitting city councilman?
3   A.   No.
4   Q.   Have you had any dealings with Mr. Williams in the past?
5   A.   No.
6   Q.   What about Ms. Nicole Burdett?  Are you familiar with her?
7   A.   No, I'm not.
8          MS. UEBINGER:  I don't have anything further.  Thank
9   you.
10         THE COURT:  Thank you, Counsel.
11             Mr. Gibbens, any redirect?
12         MR. GIBBENS:  Yes, Your Honor.  I'll be brief.  Yes,
13  sir.

REDIRECT EXAMINATION

14
15  BY MR. GIBBENS:
16  Q.   Agent Marable, Ms. Uebinger just asked you if your
17  supervisor asked you if you wanted to pursue the matter.  What
18  did you understand that to mean?
19  A.   I guess he wanted to ask me if I was looking to pursue the
20  matter such as continue to try to interview him or perhaps open
21  an investigation on him.
22  Q.   Okay.  But I thought you told me that Mr. Williams was
23  never anything more than a witness to you.
24  A.   Yes.  At that time, when I went out the first time to
25  interview him, he was nothing more than a witness.

03:41

1  Q.   Okay.  Between that time and today, you have never learned

2  anything else about Mr. Williams, have you?  You don't know

3  anything more about Mr. Williams' taxes between the day you

4  went out to interview him and today, correct?

5  A.   No, because I didn't open an investigation on

6  Mr. Williams.

7  Q.   Right.  As far as contacting him to try to interview him,

8  Mr. Williams did give you his cell phone number, didn't he?

9  A.   I don't recall if it's his cell phone number, but I did

10  have a number written on my calendar.

11  Q.   Right.  Did you ever try to call him at that number?

12  A.   I'm not sure.  I don't recall.

13  Q.   But you're not saying you didn't think you would be able

14  to talk to him if you tried one more time?

15  A.   I don't understand.  Can you repeat what you said?

16  Q.   You're not trying to say that you believed Mr. Williams

17  would refuse to meet with you?

18  A.   At that time I don't know what was the case why he didn't

19  show up or try to contact me to schedule another interview

20  during that short period of time, like on November 5, so I

21  don't know.

22  Q.   You just never tried to talk to him again?

23  A.   At that time, after I spoke to my ASAC, I said, "No, I'm

24  not going to speak with him anymore."

25  Q.   Okay.  Mr. Henry Timothy has never been investigated for

03:43

1  putting false information on his clients' tax returns, has he?

2  **A.**    You said has he?

3  **Q.**    Has he ever been investigated for putting false

4  information on his clients' tax returns?

5  **A.**    No.  He has only been -- I only investigated him not

6  adding his business profit to his Schedule C.

7           **MR. GIBBENS:**  Thank you.  That's all I have,

8  Your Honor.

9           **THE COURT:**  All right.  Thank you.

10          Thank you, Agent.

11          Call your next witness, please.

12          **MR. GIBBENS:**  Judge, our next witness is going to be

13  Agent Tim Moore.

14          **THE COURT:**  Swear the witness.

15                       **TIMOTHY MOORE,**

16  having been duly sworn, testified as follows:

17          **THE DEPUTY CLERK:**  Please state and spell your name

18  for the record.

19          **THE WITNESS:**  Timothy Moore, T-I-M-O-T-H-Y, Moore,

20  M-O-O-R-E.

21                    **DIRECT EXAMINATION**

22  **BY MR. MAGNER:**

23  **Q.**    Agent Moore, you're a special agent with the IRS?

24  **A.**    I am.

25  **Q.**    You were assigned to the FBI public corruption squad?

TIMOTHY MOORE - DIRECT

03:45

1    **A.**    Correct.

2    **Q.**    You have worked with them for how long?

3    **A.**    Probably since 2002.

4    **Q.**    Do you have an office space, a cubicle at the FBI?

5    **A.**    I do.

6    **Q.**    Do you work regularly with Special Agent Goodson on

7    various public corruption matters?

8    **A.**    Yes.

9    **Q.**    You were aware of --

10           **THE COURT:** Excuse me.  Agent, speak up a little bit.

11   Your voice is kind of weak.

12           **THE WITNESS:** Yes, sir.

13           **THE COURT:** Thank you.

14   **BY MR. MAGNER:**

15   **Q.**    You were aware that the FBI was investigating Jason

16   Williams back in 2016 and 2017?

17   **A.**    No, I wouldn't say that.

18   **Q.**    You had no awareness that they were looking at

19   Mr. Williams?

20   **A.**    No.  At some point I heard Mr. Williams' name around the

21   office.  What they were investigating or the extent of it, I

22   have no idea.  When Kristie, my boss, mentioned the case to me,

23   I knew at that point that something was going on, but I didn't

24   know the extent of it.

25   **Q.**    All right.  You knew that there was at least some type of

03:46

1    investigation of Mr. Williams before you spoke with Kristie

2    Gregoire on about November 5, 2018, correct?

3    **A.**    Right.  That would be just from overhearing it from being

4    in proximity of the other two agents that were working the

5    case.

6    **Q.**    That was Special Agent Goodson and who else?

7    **A.**    Cary.

8    **Q.**    What is Cary's last name?

9    **A.**    I'm drawing a blank.

10   **Q.**    That's all right.  How far is your cubicle from

11   Special Agent Goodson's cubicle at the bureau?

12   **A.**    My cubicle is next to his.

13   **Q.**    Okay.  This other fellow, Cary -- is it maybe something

14   like McDonald or something like that?

15   **A.**    I honestly do not remember.

16   **Q.**    All right.  How far were you from his cubicle?

17   **A.**    I'm on the end, Todd is in the middle, and then Cary would

18   be on the other end.

19   **Q.**    Okay.

20   **A.**    So Cary is probably 12 feet away, 15 feet.

21   **Q.**    All right.  Although you may not be intimately involved in

22   the other FBI public corruption agents' investigations, you

23   have a general awareness of what they are working on at any

24   given time, correct?

25   **A.**    Some cases I would; some I would not.

TIMOTHY MOORE - DIRECT

03:47

1 **Q.** Okay. So the judge can understand, these are not

2 individual offices; they are cubicles in a bullpen. Correct?

3 **A.** You can say that.

4 **Q.** You can reach over your cubicle with your hand to

5 Special Agent Goodson's cubicle, correct?

6 **A.** I could.

7 **Q.** Right. There's no roof. There's no ceiling. These are

8 open cubicles that you-all work together in a collegial way.

9 Correct?

10 **A.** Sure.

11 **Q.** All right. In November of 2018, you were aware that

12 Mr. Williams was a city councilman?

13 **A.** I can't say that. I couldn't tell you who is on the city

14 council today if you ask me besides Mr. Williams.

15 **Q.** Okay. You are aware that he is a public official?

16 **A.** Well, sure, I am.

17 **Q.** I mean, at the time, in November of 2018.

18 **A.** Yeah, I would say so. I mean, if Todd and those guys had

19 an investigation, then I would know he is a public official

20 because that's who they work.

21 **Q.** Right. That's all they work are public officials, right?

22 **A.** Yeah. Public officials. We have a neighboring squad that

23 works law enforcement, things of that nature.

24 **Q.** Okay. Did you have access to the Jason Williams

25 investigation on your bureau computers?

03:49

1   **A.**   No.

2   **Q.**   Okay.  Whether you access it or not, you would have been

3   able to access those records if you had chosen to, correct?

4   **A.**   That case was probably restricted, so I would say no, but

5   I couldn't tell you 100 percent if we are talking November of

6   2018.

7   **Q.**   All right.  Do you discuss your cases with the other

8   bureau agents at lunch and in other extracurricular activities?

9   **A.**   I don't do either with them, really.

10  **Q.**   Okay.  You don't eat lunch with these other FBI agents?

11  **A.**   I eat at my desk.  I don't get out to lunch.

12          **THE COURT:**  Mr. Magner, we are not too interested in

13  the eating habits of government agents, so why don't you move

14  on to something that deals with selective or vindictive

15  prosecution.

16          **MR. MAGNER:**  Yes, sir.

17  BY MR. MAGNER:

18  **Q.**   What did Supervisory Special Agent Gregoire tell you

19  around November 5, November 6 about an interview of

20  Jason Williams?

21  **A.**   She mentioned that Lori had went out to interview

22  Mr. Williams but did not make contact, and she wanted me to

23  look into Mr. Williams' situation.

24  **Q.**   All right.  She wanted you to look into Mr. Williams

25  because he was a public official, correct?

03:50

1   A.   He was a public official, yes.

2   Q.   That's why she wanted you to look into him, because he was

3   a public official, right?

4   A.   Well, he is a public official and his tax returns

5   apparently looked egregious to the agents that had seen them.

6   Q.   All right.  But the reason why you were tapped for this

7   was because you are a public corruption agent and Mr. Williams

8   was a public official, correct?

9   A.   It would make sense for me to look at it as opposed to

10   somebody else, yes.

11   Q.   Right.  Were you aware that an appointment had been

12   scheduled the following day, for November 6, after

13   Agent Marable was unable to meet up with Mr. Williams on the

14   5th?

15   A.   No, I'm not aware of those details.  I think my initial

16   knowledge of anything began on the 7th, the day I requested

17   Mr. Williams' tax returns.

18   Q.   All right.

19        MR. MAGNER:  If we could pull up Exhibit 10, the IDRS

20   form.

21   BY MR. MAGNER:

22   Q.   While that's coming up, you are familiar with this form,

23   correct?

24   A.   Sure.

25   Q.   You prepared it on November 7?

03:51

1  A.   Yes.

2  Q.   This is the only paperwork that was generated and then

3  approved by Agent Gregoire which allowed you to have

4  Mr. Williams' tax returns?

5  A.   Sure.  That's the same for anybody that we want to pull

6  tax returns on.  It creates a record.  We do that routinely.

7  Q.   So to answer my question, this is the only paperwork that

8  was generated that allowed you to get access to Mr. Williams'

9  tax returns, correct?

10  A.   That's correct.

11  Q.   You interviewed Henry Timothy on April 23, 2019, correct?

12  A.   That sounds right.

13  Q.   All right.  Before that interview did you review the prior

14  Memorandum of Interview of Mr. Timothy by Special Agent

15  Marable?

16  A.   No.

17  Q.   Was there some reason why you didn't?

18  A.   It wasn't related to what I was investigating.  I never

19  had any conversations with Special Agent Marable about this

20  case.

21  Q.   But didn't you run this through indices to see if the

22  subject had been interviewed before?

23  A.   No.

24  Q.   All right.  Well, the IRS at least, then, had corporate

25  knowledge that Mr. Timothy had lied about his bank accounts?

03:53

1   You have since learned that, right?

2   **A.**   I heard y'all talk about it today.  I know Mr. Williams --

3   not Mr. Williams.  Mr. Timothy had his own investigation that

4   he has been charged with.  The details of that were of no

5   concern to me.

6   **Q.**   It wouldn't be important that this witness in your case,

7   that you have listed as a witness in your case, has lied to the

8   agents about the existence of bank accounts?  That wouldn't be

9   important to you?

10  **A.**   No.  I would need to interview him and test the veracity

11  of his statements regarding Mr. Williams, which is who I was

12  investigating.

13  **Q.**   The IRS knew from Ms. Marable's interviews that he had

14  lied about his gambling habits, correct?

15  **A.**   I have no idea.

16  **Q.**   Okay.  You since have not looked at those earlier

17  Memorandum of Interview of Mr. Timothy that Agent Marable

18  conducted?

19  **A.**   I have not.

20  **Q.**   All right.  When you interviewed Timothy on April 23 or

21  thereabouts 2019, he told you that Ms. Burdett presented him

22  with her QuickBooks spreadsheets, correct?

23  **A.**   I would have to see the memo to be a hundred percent for

24  sure, but that sounds correct.

25  **Q.**   And that Timothy prepared the tax returns based upon those

TIMOTHY MOORE - DIRECT

03:54

1  spreadsheets, correct?

2  **A.**   That sounds right.

3  **Q.**   There was no mention in that initial interview of

4  Timothy -- I'm sorry.  Strike that.

5        There was no mention in that initial interview of

6  Timothy that Burdett pressured him to prepare the tax returns

7  in a certain way, was there?

8  **A.**   No.  Mr. Timothy, he held back a lot in that initial

9  interview.

10  **Q.**   So that's your view, that Timothy held back a lot, not

11  that he changed his statements, correct?

12  **A.**   Well, he did both.

13  **Q.**   All right.  Let's look at Government Exhibit 11, which is

14  your special agent report.

15        **MR. MAGNER:**  We are going to introduce this, Judge,

16  under seal because it involves sensitive tax information.

17        I would just like you to look at the first page

18  and see if you can identify that as your special agent report.

19        **THE COURT:**  It's ordered that it be sealed.

20        **MR. MAGNER:**  Thank you.

21  BY MR. MAGNER:

22  **Q.**   Is that the cover page of your special agent report?

23  **A.**   It is.

24        **MR. MAGNER:**  Can we please pull up the paragraph from

25  your report that starts on page 4, last full paragraph.

BY MR. MAGNER:

Q.    Do you recognize this paragraph in your report?

A.    Yes.

Q.    Essentially what this says was that Timothy would prepare a return accurately and then call Burdett and tell her how much tax is owed.  Burdett would tell Timothy that she needs to talk to Williams.  After talking to Williams, Burdett would call Timothy back and tell him to find more expenses.  Burdett and Timothy would have two or three conversations like this each year until they arrived at a final return that Williams liked.

Is that the gist of that statement?

A.    Yes, sir.

Q.    You repeat that statement -- I think you may even like cut, copy, and paste it -- throughout your report on page 4, page 6, page 9, and I believe page 15 and 16.  Does that sound right, that you would have repeated that same verbiage throughout your report?

A.    Yeah.  If it applied to that section of the report, I would definitely repeat it.

Q.    All right.  The special agent report, the body of it makes no mention whatsoever of Timothy's false statements, does it?

A.    No.  His Memorandum of Interview was cited in my report and was available to every person that reviewed this report.

Q.    In the body of the report, you never make any mention of Timothy's false statements, do you?

TIMOTHY MOORE - DIRECT

03:57

1  **A.**    No, I did not.  It's not necessary.

2  **Q.**    Then you interviewed Mr. Timothy again with Mr. Goodson

3  and AUSA Uebinger on November 8, 2019, correct?

4  **A.**    That sounds right.

5  **Q.**    His attorney was there for that meeting, was he not,

6  Timothy's attorney?

7  **A.**    Mr. London was, yes.

8  **Q.**    All right.  At the first part of that interview, Timothy

9  told you that Burdett provided the QuickBooks accounts in paper

10  form, right?

11  **A.**    I don't recall specifically, but I wouldn't be surprised.

12  **Q.**    All right.  And that Timothy then prepared the return

13  based upon those QuickBooks reports, correct?

14  **A.**    Yes.

15  **Q.**    There were no questions about the completed returns by

16  Ms. Burdett.  He didn't say anything about that, right?

17  **A.**    You're talking about the beginning of the interview?

18  **Q.**    Yes.

19  **A.**    Yeah.  We let him talk for a while, and then we called him

20  out because we knew he was lying to us.  At that point he

21  exited the room with his attorney and came back in and told us

22  what we believed to be the truth at that point.

23  **Q.**    In the first part of that interview --

24           **THE DEPUTY CLERK:**  Counsel --

25

03:58

1    **BY MR. MAGNER:**

2    **Q.**    -- Timothy said that no one told him what to put down as

3    expenses, right?  So in that first part of the interview, there

4    was no mention by Timothy --

5            **THE COURT:**  Hold on.  Stop.  Stop.  I got cut off

6    right after we sealed the document.

7            **MR. MAGNER:**  I'm sorry, Judge.

8            **THE COURT:**  The government bureaucracy strikes again,

9    so start from there.  I apologize.  If there wasn't capital

10   punishment in this country, I would probably do something to

11   whoever is running this stupid, damn machine.

12            Ask your question from the time the document was

13   sealed, and put the document up again so that I can see it.

14   This is absolutely outrageous.

15            **MR. MAGNER:**  All right.  I'll try to go back as best

16   I can.  If we can pull up the paragraph starting on 4.

17            **THE COURT:**  All right.  That's when I got cut off.

18   Go ahead, Mr. Magner.

19   **BY MR. MAGNER:**

20   **Q.**    Okay.  So just to repeat, Agent Moore, you stated here

21   that Timothy would prepare a return accurately and then call

22   Burdett to tell her how much tax is owed.  Burdett would tell

23   Timothy that she needs to talk to Williams.  After talking to

24   Williams, Burdett would call Timothy back and tell him to find

25   more expenses.  Burdett and Timothy would have two or three

TIMOTHY MOORE - DIRECT

04:00

1    conversations like this until they arrived at a final return

2    that Williams liked.

3            Is that the gist of what you stated in your special

4    agent report?

5    **A.**    Yes.

6    **Q.**    You stated it verbatim on page 4, page 6, page 9, and

7    pages 15 and 16, correct?

8    **A.**    I have no reason to doubt that.

9    **Q.**    Okay.  You basically just cut, copied, and pasted that

10   same section throughout the report, right?

11   **A.**    Yeah.  If it applied to that section, I would put it in

12   there for sure.

13   **Q.**    Okay.  In the body of the report, you say nothing about

14   Timothy falsely representing himself to be a CPA, correct?

15   **A.**    Yeah.  As I mentioned before, the report is going to be my

16   findings and my recommendations.  That particular interview, as

17   we discussed, from April 23 was cited in my report and attached

18   to my report, so everybody can see what was in that document.

19   **Q.**    In the body of the report, you say nothing about him

20   falsely representing himself to have an MBA, correct?

21   **A.**    I don't know of him ever saying he has an MBA.

22   **Q.**    All right.  Then you interviewed Timothy again on

23   November 8, along with Special Agent Goodson and AUSA Uebinger,

24   right?

25   **A.**    Right.

04:02

1  **Q.**  In the first part of that interview -- and Timothy's
2  lawyer was there, Steve London, right?
3  **A.**  Right.
4  **Q.**  Timothy told you that Burdett provided the QuickBooks
5  account in paper format, right?
6  **A.**  Sounds right.
7  **Q.**  That he prepared the returns based upon those QuickBooks
8  accounts, right?
9  **A.**  Sounds right.
10  **Q.**  He told you that nobody questioned him about the completed
11  returns, correct?
12  **A.**  That sounds right.  At some point, like I said, we let him
13  keep talking, and then it got so outrageous we called him out
14  and let him know we weren't buying what he was selling.  At
15  that point he left the room with his attorney and came back and
16  began to tell us what we believed to be the truth.
17  **Q.**  What you believed to be the truth, right?
18  **A.**  Yes, myself and everybody that has reviewed this case
19  since then.
20  **Q.**  All right.  He initially told you that no one told him
21  what to put down as expenses, correct?
22  **A.**  Yeah, he was pulling the expenses off the QuickBooks
23  files.
24  **Q.**  Right.  Then his lawyer took him aside and took him out of
25  the room, right?

04:03

1  **A.**   Right.

2  **Q.**   How long were London and Timothy outside of the room?

3  **A.**   I don't remember specifically.  It may be noted in the

4  302.  I would probably say, just based on memory, 10 minutes.

5  **Q.**   All right.  Then it was a completely changed story after

6  that, right?

7  **A.**   Yes.

8  **Q.**   In the body of your special agent report, you make no

9  mention of that changed story, do you?

10  **A.**   No.  My report is going to be the final version of the

11  findings of the investigation and my recommendations based on

12  those findings.

13        **MR. MAGNER:**  All right.  Please pull up Exhibit 12.

14  BY MR. MAGNER:

15  **Q.**   What this is, you call it a memorandum of contact, when I

16  met with you, Agent Goodson, and AUSA Uebinger?

17  **A.**   That's what that is, yes.

18        **MR. MAGNER:**  Are you good, Judge?  We are okay?

19  Judge, are you with us?

20        **THE COURT:**  Yeah.  I'm coping, but I'm with you.

21        **MR. MAGNER:**  Okay.  Thank you, Judge.

22  BY MR. MAGNER:

23  **Q.**   So what this was, this was a meeting that you had with me

24  in Lafayette at the U.S. Attorney's Office, correct?

25  **A.**   Correct.

TIMOTHY MOORE - DIRECT

04:04

1  **Q.**   I basically gave you a proffer of what Ms. Burdett's

2  testimony would be, correct?

3  **A.**   Correct.

4  **Q.**   I told you that Burdett brought the QuickBooks to Timothy,

5  Timothy made the decisions as to deductions, that there were

6  little or no substantive discussions after she provided the

7  QuickBooks, that there were no drafts and no revisions,

8  correct?

9  **A.**   What you said is what I wrote down.

10  **Q.**   Okay.  I told you that Timothy falsely claimed to be a

11  CPA, and that this would be Ms. Burdett's testimony as a

12  defense witness, as a defendant, or as an immunized witness,

13  correct?

14  **A.**   Yeah.

15  **Q.**   Okay.  Then when you prepared your special agent report

16  that we talked about, in your report you have to be fair and

17  accurate as to the summary of your findings, correct?

18  **A.**   Correct.

19  **Q.**   You can't just ignore the bad stuff and wish that away,

20  right?  This has to be reviewed by a whole chain of command at

21  the IRS and a whole chain of command at the Department of

22  Justice, correct?

23  **A.**   Yes, a lot of people review it.

24  **Q.**   In the report you make no mention of the fact that there

25  was a spreadsheet that the IRS had prepared -- and we have as

04:06

1    Exhibit O to our motion -- which showed that Timothy had

2    hundreds of clients with the same or worse Schedule C

3    deductions, do you?

4    A.    I wasn't in possession of that, no.

5    Q.    Well, the IRS was in possession of it, correct?

6    A.    The IRS is a big entity.  I was in possession in regards

7    to Mr. Williams and Ms. Burdett.

8    Q.    The IRS may be a big entity, but there's one government,

9    and you are the representative of the government when you

10    prepared your report, correct?

11    A.    That's correct.  Mr. Timothy's other tax clients have no

12    bearing on Mr. Williams and Ms. Burdett.

13    Q.    That was your conclusion that it had no bearing, the fact

14    that Timothy made all of the same types of deductions on

15    hundreds of other clients' tax returns?

16    A.    I had no knowledge of that --

17    Q.    Is that your testimony?

18    A.    -- at the time.

19    Q.    Okay.

20    A.    It still has no bearing on this.  My job is to prove if

21    the elements of the crime have been met by the two individuals

22    named here, and that's what's going to be evidenced in the

23    report.

24    Q.    All right.

25    A.    I didn't investigate Mr. Timothy.

04:07

1  Q.   I would agree with that.  So when Timothy told you that he
2  would prepare drafts of these returns and make modifications to
3  them, you have not uncovered any such draft returns, have you?
4  A.   Actually, I have, and they have been turned over in
5  discovery.
6  Q.   Oh, so you are saying that there are draft returns of
7  Mr. Williams that --
8  A.   There's more than one copy of a return there, yes.
9  Q.   All right.  That are changed from one to the next on the
10 same day?
11 A.   I don't know about the same day.
12 Q.   You did not even look at his computer records, his Intuit
13 professional records, to see if there was any support for his
14 claim that he would modify these tax returns based upon what
15 Ms. Burdett told him?  You never even looked, did you?
16 A.   Mr. Timothy has been subpoenaed and all his records have
17 been turned over, to the best of our knowledge.
18 Q.   Right.  There's no reflection whatsoever in those computer
19 records to substantiate his story that he would change these
20 tax returns, is there?
21 A.   Mr. Timothy has very minimal records.
22 Q.   The answer to my question, sir, is that there is no
23 evidence whatsoever that you have been able to obtain that
24 would support Timothy's claim that he would modify these tax
25 returns based upon multiple conversations with Ms. Burdett, is

04:09   1   there?

2   **A.**    Not from Mr. Timothy, no.

3   **Q.**    Not from anywhere.  There are no computer records to show

4   that Timothy would modify these tax returns at Ms. Burdett's

5   urging.  There's no computer records that show that whatsoever.

6   **A.**    I do have multiple copies of one year's worth of returns

7   from Mr. Gibbens that he turned over for Mr. Williams.

8   **Q.**    All right.  Your report makes no mention of the fact that

9   Mr. Timothy stated, in response to civil discovery, that he

10  believed all the deductions that were made were appropriate and

11  consistent with the law, yet another inconsistent --

12          **MS. UEBINGER:**  Your Honor, I'm going to object at

13  this point -- this is Kelly Uebinger -- to relevance as the

14  civil case is not relevant to this one.

15          **THE COURT:**  The objection --

16          **MR. MAGNER:**  Bad faith, Judge.

17          **THE COURT:**  Excuse me.  Excuse me, Counsel.  The

18  objection is sustained.

19          **MR. MAGNER:**  Could you please pull up Government

20  Exhibit 4.

21  **BY MR. MAGNER:**

22  **Q.**    Do you recognize that, sir?

23  **A.**    I do.

24  **Q.**    So this is your request for a grand jury investigation

25  from January of 2019, correct?

04:10

A.    That's correct.

Q.    The very last paragraph says:  "The primary subjects of this investigation are expected to use every possible means to hinder the investigation.  The witnesses are expected to be hostile and intimidated by the targets; therefore, the only way to gain cooperation and truthful testimony is to use the grand jury."

There are no allegations in this case of witness intimidation, are there?

A.    No.  That's the expectation at the beginning of it.  As an example, we tried to serve the subpoenas in Ms. Burdett's case on two relatives.  We still haven't got compliance on that. These type of investigations, that's to be expected on the front end.

Q.    There's no evidence whatsoever of witness intimidation or obstruction of justice in this case, and there are no charges in connection with that, are there?

A.    That's correct.

Q.    Mr. Gibbens and I have accepted all of the subpoenas in this case that have been served upon our clients and have provided responses to all of that over the course of the last two years, correct?

A.    There have been some responses.

Q.    You talked about subpoenas to the family members.  You served those subpoenas on Ms. Burdett's daughter, her elderly

04:12

1   mother, her brother, her father, and you served those on the

2   date of our last hearing, correct?

3   **A.**   No, that's incorrect.

4   **Q.**   You attempted to serve them on the day of our hearing?

5   **A.**   I never served her father.  Her mother was served way back

6   when her investigation began.  The only two we served the day

7   of the motion was the daughter and the brother.

8   **Q.**   All right.  That was on the day of the hearing, correct?

9   **A.**   The day of the hearing, correct.

10  **Q.**   You recently interviewed her hairdresser, Niki, right?

11  **A.**   Yes.  The investigation is continuing.  I interviewed her

12  hairdresser and her house cleaner, I believe, last --

13  **Q.**   Right.  You questioned her hairdresser about her knowledge

14  of certain people having affairs, romantic affairs, correct?

15  **A.**   Correct, trying to verify if that happened or didn't

16  happen.

17  **Q.**   You pressed her on that point even though she said she

18  didn't know anything about that, right?

19  **A.**   No, I didn't press her.

20  **Q.**   All right.  You interviewed this woman Bree, who cleans

21  Ms. Burdett's home, right?

22  **A.**   I sure did.  The reason I did that was because --

23  **Q.**   I didn't ask the reason, sir.

24  **A.**   -- of all the cleaning expenses on her Schedule C for her

25  law firm.

04:13

1    **THE COURT:**  Excuse me, Mr. Magner.  Agent Moore is

2    entitled to explain an answer in response to your question.

3    Don't interrupt him, and I don't expect the witness to

4    interrupt you.

5           Agent Moore, finish your answer.

6    **THE WITNESS:**  Yes.  The reason we were interviewing

7    Bree Austin is because on Ms. Burdett's Schedule C for her law

8    firm, it had cleaning expenses, and Bree Austin was the one

9    that cleaned her home.  So we wanted to verify if Bree was

10   cleaning Ms. Burdett's personal residence or if she was

11   actually cleaning the law office somewhere to determine if the

12   deduction was legitimate or not.  We do that to verify all

13   these expenses.  That's what we do.

14   **BY MR. MAGNER:**

15   **Q.**   All right.  You requested that Ms. Burdett and

16   Mr. Williams be charged with two Title 31 offenses; isn't that

17   right?

18   **A.**   No, I think there was five in my report that were within

19   statute, I believe.

20   **Q.**   Five different counts as to two different statutes.

21   **A.**   Yeah, I'm sorry.  Yes.

22   **Q.**   All right.  To your knowledge no one in this district has

23   ever been charged with those offenses, have they?

24   **A.**   I don't know about the Eastern District.  I contacted our

25   national office yesterday.  They gave me a spreadsheet of the

04:14

1   whole -- I forget, maybe 30, 40 of them nationwide have been

2   charged that.  I was also involved in a case in the

3   Middle District, *Calmese Motorsports*.  I was involved in that

4   case as it was happening.  That was a Title 31 case as well.

5   **Q.**  But no one in this district has ever been charged with

6   those violations before?

7   **A.**  I don't know that.

8        **MR. MAGNER:**  Could you please pull up Government

9   Exhibit 3.

10   **BY MR. MAGNER:**

11   **Q.**  So, sir, after you obtained Mr. Williams' tax returns, you

12   requested that a grand jury -- what is this document?

13   **A.**  This is a document that we use to open a preliminary

14   investigation, which it basically means we are going to spend

15   some time seeing if this case meets the criteria for a full

16   investigation.  So this is the document that we submit along

17   with making the request in our computer system.

18        **MR. MAGNER:**  If you could skip down to number 2 in

19   the lower part.

20   **BY MR. MAGNER:**

21   **Q.**  It states there, where you were asked to briefly summarize

22   the allegations:  "It is alleged that the subject is receiving

23   kickbacks in exchange for city contracts and filing tax

24   returns."

25        How would you know that there were allegations about

TIMOTHY MOORE - DIRECT

04:16

1    kickbacks if you hadn't spoken to the FBI?

2    **A.**    Well, this letter is dated December 10.  So between

3    November and December, I definitely would have spoken to the

4    FBI.

5    **Q.**    Actually, it's dated November 30, 2018.

6    **A.**    No, November 7, when I requested Mr. Williams' tax

7    returns.

8    **Q.**    Right.  If you look at what's before you there, Government

9    Exhibit 3, it's dated November 30, 2018, correct?

10   **A.**    Yeah.  That's my mistake.  I had opened multiple primary

11   investigations at the time and I just use the same form, and I

12   didn't notice the date at the top.

13          But to answer your question, between November 7 and

14   December 10, I definitely spoke with Todd Goodson to confirm

15   they had an investigation, seeing if they were willing to work

16   together should we have something that would be able to be

17   predicated.

18   **Q.**    By this point AUSA Uebinger was the AUSA assigned to the

19   case?

20   **A.**    When I started she was the AUSA, yes.

21   **Q.**    All right.  She told you that that was not going to be

22   prosecuted, these FBI allegations of kickbacks?  She told you

23   that was not going to be prosecuted, correct?

24   **A.**    No, that's incorrect.

25   **Q.**    Well, didn't you tell Supervisory Special Agent Gregoire

04:18

1   that that was not going anywhere?

2   A.   No.

3   Q.   So she's lying?

4   A.   I can't speak for her.  I wouldn't say something that's

5   untrue to her.

6   Q.   Okay.  So you never had a conversation with Gregoire where

7   you said, "This FBI case isn't going anywhere and we have to

8   make it a tax case"?

9   A.   I guess you are making assumptions that the FBI case is

10  not going anywhere.  I wouldn't have said that.

11  Q.   Well, all I can do is rely on your supervisor.

12          MR. MAGNER:  I will tender the witness, Your Honor.

13          THE COURT:  Thank you.

14              Ms. Uebinger.

15          MS. UEBINGER:  Thank you, Your Honor.

16                       CROSS-EXAMINATION

17  BY MS. UEBINGER:

18  Q.   So, Agent Moore, after your supervisor, Ms. Gregoire,

19  asked you to take a look at this matter, what action did you

20  take?

21  A.   The first thing I do, as in any case because I work for

22  the IRS, is pull copies of the tax returns, see what they look

23  like.  Then between November 7 and probably the second week of

24  January, I was trying to develop to see if the Schedule C's are

25  accurate or not.

04:19

1       So I would take a look at Mr. Williams' lifestyle.  I
2  looked at the bank accounts that were available, looked at the
3  expenditures that were coming out of the law firm account.  At
4  the end of the day, I was able to put together what we call a
5  grand jury package, with my findings between those two months,
6  to predicate a full investigation to see if there's merits to
7  this case.
8  Q.   So how does it get from her asking you to take a look to
9  opening up a primary investigation?  Is that when you looked at
10  the bank accounts and -- what other documents did you look at?
11  A.   The first thing I looked at was his tax returns.  Based on
12  those it's worthy of a further look.  Based on that I think I
13  checked the property records, looked at some bank records that
14  were available to me.  I was going to be spending some time on
15  it because it looked like there was merit to it, so we opened a
16  primary investigation.  As I said, in January I had enough,
17  because I have to go through a stringent approval process, for
18  a subject criminal investigation to be opened.
19  Q.   How were you able to have access to bank records early on,
20  back in November of 2018?
21  A.   The FBI had them.
22  Q.   The FBI, at any point in 2018, did they approach you and
23  say, "Look, we are having a difficult time with this case.  Can
24  you look at it as a tax case"?
25  A.   Absolutely not.  I approached them after my boss asked me

04:21

1  to look at Mr. Williams because I thought they had an

2  investigation, so I wanted to confirm that and ask them if they

3  were willing for me to join the investigation if I could get a

4  case predicated, if it was necessary.

5  **Q.**   What was your initial impression --

6  **A.**   [Zoom audio distortion] how it would go, we would have to

7  work a case administratively, if there was a case to be worked.

8  But they did not approach me, no; I approached them.

9  **Q.**   What was your impression initially, after reviewing the

10 tax returns?

11 **A.**   After looking at the tax returns, I mean, Mr. Williams was

12 not -- his net profit was really low, just that and his year

13 after year after year -- I began to look more, saw a newspaper

14 article where he had tax liens in the past going back to 2001,

15 so there's some history there.

16         When I looked at the bank records, I guess the main

17 thing was all the items -- what appear to be personal

18 expenditures that were being spent from the law firm accounts

19 seemed very excessive.  So it was worthy of us looking at it

20 further to see if something is there.

21 **Q.**   Agent, why was it relevant to determine, when looking at

22 his tax returns, whether he made a profit or not?  What's the

23 relevance of that?

24 **A.**   Well, most people, if their business is not profitable,

25 they are not going to stay in business long, especially not

04:22

1  year after year after year.  I would assume attorneys work
2  really hard, and I don't think they would go through all that
3  not making any money.
4  Q.   Agent, let me ask you to look at Government Exhibit 6,
5  please.
6         MS. UEBINGER:  I'm sorry.  We are trying to pull it
7  up now.
8         THE COURT:  Any luck, Counsel?
9         MS. UEBINGER:  It's coming, Your Honor.  I'm sorry
10 about that.
11        THE COURT:  It's gone again.
12 BY MS. UEBINGER:
13 Q.   Agent, while they try to bring that exhibit up, you
14 mentioned that you reviewed the bank records.  Did you prepare
15 any type of schedule or chart of those records concerning what
16 you believe to be potential personal expenditures?
17 A.   Yes.  I prepared a document that I attached to my approval
18 package outlining what I thought to be potential personal
19 expenditures.
20 Q.   We are trying to pull that document up now, which we are
21 not being successful, but let me ask you.  Are you familiar
22 with that particular spreadsheet that you prepared?
23 A.   Yes.
24 Q.   Can you explain to the Court what's contained on the
25 spreadsheet.

04:25

**A.**   Well, I think the totality of the potential bad
expenditures at the time was probably around three-quarters of
a million dollars, but it included mortgages on various
property.  It included gym memberships, vitamins, hair salons,
student loan debt, personal tax liability debt, things that
aren't legitimate business expenses.

**THE COURT:**  Excuse me.  I'm not familiar with the
spreadsheet.  If you can say, did the grand jury have the
benefit of that spreadsheet?  Do you know?  Agent Moore?

**THE WITNESS:**  Oh, I'm sorry.  I don't know if they
saw that spreadsheet because that was a preliminary one.  We
had a more final version with the final findings of my
investigation from -- I think the investigation probably lasted
a year or a year and a half.  They would have had something
that would have been more current, but it would have been very
similar.  Those potentials at the time turned out to be
illegitimate expenses deducted by Mr. Williams.

**THE COURT:**  Thank you.

Go ahead, Counsel.

**MS. UEBINGER:**  Thank you, Your Honor.

BY MS. UEBINGER:

**Q.**   Agent Moore, can you explain to the Court -- do you recall
approximately how many different classifications of personal
expenses you gleaned from these bank records?

**A.**   There was probably 40.

04:26

1  Q.   Was that concerning to you?

2  A.   Well, sure.  Yes.  Absolutely.

3  Q.   Are you saying that those personal expenditures are

4  expenditures that you believed or you suspected at the time

5  ended up on the business Schedule C of the tax returns?

6  A.   Right.  That's what it appeared at the time to have

7  happened, and it was done year after year after year.  So it

8  wasn't like it was a onetime thing, a one year thing.  I think

9  I covered five years in that particular spreadsheet.  So we had

10  something that was going on.  If it was illegitimate, then

11  that's a significant pattern that we look at.

12  Q.   Is it your testimony that you prepared that draft early on

13  after you were asked to take a look at this matter?

14  A.   Yes, that would have been prepared by -- I think I

15  submitted the initial review in mid-January of 2019.  So

16  between November 7, when I got invited onto the case or asked

17  to look at it, that next eight to ten weeks I compiled all that

18  to predicate the case.

19  Q.   So once that spreadsheet was prepared, you said it was

20  concerning.  Did it cause you to want to look further and to

21  determine whether or not those expenses were, in fact,

22  personal?

23  A.   Well, sure.  That's why we investigate a case, to

24  determine the validity of what we think is happening.

25  Q.   When you first began looking at the case back in early

04:28

1    November of 2018, you testified earlier -- were you or were you

2    not aware that Mr. Williams was a city councilman?

3    **A.**    I'm sure if I didn't know, the day I asked Todd I would

4    have known.  I probably looked him up as soon as Kristie asked

5    me to determine what was going on here.

6    **Q.**    You did know, though, that he was a public official,

7    correct?

8    **A.**    I would assume that for sure, yeah.  I would think I would

9    have known that.  If you ask me when exactly I knew that, I

10   don't know.

11   **Q.**    Did you take any action in this case just because he is a

12   public official?

13   **A.**    No.

14   **Q.**    Have you taken any action in this case because he is

15   running for district attorney?

16   **A.**    Of course not.

17   **Q.**    Did you take any action in this case because he is black?

18   **A.**    Of course not.

19   **Q.**    Did you initially know that Mr. Williams is a black man?

20   **A.**    No, I didn't know that until I pulled his picture off his

21   website.

22   **Q.**    So once you compiled this spreadsheet, looked at the tax

23   returns, pulled the property records, just briefly, what were

24   the next steps in your investigation?

25   **A.**    Well, by that time I felt like I had enough to send it

04:29

1 through the approval process to open it up to a full

2 investigation.  As Ms. Gregoire said, that process is it has to

3 go through her, it has to go through my ASAC and my SAC as well

4 as internal legal counsel to see if there's justification to

5 open the case, and then it goes to DOJ tax for their

6 concurrence.  That was just to open the case.

7 Q.   Did all of that happen in this particular case?

8 A.   Sure.

9 Q.   Once it became a full-blown grand jury investigation, was

10 it also sent to DOJ tax and my office for approval?

11 A.   At the end of the investigation or at the time my report

12 was finished, then it went through a very stringent approval

13 process as well.

14 Q.   Agent, did any other agent and/or supervisor ever call you

15 in early November of 2018 and tell you that Jason Williams had

16 agreed to be interviewed?

17 A.   No.

18 Q.   Was it your understanding that Agent Marable was not -- I

19 think your words were that she wasn't able to catch up with him

20 and interview him; is that correct?

21 A.   Yeah.  I knew they didn't meet up on the particular day

22 when they were trying to, but I never spoke to Agent Marable

23 about the case.  I was tasked with looking at it, see if

24 there's any merit to it.  I never spoke to her.

25 Q.   So when Agent Marable was not able to speak to him, did

04:31

1  you pick up the phone and call Mr. Williams and try to

2  interview him shortly thereafter?

3  A.   No, absolutely not.

4  Q.   Did anyone ever relate to you the fact that he was open to

5  being interviewed in November of 2018?

6  A.   No.  I don't know anything about that.  I do now, but I

7  didn't know then.

8  Q.   I'm sorry.  I couldn't hear you.

9  A.   I said at the time I didn't know that.  Obviously, I have

10  learned that through this process.

11  Q.   Now, when you are investigating a case involving a public

12  official, is that something that you have to notify your

13  supervisors of?

14  A.   Yes.  I keep my supervisors apprised of all my cases and,

15  of course, they know who we are working with.  They keep track

16  of various professions, types of cases we work, whether

17  Title 18, Title 31, Title 26.  So, yes, I definitely keep them

18  apprised.  Kristie and I, we talk often, so she will know if

19  I'm working a public official for sure.

20  Q.   Not just Ms. Gregoire, but I'm talking about the ASAC and

21  the SAC.  Is it important that they be kept in the loop if you

22  are, in fact, working a public official?

23  A.   Yes.  They want to know what's going on.

24  Q.   Tell the Court.  Why is that important?  If you left that

25  out of your case report or your approval documents, would that

04:32

1    be a problem?

2    **A.**    Well, sure.  Those are typically -- well, I guess people

3    will tag them as more high-profile cases.  Upper management

4    wants to know what's going on in those cases and make sure we

5    are not doing something that's going to embarrass us or

6    something that we are not going to do or that we shouldn't do.

7    **Q.**    Agent, is it fair to say that you have very little

8    authority to do things on your own?  In other words, most of

9    your investigative steps have to be approved by your

10   supervisors?

11   **A.**    I wouldn't say the investigative steps unless it's, for

12   example, search warrants, undercover operations, things like

13   that.  They have their own approval process.  As far as who I

14   go interview on a daily basis or what subpoenas are issued on a

15   daily basis, I don't need approval for that, no.

16   **Q.**    But you do need approval for initiating a case and moving

17   it forward from a primary investigation to a grand jury

18   investigation?

19   **A.**    Yes.  I can't open a case.  As I explained earlier,

20   there's many levels of approval for a case to open, and there's

21   even more levels of approval for a case prosecuted.  Then I

22   have to convince you guys that there's merits to the case for

23   you to even let us in.

24   **Q.**    Agent, prior to you receiving that phone call from your

25   supervisor, have you had any past dealings with Mr. Williams?

04:34

1  A.   No.  I don't know Mr. Williams.

2  Q.   What about Ms. Burdett?  Have you had any past dealings

3  with Ms. Burdett?

4  A.   No.

5  Q.   Mr. Magner mentioned in his questioning that there was a

6  meeting that took place at my office with myself, with you, and

7  with Agent Goodson.  Do you recall that meeting?

8  A.   I do.

9  Q.   You did a report of that meeting that we went through a

10  little bit earlier.  Do you recall telling Mr. Magner at that

11  meeting that although we would like to speak with Ms. Burdett,

12  that either way we were going to move forward with our cases?

13  A.   Yes.  Mr. Magner was made aware that there was an

14  investigation regarding Ms. Burdett separate and aside from

15  Mr. Williams' tax returns, but one that concerned her personal

16  tax returns.

17  Q.   Do you recall telling Mr. Magner whether she came in or

18  not to talk to us, we were just going to proceed as we normally

19  do and just move forward in the case?

20  A.   That's what we do, yes.

21  Q.   Do you recall Mr. Magner at that meeting telling us that

22  he knew that Ms. Burdett's returns were bad, that they had

23  false items on them?

24  A.   Yes.

25          MS. UEBINGER:  I don't have anything further.  Thank

04:35

1  you.

2           THE COURT:  Any brief redirect?

3           MR. MAGNER:  Yes, Judge, very briefly.

4                    REDIRECT EXAMINATION

5  BY MR. MAGNER:

6  Q.    In response to those last few questions from Ms. Uebinger,

7  you were going to move forward with these prosecutions

8  regardless of what Ms. Burdett told you or not?  Is that what

9  you are saying?

10  A.    We had to open an investigation into Ms. Burdett and, yes,

11  we were going to pursue that and determine if it's something

12  that can be prosecuted or if it's not prosecutable.

13  Q.    Okay.  I gave you a clear presentation of what her

14  testimony would be, did I not?

15  A.    You did.

16  Q.    All right.  Also in response to Ms. Uebinger's questions a

17  few moments ago, you said that all initiation of investigations

18  and the ramping up of the investigation process is supervised

19  by the management at the IRS, correct?

20  A.    No, it's not supervised.  You need approval for the actual

21  opening of an investigation.  I'm not supervised on a daily

22  basis while I'm doing it.

23  Q.    No, I understand not individual steps or investigative

24  tasks, but the opening of the investigation, the opening of the

25  grand jury investigation, and submitting the case for

125

TIMOTHY MOORE - REDIRECT

04:37

1   prosecution, that all has to be approved by IRS management,

2   correct?

3   A.   Yes.

4   Q.   Your immediate manager and supervisor was Ms. Gregoire,

5   who we heard from earlier this afternoon, correct?

6   A.   That's correct.

7   Q.   All right.  I think you told us a few moments ago that you

8   probably looked up Mr. Williams the very first day when

9   Ms. Gregoire approached you, correct?

10  A.   Yeah, probably so, if I would have had time to see if

11  there's some merits beginning that day, yes.

12  Q.   You in all likelihood would have Googled him then, right?

13  A.   Well, it's possible.

14       MR. MAGNER:  Could we please pull up Defense

15  Exhibit 2.

16  BY MR. MAGNER:

17  Q.   While we are doing that, that was the press account from

18  October 24, 2018, where Mr. Williams announced that he was

19  running for district attorney, correct?

20  A.   I can't see it.

21       MS. PARDEE:  Can we break in and change the

22  permission to allow us to present this exhibit, Cherie?

23       MR. MAGNER:  Cherie, can you allow us to present it?

24       THE DEPUTY CLERK:  Yes, you can try.

25

04:38

1  BY MR. MAGNER:

2  Q.   So if you looked him up or if you Googled him, in all

3  likelihood you would have found this article in *The Advocate*

4  about two weeks earlier, right?

5  A.   I did find an article when I was preparing my grand jury

6  package, which was included in there, and the [Zoom audio

7  distortion] on it, if I remember correctly, was January 10.  So

8  that's when I would have seen the article or one similar to it.

9  Q.   Right, but you would have researched him and probably

10  Googled him the day that Gregoire referred the matter to you,

11  right?

12  A.   I can't confirm or deny that.

13  Q.   Okay.  In response to Ms. Uebinger's questions, you said

14  that the extent of the personal expenses on the Schedule C of

15  Mr. Williams was concerning.  Do you remember that question and

16  answer?

17  A.   Yes, sir.  It warrants a further look to see if they were

18  legitimate or not.

19  Q.   Okay.  Was it concerning to you that Mr. Timothy had

20  stated on multiple occasions that he made those decisions as to

21  the deductions?  Was that concerning to you?

22  A.   Yeah, it was concerning because I didn't believe him.

23  Q.   Okay.  You never told the grand jury when you testified

24  that Timothy falsely claimed to be a CPA, did you?

25  A.   I don't know if I was asked that or not.  I did see that

04:40  1  he [Zoom audio distortion] --

2  **Q.**   You never told the grand jury that Timothy had given

3  completely different accounts of who made the decision about

4  deductions, did you?

5  **A.**   I don't think that was asked of me, no.

6  **Q.**   You never told the grand jury that Timothy was under

7  investigation himself, did you?

8  **A.**   I don't think that was asked of me.  I don't know.

9  **Q.**   Okay.  It would have been Ms. Uebinger asking you those

10  questions?

11  **A.**   Yes.

12         **MR. MAGNER:**  I have nothing further, Judge.

13         **THE COURT:**  Thank you.

14         **MS. UEBINGER:**  Your Honor, I'm sorry.  The problem

15  with our exhibit is that we needed Ms. Cherie to share with us.

16  I would like to just quickly pull it up and introduce it if

17  there's no objections.

18         **THE DEPUTY CLERK:**  I'm not sure --

19         **THE COURT:**  Counsel, I'm not going to continue to be

20  a victim of modern science.  I'm familiar with the document.

21  Unless you can get it up in 30 seconds, we are moving on.

22         **MS. UEBINGER:**  Your Honor, I don't need to display

23  it.  I would just like to offer, file, and introduce it.  The

24  agent has it --

25         **THE COURT:**  So ordered.

04:41

1    **MS. UEBINGER:**  Thank you.

2    **THE COURT:**  So ordered.  It's in.

3         Next witness.  We are running out of time,

4    Counsel.

5    **MR. GIBBENS:**  I know, Judge.  I'm trying to go very

6    quickly.  Our next witness is Jennifer Lopez-Martinez,

7    Your Honor.

8    **THE COURT:**  Let me just tell you-all now, because of

9    the time that you have taken, we are going to go until 5:30,

10   but not one second after that.  I have another commitment.

11   **MR. GIBBENS:**  Yes, sir.

12   **THE COURT:**  Who's your next witness?

13   **MR. GIBBENS:**  Jennifer Lopez-Martinez.

14   **THE COURT:**  Swear the witness.

15                **JENNIFER LOPEZ-MARTINEZ,**

16   having been duly sworn, testified as follows:

17   **THE DEPUTY CLERK:**  Please state and spell your name

18   for the record.

19   **THE WITNESS:**  My name is Jennifer Lopez-Martinez,

20   J-E-N-N-I-F-E-R, last name L-O-P-E-Z, hyphen, M-A-R-T-I-N-E-Z.

21                **DIRECT EXAMINATION**

22   BY MR. GIBBENS:

23   **Q.**   Agent Martinez, my name is Billy Gibbens.  I represent

24   Jason Williams.

25        You assisted Agent Lori Marable in her investigation

04:42

1    of Henry Timothy; is that correct?

2    **A.**    I did.

3    **Q.**    What were you investigating Mr. Timothy for?

4    **A.**    Lori was the case agent, so she knows a little bit more

5    about it, but it's basically about his preparation for tax

6    returns.

7    **Q.**    Okay.  You-all were looking at him for putting bad

8    information or bad deductions on his clients' tax returns; is

9    that right?

10   **A.**    Yes.

11   **Q.**    Okay.  As part of that investigation, Agent Marable

12   decided and you helped her to interview some of Mr. Timothy's

13   clients; is that right?

14   **A.**    Yes.

15   **Q.**    One of those clients was Jason Williams?

16   **A.**    Yes.

17   **Q.**    He was interviewed as a witness in the Timothy

18   investigation?

19   **A.**    Well, we attempted to interview him, but it was never

20   conducted.

21   **Q.**    Right.  But as a witness as opposed to a subject or a

22   target, correct?

23   **A.**    Correct.

24   **Q.**    At the time that you made that decision to interview

25   Mr. Williams, you had seen his tax information, hadn't you?

04:44

1  **A.**  I had not because I am not the case agent.

2  **Q.**  Okay.  Have you ever reviewed Mr. Williams' tax

3  information?

4  **A.**  No, I did not.  Lori just gave me an overall summary, but

5  I did not review it myself.

6  **Q.**  If you had not reviewed it, did you tell Agent Gregoire

7  that Mr. Williams' returns were egregious?

8  **A.**  I did, but that was just according to Lori.

9  **Q.**  Okay.  So you had never seen those returns?

10  **A.**  I had not.

11  **Q.**  Lori did not tell you that Mr. Williams was a subject or a

12  target of her investigation, did she?

13  **A.**  No, she did not.

14  **Q.**  But you took it upon yourself to tell your supervisor,

15  Ms. Gregoire, that Mr. Williams' returns were egregious; is

16  that right?

17  **A.**  No, that wasn't how it happened.  I basically went to her

18  because once we found out he was a councilman in the

19  New Orleans area, that is when I took it upon myself to inform

20  my manager that he was a councilman.

21  **Q.**  So you informed your manager that there was a witness in a

22  separate investigation who was a councilman?  Is that what you

23  informed her?

24  **A.**  Right.  I just said what Lori told me, that Lori said it

25  was egregious.

04:45

1  **Q.**   I'm sorry.  You told Agent Gregoire that there's a witness
2  who is a councilman and Lori says his returns are egregious?
3  **A.**   Right.
4  **Q.**   Am I getting that correctly?
5  **A.**   Yes.
6  **Q.**   What was Ms. Gregoire's reaction to that?
7  **A.**   She just stated not to speak to Jason Williams after that
8  point.
9  **Q.**   Were you asking her to open an investigation into
10  Mr. Williams?
11  **A.**   I did not.
12  **Q.**   Did you give her any documentation about Mr. Williams or
13  his returns?
14  **A.**   No.
15  **Q.**   You had not seen any documentation about Mr. Williams or
16  his returns?
17  **A.**   No.
18  **Q.**   Agent Marable did not ask you to open an investigation
19  into Mr. Williams, did she?
20  **A.**   No.
21  **Q.**   Did you interview or attempt to interview any other
22  clients of Mr. Timothy?
23  **A.**   We did.
24  **Q.**   Who were they?
25  **A.**   I don't remember because I'm not the case agent.

04:47

1    **Q.**   Did Agent Marable tell you anything about their tax
2    information?
3    **A.**   The same thing, that they were egregious.
4    **Q.**   So Agent Marable told you that the other witnesses that
5    you were going to go interview also had egregious tax returns?
6    **A.**   Yes.
7    **Q.**   Am I understanding that correctly?
8    **A.**   Uh-huh.
9    **Q.**   Were either of them public officials in New Orleans?
10   **A.**   No, they were not, not that I know of.
11   **Q.**   Did you tell Agent Gregoire about either of those
12   witnesses?
13   **A.**   I did not.
14   **Q.**   You didn't tell her that either of them had egregious tax
15   returns, did you?
16   **A.**   I did not.
17   **Q.**   Why not?
18   **A.**   Like I stated before, because he was a councilman, that is
19   the only reason why I went to my manager.
20   **Q.**   So the only reason you told Agent Gregoire that
21   Mr. Williams --
22   **A.**   Well, it's an obligation that we have to do.  It's an
23   obligation.
24   **Q.**   It's an obligation to do what?
25   **A.**   To inform our upper management when we have situations

04:48

1    like that, whether it's a public official -- it could be

2    anyone.  We just have to inform our managers.

3    **Q.**    Well, before you interviewed Mr. Williams, you knew he was

4    a public official, didn't you?

5    **A.**    I did not know he was a public official.

6    **Q.**    When did you find out he was a councilman?

7    **A.**    As soon as we attempted to interview him at his office,

8    that day we went into another manager at the time -- she is

9    retired -- Marilyn Cherie's office, and she told us he was a

10    councilman.

11    **Q.**    Okay.  So your testimony is that whenever there is a

12    public official that you believe their tax returns are

13    egregious, you have to tell your supervisor?

14    **A.**    Not necessarily egregious, but if it's a witness in an

15    investigation, yes.

16    **Q.**    So you were just telling her that he was a witness in an

17    investigation; you were not telling her go look at his tax

18    returns?

19    **A.**    No, I did not.

20    **Q.**    You didn't even think there were any reason to look at

21    Mr. Williams' tax returns because you hadn't seen them, had

22    you?

23    **A.**    No.

24    **Q.**    What did Agent Gregoire do after you gave her this

25    information?

04:50

1  **A.**  I have no idea.

2  **Q.**  Did she assign the case to somebody else?

3  **A.**  I don't know.  I mean, after all this, now we know that

4  she must have assigned it to Tim, but I didn't have any idea

5  what happened.

6  **Q.**  Okay.  So there was no discussion with Agent Gregoire that

7  somebody else was supposed to go interview Mr. Williams in

8  connection with the Timothy investigation, was there?

9  **A.**  No.

10  **Q.**  In fact, the discussion was don't go interview

11  Mr. Williams in connection with the Timothy investigation;

12  isn't that right?

13  **A.**  Yes.

14  **Q.**  So she was instructing you not to interview a witness in

15  your investigation of Henry Timothy; is that right?

16  **A.**  Well, it's not my investigation, it's Lori's, but yes.

17  **Q.**  Did you ever interview any other Henry Timothy clients?

18  **A.**  We couldn't get in touch with anyone.  No one would call

19  us back.

20  **Q.**  Did you refer any other Timothy clients for any type of

21  investigation?

22  **A.**  I'm not sure.  You would have to ask the case agent that.

23  **Q.**  You personally didn't do it?

24  **A.**  Right.  No, I did not.

25  **Q.**  Have you ever spoken with Agent Moore about Mr. Williams'

04:51

1    case?

2    **A.**    No.  Mr. Tim Moore?

3    **Q.**    Correct.

4    **A.**    No.

5    **Q.**    Aside from the one conversation you had with Agent

6    Gregoire after the interview attempt, did you speak with her

7    about Mr. Williams again?

8    **A.**    There was no need to, no.

9              **MR. GIBBENS:**  I tender the witness, Your Honor.

10             **THE COURT:**  Thank you.

11                  Counsel, go ahead.

12             **MS. UEBINGER:**  Thank you, Your Honor.

13                            **CROSS-EXAMINATION**

14   BY MS. UEBINGER:

15   **Q.**    Agent Lopez-Martinez, do you recall Agent Marable telling

16   you that she was looking at Henry Timothy for failing to claim

17   all of his gross receipts income on his return?

18   **A.**    No.  We didn't speak in detail.

19   **Q.**    So is it your testimony you were not involved in that

20   investigation?  Your only involvement was being the secondary

21   on potential witness interviews?

22   **A.**    Exactly.

23   **Q.**    The day that you went to Mr. Williams' office, do you

24   recall that day?

25   **A.**    Yes.

04:53

1    **Q.**    Do you recall being at the office?

2    **A.**    Yes.

3    **Q.**    Were you able to meet with Mr. Williams?

4    **A.**    No, we were not.

5    **Q.**    Were you angry because Mr. Williams failed to show up at

6    the office?

7    **A.**    No.

8    **Q.**    Why not?

9    **A.**    Because it happens all the time witnesses don't show up.

10   **Q.**    Did you take any action in this case because you were

11   angry at the fact that Mr. Williams didn't show up?

12   **A.**    No.

13   **Q.**    Now, when you went back to the office or later you spoke

14   with your supervisor, Special Agent Gregoire, did you tell her

15   because -- she is your supervisor, correct?

16   **A.**    Yes.

17   **Q.**    At the time was she Lori Marable's supervisor?

18   **A.**    No, she was not.

19   **Q.**    You felt you had an obligation to relay to her the fact

20   that y'all went to interview someone that you didn't know was a

21   councilman but later found out was a councilman?

22   **A.**    Yes.

23   **Q.**    It's your testimony that you did tell her that Lori

24   Marable, Special Agent Marable, did tell you that she felt his

25   returns were egregious?

1     **A.**    Yes.

2         **MS. UEBINGER:**   Thank you.   I have nothing further.

3         **THE COURT:**   Thank you.

4           Any redirect?

5         **MR. GIBBENS:**   No, sir.

6         **THE COURT:**   Thank you.   Call your next witness.

7         **MR. GIBBENS:**   Judge, we will call Harold Asher at

8 this time.

9         **THE COURT:**   Thank you.   Is Mr. Asher present?

10         **MR. GIBBENS:**   Yes, sir.   They just logged him in.

11         **THE COURT:**   Swear the witness.

12               **HAROLD ASHER,**

13 having been duly sworn, testified as follows:

14         **THE DEPUTY CLERK:**   Thank you.   Please state and spell

15 your name for the record.

16         **THE WITNESS:**   My name is Harold Asher.

17               **VOIR DIRE**

18 **BY MR. GIBBENS:**

19   **Q.**    Can you speak up a little bit, Mr. Asher.

20   **A.**    Sure.

21   **Q.**    Spell your name for the record, please.

22   **A.**    Oh, I'm sorry.   H-A-R-O-L-D is my first name, and my last

23 name is Asher, A-S-H-E-R.

24   **Q.**    What's your occupation?

25   **A.**    I'm a certified public accountant.

04:56

1    **Q.**    How long have you been a CPA?

2    **A.**    I started working in 1975.  It was a one-year requirement

3    to get your CPA, and I've been a CPA since 1976.  44 years.

4    **Q.**    Do you have any particular experience in tax?

5    **A.**    I've been working in the tax area literally from 1975, so

6    I would say 45 years of experience.  Although our firm does

7    primarily consulting work now, we still prepare about 200 or

8    300 returns a year.

9    **Q.**    Okay.  Are you certified in forensics?

10   **A.**    I have a designation by the American Institute of

11   Certified Public Accountants giving me a -- certified in

12   financial forensics.  I'm also a forensic CPA.

13            **MR. GIBBENS:**  Judge, at this time we would offer

14   Mr. Asher as an expert in tax and accounting.

15            **THE COURT:**  Ms. Uebinger, any questions?

16            **MS. UEBINGER:**  No, sir.  No objection from the

17   government.

18            **THE COURT:**  I'm familiar with Mr. Asher's background

19   and his experience.  The Court will recognize him as an expert

20   regarding the issues dealing with accounting in this case.

21            **MR. GIBBENS:**  Your Honor, I know that the Court is

22   familiar with the declaration that we provided before the

23   hearing.  Just to shortcut some of this because I know we are

24   short on time, I would ask at this time for Mr. Asher just to

25   identify it and let us know that it's true and correct, and

04:57

1    then I would offer that into the record.  That would be Defense

2    Exhibit D-5, along with all of the attachments.

3           **MS. PARDEE:**  Cherie, can you change the settings to

4    allow us to screen share again.

5           **THE COURT:**  I can't see Mr. Asher.

6               Mr. Asher, did you understand Mr. Gibbens?

7           **THE WITNESS:**  Yes.  Yes, Your Honor, this is, with

8    the exception I noted that there are a few, very few changes to

9    this declaration.  If you would like, I will go through them,

10   but they are very minor and inconsequential and do not change

11   any of my findings.  It's just a few typos here or there.

12          **THE COURT:**  Well, why don't you just quickly

13   summarize them.

14          **THE WITNESS:**  Excuse me, Your Honor?

15          **THE COURT:**  Why don't you just quickly summarize

16   them.

17          **THE WITNESS:**  Okay.  On item 19 on page 3 of my

18   declaration, instead of 25.06 percent, it should be

19   23.06 percent, Judge.

20              On my Schedule D, I found two linking errors

21   today.  If you go down to Mr. Williams at the bottom and

22   shaded, his total should be -- instead of $2,083,548 for his

23   total revenues, it's properly $2,662,117 with a corresponding

24   percent change of 8.08 percent.

25              For Mr. or Ms. Rosiere, the very last one,

04:59

1  contractor, those total revenues are $1,570,063 as opposed to

2  $1,306,912.

3  Those were the only changes that I noted.

4  **THE COURT:**  All right.  Thank you.

5  Go ahead, Mr. Gibbens.

6  **MR. GIBBENS:**  Yes, sir.

7  **DIRECT EXAMINATION**

8  BY MR. GIBBENS:

9  **Q.**  Mr. Asher, you reviewed a database of all of Mr. Henry

10  Timothy's clients that was compiled by the IRS; is that

11  correct?

12  **A.**  Yes, I did, and I think that's Attachment B to this

13  declaration.

14  **Q.**  Based on your review of that, was it your conclusion that

15  across the board Mr. Timothy took large Schedule C deductions

16  for all of his clients?

17  **A.**  Well, I would say he took deductions that generated

18  taxable incomes that were less -- the expenses were greater

19  than I thought that they would have been, which gave rise to

20  lower net income percentages for literally all of his

21  Schedule C clients that he represented.  So the answer to your

22  question is yes, I did see large ones, and they were larger

23  than I would have expected based upon the statistics provided

24  by the IRS in this matter.

25  **Q.**  Was Mr. Williams an outlier compared to the rest of

05:01  1  Mr. Timothy's clients?

2  **A.**   He actually performed better than a number of them who you

3  would have expected to have had a higher income.  The answer is

4  no, he was not an outlier.  He appeared to be treated like

5  literally over a thousand other tax returns that I looked at.

6           **THE COURT:**  Excuse me, Mr. Gibbens.

7                I have a question, Mr. Asher.  I believe you

8  have opined that it's not unusual for a law firm to deduct cost

9  of goods sold; is that correct?

10           **THE WITNESS:**  That is absolutely correct, and the

11  statistics that the IRS published validates that, Your Honor.

12           **THE COURT:**  Tell me what goods a law firm sells.

13           **THE WITNESS:**  Well, it's not only cost of goods; it's

14  also direct cost of operations.  You would put in that other

15  costs.  You would put things like if you had a co-counsel, for

16  example, and the client paid you, you would put the payments

17  that you would pay to a co-counsel.  You would put filing fees

18  into that category.  You would put expert fees into that

19  category.

20           **THE COURT:**  Why wouldn't that be put in the category

21  of professional services or expenses for services rendered?

22           **THE WITNESS:**  Well, the answer is it's the tax

23  return's preparer -- the tax preparer's determination where the

24  tax preparer wants to put it.  You give the raw data to the tax

25  preparer, and the tax preparer decides whether they want to put

05:03

1    it as an other expense, such as what you decided, or as a cost

2    of goods sold and [Zoom audio distortion], Your Honor.

3         **THE COURT:**  Excuse me.  Is it customary in your

4    experience that law firms have an expense for cost of goods

5    sold as opposed to, say, services rendered?

6         **THE WITNESS:**  The answer is it's -- is it customary?

7    I would say about 60 percent would -- or 40 percent would put

8    it in cost of goods sold, about 60 percent would put it as

9    professional fees or other those expenses, but it's certainly

10   not unusual.  It would not be a trigger to me that there was

11   any impropriety.  It's just where one chose to report the

12   expenses.  It's quite common, actually.

13        **THE COURT:**  All right.  Thank you.

14        **MR. GIBBENS:**  Judge, if I could just follow up on

15   that.

16             If we could go to Exhibit C to Mr. Asher's

17   declaration, and can you blow that up a little bit so we can

18   see the very first two columns.

19   **BY MR. GIBBENS:**

20   **Q.**   Mr. Asher, I know you used this data.  This is an IRS data

21   bank that compiles information taken off of Schedule C's for

22   certain industries on a nationwide basis; is that right?

23   **A.**   That's correct.  The IRS publishes statistics, Judge, and

24   I've indicated where.  If you wanted to, you can duplicate what

25   I did by going to the website.  This is an IRS website.  This

05:05

1    is an IRS schedule.  They do it nationally.  They do it by

2    state.  They do it by county.  I happen to have used the --

3    this is the national statistics.

4            You can see nationally, Judge, and this is for -- if

5    you look up at the top left-hand corner, this is for the year

6    2013.  If you scroll down to the column that's "CP" -- this is

7    a screenshot -- this is for legal services, which are law

8    offices, and it's item 93.  They happen to do about 120

9    different items for Schedule C's which are sole proprietors,

10   and these are nonfarm sole proprietors.

11           What you can see, Judge, is for the 342,911

12   Schedule C's filed for 2013, for lawyers in 2013, the IRS has

13   determined the total revenues were -- this is small, so I'm

14   going to say approximately $40 billion because these amounts

15   are not in dollars but in thousands of dollars, and that the

16   law firms themselves took -- and you see on line 17,

17   Your Honor, it says cost of sales and operations.  So it's not

18   just cost of sales; it's also direct cost of operations.  You

19   can see that the total there for that particular year was about

20   $2.6 billion or about 6 percent of the total amount that all of

21   the lawyers reported as revenues on Schedule C for 2013

22   according to the IRS.

23           **THE COURT:**  Thank you.

24           Go ahead, Mr. Gibbens.

25           **MR. GIBBENS:**  Thank you.

05:07

**BY MR. GIBBENS:**

**Q.**   Just one more quick question on that highlighted line, on 17, Mr. Asher.  All those numbers would have come from the cost of goods sold line on the Schedule C; is that right?

**A.**   If you look and you follow down, Judge, 19 -- actually lines 18 through 23, those are the lines that were in cumulative filled out by the 342,000 lawyers, some of whom reported it under cost of sales.  But you can see it's clearly not just cost of the sales, it's also cost of operations.

So it's basically the direct cost of generating those revenues, and the lion's share of the numbers and other costs, which would be the accumulation of the things that you discussed, Your Honor, such as professional fees, that's where those would be.

**THE COURT:**  Thank you.

Go ahead, Mr. Gibbens.

**BY MR. GIBBENS:**

**Q.**   Mr. Asher, did you look at a few particular clients of Mr. Timothy aside from Mr. Williams?

**A.**   Yes, I did, and if you will go to --

**Q.**   Let me just get to my question so we can try to speed things up.  As a forensic fraud examiner, were there other clients of Mr. Timothy that you would be interested in looking deeper into their returns?

**A.**   Well, there were literally hundreds, if not over a

05:08

1  thousand that I would have selected, but I picked out some for

2  purposes of pointing them out to Your Honor, just a few that to

3  me would raise -- that I would want to examine very, very

4  closely.

5  Q.   Okay.  Those are set forth in Exhibit D to your

6  declaration?

7  A.   That's correct.

8  Q.   Okay.  We won't go through it, in the interest of time,

9  but in Exhibit D --

10        MR. GIBBENS:  If we could just scroll down a little

11  bit to show the red highlights.

12  BY MR. GIBBENS:

13  Q.   This is showing us, Mr. Asher, the percentage of the

14  income that Mr. Williams paid taxes on, 10.33 percent, is

15  actually greater than all of the rest of these other

16  Henry Timothy clients; is that right?

17  A.   Right.  I corrected that.  His actual amounts should be

18  8.1 percent.  So it's greater than all but Mr. DuPont, but I

19  would still include Mr. DuPont in there.  The way the income

20  was reported for these particular individuals that were not

21  correlated in some cases with their revenues, in other cases

22  you know that the peer group -- for example, Mr. Douglas, home

23  health is about a 40 percent net income according to the IRS

24  statistics, Your Honor.  His was 2 percent.

25        Go down to the bottom, Mr. Rosiere.  Despite all of

05:10

1    his revenues -- it's actually $1.5 million dollars of

2    revenues -- he only reported $8,000 of profit, and he is a

3    contractor.  Contractors are in the 20 to 30 percent range,

4    Your Honor.

5              So all of these that are in red would be parties that

6    I would want to look at to make a determination as to what

7    Mr. Timothy did vis-à-vis those expenses.

8              THE COURT:  Thank you.

9              THE WITNESS:  These are a few examples.

10   BY MR. GIBBENS:

11   Q.    Also in your declaration you address whether or not you

12   were able to determine that any other Henry Timothy clients

13   were public officials.  Were you able to determine that there

14   were any other public official clients aside from Mr. Williams?

15   A.    Actually, I asked your office to search the data banks,

16   the appropriate data banks, and you represented to me that your

17   search gave no other representatives who were public officials

18   other than Mr. Williams.

19             MR. GIBBENS:  Okay.  Thank you.

20             Judge, we will tender the witness.

21             THE COURT:  Thank you.

22             Ms. Uebinger, go ahead.

23             MS. UEBINGER:  Ms. Cherie, could you please share

24   with us so we can display exhibits.

25

05:11

1                        CROSS-EXAMINATION

2   BY MS. UEBINGER:

3   **Q.**   Mr. Asher, good afternoon.  My name is Kelly Uebinger.  I

4   have a few questions for you.

5            Let me first ask you to look at the spreadsheet that

6   you just reviewed with Mr. Gibbens labeled as 5-C, which is the

7   nonfarm sole proprietorship income statements by industrial

8   sectors, page 2.

9            While we are trying to bring up the exhibit, the

10  particular category that you were referring to is labeled as

11  legal services.  Can you define that term for me, "legal

12  services."  What does that category include?

13  **A.**   Well, it would certainly include attorneys.

14  **Q.**   But it could certainly also include other businesses, too,

15  such as, let's say, maybe a court reporting service, maybe

16  Westlaw, LexisNexis; isn't that correct?

17  **A.**   Well, it would only be the ones that are the

18  C corporations, and I will tell you that the entities -- for

19  example, it would not include partnerships.  It would not

20  include corporations.  Westlaw is a corporation.  Most of the

21  entities that I am familiar with that are court reporting firms

22  are not Schedule C's, but operate as either partnerships or

23  S corporations or C corporations.  So the answer is yes, it

24  could, but I have seen no breakdown.  All we are trying to do,

25  Ms. Uebinger, is to use the best information that is available.

05:13

1  **Q.**  Sir, let me ask you.  The judge asked you several

2  questions about the term "cost of goods sold."  That is a term

3  of art which is defined and applies if you are a manufacturer,

4  a wholesaler or a retailer, or you have a business which makes,

5  buys, or sells goods; isn't that correct?

6  **A.**  Yes.  If you are limiting your analysis to cost of goods

7  sold, that's correct.  But if you would pull that schedule up,

8  that exhibit, it's not only cost of goods sold that would go

9  there, but also the cost of operations.  So that if you as a

10  tax preparer -- if I, Harold Asher, as a tax preparer, was

11  doing Jason Williams' -- I would say that there have been

12  numerous returns that I have filed in the past where I have put

13  things like expert fees or court costs or fees that are paid to

14  co-counsels where the attorney gets paid from the client --

15  excuse me, by the opposing party and then those funds are

16  disbursed to an outside co-counsel, those are often found in

17  the cost of -- you're calling cost of goods sold, but also it's

18  cost of operations, which goes expanded beyond that, and that's

19  where those costs would be accumulated.

20  **Q.**  Yes, sir, and I understand that.  My question for you is

21  this.  You would agree with me that there is a difference

22  between the IRS' definition and, in fact, most businesses'

23  definition of "cost of goods sold" versus "cost of operational

24  expenses"?  There's a distinction, correct.

25  **A.**  I don't understand.  If what you are saying --

05:14

1   **Q.**   Let me rephrase.  Could I rephrase it?

2   **A.**   Absolutely.

3   **Q.**   Sir, isn't it true that there's a distinction between the

4   definition of "cost of goods sold" and "cost of sales and

5   operations"?  Yes or no?

6   **A.**   Well, they would both -- is there a difference?  The

7   answer is for tax returns purposes there is no difference.

8   They would both be reported in the same place, the same lines

9   on Schedule C's.  So a manufacturing entity or a restaurant or

10  a retail store would put them there.  A law firm would also put

11  them there.  It's a cost of operations.

12  **Q.**   Sir, but my question is this.  Isn't it true, like you

13  said -- on this particular spreadsheet it says cost of sales

14  and operations.  Isn't that a more expansive category than just

15  cost of goods sold?

16  **A.**   It's more expansive from a technical standpoint, but as it

17  relates to filing tax returns, they are synonymous, because a

18  tax preparer for an attorney would assume and would include a

19  direct cost of operations in the cost of goods under other

20  costs, which is what, in fact -- it's my understanding that's

21  exactly what Mr. Williams did.  So I [Zoom audio distortion] --

22  **Q.**   Sir, no, my question is this.  It sounds like --

23  **A.**   [Zoom audio distortion] a tax preparer or a tax return for

24  a law firm treating it that way.  It's done not infrequently.

25  **Q.**   I'm not asking you about that.  You are missing the point.

05:16

1    My question is this.  On this spreadsheet that we have in front

2    of us, it says "cost of sales and operations, total."  That

3    would include operating expenses of these particular

4    businesses, correct?

5    **A.**    No, ma'am.  If you take a look, you're only going to put

6    into that -- if you will go down to line 22, you will see the

7    expenses that are the variable expenses that one would put in

8    that under other costs on line 22.  On the other items, if you

9    wanted to see, for example, you take -- starting on line 24,

10   you are going to pick up the other expenses, advertising

11   expenses.  Line 25 is car expense.  Your Honor had asked about

12   legal and professional fees.  That would be on line 32.  You

13   would also put certain expenses and other expenses on line 36.

14          **THE COURT:**  Well, Mr. Asher, excuse me.  You are

15   getting far afield.  Let me ask another question maybe in

16   another way instead of the question that's been asked.

17              Is it your testimony that for accounting

18   purposes the cost of goods sold by a law firm in a law practice

19   can include intangibles?

20          **THE WITNESS:**  Intangibles?  No, sir, I would not

21   include intangibles.  You would have that as an amortization

22   expense or --

23          **THE COURT:**  Well, then give the government an example

24   of what exactly is a good sold by a law firm.

25          **THE WITNESS:**  It's not just sold, Your Honor.  This

05:18

1   is meant to capture by a tax client -- by a tax preparer, it is

2   meant to capture certain direct expenses that are attributable

3   to a particular case as opposed to the office, the overall

4   office practice.  For example, your employees, your rent, your

5   advertising, you are not going to assign that to any one

6   particular case.  However --

7           THE COURT:  I understand your answer.

8                Go ahead, Counsel.

9   BY MS. UEBINGER:

10  Q.   So, Mr. Asher, in looking at your declaration, if you

11  could direct your attention to paragraph 15.  I'm sorry.  It's

12  paragraph 14.

13          MS. UEBINGER:  Can you pull up his declaration, which

14  would be page 3.

15  BY MS. UEBINGER:

16  Q.   So while they are trying to pull it up, let me go ahead

17  and read it to you because I know you are familiar with it

18  since you wrote it.  It says:  "Based on the IRS' statistics,

19  Mr. Williams' deductions for cost of goods sold was less than

20  half of the national average and should not have raised a red

21  flag to the IRS."

22          Isn't that a misleading statement because the

23  schedule that you're looking at does not refer to cost of goods

24  sold anywhere on it?  It refers to cost of sales and

25  operations, correct?

05:19

1  **A.**   Well, all I can tell you is -- the answer is yes.  But in

2  answer to your question, there were lawyers who deducted more

3  than 6 percent of their revenues under the cost of goods sold

4  line on their Schedule C tax returns.

5  **Q.**   I understand that, but that's not what I asked you.

6  **A.**   It's not something --

7  **Q.**   What this schedule says, it refers to cost of operations.

8  Isn't it true that a law firm can have cost of operations

9  without having cost of goods sold?

10  **A.**   The answer, yes, but that's logically not correct because

11  the law firm -- and as it showed in 2000, each year --

12        **THE COURT:**  Excuse me.  Mr. Asher, stop arguing with

13  counsel.  Just listen to the question and answer the question.

14  If there's need for the defense to respond after that, you will

15  have an opportunity, but don't argue with counsel.

16        **THE WITNESS:**  Yes, Your Honor.

17  BY MS. UEBINGER:

18  **Q.**   My question, sir, is wouldn't it have been more accurate

19  for you to say that Mr. Williams' deductions for cost of goods

20  sold -- you should have labeled it the same as the spreadsheet

21  that you reference, which is "cost of sales and operations,

22  total," correct?  That would have been more accurate?

23  **A.**   No, ma'am.  I do not believe that's correct.

24  **Q.**   Do you have a schedule of national averages for purely

25  cost of goods sold?

05:21

1  A.   National averages for lawyers -- the answer is yes, I do

2  have it, but I wanted to break it down, Counsel, to the one

3  that is most [Zoom audio distortion] --

4  Q.   Could you point us to that schedule for just cost of goods

5  sold, not cost of operations.

6  A.   Well, on the return, the return says cost of goods sold,

7  but you accumulate on the return cost of operations, direct

8  cost of operations on that as well.

9  Q.   Sir, I heard you when you were responding to the judge.  I

10  understand what you were saying, that we don't want to get into

11  an argument about where you put it.  If you have the legitimate

12  business expense, whether you put it under cost of goods sold

13  or whether you put it under professional fees, if you have that

14  expense, it should be deducted someplace, correct?

15  A.   That's fair.  Yes, ma'am.

16  Q.   But you shouldn't put it in both places, should you?  You

17  shouldn't double count it in cost of goods sold and under

18  professional fees.  Would that be fair to say?

19  A.   Well, you shouldn't -- you can have certain items that

20  would go into cost of goods sold that you would not also put

21  into -- you shouldn't put the same expense twice.

22  Q.   Well, my question is let's say under line 27a of a

23  Schedule C under other expenses you had $50,000 in professional

24  fees.  You shouldn't put it both on 27a and then on the second

25  page, part 3, line 42, under cost of goods sold.  You shouldn't

05:23

1    put another $50,000 if, in fact, the total was just $50,000.

2    Correct?

3    **A.**    That's correct.  You shouldn't deduct the same expense

4    twice.

5    **Q.**    Let me direct your attention to Government Exhibit 10.

6          **MS. UEBINGER:**  If we can ask Ms. Cherie to share the

7    screen.

8          **THE COURT:**  Lots of luck, Counsel.

9          **MS. UEBINGER:**  Yes.  Is it coming up?

10         **THE DEPUTY CLERK:**  The screen sharing is on.

11   **BY MS. UEBINGER:**

12   **Q.**    Because we are short on time, Mr. Asher, did you review

13   Mr. Williams' Schedule C's in preparation for your testimony

14   here today.

15   **A.**    Yes, ma'am.

16   **Q.**    I would assume, because you have 45 years' experience, you

17   are very familiar with Schedule C.  Is that accurate to say?

18   **A.**    I've been involved in preparing thousands of Schedule C's,

19   yes, ma'am.

20   **Q.**    Yes, sir.

21         **MS. UEBINGER:**  Can we please turn to page 2 of that

22   exhibit.

23   **BY MS. UEBINGER:**

24   **Q.**    Sir, as you can see on line 42 of that document, there's a

25   cost of goods sold figure that's listed for $55,499.  Do you

05:24  1  see that?

2  **A.**  I can see that there's a number on my screen, which is --

3  it's kind of small, so I will take your word that it's that

4  amount.

5  **Q.**  Yes, sir.

6  **MS. UEBINGER:**  Just because of the time constraints,

7  for the record, I identify that as Mr. Williams' Schedule C for

8  the year 2015.

9  **BY MS. UEBINGER:**

10  **Q.**  Would that have been a document that you would have

11  reviewed prior to your testimony here today?

12  **A.**  Yes, ma'am.

13  **Q.**  Can you tell me, what does that cost of goods sold number

14  represent for Mr. Williams?  What expense was that?

15  **A.**  I do not know.

16  **Q.**  You don't know?

17  **A.**  It was not identified.  No, ma'am.

18  **Q.**  If you were asked to analyze this tax return, how would

19  you determine what that number represents?  What steps would

20  you take?

21  **A.**  Well, there should be an input sheet that would say what

22  costs were accumulated that would go into that particular

23  account.  There would probably be a computer input sheet that

24  would tie into that.  So I would go back to the data source of

25  the data return preparer and find out what information went

05:25   1   into that.

2           Part of the problem with lawyers, Judge, is that it's

3   a timing issue.  Although you are a cash basis, there are

4   certain costs that you cannot deduct until a case is resolved

5   in that particular year.  For example, if Mr. Williams is

6   representing a client and has a cost in 2012, but that case is

7   not over until 2013, those costs that are attributable to that

8   particular client cannot be deducted until 2013 when that case

9   is closed.

10  Q.   Yes, sir.

11  A.   So one has to go back and figure out what goes into those

12  particular costs, what is the timing of those accumulation

13  costs, and how is that determined.

14  Q.   So my question for you is if you were given access to this

15  particular law firm's QuickBooks and other financial data and

16  you reviewed that data and you determined that that $55,499 was

17  purely comprised of personal expenses, would that be

18  appropriate to put on his tax return?

19  A.   Oh, absolutely not, no.  I don't know that I could do that

20  unless I was able to get the tax preparer's work paper and the

21  electronic files of the tax preparer to make that

22  determination.

23          Your Honor, the devil is in the details, and you have

24  to perform a detailed audit of that.  You cannot make that

25  determination, Judge, by just looking at the tax return and

05:27

1  saying this is an unusual tax return because it has a cost of

2  sales or other costs included in the cost of goods sold.  That

3  information is not available.

4  **Q.**   If that information had been available and if you had

5  discovered it, that would raise a red flag for you, wouldn't

6  it?

7  **A.**   When you say "that information," could you please expand.

8  **Q.**   If the $55,000 was purely personal expenses.

9  **A.**   That should not be deducted.  If it's a personal expense,

10 it should not be deducted, that's correct.

11 **Q.**   Mr. Asher, have you ever testified in a federal criminal

12 case?

13 **A.**   I was involved in Worldwide Gaming -- your Honor, I'm sure

14 maybe you remember that -- years and years ago with Bally's.  I

15 don't know if I was tendered or not.  I was hired by the

16 Department of Justice to represent one of the defendants as

17 part of their indigent defender program.  I may have testified

18 for two or three minutes, and then they had a break and settled

19 the case.

20 **Q.**   So is it fair to say --

21 **A.**   Other than that, I have not testified, and I don't know

22 that I testified in that particular case.

23 **Q.**   So has most of your testimony been in civil cases, then?

24 **A.**   Civil cases, the answer is yes.  I've done a fair amount

25 of domestic cases.  There's a lot of forensic work involved in

05:28

1    a domestic case, marital relations, but it's primarily been in

2    civil cases.

3    **Q.**    Have you ever worked as a criminal investigator for the

4    IRS or the FBI or any other agency?

5    **A.**    Not as a criminal investigator, but currently we are --

6    there are about 10 cases that we have been hired on to do

7    investigations in civil matters.  We do a fair amount of work

8    for the Department of Justice out of Honolulu.  Right now we

9    have about eight cases that are going on with them.  We have

10   done about a dozen cases for them where we investigate in

11   detail, look at tax returns, too, because there's a large

12   military presence there.

13   **Q.**    Sir --

14   **A.**    We look at those taxes, do a lot of forensic work there.

15   We currently --

16   **Q.**    Yes.  I'm sorry to cut you off --

17   **A.**    -- have two cases hired by the Department of Justice --

18                **THE COURT:**  Wait, wait, wait.  Mr. Asher, counsel has

19   a question.

20                **THE WITNESS:**  Oh, I'm sorry, Your Honor.

21   **BY MS. UEBINGER:**

22   **Q.**    Yes.  Thank you for answering my questions, sir.  We are

23   short on time.

24                I wanted to ask you if you were asked to look at this

25   2015 tax return and particularly the Schedule C -- you

05:30

1   mentioned to the judge that the devil is in the details.  Would

2   you agree with me that a lot of work would have to go into that

3   to verify whether those numbers are accurate or not, just like

4   we discussed with the $55,000 cost of goods sold?

5   A.   Well, it depends on what I'm given.  The devil is in the

6   details.  If I'm given all of the information, if I have the

7   tax preparer's records that the tax preparer is required to

8   keep, the work papers of the tax preparer should walk me

9   through all the way there.  So I would depend on the tax

10  preparer to be the Rosetta stone in that particular case.  If

11  the tax preparer has done their job, I could probably do that

12  in a relatively short period of time.

13  Q.   Sir, let me direct your attention to paragraph 2 of your

14  declaration, and I will read it for you:

15          "I have been informed by Mr. Williams' counsel that

16  the IRS has stated that it opened a criminal tax investigation

17  into Mr. Williams because Mr. Williams' tax returns reported

18  little profit from 2013 to 2016, a loss in 2017, Mr. Williams'

19  Schedule C included expenses that the IRS deemed excessive, and

20  Mr. Williams took deductions in excess of $100,000 for cost of

21  goods sold."

22          Were you ever told that the special agent also

23  determined that there were 40 categories of personal expenses

24  that he found on these Schedule C returns?  Was that

25  information ever provided to you?

05:31

1   **A.**   I haven't heard the number "40 categories."  I am aware

2   that there are issues relating to propriety of expenses and who

3   is responsible for creating those expenses on the tax returns,

4   but I have not completed my analysis on [Zoom audio

5   distortion].

6   **Q.**   But if you were asked to analyze these returns or these

7   were returns you were preparing yourself, if you found out that

8   there were 40 categories on these returns of purely personal

9   expenses, would that concern you?

10   **A.**   If I was preparing it?  Well, if I was preparing it, I

11   would get the underlying information and we, as preparers, have

12   to determine the propriety of those expenses.  So me, as

13   preparer, would only put the expenses that me, with my training

14   and experience, know are allowable and deductible.  There would

15   not be 40 categories if I were the preparer.

16   **Q.**   If you were reviewing this return and you saw 40

17   categories, you would consider that to be an issue and a

18   problem, correct?

19   **A.**   I don't understand your question.  I'm sorry.

20   **Q.**   As a forensic CPA, if you were asked to analyze this

21   return and you determined that these returns contained over

22   40 categories of personal expenses, would that be a problem?

23   **A.**   Possibly.  I would want to know what is the process that

24   they went through to go from one being able to determine that

25   these were personal expenses and how they ended up on the tax

05:33  1    return.

2    **Q.**    Correct.  You would have to investigate the matter and

3    pursue follow-up steps just like the investigator did in this

4    case, correct?

5    **A.**    I don't know what the investigator did in this case, but I

6    would wonder why if the -- if the personal nature is so

7    transparent, why those items ever got on a tax return because

8    me, as tax preparer, face massive penalties, criminal and

9    civil, for putting those kinds of items on the tax return.

10   **Q.**    You would agree, though, that including personal expenses

11   on a business Schedule C would reduce the taxpayer's liability,

12   correct?

13   **A.**    Of course.  Including any expenses that are not deductible

14   would decrease their tax liability.

15   **Q.**    You are aware that Mr. Williams is an attorney, correct?

16   **A.**    Of course he is an attorney.

17   **Q.**    Are you aware that on his website he says that he handles

18   tax evasion matters and that he took tax in law school?  Did

19   you know that?

20   **A.**    Well, my only response to that would be, if I may

21   expand --

22              **THE COURT:**  No, you may not.  Just answer the

23   question, Mr. Asher.

24              **THE WITNESS:**  I do not know that.

25   BY MS. UEBINGER:

05:34

1  Q.  Sir, isn't it true that taxpayers, when the return is

2  finished and it's about to be filed, that they certify that the

3  returns are accurate and they certify that under penalties of

4  perjury, correct?

5  A.  A return that has been prepared by their tax preparer,

6  yes.

7  Q.  You ask your clients, I would assume, in your practice to

8  review their returns to make sure they are, in fact, accurate?

9  A.  In our practice, most of our clients depend on me to make

10  those determinations.  So, no, I do not ask them that.

11  Q.  You do ask them to review the returns, correct?

12  A.  Actually, we generally don't.  We give them the return and

13  tell them to file it.

14  Q.  Can you define the term "willfulness" for me?  Do you know

15  what that means?

16  A.  I'm not a lawyer, so you're asking me as a layperson.  I

17  do not have an expert opinion on that, but --

18  Q.  So are you aware of the fact that in tax fraud cases the

19  government is required to prove willfulness, which is a

20  violation of a known legal duty, beyond a reasonable doubt?

21  Did you know that?

22  A.  No, ma'am.

23  Q.  Would you expect that Jason Williams, an attorney who does

24  tax evasion cases, would be intelligent enough to review his

25  returns and understand them?  You would expect that, correct?

05:36

1          **MR. GIBBENS:**  Your Honor, I'm going to object.

2          **THE COURT:**  The objection is sustained.  That's pure

3    argument.  Either finish your examination or finish now.

4          **MS. UEBINGER:**  Just a few more questions, Your Honor.

5    BY MS. UEBINGER:

6    Q.    You mentioned, Mr. Asher, that you did look at some of the

7    other tax information of other Henry Timothy clients.

8    Particularly, you looked at people who -- there was an auto

9    mechanic shop owner, maybe a restaurant owner.  Do you remember

10   the other professions?

11   A.    They were basically representative of the New Orleans

12   economy.  I looked at 6,500 tax returns that were prepared, of

13   which about 1,500 of them were for Schedule C's.  As I recall,

14   it was -- tongue in cheek -- lawyers, doctors, and Indian

15   chiefs.  They had everything.

16   Q.    Do you recall comparing Mr. Williams' returns to any other

17   lawyers other than people in his office, anyone similarly

18   situated to Mr. Williams?

19   A.    No, ma'am.

20   Q.    What about any other CPAs or maybe medical doctors, any

21   other professionals?

22   A.    No, ma'am.

23   Q.    No, in fact, you didn't do that, did you?

24   A.    I did not, no.  I didn't compare the tax returns that

25   Mr. Timothy prepared for numerous professions or occupations,

05:37

1    and three of them that -- literally across the board all of the

2    Schedule C's had net income that was materially less than one

3    would expect in comparing it to the U.S. standard.  I found

4    that truckers had -- I think he had about a hundred truckers,

5    as I recall, that had much lower income.  He had --

6            THE COURT:  Mr. Asher, excuse me, but I don't think

7    counsel for the government asked you about truckers.

8            THE WITNESS:  Okay.

9            THE COURT:  Counsel, repeat your question.

10            Mr. Asher, answer the question only, please.

11            THE WITNESS:  Yes, sir.

12   BY MS. UEBINGER:

13   Q.    Sir, isn't it true that the returns that you compared were

14   people who were in professions that are not very similar to

15   Mr. Williams' profession as an attorney?  Isn't that correct?

16   A.    I don't know what is similar to an attorney.

17   Q.    Is a trucking business similar to an attorney?

18   A.    Well, from an educational standpoint, no, but the trucker

19   has to get revenues in and they have expenses like an attorney.

20   Q.    From an accounting standpoint, wouldn't you agree that

21   that's a dissimilar industry from that of a practicing

22   attorney?

23   A.    Well, of course, but every occupation is different from a

24   practicing attorney.  They are all distinct.  That's why there

25   are 120 different categories of expenses.

05:39

1    **MS. UEBINGER:**  Thank you, sir.  I have nothing

2  further.

3          **THE COURT:**  Mr. Gibbens, anything?

4          **MR. GIBBENS:**  No, sir.

5          **MR. MAGNER:**  Judge, we need to offer our exhibits.  I

6  can do it by an email to Ms. Miller, whatever the Court

7  prefers.

8          **THE COURT:**  What about Agent Goodson?  Are you not

9  going to call him?

10          **MR. GIBBENS:**  No, Judge.  We will pass on him.  I

11  apologize to him for making him wait.  I think in the interest

12  of time we are satisfied --

13          **THE COURT:**  Well, if it's important to you, I will

14  hold this over until tomorrow and you can put him on tomorrow,

15  but I can't continue much beyond this evening.

16          **MR. GIBBENS:**  I understand.

17          **THE COURT:**  I don't want to disadvantage either side.

18  If you believe that Agent Goodson is important to your

19  presentation, I will keep the record open until 1:30 tomorrow

20  where you can bring him in and examine him, but that's up to

21  you-all.  I have to quit within the next few minutes because I

22  do have another commitment.

23          **MR. GIBBENS:**  I understand.

24          **THE COURT:**  It's up to you.

25          **MR. GIBBENS:**  Judge, if it's okay, we will talk after

05:40

we adjourn, and we will let Ms. Miller know tonight if we want
to do that.  We will let her know within the next 30 minutes if
we want to or not or if we are just okay to rest.

       **MR. MAGNER:**  Judge, I just sent our offer of exhibits
to Ms. Miller.  I can do it on the record, whatever the Court
pleases.

       **THE COURT:**  Go ahead.  You can do it now.

       **MR. MAGNER:**  Yes, sir.  We would offer:

       Defense Exhibit 2, the news article; Exhibit 10,
the IDRS form; Exhibit 15, the Information Referral form;
Exhibits 3 and 4, the PACER printout for the Title 31
violations; Exhibits 5, A through D, including the declaration
of Mr. Asher; Exhibit 6, the tax return of the Brownlows;
Exhibits 24 and 25, the calendar; Exhibit 12, the memo of the
contact with me; Exhibit 22, the text to refresh the witness'
recollection about the canceled meeting; Exhibit 26, the form
that was used to begin the investigation on December 10, 2018,
which may have been referenced as a government exhibit, but
it's the same as our Exhibit 26; Exhibit 11, the special
agent's report under seal.

       We would also offer the grand jury testimony of
Special Agent Moore, which we believe the Court has, which we
only got about a half an hour or 20 minutes into the hearing.
Those are our exhibits.

       **THE COURT:**  Any objection?  I can't hear you.

05:42

1      **MS. UEBINGER:**  Your Honor, we would ask that the
2  grand jury be sealed if it's admitted.
3      **THE COURT:**  So ordered.
4      **MR. MAGNER:**  No objection, Judge.
5      **MS. UEBINGER:**  The government has two exhibits, which
6  are 6 and 10.
7      **THE COURT:**  They will be admitted.  Any objection?
8      **MR. GIBBENS:**  No, sir.
9      **MR. MAGNER:**  No, sir.
10      **THE COURT:**  They will be admitted without objection.
11          Now, let me talk about where we are and where
12  you want to go.  If you want to put on Agent Goodson, I will
13  keep the record open until 1:30 tomorrow.  I assume that he
14  would be available.  If you are finished, then we have to
15  discuss what the defense intends to do next.  If, as I expect
16  or suppose, there will be a renewed motion to dismiss, that has
17  to be scheduled.
18          If you want to keep the record open for Goodson,
19  I will do that.  We can resume at 1:30 tomorrow.  Otherwise,
20  let's talk about what the defendants would like to do once this
21  proceeding ends.
22      **MR. MAGNER:**  Yes, Your Honor.  On behalf of
23  Ms. Burdett, we would renew our motion to dismiss the
24  indictment as to her.  I don't know if the Court is open for
25  any arguments tomorrow afternoon, but we would certainly renew

05:44  1    our motion to dismiss.

2              **MR. GIBBENS:**  Judge, on behalf of Mr. Williams, we

3    would ask the same.  I would ask to be able to file an

4    additional brief on this once we get the transcript so maybe --

5              **THE COURT:**  That's what I intend to do.  I am not

6    going to rule and I don't need oral argument because I'm going

7    to give each side time to file briefs and make their points at

8    that time.

9              If Agent Goodson is not going to testify, then

10   I'm going to want briefs by the defendants on their motion to

11   dismiss within one week from today.  I will want the government

12   to file their response three days after the filing of the

13   defendants' motion to dismiss.  I am not going to rule on the

14   motion.  I don't need oral argument.  This is too important,

15   and I want to have your arguments in writing.

16             **MS. UEBINGER:**  Yes, Your Honor.

17             **MR. GIBBENS:**  Thank you.

18             **THE COURT:**  So seven days and a three-day response.

19   If you want Agent Goodson, I just want to stress I will keep

20   the record open.  We will resume at 1:30 tomorrow.

21             **MR. GIBBENS:**  Okay.  We will discuss that, and we

22   will let Ms. Miller know, Judge.

23             **THE COURT:**  All right.  Otherwise, Court is

24   adjourned.  Thank you all.  I apologize for these electronic

25   issues.  I wish mightily that we didn't have stupid machines

05:46   1  like this and that I could be in my courtroom with all of you

2  and treat you the way litigants in my courtroom and

3  professionals in my courtroom ought to be treated and not by

4  some idiot machine like this.  I apologize.  I guess it's

5  necessary.  I will withhold my opinion about that.

6           Let Annie Miller know.  If we are finished, then

7  file your briefs in support of a motion to dismiss in

8  seven days and three days for the government to reply.

9           Anything else?

10         **MR. GIBBENS:**  Thank you Judge.

11         **MS. UEBINGER:**  Thank you, Your Honor.

12         **THE COURT:**  I want to thank everybody.  Again, I want

13  to apologize for the difficulties that we have had through the

14  modern world of electronics.  Thank you all.  Court is

15  adjourned.

16         (Proceedings adjourned.)

17                          * * *

18                     <u>**CERTIFICATE**</u>

19         I, Toni Doyle Tusa, CCR, FCRR, Official Court
   Reporter for the United States District Court, Eastern District
20 of Louisiana, certify that the foregoing is a true and correct
   transcript, to the best of my ability and understanding, from
21 the record of proceedings in the above-entitled matter.

22

23
                        */s/ Toni Doyle Tusa*
24                      Toni Doyle Tusa, CCR, FCRR
                        Official Court Reporter

25