UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO: 20-55** |
| v. | * | **SECTION: "F" (4)** |
| **JASON R. WILLIAMS**<br>**NICOLE E. BURDETT** | * | |
| | * * * | |

**DEFENDANTS' MEMORANDUM**
**IN SUPPORT OF RENEWED MOTION TO DISMISS**

   To prove vindictive or selective prosecution, Mr. Williams and Ms. Burdett were required to establish that this prosecution was "the product of individual or institutional abuse or 'deliberately based upon an unjustifiable standard such as . . . arbitrary classification, including the exercise of protected statutory and constitutional rights.'" Rec. Doc. 79, at 22-23 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). The government's testimony at the evidentiary hearing proved a clear and straightforward case of selective and vindictive prosecution:

- Agent Lori Marable decided to interview Mr. Williams as a witness in the investigation of tax preparer Henry J. Timothy.

- After reviewing Mr. Williams' tax returns, Agent Marable still considered him to be a witness and did not refer him for investigation or prosecution.

- Marable's partner, Agent Jennifer Lopez-Martinez, realized Mr. Williams was a city councilman and told her boss, Agent Kristie Gregoire.

- Even though neither Lopez-Martinez nor Gregoire had ever seen Mr. Williams' tax returns, Gregoire immediately referred Williams to "public corruption" Agent Tim Moore for a criminal tax investigation, knowing that Williams was a declared candidate for district attorney.

1

- Agent Moore, who also knew Mr. Williams was a candidate for district attorney, opened a full-fledged grand jury investigation predicated on FBI bribery allegations, which he privately admitted to Gregoire were baseless.

- Agent Moore also deliberately ignored the issue that brought Mr. Williams before the IRS in the first place—tax preparer Henry J. Timothy, who by all objective measures treated Mr. Williams no differently than any of his other clients—and worse, intimidated Mr. Timothy into changing his story to what the government wanted to hear.

- Finally, Ms. Burdett became a target only after her lawyer informed the government that her truthful testimony would be consistent with all the objective evidence—that she brought complete business records to Timothy and that Timothy chose which deductions to take.

As is explained more fully below, the evidentiary hearing revealed that the government improperly selected Jason Williams and Nicole Burdett for tax investigation and prosecution from all of Mr. Timothy's clients simply because Williams is a public official and a declared candidate for elected office. This pernicious behavior constitutes selective and vindictive prosecution, and the indictment should be dismissed.

### A. Agent Marable reviewed Mr. Williams' tax returns and did not refer him for criminal investigation.

In October 2018, IRS Special Agent Lori Marable decided to interview Jason Williams as a **witness** in her investigation of tax preparer Henry J. Timothy.[1] Agent Jennifer Lopez-Martinez, who accompanied Marable to the interview, explained that the IRS was looking at Mr. Timothy "for putting bad information or bad deductions on his clients' tax returns."[2]

---

[1] Evid. Hrg. Tr. at 63:12-15. ("Q: You were interviewing all of those people, including Mr. Williams, as witnesses in your investigation of Mr. Timothy; is that right? A: That is correct.")
[2] *Id.* at 129:7-10.

2

Before attempting to interview Mr. Williams, Agent Marable reviewed his tax returns and noted that there were potential "false items" on it.[3] However, that did not make Mr. Williams a subject or target of her investigation,[4] and **Marable did not refer Mr. Williams for a separate investigation into his own taxes**.[5]

In addition to Mr. Williams, Agent Marable decided to interview a number of other individuals who had "suspicious" items on the tax returns that Mr. Timothy prepared.[6] Agent Marable did not refer any of those individuals for a separate criminal investigation either.[7] Clearly, when the government viewed Mr. Timothy's clients as a group, it decided that Mr. Timothy was the problem and that his clients had done nothing wrong.

Agent Marable briefly spoke with Mr. Williams on October 22, 2018 when she appeared at his home unannounced and scheduled an appointment the following week for a formal interview, which did not take place.[8] However, the missed meeting was not a cause of concern for Agent Marable, who explained that "[p]eople always don't show up for appointments and things like that."[9] At the end of the day, Mr. Williams "never became anything more than a witness" to Agent Marable, and she "never referred him for investigation to anybody."[10] Indeed, Agent Marable's missed meeting should have been the end of the IRS's interest in Mr. Williams, but everything changed when Supervisory Agent Kristie Gregoire and Special Agent Tim Moore realized that the

---

[3] *Id.* at 64:14-16 ("I saw his tax information, and his tax information—his tax return looked like they had—well false items on it.")
[4] *Id.* at 63:24-64:1 ("Right, but you were not interviewing them [Timothy's clients, including Mr. Williams] as subjects or targets of your investigation, were you?  A.  No.")
[5] *Id.* at 64:23-25, 65:1 ("Q: When you saw Mr. Williams' tax information for the first time, you did not refer him out for a separate investigation into Mr. Williams' own tax returns, did you?  A: No, I did not refer it.")
[6] *Id.* at 65:2-4 ("Q: You mentioned that you picked other people whose tax returns looked suspicious; that that right? A: That is correct.")
[7] *Id.* at 65:5-7 ("Q: Did you refer any of those people out for a separate criminal investigation?  A: No, I did not refer anyone.")
[8] *Id.* at 65:15-20.
[9] *Id.* at 85:20-21.
[10] *Id.* at 77:22-23.

3

field agents had contacted Williams, whom Gregoire and Moore knew was an elected official and a declared candidate for office.

### B. Agent Gregoire initiated a criminal tax investigation without cause.

Special Agent Kristie Gregoire is Agent Lopez-Martinez's supervisor. She is also a personal acquaintance of Mr. Williams and went to grade school, high school, and college with Mr. Williams' ex-wife, who is now a government witness.[11]

When Agent Lopez-Martinez realized that Mr. Williams was a New Orleans councilman, she told Agent Gregoire—not because Lopez-Martinez was reporting criminal activity, but because a field agent is required to notify her supervisor if she contacts a witness who turns out to be a public official.[12] She also informed Agent Gregoire that Williams' tax returns were "egregious."[13] However, Lopez-Martinez admitted at the hearing that she had not actually seen Mr. Williams' returns before she provided that description and "that was just according to Lori [Marable]."[14] And of course Agent Marable did *not* testify that she believed Mr. Williams' returns were "egregious" but explained that she reviewed Mr. Williams' tax returns and did **not** refer him for investigation.[15]

Agent Lopez-Martinez further testified:

(1) that the other witnesses she and Marable intended to interview in the Timothy investigation "also had egregious tax returns";[16]

(2) that she was just telling Gregoire that Mr. Williams was a witness in an investigation;[17]

(3) that she was not telling Gregoire to look at Mr. Williams' tax returns;[18]

---

[11] *Id.* at 12:14-20.
[12] *Id.* at 132:25, 133:1-2.
[13] *Id.* at 130:6-8.
[14] *Id.* at 130:6-9.
[15] *Id.* at 77:22-23.
[16] *Id.* at 132:4-6.
[17] *Id.* at 133:16-19.
[18] *Id.*

4

    (4)    that she did not give Gregoire "any documentation about Mr. Williams or his returns";[19]

    (5)    that she did not ask Gregoire to open an investigation into Mr. Williams;[20] and

    (6)    that Agent Marable had not suggested opening an investigation into Mr. Williams.[21]

Nonetheless, based on this undocumented, second-hand report from Lopez-Martinez, who neither requested an investigation nor distinguished Mr. Williams from any other Henry J. Timothy clients, Agent Gregoire immediately referred Mr. Williams to Agent Tim Moore for a criminal tax investigation. Even worse, Agent Gregoire told Agent Lopez-Martinez "not to speak to Jason Williams after that point"[22] and "was instructing [her] not to interview a witness in [her] investigation of Henry Timothy."[23] In her own testimony, Agent Gregoire lamely described this interference in the Timothy investigation as a "courtesy" to Mr. Williams.[24]

Finally, in addition to opening an investigation based on Mr. Williams' status as an elected official, Gregoire admitted that she knew Mr. Williams was running for district attorney when she requested a full-blown grand jury investigation.[25] Indeed, an October 24, 2018 newspaper article reporting that Mr. Williams announced his bid for Orleans Parish District Attorney was part of the IRS's official request to authorize the use of the grand jury to investigate Mr. Williams.[26]

---

[19] *Id*. at 131:12-14.
[20] *Id*. at 131:9-11.
[21] *Id*. at 131:18-20.
[22] *Id*. at 131:6-8.
[23] *Id*. at 134:14-16.
[24] *Id*. at 32:18-22.
[25] *Id*. at 12:3-6.
[26] *Id*. at 11:11-18; *see also* Def. Ex. 2.

### C. Agent Moore accepted the referral and advanced it through pretext and deception.

The government's pretext and deception continued when the matter was assigned to Agent Tim Moore, who specializes in handling "public corruption" cases.[27] As a predicate for opening his "primary investigation" on December 10, 2018, Agent Moore stated that "it is alleged that subject is receiving kickbacks in exchange for city contracts and filing false tax returns." Gov't Ex. 3. When he requested authorization to conduct a full-fledged grand jury investigation a month later, on January 11, 2019, Moore attested that:

> Allegations of **mail fraud, wire fraud, bribery, and money laundering** have been investigated **for the last few months by IRS-CI**, United States Attorney's Office, and the FBI. The United States Attorney's Office anticipates this investigation to continue to look into these investigations along with income tax related issues and the appropriate Title 26 charges . . . . The primary **subjects** of this investigation are expected to use every possible means to hinder the investigation. The **witnesses are expected to be hostile and intimidated by the targets**, therefore, the only way to gain cooperation and truthful testimony is to the [sic] use of the grand jury.

Gov't Ex. 4 (emphasis added).

There are numerous, serious misrepresentations in the government's requests. First and most importantly, although the IRS officially predicated its "primary investigation" and grand jury investigation on the FBI's public corruption allegations, Agent Gregoire testified that Agent Moore privately told her the FBI's allegations were meritless:

> Q. Well, didn't Agent Moore tell you that the FBI investigation had stalled and was not going to result in any FBI violations?
>
> A. I believe at some point he told me that they didn't have anything, but I cannot recall when exactly that was.[28]

---

[27] *Id.* at 31:19-23.
[28] *Id.* at 23:22-25, 24:1.

6

Second, while Agent Moore represented that **IRS-CI** had been investigating "mail fraud, wire fraud, bribery, and money laundering" for "**the past few months**," Agent Moore testified at the hearing that "my initial knowledge of anything began on [November] 7th" and was limited to reviewing Mr. Williams' taxes.[29] And the IRS's records indicate that its "primary investigation" had only been open since December 10, 2018.  Gov't Ex. 3.  Simply put, Agent Moore exaggerated the scope and seriousness of the meritless "public corruption" investigation in order to authorize his selective and vindictive tax prosecution.

Third, despite predicating its investigation on the "expectation" of witness intimidation and harassment, the government admitted at the hearing that "there's no evidence whatsoever of witness intimidation or obstruction of justice in this case."[30]

Accordingly, by January 2019, Mr. Williams had been placed under a full-fledged grand jury criminal tax investigation that was (1) initiated by a supervisory agent who had not seen Williams' taxes and who had interfered with the investigation of Williams' tax preparer, (2) referred to a "public corruption" agent who privately admitted to his supervisor that the public corruption charges were meritless, and (3) advanced on a false theory of obstruction and intimidation.  And as stated above, as a revelation of the government's true motive, the newspaper article announcing Mr. Williams candidacy for district attorney was part of the grand jury authorization request.[31]

If all that were not bad enough, the government has deliberately blinded itself to what started this debacle—Henry J. Timothy, the tax preparer who by all objective measures treated Williams the same as all of his other clients.

---

[29] *Id*. at 94:15-17.
[30] *Id*. at 108:15-18.
[31] *Id*. at 11:11-18

    **D.**    **The objective data proves that Williams and Burdett have been singled out for prosecution, while other similarly situated individuals have not been charged.**

In their original motion to dismiss, the defendants set forth numerous examples from the government's own materials that showed Mr. Williams was no different than most other Henry J. Timothy clients. Rec. Doc. 51-1 at 10. The evidence admitted at the evidentiary hearing confirmed this to be true.

First, on a global basis, it is clear that Mr. Timothy was taking excessive deductions for almost all of his Schedule C clients. Timothy's Schedule C clients with gross revenues of more than $100,000 reported an average of 8.44% of their gross revenue as net taxable income, compared to a national average of 27% to 30%. Def. Ex. 5-D. For Schedule C clients earning more than $200,000, Timothy's tax rate was 5.81% compared to the 27% to 30% national average. *Id*. In light of this data, it is difficult to believe that Timothy was taking excessive deductions for Mr. Williams only because Mr. Williams asked him.

Second, on an individual basis, Mr. Timothy's deductions for many of his clients were no different, and in some cases much higher, than the deductions he was taking for Mr. Williams. Def. Ex. 5-D. For example, home health care service owner C.D. reported $3,537,277 in revenue from 2013 to 2016 and paid taxes on only $91,600. *Id*. Construction company owner J.B. reported $1,986,744 in revenue for 2013 and paid taxes on only $62,035. *Id*. And contractor R. reported $1,306,912 in revenue from 2013 to 2016 and paid taxes on only $8,633. *Id*. The IRS investigated and cleared C.D. of any wrongdoing; and it did not even look into the others.

Third, it is now clear that Mr. Williams is the only elected official on Mr. Timothy's client list. Def. Ex. 5, ¶ 22.

Finally, it is undisputed that Mr. Williams and Ms. Burdett are the only individuals to be charged with failing to file a Form 8300 in the Eastern District of Louisiana in the past 50 years.[32] And as the Court knows, the government used the alleged prescription of Count 7—failing to file a Form 8300 on or about June 27, 2017—to justify bringing the indictment on the eve of the deadline to qualify for the district attorney's race, in the midst of the summer COVID lockdowns.[33]

### E.   Once the government decided to charge Mr. Williams, it willfully blinded itself to Mr. Timothy.

Agent Gregoire admitted that she knew Agents Marable and Lopez-Martinez were attempting to interview Mr. Williams "because he was a client of a tax preparer that they were investigating."[34] However, once Agents Gregoire and Moore fixed their sights on Mr. Williams, the government intentionally abandoned any notion that Mr. Timothy was putting false information on all of his clients' tax returns, even though the objective evidence compiled by the IRS and outlined above makes it clear that is exactly what Timothy was doing.

Instead, the government developed a theory that Timothy was compiling false returns at the direction of Mr. Williams and Ms. Burdett and would create increasingly fraudulent draft returns until Williams and Burdett approved the final fraudulent one. As is outlined in detail in the defendants' original motion to dismiss, this theory is difficult to believe at the outset in light of the evidence that (1) Timothy repeatedly told the government and others that he made all decisions on Mr. Williams' returns, (2) Mr. Timothy judicially admitted in a civil proceeding that he believed Mr. Williams' returns were appropriate when he filed them, (3) Mr. Timothy produced nothing other than a final return and no drafts or alterations, (4) Ms. Burdett had to hound Mr. Timothy to prepare the returns before the filing deadline, (5) Timothy acknowledged his

---

[32] Def. Exs. 3 and 4.
[33] *See* Rec. Doc. 30 at 3.
[34] Evid. Hrg. Tr. 28:9-12.

9

handwriting on Mr. Williams' financial papers checking and crossing out what items should be deducted, (6) all of Mr. Timothy's deductions are plainly listed on Mr. Williams' tax returns, (7) Timothy misrepresented himself as a CPA, (8) another Timothy client (J.B.) told the government that Timothy made improper deductions without his knowledge, and (9) Timothy generally deducted 90% of his clients' income across the board.

In spite of all the objective evidence, the government insisted that Mr. Williams—and not Mr. Timothy—was responsible for any errors on Mr. Williams' tax return, and that it was "outrageous" to suggest otherwise.  As Agent Moore testified:

> At some point, like I said, we let him keep talking, and **then it got so outrageous we called him out and let him know we weren't buying what he was selling**.  At that point he left the room with his attorney and came back and began to tell us what we believed to be the truth.[35]

In other words, when Mr. Timothy told the government the obvious truth—that he made the tax decisions and treated Mr. Williams the same as all of his clients—the government literally forced Timothy to change his story by accusing him of lying to federal agents, a federal crime under 18 U.S.C. § 1001.

To get what it wanted—a federal criminal charge against Jason Williams—the government (1) turned Mr. Williams from a witness to a target without basis, (2) interfered with a separate investigation into tax preparer Henry J. Timothy, (3) made knowing misrepresentations in its efforts to open a preliminary investigation and then a grand jury investigation, (4) deliberately ignored all objective evidence, (5) intimidated its star witness, Henry J. Timothy, into telling the story that the government wanted to hear, and (6) when presented with an attorney proffer of Ms. Burdett's testimony that corroborated she provided complete business records to Timothy and that Timothy decided what expenses could be deducted, indicted her too.

---

[35] *Id.* at 102:12-16 (emphasis added).

As the Court is well aware, the government has also decided to move forward with an investigation targeting Ms. Burdett for her own tax returns—prepared by Timothy in the same manner as he did for Mr. Williams—after the defendants filed their initial motions to dismiss. The government admitted at the October 2, 2020 hearing that it intends to secure a separate indictment, rather than supersede, and the effect of doing so would be to have the case allotted to a different section of Court.[36] The timing and circumstances, which include Agent Moore serving subpoenas in person upon Ms. Burdett's family members just hours before the October 2, 2020 hearing, strongly suggest that this decision was made in retaliation for her exercise of her constitutional rights to file pretrial motions.[37]

### F. The government's bad behavior is magnified by its shifting and inconsistent explanations.

Finally, if there were any doubt about the government's improper motives, the Court should consider the government's changing explanations for its actions as evidence of bad intent. In its initial response to the defendants' motion to dismiss, the government claimed that "[b]ecause Williams failed to meet with SA Marable and due to the fact that he was a public official, SA Marable's supervisor requested that IRS Special Agent Tim Moore get involved."[38]

The government gave a different explanation at the October 2, 2020 hearing, claiming that Mr. Williams' interview was transferred to Agent Moore because Agent Marable was moving to Baton Rouge:

> Now, in her personal life what was going on was she was getting ready to be transferred to another office. She got back to her office that day after sitting for two hours. She mentioned it to her supervisor, you know, basically, "I wasted lot of time on this, and Mr. Williams didn't even show up." The supervisor said something

---

[36] Should any new indictment be allotted to a different section of this Court, Ms. Burdett will file a motion to have the indictment transferred to Section F to remedy the government's blatant forum-shopping.
[37] Evid. Hrg. Tr. at 109:4-9. The impermissible retaliatory purpose of these threatened new charges was briefed in Doc. 70.
[38] Doc. 61 at 3.

11

> to the effect of – and don't quote me on this – "but since you are moving anyway, we are going to turn this over to Special Agent Tim Moore."[39]

The government further explained:

> She goes back to the office. The supervisor says, "Well, he is a city councilman," or another agent mentioned that he is a councilman. She said, "I didn't know that," talked to the supervisor. The supervisor said, "You're moving. You're leaving anyway. He's a city councilman. We are going to give this matter" – not a case. "We are going to give this matter to Special Agent Tim Moore."[40]

As we now know, neither explanation is true. Agent Marable testified that she "never had any conversations with [Agent Gregoire]," that she never had a conversation about transferring the Williams interview to Agent Moore because she was moving to Baton Rouge, and that by the time of the Williams interview she "had already moved to Baton Rouge group." In a final unusual contradiction, Agent Marable did not even know that her interview of Mr. Williams had been transferred at all:

> Q: Was your interview of Mr. Williams transferred to anyone as far as you know?
>
> A: Not that I know of.[41]

Similarly, Agent Lopez-Martinez testified that "there was no discussion with Agent Gregoire that somebody else was supposed to go interview Mr. Williams in connection with the Timothy investigation."[42]

The case also clearly was not transferred because Mr. Williams "failed to meet with SA Marable." In fact, at the evidentiary hearing the government went to great lengths to establish that the missed meeting had nothing to do with the later investigation. Agent Marable testified that she was not "angry or irate" that the meeting did not occur, and that "[p]eople always don't show up

---

[39] October 2, 2020 Hrg. Tr. at 25:10-17.
[40] *Id*. at 26:25 – 27:6.
[41] Evid. Hrg. Tr. at 71:11-13.
[42] *Id*. at 134:6-9.

12

for appointments and things like that."[43]   Similarly, Agent Lopez-Martinez testified that "it happens all the time witnesses don't show up" and that she did not "take any action in this case because she was angry at the fact that Mr. Williams did not show up."[44]

The reason for the government's shifting explanations is that the true explanation is pernicious: the government selectively and vindictively prosecuted Mr. Williams, and Ms. Burdett as collateral damage, because Mr. Williams is a public official and a declared candidate for elected office.

> **G.    Mr. Williams and Ms. Burdett have established that their prosecution is the result of selective and vindictive prosecution, and the indictment against them should be dismissed.**

As set out in the October 8, 2020 Order and Reasons (Rec. Doc. 79), the Court is well-aware of the standards of proof required for dismissal of an indictment for vindictive or selective prosecution.  The evidence developed at the hearing established that there were hundreds of similarly-situated individuals who filed thousands of returns—Timothy's clients who, like Mr. Williams and Ms. Burdett, submitted tax returns that included Schedule Cs—who were not investigated, let alone prosecuted.[45]  With the sole exception of Mr. Williams, none of Timothy's clients were public officials.[46]

The government admitted at the hearing that it referred Mr. Williams for prosecution *because* he is a public official and declared candidate: Gregoire transformed Mr. Williams from a witness to a target solely because he is a public official—without having looked at his returns—and Moore specifically included the fact of Mr. Williams' position on the City Council and declared candidacy for District Attorney as justification for his request for a grand jury

---

[43] *Id.* at 85:20-21.
[44] *Id.* at 136:9-12.
[45] *Id.* at 140:25-141:5.
[46] *Id.* at 146:11-18.

investigation.[47]  *See* Doc. 79 at 25 ("'[D]iscriminatory purpose . . . implies more than . . . intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action *at least in part because of*, not merely in spite of, its adverse effects upon an identifiable group.'") (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985) (emphasis added)).

And the government's claim that its investigation of Ms. Burdett is "completely separate" from its investigation of Mr. Williams is simply false: Ms. Burdett became a target in the Williams investigation only because her truthful testimony would be inconsistent with the government's misguided theory of the case.[48]

---

[47] *Id.* at 11:11-12:6; 30:2-31:11; Gov't Ex. 5; Def. Ex. 2.  Disturbingly, the government seemed not to know that participation in political activity is protected by the First Amendment, *see* Doc. 78 at 2; the Court disposed of that argument in its October 8, 2020 Order.  *See* Doc. 79 at 40 ("To be sure, a prosecution cannot be motivated by a suspect's exercise of constitutional rights through participation in political activity.")

[48] *See* Doc. 78-1, Doc. 78-2 (letters from the government stating that since Ms. Burdett has "declined our offer, we have added her to this matter as a target and have requested her personal tax returns, thus exposing her to potential criminal and civil liability").

This evidence is sufficient to trigger a presumption of vindictiveness in the vindictive prosecution analysis and to shift the burden to the government "to demonstrate a legitimate basis for selecting the defendant for prosecution" in the selective prosecution analysis. *See* Doc. 79 at 25 (quoting *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984) (discussing selective prosecution); 27-28 (discussing vindictive prosecution). Not only did the government fail to demonstrate a legitimate basis for prosecuting the defendants, the government's own witnesses established that Mr. Williams and Ms. Burdett were improperly and perniciously selected for prosecution. Accordingly, the Court should dismiss the indictment.

Respectfully submitted,

| | |
|---|---|
| *s/Michael W. Magner* | */s/ William P. Gibbens* |
| MICHAEL W. MAGNER (#1206) | William P. Gibbens, 27225 |
| AVERY B. PARDEE (#31280) | SCHONEKAS, EVANS, MCGOEY |
| Jones Walker LLP | & MCEACHIN, L.L.C. |
| 201 St. Charles Ave., Suite 5100 | 909 Poydras Street, Suite 1600 |
| New Orleans, LA 70170 | New Orleans, Louisiana 70112 |
| Telephone (504) 582-8316 | |
| apardee@joneswalker.com | (504) 680-6065 |
| mmagner@joneswalker.com | billy@semmlaw.com |
| ***Attorneys for Nicole E. Burdett*** | ***Attorney for Jason R. Williams*** |