1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2               FEDERAL GRAND JURY

3      * * * * * * * * * * * * * * * * * * * * * * * *
       IN THE MATTER OF:          *
4                                 *
       UNITED STATES OF AMERICA   *
5                                 *
       VERSUS                     * NO.   08-19-50
6                                 *
       JASON R. WILLIAMS (01)     *
7      NICOLE E. BURDETT (02)     *
                                  *
8      * * * * * * * * * * * * * * * * * * * * * * * *

9           TESTIMONY OF HENRY TIMOTHY, TAKEN
       BEFORE THE FEDERAL GRAND JURY, ON FRIDAY,
10     THE 26TH DAY OF JUNE, 2020, COMMENCING AT
       2:27 P.M.

11

12     APPEARANCES:

13     KELLY P. UEBINGER, ESQUIRE
       DAVID AYO, ESQUIRE
14     Assistant United States Attorneys

15     LADIES AND GENTLEMEN OF THE GRAND JURY
       AUGUST 2019 GRAND JURY

16

17

18

19

20

21

22

23

24

25

1   (Whereupon, the witness, HENRY TIMOTHY,

2   entered the grand jury room.)

3        THE FOREPERSON:  Could you state and

4   spell your name, please, so she can hear

5   you.

6        THE WITNESS:  Spell it?  Henry

7   Timothy.  H-e-n-r-y, T-i-m-o-t-h-y.

8        THE FOREPERSON:  Raise your right

9   hand, please.  Do you solemnly swear to

10  tell the truth, the whole truth and

11  nothing but the truth, in this and related

12  cases so help you God?

13       THE WITNESS:  I do.

14       THE FOREPERSON:  Thank you.

15       MS. UEBINGER:  Thank you, ma'am.  And

16  we do have a quorum?

17       THE FOREPERSON:  We do.

18              TIMOTHY HENRY

19  after having been first duly sworn, did

20  testify as follows:

21              EXAMINATION

22  BY MS. UEBINGER:

23       Q.   Mr. Timothy, before we get

24  started we need to put a few things on the

25  record that we've previously talked about.

1          A.     Yes.

2          Q.     You understand that your

3    testimony today will involve you waiving

4    your Fifth Amendment right against

5    self-incrimination?

6          A.     Yes.

7          Q.     Is it your intention -- are

8    you here today voluntarily?

9          A.     Yes.

10          Q.     And you understand that some

11    of the things you're going to be

12    testifying to will involve violations of

13    federal law?

14          A.     Yes.

15          Q.     And just so the grand jury

16    knows, you are represented by counsel, Mr.

17    Stephen London?

18          A.     Yes.

19          Q.     And he couldn't be here with

20    us today, but he is available via phone in

21    case you need to speak with him; correct?

22          A.     Yes.

23          Q.     So if at any time you need a

24    break or you want to talk to Mr. London,

25    don't hesitate to let us know.  We'll take

1    a break and you can give him a call if

2    you're unsure of anything.

3            A.    Okay.

4            Q.    Thank you, sir.  So again,

5    could you go ahead and state your full

6    name.

7            A.    Henry Timothy.

8            Q.    And, Mr. Timothy, are you

9    currently employed?

10            A.    Self-employed.

11            Q.    And what do you do?

12            A.    I prepare taxes.

13            Q.    And where do you do that?  In

14    what city?

15            A.    In Bridge City.

16            Q.    Okay.  So explain this to me.

17    I know you've done it before.  Bridge City

18    and Westwego, is that the same thing or

19    not?

20            A.    It's between Avondale, Bridge

21    City and Westwego.  It's all labeled under

22    Westwego.

23            Q.    Okay.  And do you work out of

24    your home?

25            A.    Yes, I do.

1          Q.    And how long have you been
2    doing tax preparation work?
3          A.    About ten years now.
4          Q.    And what did you do before
5    that time?
6          A.    I was in accounting and
7    controller for some refineries and
8    corporations.
9          Q.    And how long did you do that,
10   the controller work?
11         A.    From 1974 to 19 -- about 35
12   years.
13         Q.    And let's shift back to the
14   tax preparer business.  What is the name
15   of your business?
16         A.    B&B Accounting Services, LLC.
17         Q.    And what is your educational
18   background?
19         A.    I graduated from UNO in
20   accounting.
21         Q.    And when did you graduate
22   approximately?  Do you remember the year?
23         A.    1974.
24         Q.    And are you a CPA?
25         A.    No, ma'am.

1          Q.    Now, are you familiar with

2    Jason Rogers Williams and Nicole Burdett?

3          A.    Yes, I am.

4          Q.    And how did you first meet Mr.

5    Williams and Ms. Burdett?

6          A.    I met them through my

7    father-in-law.

8          Q.    And was your father-in-law,

9    was he friendly with Nicole Burdett's

10   family?  Did he know them?

11         A.    Yes, he did.

12         Q.    And did he make the

13   introduction to you and Mr. Williams and

14   Ms. Burdett?

15         A.    Yes.

16         Q.    And approximately when would

17   that have occurred?  What year?

18         A.    Approximately 2010.

19         Q.    And what was the purpose of

20   that meeting?

21         A.    Mr. Williams needed some

22   amendments done on previous years taxes

23   and -- okay.

24         Q.    Before we get to that, was Mr.

25   Trentacosta, was he also a tax preparer?

1          A.     Yes, he was.

2          Q.     And why was he introducing you

3     to them instead of him doing the tax work?

4          A.     Because he couldn't do it.   He

5     doesn't do computer work.

6          Q.     And is he up in age, retired

7     at this point?

8          A.     Yes.   He's 90-years-old now.

9          Q.     And where did this meeting in

10    2010 take place?   Whose house?

11         A.     At his home.

12         Q.     Meaning Mr. Trentacosta?

13         A.     Mr. Trentacosta's home.

14         Q.     And who was present for the

15    meeting?

16         A.     My father-in-law Mr.

17    Trentacosta, myself, Nicole Burdett and

18    Jason Williams.

19         Q.     And was that the first time

20    you had met Ms. Burdett?

21         A.     Yes, it is.

22         Q.     And was that the first time

23    you had met Mr. Williams?

24         A.     Yes.

25         Q.     So what did Mr. Williams, did

1    he ask you to do anything at that meeting?

2         A.    He asked me to look at all his

3    previous years taxes.  He wasn't happy

4    with the results that he had from before,

5    and see if I could find any expenses that

6    would help him reduce his tax liability.

7         Q.    And what do you mean by he

8    wasn't happy with the results of those

9    taxes?

10        A.    From what he told me was that

11   he thought that they were prepared

12   incorrectly before, and that he wanted me

13   to look at them and see if I could prepare

14   them better.

15        Q.    And are we talking about

16   taxes -- this is in 2010.  So what tax

17   returns did he want you to amend and

18   re-file?

19        A.    All the way back to 2002.

20        Q.    Did you find that to be a

21   little odd that he wanted to go back that

22   far and correct taxes and re-file them?

23        A.    Yes.

24        Q.    And why did you think that was

25   odd?

1          A.    Because usually the period

2     that they want to go back and amend is

3     three years.  Not that far back.

4          Q.    And what did he tell you about

5     his expenses?

6          A.    He thought that he didn't have

7     enough expenses reported on the tax

8     returns.

9          Q.    So did you agree at that

10     meeting to do that work for him?

11          A.    I agreed to review them and I

12     would let him know if I would do it.

13          Q.    And why was Nicole Burdett

14     there?  What did you understand her role

15     to be?

16          A.    Just to introduce my

17     father-in-law to Jason.

18          Q.    And was she a lawyer at that

19     time?

20          A.    If she was, she had just

21     become a lawyer.

22          Q.    And what about Mr. Williams,

23     did he tell you that he was a lawyer?

24          A.    Yes.

25          Q.    And did you understand that

1    they worked together at Mr. Williams' law

2    firm?

3           A.    Yes.

4           Q.    Okay.  So you said that you

5    would review the returns and get back with

6    him.  Did you, in fact, do that?

7           A.    Yes, I did.

8           Q.    And what did you do regarding

9    those prior returns?

10          A.    I re -- I amended them and

11   then I reviewed them with him.  And then

12   we wind up -- he signed them and then we

13   sent them off to the IRS.

14          Q.    When you say you reviewed them

15   with him, did you have another in-person

16   meeting with Jason Williams?

17          A.    Yeah.  At his office.

18          Q.    And that is at his law firm

19   office on St. Charles Avenue?

20          A.    Yes.

21          Q.    And who was present for that

22   meeting?  Was it just you and Mr.

23   Williams?

24          A.    Yes.

25          Q.    And tell us what type of work,

1      what did you do to change those returns?

2              A.     I looked at he didn't have

3      enough expenses reported, I guess his

4      income and we amended them for that.

5              Q.     So you increased the expenses?

6              A.     Yes.  He also missed some

7      child additions where he didn't report

8      his, some of his kids on the returns.

9              Q.     All right.  In addition to

10     that, tell us about the expenses.  How

11     were you able to increase those expenses?

12     If it's 2010 or 2011 when you actually sat

13     down and prepared the returns; do you

14     recall, the amended returns?

15             A.     The amended returns?

16             Q.     Yes, sir.

17             A.     I think it was 2010.

18             Q.     Okay.  So when you're

19     preparing these returns as far back as

20     2002, how did you come up with additional

21     expenses?

22             A.     He gave me a list of his

23     expenses and I wrote them down.  And some

24     of them were not originally on the return.

25             Q.     Okay.  So how was he able to

1    provide you these expenses from earlier

2    years when, in fact, they hadn't been

3    provided when the returns were filed?  Did

4    you find that to be out of the ordinary?

5          A.    Yes.

6          Q.    And how so?

7          A.    Because if he would have put

8    them on there originally, he wouldn't have

9    had to amend the tax returns.

10         Q.    Did he tell you at that time

11   that he met with you to prepare the

12   amended returns that he had tax liens

13   already filed against him?

14         A.    No.

15         Q.    At any point during your

16   relationship with him, did he explain to

17   you his long history with the IRS of not

18   paying and the tax liens?

19         A.    No.

20         Q.    So when you sat down with him

21   and went over the amended returns, what

22   did you explain to him?

23         A.    I explained that what he

24   originally came up with and what I came up

25   with, there was a big difference between

1    the tax returns.

2              Q.    So were the amended returns

3    filed with the IRS?

4              A.    They had to be mailed in, yes.

5              Q.    And those were mailed in and

6    he signed those?

7              A.    He signed them and he mailed

8    them.

9              Q.    And what did the amended --

10   the amended returns, did they increase or

11   decrease his tax liability?

12             A.    All of them decreased his tax

13   liability.

14             Q.    For that whole time frame of

15   2002 to 2009?

16             A.    Yes.

17             Q.    Other than the list of

18   expenses that he gave you, was he able --

19   did he provide you with any back-up

20   documentation?

21             A.    No.

22             Q.    What did you understand any of

23   Nicole Burdett's role to be with the firm?

24   What did she do for the firm?

25             A.    When I first met her I didn't

1    know.  I thought she was just a lawyer.

2          Q.    And overtime what did you come

3    to understand about her role?

4          A.    I found that she was the one

5    who created all the financial reports

6    through QuickBooks.  And more or less did

7    everything in the office, like

8    administrative work.

9          Q.    You told us that when you

10   prepared those amended returns, that it

11   was out of the ordinary, but you did it

12   anyway?

13         A.    Yes.

14         Q.    And why?

15         A.    I can't give you a good answer

16   on that one.

17         Q.    As we sit here today, do you

18   believe that those expenses that you put

19   on those returns, that all of them were

20   legitimate expenses?

21         A.    Today, no.

22         Q.    So you know that you falsified

23   the amended returns?

24         A.    Yes.

25         Q.    But you did that based on

1      whose instructions?

2              A.    Jason's instructions with the

3      papers that he gave me.

4              Q.    Did Jason make it clear to you

5      that he wanted you to reduce his tax

6      liability?

7              A.    Yes.

8              Q.    So after the amended returns

9      were filed, did you continue preparing his

10     returns?

11             A.    I started preparing his

12     returns annually then, yes.

13             Q.    With the year 2010?

14             A.    Starting in 2010.

15             Q.    And then you prepared them for

16     every year thereafter through 2017?

17             A.    Yes.

18             Q.    So tell us how that would

19     work.  You said that Nicole Burdett

20     performed some of the administrative

21     functions for the firm.  Is that fair and

22     accurate?

23             A.    Yes.  She would bring me

24     QuickBooks reports.

25             Q.    She would bring them to you

1     where?

2          A.    At my office at home.

3          Q.    In Bridge City?

4          A.    Yes.

5          Q.    What else would she bring you

6     besides the QuickBooks?  Anything else?

7          A.    Just the QuickBooks.

8          Q.    Did the QuickBooks consist of

9     a profit and loss statement?

10         A.    Yes.

11         Q.    Did she bring you that as

12    well?

13         A.    Yes.

14         Q.    Did you also prepare the 1099

15    forms for the firm?

16         A.    She would send that to me

17    through the computer and I would prepare

18    them, yes.

19         Q.    And explain to the grand jury,

20    what's the 1099 forms?

21         A.    The 1099 is income that's

22    other than the W-2.  When a person works

23    and they don't take out taxes they get a

24    1099 for that and they have to pay their

25    own taxes.

1      Q.    Okay.  Let me show you what

2   I've marked as Grand Jury Exhibit Number

3   2, and I'll ask that it be attached to

4   your transcript.

5            Are you familiar with this

6   particular document?

7      A.    Yes.

8      Q.    Can you tell us what it is?

9      A.    It's a profit and loss

10   statement for 2013 for Jason Rogers

11   Williams.

12      Q.    Now, what should this profit

13   and loss statement represent if it

14   pertains to the law firm?

15      A.    It represents the income that

16   the law firm made and the expenses that

17   they incurred to reach a bottom line as to

18   what the income is.

19      Q.    And when Nicole Burdett

20   provided you with this form, what did she

21   tell you to do with it?

22      A.    To prepare the taxes from it.

23      Q.    Based on the information in

24   this form?

25      A.    Based on this information from

1    the form.

2           Q.    Now, in addition to business

3    expenses, this form clearly contains items

4    labeled as personal expenses.  Is that

5    accurate?

6           A.    Yes.

7           Q.    And did you use some of the

8    personal expenses, did you place those on

9    the Schedule C on Jason Williams' 1040 tax

10   returns?

11          A.    Yes.

12          Q.    And why did you do that?

13          A.    Because they were trying to

14   reach a certain amount at the bottom line.

15          Q.    And what do you mean by that?

16   Are you referring to a certain amount of

17   tax liability for the year?

18          A.    Right.  What their tax

19   liability would be.

20          Q.    So did they have a threshold

21   that they wanted to get to?  Is that what

22   you're saying?

23          A.    Well, based on the report, it

24   showed much lower than I could go and they

25   didn't want to go that low.

1      Q.    So what were their intentions?

2      A.    To get to a point where they

3  felt satisfied that they could feel

4  comfortable with the bottom line.

5      Q.    Okay.  So you told us that

6  Nicole would drop off, Nicole Burdett

7  would drop off the tax information,

8  including the QuickBooks and this profit

9  and loss statement.

10      A.    Right.

11      Q.    What would you then do with

12  it?

13      A.    I would prepare the tax

14  return.  I would send her a review for

15  them to look at.  And then if they were

16  fine with it, then she would give me the

17  okay through Jason to send it off

18  electronically.

19      Q.    What would she tell you?

20  Would you prepare a draft of the return

21  and then call her or how did that go?

22      A.    I would send -- I would call

23  with the draft.

24      Q.    And what would you tell her?

25      A.    That I had the draft and this

1    is what the numbers were and then she

2    would get back to me with Jason.

3         Q.    During that conversation would

4    you say, okay, the tax liability for 2013

5    is X amount?

6         A.    Correct.

7         Q.    And what would she tell you?

8    Would she say okay, file it?

9         A.    She told me she would have to

10   talk to Jason first.  And then after she

11   did, if they were satisfied with the

12   numbers then I would file them.

13        Q.    Were they satisfied with the

14   numbers?

15        A.    Not always.

16        Q.    And when they were not always

17   satisfied what would happen?

18        A.    I would inflate the expenses

19   some more by adding more personal that was

20   on the profit and loss.

21        Q.    And you said that you would

22   inflate them some more.  So the original

23   draft version, is it fair to say that that

24   did contain some personal expenses?

25        A.    Some personal -- the original?

 1          Q.     Yes, sir.

 2          A.     Did not pertain to the

 3     original personal expenses.  I would

 4     inflate them after if they weren't happy

 5     with the original draft.

 6          Q.     And did you -- why did you do

 7     that?

 8          A.     I felt like I became

 9     overwhelmed with everything and I just

10     wanted to make him happy.

11          Q.     So when they asked you to go

12     lower, you would go lower?

13          A.     Yes.

14          Q.     And the only way to do that

15     was how?  How would you go lower?

16          A.     I would increase some of the

17     specific expenses, inflate them to where

18     the net income would go lower.

19          Q.     Now, you said you would

20     increase them.  Would you sometimes just

21     make up a number?  For example, if the

22     contract labor, and this is just an

23     example, let's say was 150,000, would you

24     sometimes just inflate that to 200,000?

25          A.     Yes.

1          Q.    And certain categories that
2     we've seen like supplies, would you just
3     increase those amounts?
4          A.    I would add some of the
5     personal expenses on there from the credit
6     card expenses.  There were some personal
7     and I would increase that and the
8     supplies.
9          Q.    Did Nicole Burdett or Jason
10    Williams ever tell you do not use those
11    personal expenses on my Schedule C?
12         A.    No.
13         Q.    Did that ever happen during
14    the entirety of the relationship?
15         A.    No.
16         Q.    In fact, when she gave you
17    those forms, what did she tell you to do
18    with them?
19         A.    Just to prepare the taxes and
20    then give them the draft and they would
21    review it and let me know what they wanted
22    to do.
23         Q.    Did she always say that she
24    would have to talk to Jason before it was
25    finalized?

1          A.    Yes.

2          Q.    So based on this long-term

3     relationship that you had with them, who

4     did you believe was calling the shots on

5     these tax returns?

6          A.    Jason.

7          Q.    You mean Jason Williams?

8          A.    Yes, ma'am.

9          Q.    Now, for these particular, the

10    returns from 2013 to 2017, were those

11    electronically filed?

12         A.    From 2010?

13         Q.    From 2010 to 2017.

14         A.    Yes, ma'am.

15         Q.    And particularly the counts in

16    the indictment were 2013 to 2017.  Those

17    were electronically filed, all of those?

18         A.    Yes.

19         Q.    Okay.  Did you get

20    authorization from Jason Williams before

21    you filed those returns?

22         A.    I sent it over to Nicole to

23    do, yes.

24         Q.    Did he ever call and complain

25    and say I didn't want to file that one,

1     take it back or anything to that effect?

2              A.    No.

3              Q.    How would you and Nicole

4     communicate?  Was it in-person or on the

5     phone?

6              A.    Mostly on the phone.

7              Q.    How much did you charge Jason

8     Williams to prepare these tax returns?

9              A.    In the beginning it was only

10    $200.  And by the time I finished, it

11    maybe went up to 500.

12             Q.    So is it fair to say that you

13    didn't make a good deal of money off of

14    preparing these returns?

15             A.    No.

16             Q.    And we're going to get more

17    into this at a later time, but just

18    briefly for the grand jury's

19    understanding, did you also prepare Nicole

20    Burdett's personal tax returns?

21             A.    Yes, I did.

22             Q.    And did you do a similar thing

23    with her tax returns where she would

24    provide you, excuse me, with a profit and

25    loss for herself containing personal and

1    business expenses?

2         A.    Yes.

3         Q.    And did you, in fact, falsify

4    those returns as well?

5         A.    Yes.

6         Q.    What about an attorney, are

7    you familiar with an individual named

8    Bobby Hjortsberg?

9         A.    Yes.

10        Q.    And who is he?

11        A.    He's an attorney that works in

12   the firm.

13        Q.    Did you also prepare some of

14   his tax returns?

15        A.    Yes.

16        Q.    And how did you meet Mr.

17   Hjortsberg?

18        A.    Through Nicole.

19        Q.    And did he come to your office

20   to meet with you?

21        A.    Yes.

22        Q.    And what did he ask you to do?

23        A.    To inflate the returns.

24        Q.    And what would he bring with

25   him when he would meet with you?

1          A.    He would bring me his list of

2    expenses.

3          Q.    And you would prepare a draft

4    of the return?

5          A.    Yes.

6          Q.    And did you ever have any back

7    and forth with Bobby Hjortsberg?

8          A.    Yes.  In-person.

9          Q.    And what would he tell you?

10         A.    He would want to try and reach

11   a certain number, also.

12         Q.    Would he also ask you to go

13   lower?

14         A.    Uh-huh (affirmative response).

15         Q.    And how -- did you do that?

16         A.    Yes.

17         Q.    And how were you able to do

18   that?

19         A.    I was -- I'm sorry.  I didn't

20   hear the question.

21         Q.    How were you able to go lower

22   to reduce the tax liability?

23         A.    Inflate the expenses.

24         Q.    What happened in 2017 for tax

25   year 20 -- well, in 2018, did they

1    continue using you to prepare their

2    returns?

3         A.   No.

4         Q.   So what happened?  Were you

5    let go or --

6         A.   They just told me they were

7    going to go to someone else and I was very

8    relieved about that.

9         Q.   Did they tell you why they

10   were going to someone else?

11        A.   They insinuated that they won

12   a big law case and they just wanted to go

13   somewhere else at the advice of their

14   financial advisor.

15        Q.   And you said when they told

16   you they were going to someone else, how

17   did you feel?

18        A.   Very relieved.

19        Q.   Why?

20        A.   Because I was getting to the

21   point where I didn't want to do their tax

22   returns anymore.

23        Q.   And why didn't you want to do

24   them?

25        A.   Because of the pressure they

1    were putting on me to reduce everything.

2         Q.    So you knew that you were

3    doing things that were not legally

4    correct?

5         A.    Yes.

6         Q.    But you continued doing it up

7    until the point where they said they were

8    going to someone else?

9         A.    Yes.

10        Q.    Now, sir, are you aware of the

11   fact that in addition to this

12   investigation, that the IRS has a separate

13   investigation on you concerning your

14   failure to report all of your income on

15   your tax returns?

16        A.    Yes.

17        Q.    And is it your understanding

18   that that investigation and those charges

19   will be dealt with at a separate time?

20        A.    Yes.

21        Q.    So you told us that you met

22   Jason Williams and Nicole Burdett in 2010.

23   And is it fair to say that you continued

24   having communications and preparing the

25   returns through 2017?

1          A.    Yes.

2          Q.    At any point did either Jason

3    Williams or Nicole Burdett pick up the

4    phone or come see you or say, look, we

5    want to be conservative?  Remove all of

6    these personal expenses.  I'm just going

7    to pay what I owe?

8          A.    Never.

9        MS. UEBINGER:  Do y'all have any

10   questions for Mr. Timothy?

11       GRAND JURORS:  (No response).

12       MS. UEBINGER:  Thank you, sir.

13          David, anything else?

14       MR. AYO:  No.

15       MS. UEBINGER:  Thank you, sir.

16   You're excused.

17   (Whereupon, the witness was excused and

18   left the grand jury room at 2:51 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3       I do hereby certify that the foregoing is

4       a true and accurate transcript, to the

5       best of my skill and ability, from my

6       stenographic notes of this proceeding.

7

8       June 26, 2020

9

10

11

        - - - - - - - - - - - - - - - - - - - - - - - - - - - -
12      DAWN D. TUPPER, CCR, RPR
        Certified Court Reporter (#94015)
13      Registered Professional Reporter

14

15

16

17

18

19

20

21

22

23

24

25