UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                          CRIMINAL  ACTION

v.                                                NO. 20-55

JASON WILLIAMS AND NICOLE BURDETT                 SECTION "F"


ORDER AND REASONS

The specter that a political agenda or federal agency animosity towards a local "reformist" District Attorney-elect prompted this federal tax prosecution against the prominent public official and his law partner at his criminal defense firm looms large over these proceedings.  Orleans Parish City Councilman and now District Attorney-elect Jason Williams and his law partner, Nicole Burdett, claim that the government singled them out for tax fraud prosecution in violation of their constitutional rights to equal protection and due process.  Mr. Williams submits that the government impermissibly targeted him based on his status as a sitting public official and as a reform candidate for District Attorney.  The government and the accused generally agree on the rigorous legal hurdles obstructing the accused's constitutional challenge to the tax fraud indictment.  They clash on whether the

evidence elicited during the October 22 evidentiary hearing overcomes the presumption of prosecutorial regularity and good faith.  Before the Court is a renewed motion to dismiss the June 26, 2020 indictment by Jason Williams and Nicole Burdett, as well as a motion to dismiss the December 4, 2020 indictment in Criminal Action Number 20-139 by Nicole Burdett.  Resolving whether the prosecution is unduly selective or vindictive turns on considering the trajectory of the bureaucracy laden investigation turned tax fraud prosecution and assessing how the evidence measures up against the lofty burden and cramped conception of constitutional rights imposed by the case literature.  In many respects, the facts underlying the accused's constitutional claims robustly inform their defenses to the government's charges and likely will be explored as part of their telegraphed incomplete- or shoddy-investigation defense to the charges at trial.  For this reason and the reasons that follow, the renewed motions to dismiss the indictment are DENIED.

## Background

On June 26, 2020, a specially-convened federal grand jury returned an 11-count indictment, charging Jason R. Williams and Nicole E. Burdett with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 1); five counts of aiding and assisting in the preparation and presentation

2

of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2) (Counts 2, 3, 4, 5, and 6);[1] and five counts of failing to file IRS Forms 8300 relating to cash received in trade or business, in violation of 31 U.S.C. §§ 5331 and 5322 (Counts 7, 8, 9, 10, and 11).[2]

The indictment was returned while Mr. Williams was a city councilman campaigning to be Orleans Parish District Attorney. As for the conspiracy and preparation of fraudulent tax returns charges, Mr. Williams and Ms. Burdett contend that they were improperly singled out from hundreds of other clients of their tax preparer, convicted felon Henry Timothy, whom they relied upon to determine which law firm expenses should be deducted on Jason Williams' tax returns for the charged tax years. As for the Title 31 charges, Mr. Williams and Ms. Burdett are the only individuals

---

[1] Each charged § 7206(2) violation concerns allegedly inflated Schedule C business expenses in the amount of: $200,000 (tax year 2013; Count 2); $90,000 (tax year 2014; Count 3); $170,000 (tax year 2015; Count 4); $140,000 (tax year 2016; Count 5); $120,000 (tax year 2017; Count 6). The government alleges that the defendants misclassified Jason Williams' personal expenses as business expenses and provided this false information to tax preparer, Henry Timothy, for inclusion on the Schedule C (profit and loss from a business) portion of Williams' tax returns; and that these allegedly fraudulent tax returns reduced Williams' tax liability in excess of $200,000.

[2] Each charged §§ 5331 and 5322 violation concerns an occasion in which Mr. Williams and Ms. Burdett allegedly failed to report cash payments in excess of $10,000 from clients for legal services; five occasions between June 2017 and August 2018, for a total of $66,516.

to be charged with failing to file a Form 8300 in the Eastern District of Louisiana at least in the past 50 years.

This Order and Reasons assumes familiarity with prior motion practice, proceedings, and Orders and Reasons. After granting the defendants' request for limited discovery on their selective and vindictive prosecution theories (but denying without prejudice dismissal of the indictment), an evidentiary hearing was conducted on October 22, 2020. Four government agents along with a defense expert Certified Public Accountant testified, and documentary evidence was submitted by all parties.

Meanwhile, on December 5, 2020, Jason Williams was elected District Attorney for Orleans Parish; the day prior to the run-off election, on December 4, 2020, Nicole Burdett was separately indicted on four counts of making and subscribing a false tax return, in violation of 26 U.S.C. § 7206(1), concerning her personal tax returns.[3] Criminal Action Number 20-139 was randomly

---

[3] Each charged § 7206(1) violation concerns a particular tax year's Form 1040 tax return that was allegedly false and fraudulent insofar as Nicole Burdett filed as Head of Household, even though she was married at the time, and the tax return allegedly contained false and fraudulent Schedule C business expenses exceeding a certain amount, causing Nicole Burdett to qualify for the Earned Income Tax Credit: Count 1 relates to tax year 2014 and allegedly false Schedule C expenses exceeding $50,000; Count 2 relates to tax year 2015 and allegedly false Schedule C expenses exceeding $70,000; Count 3 relates to tax year 2016 and allegedly false Schedule C expenses exceeding $100,000; Count 4 relates to tax

allotted to another Section of Court, which granted Ms. Burdett's motion to transfer the case to this Court given the relatedness of pretrial issues presented in the cases and to prevent duplication of pretrial proceedings and inconsistent rulings.[4]

*Pre-Indictment/Federal Investigations*

Jason R. Williams is an attorney and public official who has served as a Councilmember-At-Large for New Orleans City Council, the legislative branch of New Orleans City government. Councilman Williams qualified to run, and formally entered the race, for the office of District Attorney for Orleans Parish; the election was November 3, 2020.  After winning the run-off on December 5, Williams will serve as District Attorney for Orleans Parish starting on January 11, 2021.

Until then and for past years, Councilman Williams heads his law firm, Jason Rogers Williams & Associates LLC, which focuses on

year 2017 and allegedly false Schedule C expenses exceeding $60,000.

[4] In between the June 2020 indictment and Ms. Burdett's December 2020 indictment, on September 22, 2020, the government filed a bill of information charging Williams' and Burdett's former tax preparer, Henry Timothy, with four counts of willfully making a false tax return, in violation of 26 U.S.C. § 7206(1), related to falsifying his own Schedule C gross receipts.  Criminal Action Number 20-99 is proceeding before Judge Fallon.  On January 7, 2021, Henry Timothy pled guilty to one count of filing a false tax return for tax year 2013.  Timothy's credibility and the extent of his cooperation with federal prosecutors will surely be powerfully placed at issue at the trial of his former clients.

criminal defense.  Nicole E. Burdett is one of Mr. Williams's law partners.  She also performs certain administrative functions for the firm.

Since 2016, Mr. Williams has been -- and still is -- the target of what the prosecutors confirm is an "open and ongoing" federal investigation by the FBI into wide-ranging and undisclosed non-tax matters.[5]  At least at its inception, the ongoing FBI investigation was overseen by prosecutors at the U.S. Attorney's Office for the Eastern District of Louisiana.  At some point before July 24, 2018, prosecutors at the Western District of Louisiana became involved in the FBI investigation.  The source and unfolding of the IRS investigation was the subject of the October 22, 2020 evidentiary hearing and is summarized in some detail.

---

[5] Grand jury subpoenas to Mr. Williams bear a grand jury number of 2017R00460-97, indicating to counsel for Mr. Williams that the government has been using the grand jury to investigate Williams since 2017.  The first bank subpoenas were issued between November 2016 and July 2017 at the request of prosecutors from the Eastern District of Louisiana and agents from the New Orleans Division of the FBI.  The numbering system indicates that the Eastern District issued at least 20 and as many as 41 total subpoenas during this time period.  In addition to bank records, the subpoenas sought records from: one of Mr. Williams's college acquaintances, a man whom had received contracts from the City of New Orleans (with no involvement from Mr. Williams); and a business that performed repairs on Mr. Williams's house.

*October 22 Evidentiary Hearing Record*

Mr. Williams was not targeted by the IRS for criminal investigation until after one of its agents attempted to interview him as a witness-client of another IRS target, the now convicted felon, Henry Timothy.  The IRS investigation of Henry Timothy began as a result of an IRS criminal investigation of one of Timothy's other clients, C.D., who owned a home health company.  In 2017, IRS Special Agent Lori Marable began investigating employment tax irregularities of C.D.'s home health care company; C.D.'s tax returns were prepared by Henry Timothy.  Ultimately, SA Marable and the IRS declined to prosecute C.D., a black female who does not hold public office.[6]  SA Marable declined prosecution after she corroborated that the home healthcare company paid its employment taxes, the company's gross income was correctly accounted for and accurately reported on its tax returns, and the amount of personal expenses in the business account was *de minimis* and did not meet (unspecified) prosecution guidelines.

---

[6] SA Marable testified that she did not present the case against C.D. for prosecution because she "couldn't pin down the responsibility of the party" and "when you can't pinpoint and show who is responsible or the amount of tax wouldn't have been anything, then that's the reason why we decided to close the case." Evid. Hrg. Tr. p. 81-82 ("[e]ven though there were a lot of expenses, there were a number of family members that were involved in the business.").

The IRS investigation of C.D. led to other targets.  Although SA Marable declined to prosecute C.D., she decided to pursue an investigation against C.D.'s tax preparer, Henry Timothy, when Marable established that Timothy failed to declare all of his income from his tax preparation business for tax years 2013 through 2016.[7]

The IRS investigation trajectory is relevant to government intent and must also be considered in the context of Schedule C tax investigations generally.  Schedule C tax investigations are "complicated and time-consuming" because IRS agents must "interview numerous people...not only the subjects [but also those] who paid the subjects." Tr. p. 82 (SA Marable).  Agents must interview people, prepare and analyze spreadsheets as well as subpoena and analyze bank statements, tax returns, and other documents. Tr. p. 82.  There are "many levels of approval for a case to open, and there's even more levels for a case [to be] prosecuted." Tr. p. 122 (SA Moore).  SA Marable testified that, in investigating Mr. Timothy, she decided to contact some of his clients that appeared on the IRS-generated Scheme Development Center spreadsheet; she sorted the data and focused on those with higher income and expenses and those whose expenses "looked like

_____

[7] According to the government, the admission of the unreported income resulted in an additional tax liability of approximately $88,593.

8

they were falsified." Tr.p.62. SA Marable testified that Mr. Williams was one of Mr. Timothy's clients whom she selected to interview because his tax returns appeared to contain "false items." Tr.p.64. Similarly, SA Moore testified that the extent of the personal expenses he saw on Mr. Williams' Schedule C was "concerning" and warranted a further look to see if they were legitimate or not. Tr. p. 126.

There is some confusion regarding whether SA Marable's original investigation of Mr. Timothy focused on Mr. Timothy's conduct as tax preparer or his conduct respecting his own taxes.[8] SA Marable testified that her Timothy "investigation started off as verifying what Mr. Timothy was reporting on his own tax returns." Tr. p.67. She was investigating Mr. Timothy for "not reporting his income." Tr. p.76. But as to why she sought to interview Mr. Williams as a witness in Mr. Timothy's investigation, SA Marable stated that when the IRS investigates a tax preparer, the agents have an option to pursue charges based on false items on the preparer's own returns or false items on the clients' returns; she did not have to decide which angle to pursue at the

---

[8] Special Agent Jennifer Lopez-Martinez, who acted as secondary agent to SA Marable for witness interviews in the Timothy investigation, testified that SA Marable would know better as the case agent, but indicated that the IRS was investigating Mr. Timothy "about his preparation for tax returns," looking into whether he "put[] bad information or bad deductions on his clients' tax returns." Tr. p. 129.

time she opened the Timothy investigation.  Tr. p.77.  When asked
whether Mr. Timothy had ever been investigated for putting false
information on his clients' returns, SA Marable responded "I only
investigated him [for] not adding his business profit to his
Schedule C."  Tr. p.89.

SA Marable investigated and interviewed Timothy in 2018 and
referred him for prosecution in the latter part of 2019.  Tr.
p.79.[9] She first approached Timothy as a target on May 15, 2018.
In pulling Henry Timothy's information, SA Marable determined that
his tax return information did not match the number of tax return
clients he said he had.  As part of the Timothy investigation, SA
Marable contacted and attempted to interview several Timothy
clients to verify their identities and to verify that Timothy was
their tax preparer.  Tr. p.63 (SA Marable decided to interview
some of Timothy's clients that appeared on the spreadsheet to
verify the tax return information "and I was also interviewing
them based upon the fact that Mr. Timothy prepared their return.").
To select which Timothy clients she would interview, SA Marable
utilized information from the IRS Scheme Development Center, which
generates a spreadsheet that lists all tax preparer subject

---

[9] Ultimately, Henry Timothy was charged by bill of information on
September 22, 2020; of the four charges of willfully subscribing
a false tax return, in violation of 26 U.S.C. § 7206(1), related
to falsifying his own Schedule C gross receipts, Timothy recently
pled guilty to one count.

clients; the spreadsheet contains information included on a tax return.  From the spreadsheet, SA Marable determined which Timothy clients had high expenses or high income and whose income and expenses "looked like they were falsified."  Tr. p.62.  "[W]hen I look at a tax return [having] work[ed] for the IRS for...over 10 years," SA Marable testified, "I can look at a spreadsheet and...say...this does not look right or this does not add up to what a tax return should look like, especially if it looks like it has false information on it."  Tr. p.63.[10]

Jason Williams was one of Timothy's clients whom SA Marable contacted for witness interviews in October 2018.  Before attempting to interview Mr. Williams, SA Marable had pulled Mr. Williams' tax returns to review them, as she routinely does when interviewing witnesses in IRS investigations. Tr. p.68.[11]  Among

_____

[10] When asked about selecting witnesses to interview from a spreadsheet of hundreds of clients: "there's a number of things that...you look at when you are pulling witnesses."  Tr. p.74. This includes whether it appears that there is any false information (such as expenses that should not be included), whether they are repeat clients, what type of business the client operates. With respect to the latter, type of business, SA Marable observed that certain businesses like a home health company, restaurant, or construction company, generally have more employees and more expenses compared to an attorney or law firm.

[11] Had Special Agent Marable interviewed Jason Williams as a witness in her Henry Timothy investigation, as part of the "direct method" of investigation, she testified that she would have gone over his tax return and asked him questions about his tax liability.  She would have "ask[ed] him questions concerning his tax return, who prepared it, the items on the tax return.... I have to determine

the factors she considers when selecting witnesses to interview, SA Marable selected Mr. Williams to interview "based on his level of income and the expenses, just looking at the Schedule C part." Tr. p.73.  When SA Marable "saw [Jason Williams'] tax information -- his tax return looked like they had ... false items on it." Tr. p. 64.[12]  At the time she looked at his tax returns and decided to interview him, SA Marable knew that Mr. Williams was an attorney because that information was listed on the spreadsheet; she did not know that he was a sitting city councilman, nor did she know that he was a declared candidate for District Attorney. Tr. p. 84.[13]  When SA Marable attempted to interview Mr. Williams, she attempted to interview "a number of people that day, and Mr. Williams just happened to be one of those people."  Tr. p.73.[14] She does not remember names, and during her Timothy investigation,

---

who put the numbers, who was doing this information, whether he looked at his own return[.]" Tr. p.66-67.

[12] SA Lopez-Martinez never reviewed Mr. Williams' tax information; only SA Marable did because SA Marable was the case agent.  Tr. p. 130.

[13] SA Marable, a black woman who did not know that Jason Williams was a public official when she scheduled the November 5 interview, testified that she did not select Mr. Williams as a witness to interview because he is a black man or because he was a candidate for district attorney or because he was a sitting city councilman.

[14] SA Marable never investigated Mr. Williams as a target and she never referred him for investigation by another agent. Tr. p.77. SA Lopez-Martinez confirmed that they sought to interview Mr. Williams solely as a witness in the Timothy investigation. Tr. p. 130.  SA Lopez-Martinez's activity in the Timothy investigation was limited.  SA Marable was the case agent and SA Lopez-Martinez was merely "the secondary on potential witness interviews."  Tr. p. 135.

12

she was not able to interview any Timothy client despite her efforts.

Her first attempt to contact Jason Williams as a witness in her Henry Timothy investigation was when SA Marable stopped by unannounced at Mr. Williams' house on October 22, 2018;[15] otherwise engaged, he asked her to contact his assistant and make an appointment, which she did, scheduling a meeting for November 5, 2018.[16] SA Marable, the case agent in the Timothy matter, accompanied by Special Agent Jennifer Lopez-Martinez, as secondary for witness interviews, went to Mr. Williams's law office at the scheduled time on November 5, 2018. But Mr. Williams did not show up for the meeting. SA Marable and SA Martinez-Lopez left his office after waiting for two hours. Neither agent knew that Mr. Williams was a public official or running for office; neither supposedly was upset or insulted about the failure of a witness to

---

[15] In attempting to interview Mr. Williams, SA Marable told Mr. Williams that "I [am] here to discuss [your] tax liability" and she testified that she typically tells witnesses she attempts to interview that they are not under investigation, but that she needs to speak with them in a witness capacity. Tr. p.69.

[16] Meanwhile, Councilman Williams' announcement that he would run for Orleans Parish District Attorney in 2020, and that he was "committed to...reform[ing]" the office, was reported by the media on October 24, 2018. Neither SA Marable nor SA Lopez-Martinez knew this information when they attempted to interview Mr. Williams. It is unclear precisely when the other IRS agents involved in the investigation discovered Mr. Williams' declared intent to run for District Attorney; the October 24, 2018 article was included by SA Moore in his request to open a grand jury investigation in January 2019.

appear for an interview.  Both testified that it is commonplace for witnesses to fail to appear for IRS interviews.[17]

After leaving Mr. Williams' office, the agents attempted to contact Mr. Williams at his house, but he was not at home.  From there, the agents went to an IRS office, where both learned for the first time from a now-retired IRS supervisor that Mr. Williams was a sitting city councilman.  Tr. p. 84.[18]

It is standard protocol for IRS agents in the field to report to their supervisors if they attempt to interview or make contact with a witness whom they discover is a public official.  After

---

[17] SA Marable was not angry that the meeting did not occur; she is used to it.  Tr. p. 85 ("People always don't show up for appointments and things like that.").  She did not try to schedule another meeting: "when it came to Mr. Williams, I just decided, okay, well, I guess he doesn't want to meet, and that was the end of it." Tr. p. 86.  When her supervisor asked whether SA Marable wanted to pursue the matter with Mr. Williams, either as a witness or as a target, SA Marable told him that she did not want to take on another case outside of Baton Rouge, where she had moved.  Tr. p. 86, 87.  Ultimately, in her investigation of Henry Timothy, SA Marable had trouble locating and speaking with witnesses, which led her to pursue an "indirect method" of investigation, which includes resorting to summonses to review clients' information. When SA Marable attempted to interview Mr. Williams, she went to interview "a number of people that day, and Mr. Williams just happened to be one of those people."  Tr. p.73.  She does not remember names and she was not able to interview any other Timothy client as a witness in her Timothy investigation.  If she spoke with any Timothy clients, SA Marable asked them to send invoices for her to review.  Tr. p.67.

[18] It was Supervisory Special Agent Marilyn Cherie who told SA Marable and SA Lopez-Martinez that Jason Williams was a city councilman.

learning that Jason Williams was a public official following the
failed interview attempt, SA Lopez-Martinez advised her
supervisor, Supervisory Special Agent Gregoire, that she and SA
Marable had attempted to interview Jason Williams as a witness in
SA Marable's investigation of his tax preparer, but that Jason
Williams failed to meet with them.  Tr. p.130 ("[O]nce we found
out [Jason Williams] was a councilman in the New Orleans area," SA
Lopez-Martinez testified, "that is when I took it upon myself to
inform my manager that he was a councilman.").  SA Martinez-Lopez
also reported to SSA Gregoire that SA Marable told her (SA Lopez-
Martinez) that Jason Williams' tax returns were "egregious."  Tr.
p. 131 (SA Lopez-Martinez told SSA Gregoire that "there's a witness
who is a councilman and Lori says his returns are egregious.").
SSA Gregoire instructed her "not to speak to Jason Williams after
that point."[19]  SA Lopez-Martinez did not then advise SSA Gregoire
that there were other Timothy clients whom SA Marable had
determined had "egregious" tax returns; she only told SSA Gregoire
about Jason Williams because IRS agents in the field have an
obligation to advise their supervisors when they encounter a public
official as a potential witness.  Tr. p. 132-33.

---

[19] Gregoire said she gave this order as a courtesy to Mr. Williams.

In addition to supervising SA Lopez-Martinez, SSA Gregoire[20] also supervises IRS Special Agent Tim Moore, who also works with the FBI public corruption squad.[21]   After SA Lopez-Martinez reported that she and SA Marable had attempted to interview a city councilman whose tax returns appeared "egregious" or to contain "false items," SSA Gregoire then asked IRS Special Agent Moore to "[t]ake a look into Mr. Williams' tax matters."   At that time, SSA Gregoire was "not even aware that Mr. Williams was being investigated by FBI."[22]

---

[20] IRS Supervisory Special Agent Kristie Gregoire has been with the IRS for 20 years and in a supervisory capacity for more than six years.   Gregoire attended elementary school, high school, and college at the same schools as Mr. Williams' ex-wife, Bridget Barthelemy.   When confronted with a list of her Facebook "friends," Gregoire denied being a social person, denied "travel[ling] in the same social circles" as the Barthelemys, and stated that her familiarity with the Barthelemys was not (and need not be) disclosed in any of the investigative paperwork.   Barthelemy and Williams had a bitter divorce; Barthelemy is listed as a government witness in the special agent's report.   SSA Gregoire has not had any contact with Mr. Williams or Ms. Barthelemy in years; any contact with Mr. Williams in past years involved "pleasant conversation."

[21] SSA Gregoire supervised IRS Special Agent Lori Marable until 2017 when Marable left Gregoire's group; Gregoire had no knowledge regarding SA Marable's investigation of Henry Timothy in 2018. Because SSA Gregoire supervises SA Lopez-Martinez, who was secondary to Marable when Marable and Lopez-Martinez attempted to interview Jason Williams as a witness in Marable's investigation of Henry Timothy as tax preparer, SSA Gregoire then became aware that Jason Williams was a potential witness in an investigation for a case against his tax preparer and that the IRS case agent who had reviewed Jason Williams' tax returns reportedly described them as "egregious."

[22] SSA Gregoire testified that she was not aware and that she does not think SA Moore was aware that the FBI investigation was

In addition to his IRS duties, SA Tim Moore has also been assigned to the FBI public corruption squad since 2002; he regularly works with Special Agent Goodson on public corruption matters.  Tr. p. 90.  When his boss, SSA Gregoire, asked him to look into Mr. Williams' taxes on November 7, 2018, Moore was generally aware, having overheard from other FBI agents, that there was an FBI investigation into Mr. Williams, but he did not know the specifics.  Tr. p. 91.  For this reason -- because SA Moore was aware that the public corruption unit had been investigating Williams -- SA Moore knew that Jason Williams was a public official.  SSA Gregoire told Moore that SA Marable attempted to interview Mr. Williams but did not make contact and SSA Gregoire said she wanted SA Moore "to look into Mr. Williams' situation." Tr. p. 93.  When asked whether SSA Gregoire wanted SA Moore to look into Mr. Williams "because he was a public official," SA Moore stated: "Well, he is a public official and his tax returns apparently looked egregious to the agents that had seen them." Tr. p. 94.  Soon after SSA Gregoire asked SA Moore to take a look at Jason Williams' taxes, on November 7, SA Moore prepared an IDRS

underway when she first asked SA Moore to look into Mr. Williams' taxes.  She does not recall when SA Moore told her that the FBI didn't have anything (i.e., did not have evidence to pursue charges), but she "would assume that had to be well into 2019." In any event, she and SA Moore did not have much of a conversation about the FBI investigation because she "was just focused on IRS violations."

to request Mr. Williams's tax returns:  "the first thing I do, as in any case because I work for the IRS, is pull copies of the tax returns, see what they look like."  Tr. p. 113.  SSA Gregoire approved the IDRS form information request on November 8, 2018.[23]

From looking at Mr. Williams' tax returns, SA Moore's impression was that Mr. Williams' "net profit was really low, just that and his year after year after year I began to look more, saw a newspaper article where he had tax liens in the past going back to 2001, so there's some history there."  Tr. p. 115.  As for the relevance of looking at whether Mr. Williams made a profit, SA Moore testified that "most people, if their business is not profitable, they are not going to stay in business long, especially not year after year after year. I would assume attorneys work really hard, and I don't think they would go through all that not making any money." Tr. p. 115-16.

---

[23] On November 7, 2020, SA Moore submitted an IDRS Request requesting Mr. Williams' tax return information; SSA Gregoire signed off on this "information item" on November 8, 2018.  It was this IDRS form that authorized SA Moore to pull up Mr. Williams' (and Ms. Barthelemy's) tax returns for 2012 to 2017.  SSA Gregoire testified "[w]e always have to have an IDRS form because we have professional staff who pull the IDRS information, the taxpayer information for us, and all of that has to be documented and saved."

SA Moore testified "[t]hen between November 7 and probably the second week of January [2019], I was trying to develop to see if the Schedule Cs are accurate or not." Tr. p. 113. He explained:

> So I would take a look at Mr. Williams' lifestyle. I looked at the bank accounts that were available, looked at the expenditures that were coming out of the law firm account. At the end of the day, I was able to pull together what we call a grand jury package, with my findings between those two months, to predicate a full investigation to see if there's merits [sic] to this case.
>
> ...
>
> The first thing I looked at was his tax returns. Based on those it's worthy of a further look.  Based on that I think I checked the property records, looked at some bank records that were available to me. I was going to be spending some time on it because it looked like there was merit to it, so we opened up a primary investigation. As I said, in January [2019] I had enough, because I have to go through a stringent approval process, for a subject criminal investigation to be opened.

Tr. p. 114.  SA Moore was able to obtain Mr. Williams' bank records in November 2018 because "[t]he FBI had them."  Tr. p. 114.[24]  In looking at the bank records, SA Moore testified, "the main thing was all the items what appear to be personal expenditures that were being spent from the law firm accounts seemed very excessive.

---

[24] SA Moore approached the FBI after SSA Gregoire asked SA Moore to look at Mr. Williams' tax returns; the FBI did not approach SA Moore.

SSA Gregoire testified that SA Moore told her that the FBI had been investigating "possible allegations of kickbacks."  "[A]t some point, [Special Agent Moore] told me [the FBI] didn't have anything, but I cannot recall when exactly that was."  For his part, SA Moore does not recall talking to Gregoire about the FBI investigation.

So it was worthy of us looking at it further to see if something was there." Tr. p. 115.

SA Moore testified that he prepared a document that he believed to be potential personal expenditures; a document he attached to his approval packet. Tr. p. 116. Government Exhibit 6 is a preliminary spreadsheet Moore prepared between November 7 and the next couple months; the spreadsheet was meant to capture "the totality of the potential bad [or personal] expenditures at the time...probably around three-quarters of a million dollars[,] includ[ing] mortgages on various property[,] gym memberships, vitamins, hair salons, student loan debt, personal tax liability debt, things that aren't legitimate business expenses." Tr. p. 117. In total, SA Moore determined that there were approximately 40 different classifications of personal expenses "gleaned from the bank records" or which SA Moore "suspected at the time ended up on the business Schedule C of the tax returns." Tr. p. 117-18. SA Moore testified that "it was done year after year after year. So it wasn't like it was a one-time thing, a one-year thing. I think I covered five years in that particular spreadsheet." Tr. p. 118. Once this spreadsheet was prepared, SA Moore to wanted investigate further in order to determine the validity of what the records might indicate is happening. Tr. p. 118.

SA Moore prepared a November 30, 2018 Memo recommending the initiation of a "primary investigation" into Jason Williams; he explained that Government Exhibit 3 is "a document that [the IRS] use[s] to open a preliminary investigation, which it basically means we are going to spend some time seeing if this case meets the criteria for a full investigation."  Tr. p. 111.  The Memo states that "It is alleged that the subject is receiving kickbacks in exchange for city contracts and filing tax returns."  SA Moore included that information in this document because SA Moore "definitely would have spoken to the FBI...between November and December" of 2018. Tr. p. 112 ("[B]etween November 7 and December 10, I definitely spoke with Todd Goodson to confirm that [the FBI] had an investigation [into Jason Williams], seeing if they were willing to work together should we have something that would be able to be predicated.").  In the portion of the Memo inquiring whether the investigation is "impactful[,]" specifically, whether there are "factors adding to the investigations potential impact (media attention, notoriety of the subject, etc.)[,]" SA Moore indicated "Yes – notoriety[.]"

After SA Moore compiled the preliminary spreadsheet, looked at the tax returns and bank records, and pulled the property records, he "felt like [he] had enough to send it through the approval process to open it up to a full investigation."  Tr. p.

119-20.   SA Moore cannot launch a full investigation without approval.   Opening up a full investigation is a layered process: "it has to go through [SSA Gregoire], it has to go through [SA Moore's] ASAC [Assistant Special Agent in Charge] and [his] SAC [Special Agent in Charge,] as well as internal legal counsel to see if there's justification to open the case, and then it goes to DOJ tax for their concurrence."   Tr. 120.   Additionally, at the end of the investigation by the time SA Moore's report was finished, the case went through "a very stringent approval process" including grand jury investigation, DOJ Tax, and the U.S. Attorney's Office.

IRS case agent SA Moore's request for a grand jury investigation into Jason Williams was submitted into the record. This form was prepared by SA Moore on January 11, 2019.   Tr. p. 107-08.   An October 24, 2018 news article reporting Williams' 2020 bid for DA was included as an attachment to SA Moore's request for a grand jury on the IRS Form 9131.   SA Moore testified that it is important to keep his supervisors apprised if he is investigating a public official as a target; this information must be included in a report because "[u]pper management wants to know what's going on...and make sure we are not doing something that's going to embarrass us[.]"   Tr. p. 121-22.

22

On January 14, 2019, SSA Gregoire reviewed and concurred in SA Moore's request to expand the grand jury investigation.[25]   On February 19, 2019, the Special Agent in Charge reviewed and concurred in SA Moore's request to expand the grand jury investigation.

When asked by counsel for the government whether he pursued the investigation of Jason Williams because he was a public official or running for DA, SA Moore stated that he did not.[26]   SSA Gregoire testified that she told SA Moore to look at Mr. Williams' tax returns "because Agent Lopez-Martinez mentioned...that Jason Williams' tax returns looked egregious" and the IRS has an obligation to investigate when an agent finds that "someone's tax returns look egregious."   Tr. p. 50.   Similarly, SSA Gregoire testified:

> Q. When you spoke with Agent Moore, did you tell him that he should look into this and make this a top priority?

---

[25] It was by this time -- the time the request for a grand jury investigation was made -- that SSA Gregoire was aware that Williams was running for DA.

[26] See Tr. p. 119:
Q. Did you take any action in this case just because [Jason Williams] is a public official?
A. No.
Q. Have you taken any action in this case because he is running for district attorney?
A. Of course not.
Q. Did you take any action in this case because he is black?
A. Of course not.

A. I just asked him to look into it, and that's what we do.

Q. What specifically did you want him to look into?

A. If what Special Agent Lopez-Martinez said, if there was anything egregious on his tax returns; if not, then no worries.

Q. If he had not ... found anything, what would have happened with the matter?

A. Nothing. It wouldn't have gone anywhere.

...

Q. Did you ask Agent Moore to look into this matter because he was a sitting city councilman for the City of New Orleans?

A. No. Again, it was because of the "egregious" comment.

Q. Did it have anything to do with the fact that he had declared in October of 2018 that he was considering running for district attorney?

A. Definitely not.

Tr. p. 51-52.


*The Changed-Story of the Government's Star Witness Against*

*Williams/Burdett*


In addition to the evidence elicited during the October 22 evidentiary hearing is the record evidence that supported the defendants' request for the hearing.  Again, the Court assumes familiarity with prior proceedings and the previously submitted evidence and arguments.

Mr. Williams was visited by FBI and IRS agents on April 23, 2019.  That same day, FBI Agent Todd Goodson and IRS Agent Timothy Moore interviewed Henry Timothy about Jason Williams.  According to the FBI 302[27] for Timothy's April 23 interview, Timothy told the agents that he used spreadsheets and backup documents provided by Nicole Burdett to prepare Jason Williams's taxes.  Timothy stated that he would provide a filing authorization to Ms. Burdett, she would return the authorization signed by Mr. Williams, and then he (Timothy) would file the returns.  Nowhere in the FBI 302 does it indicate that Timothy said that Ms. Burdett would pressure him to take improper deductions.  When the agents questioned Timothy about specific items on Mr. Williams's 2012-2107 tax returns, at no time did Timothy say that Ms. Burdett instructed him to take any of these deductions.  Nothing from Timothy to inculpate Burdett or Williams in the April 23 interview.

Three days after Timothy was interviewed by federal agents, Mr. Williams's attorney met with Timothy.[28]   Timothy made

---

[27] "The term '302' refers to an FBI form bearing that number, which serves as an 'official interview memorandum.'"  United States v. Beaulieu, 973 F.3d 354, 357 n.1 (5th Cir. Aug. 31, 2020)(quoting United States v. Davis, 971 F.3d 524, 533 (5th Cir. 2020)).

[28] The government takes issue with consideration of unrecorded statements by Timothy to defense counsel, anticipating that such statements may not be used at trial unless defense counsel withdraws from the representation and prepares to be called as a witness.  There is nothing before the Court on this particular issue.  The Court need not (and would not) advise defense counsel on their obligations or any limitations concerning the informal

statements similar to those made to the agents on April 23, 2019:
he stated that Ms. Burdett would bring him Mr. Williams's
QuickBooks and other records, that he would prepare the tax returns
and send a filing authorization to Ms. Burdett, and then he would
file Mr. Williams's tax returns upon receipt of the authorization.
Mr. Timothy stated that he (Timothy) made the decisions about what
deductions should be taken, that he would ask Ms. Burdett for
clarification if necessary, and that he did everything
appropriately.  Timothy stated that there was nothing unusual about
Mr. Williams's taxes and the last thing he wanted to do was to get
Mr. Williams in trouble.

During a second interview with federal agents along with the
U.S. Attorney on November 5, 2019, Timothy initially repeated
similar statements he made to the FBI in April 2019 -- that he
reviewed Mr. Williams's records and determined what expenses could
be deducted:

---

Timothy interview.  And the government, which has charged Henry
Timothy for criminal conduct relating to his own tax returns, is
well aware that Timothy's credibility as the star government
witness will be challenged at trial, and the source of this
challenge extends beyond statements Timothy apparently made to
defense counsel pre-indictment.  It is the government's conduct
that the defense targets and any inconsistencies in Timothy's
statements, insofar as they serve as a predicate to the
government's prosecution theory, are presented by the defendants
in an attempt to prove selective or vindictive prosecution,
although they might well target issues of innocence.

> BURDETT was an attorney but was also the office
> administrator for WILLIAMS. BURDETT communicated with
> TIMOTHY by telephone and brought the QuickBooks details
> to TIMOTHY. The QuickBooks details were paper copies
> that included profit and loss statements, balance
> sheets, general ledger, and financials. If TIMOTHY had
> any questions, TIMOTHY called BURDETT and BURDETT would
> relay the questions to WILLIAMS. TIMOTHY also prepared
> BURDETT's personal taxes for tax years 2013 through
> 2017.
>
> BURDETT retrieved the tax preparations from TIMOTHY
> including the tax forms 8879. BURDETT provided the items
> to WILLIAMS who then signed the tax forms 8879. BURDETT
> then returned the signed forms to TIMOTHY and TIMOTHY
> electronically filed the tax returns. TIMOTHY stated
> that there were no questions about the completed
> returns.

See Defense Ex. E, p. 2.[29]  During this 11/5/19 interview, Timothy

took a break and, for some unexplained reason, met with his

attorney in a private room. Once the interview resumes, Timothy

changes his story. When the interview resumes, the FBI 302

indicates:

> TIMOTHY stated that BURDETT asked TIMOTHY to lower the
> amounts owed on the tax returns.
>
> ...
>
> TIMOTHY felt he had a personal relationship with BURDETT
> and he needed to make WILLIAMS and BURDETT happy.
>
> ...
>
> TIMOTHY did things he should not have done.

---

[29] Exhibit E is the FBI 302 from the government's 11/5/19 interview
of Timothy; the form indicates that it was drafted on 11/6/19 and
"entered" on 11/18/19.

That the prosecution accepted Timothy's changed without verification and contrary to the evidence indicates an improper prosecutorial motive, the defendants submit. The defendants point to evidence that contradicts Timothy's changed story (thereby, incidentally, also undermining the prosecution's theory of its case-in-chief). For example, post-indictment, in response to requests for production and admission sent to Timothy by defense counsel, Timothy through his counsel:

> admitted that at the time Defendant Timothy prepared each tax return for filing by Jason Rogers Williams, [Timothy] believed that the deductions...Timothy claimed on the return were appropriate and consistent with law.

And, the government knew that Timothy prepared Mr. Williams's tax returns with Inuit Pro Series tax software, but it failed to ask Timothy to produce electronic records. In response to the defendants' request for production, the defendants discovered evidence indicating that there were no draft tax returns for Mr. Williams, there were no alterations to the deductions on Mr. Williams's return, and that Timothy simply prepared a final return shortly before the deadline each year. According to the defendants, not a single document corroborates Timothy's claim that Ms. Burdett asked him to lower the amounts owed on Mr. Williams's taxes. And Ms. Burdett's records (which the government did not request) are consistent with Timothy's original statement that he prepared the returns on his own. The Timothy-Burdett

28

communications indicate that Ms. Burdett had to badger Timothy simply to get the returns sent to her at the last minute; there are no documents supporting the theory that Timothy prepared draft returns and then Burdett told him to lower the amounts owed on those drafts. There are no draft returns. That Timothy made the tax decisions for Mr. Williams's returns (consistent with Timothy's original statement to federal agents) is also corroborated, the defendants submit, by documents with Timothy's handwriting on the P&L statement copies.[30]

More closely scrutinizing the government's conduct, the defendants submit that the government during its investigation ignored the testimony of Timothy's other tax clients who stated that Timothy took deductions on his own without that client's participation or knowledge. On June 5, 2020, the government interviewed J.B., a former contractor employee of Mr. Williams who

---

[30] Timothy's original statements (suggesting that he determined which deductions to take) are supported by the documentary evidence, the defendants submit. For example, although Timothy most recently indicated to federal agents that he did things he should not have done, the deductions plainly list such things as "political" contributions, which Timothy only recently suggests he knew was improper. Why, the defendants ask, if Timothy actually believed that including "political" contributions was something he should not have done, did Timothy so blatantly disclose the expense for political contributions and not characterize it as something else? And the defendants point out that the government failed to investigate: Timothy's misrepresentation to his clients (that he was a CPA) and his false claim that he earned a Master of Business Administration; both investigated by the defendants and shown to be absolutely false.

also was a tax client of Timothy.  When the government pointed out that Timothy deducted $22,000 for supplies, $4,000 for meals and entertainment, $1,700 for utilities, in addition to deductions for uniforms and membership fees" on J.B.'s tax return, J.B. stated "that's insane" and that he had not previously noticed those deductions.  The government did not challenge J.B.'s assertion or its implication (that Timothy took the deductions on his own, without J.B.'s participation or knowledge), stopped asking questions of J.B., and apparently also ceased interviewing other Timothy clients altogether.

Three weeks after the government interviewed J.B., and three weeks before Jason Williams formally announced his candidacy for District Attorney, Jason Williams and Nicole Burdett were indicted on federal tax charges.

In support of the request for an evidentiary hearing in aid of their selective and vindictive prosecution claims, the defendants pointed to the government's wholesale acceptance of Timothy's changed-story and its failure to investigate other Timothy clients or Timothy's conduct as tax preparer notwithstanding what the IRS Scheme Development Center's spreadsheet conveys -- excessive deductions taken across the board by Timothy's Schedule C clients. The government-generated spreadsheet summarized all tax returns filed by Timothy (on behalf

of his clients) from 2013 through 2016.  This production shows,
the defendants submit, that Timothy consistently took aggressive
deductions for all clients: Timothy made deductions that virtually
eliminated his clients' income.  Spreadsheets compiled by the
government or by defense counsel based on the government's document
production indicate the following.  From 2013 through 2016,
Timothy's clients reported a total of $71,982,007 in Schedule C
income.  A total of $62,146,980 was deducted from those returns
(with Timothy at the helm as tax preparer), leaving taxable income
of $9,835,027.  The defendants' appreciation of the evidence
regarding Timothy's other clients is that Timothy took the same or
more deductions for other clients, and the government is not
prosecuting any of them.[31]  It is impossible, the defendants
conclude, to consider this information and not determine that
Timothy's changed story is fabricated, and (it follows) that
Timothy determined which deductions to take deductions for
Williams, without pressure from Burdett.  The only explanation for
the government's deliberate ignorance of this fact, the defendants
suggest, is its years-long pursuit of Mr. Williams and its

---

[31] Ms. Burdett is the exception.  In addition to being indicted
along with Mr. Williams regarding Mr. Williams's taxes, the
government recently indicted Ms. Burdett in a separate indictment
concerning her conduct related to her own taxes.  Mr. Williams and
Ms. Burdett are apparently the only Timothy clients being
prosecuted or investigated; the government only investigated (but
declined to prosecute) C.D.

selective and vindictive decision to prosecute him (and Ms. Burdett as collateral damage).

Claiming that the evidence amply demonstrates that they were indicted in violation of their constitutional rights to equal protection and due process, Jason Williams and Nicole Burdett now renew their motion to dismiss the 11-count indictment.[32]

## I.

A motion to dismiss the indictment for selective and vindictive prosecution must be raised before trial. See Fed. R. Crim. P. 12(b)(1), 12(b)(3)(iv)("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits[,]" and a party "must" raise by pretrial motion "a defect in instituting the prosecution, including ... (iv) selective or vindictive prosecution[.]").

Claims of selective or vindictive prosecution are "not ... defense[s] on the merits to the criminal charge itself, but ... independent assertion[s] that the prosecutor has [either] brought

---

[32] In many respects, Ms. Burdett's selective prosecution theory is derivative of Mr. William's; and her vindictive prosecution claim concerns more directly what is now a new indictment against her respecting her own tax returns.  The Court granted Ms. Burdett's motion to adopt her motion, briefing, and evidence, and also granted the government's similar motion to adopt its briefing concerning Ms. Burdett's claims pertaining to the new indictment in Criminal Action Number 20-139.

the charge [or used the charging process in retaliation] for reasons forbidden by the Constitution." United States v. Armstrong, 517 U.S. 456, 463 (1996)(selective prosecution); Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)(vindictive prosecution). When asked to exercise judicial oversight over a "special province" of another branch of government, the Court is mindful of its limitations, deference, and duty to indulge a presumption "that [prosecutors] have properly discharged their official duties." Armstrong, 517 U.S. at 464 (citations omitted). To be sure, in limited circumstances, the presumption may be dispelled. Whether such rare circumstances are clearly presented here is placed at issue in the pending motions. The Court addressed the vast breadth of prosecutorial discretion in its August 20, 2020 and October 8, 2020 Orders and Reasons; the principles underpinning the presumption of regularity owed to prosecutorial decisions are squarely challenged, and ultimately dispositive, here.

*A.*

*Prosecutorial Discretion*

In our federal criminal justice system, "[t]he Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." United States v. Armstrong, 517 U.S. 456, 464 (1996)(citing Wayte v. United States, 470 U.S. 598, 607 (1985)). The breadth of this discretion finds its source

in statute and constitutional separation-of-powers doctrine.  See id. ("[t]hey have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed.")(citations omitted).  To be sure, "the decision to prosecute is particularly ill-suited to judicial review." Wayte, 470 U.S. at 607.  A "'presumption of regularity' [attaches to] prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" Armstrong, 517 U.S. at 464 ("A selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive.").  Thus, ordinarily, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). For good reason, as the Supreme Court observed:

> Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts.  "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."

It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy."

Armstrong, 517 U.S. at 465 (citing Wayte, 470 U.S. at 607).

Though broad, prosecutorial discretion is not completely "unfettered[; s]electivity in the enforcement of criminal laws is ... subject to constitutional constraints." Wayte, 470 U.S. at 608 (citing United States v. Batchelder, 442 U.S. 114, 125 (1979)). When presented with a selective or vindictive prosecution challenge, the Court may review decisions to prosecute in limited circumstances to ensure that the decision is not the product of individual or institutional abuse or "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." Id. (citing Bordenkircher, 434 U.S. at 364-65)); Armstrong, 517 U.S. at 464-65 (the equal protection clause of the Fifth Amendment forbids (selective) prosecution based upon race, religion, or other arbitrary factor); United States v. Goodwin, 457 U.S. 368, 373 (1982)(prosecutorial vindictiveness is a due process violation for it "punish[es] a person because he has done what the law plainly allows him to do[,]" but it is difficult to prove considering that "[m]otives

35

are complex" and "[t]he imposition of punishment is the very purpose of virtually all criminal proceedings.").

*B.*

*Selective Prosecution*

A selective prosecution claim puts at issue whether "the prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Due Process Clause of the Fifth Amendment.  <u>Armstrong</u>, 517 U.S. at 463.  The Fifth Amendment's equal protection component[33] forbids the prosecution from pursuing a particular criminal case based upon an "unjustifiable" factor such as race, religion, or some other arbitrary classification.  <u>See</u> <u>Armstrong</u>, 517 U.S. at 464.  Of course, "the mere exercise of some selectivity by the government in instituting prosecutions is not itself a constitutional violation."  <u>United States v. Greene</u>, 697 F.2d 1229, 1234 (5th Cir. 1983).

<u>Armstrong</u> supplies the test applicable for selective prosecution claims and corresponding requests for discovery.  And it erects quite a hurdle.  <u>See</u> <u>Armstrong</u>, 517 U.S. at 463-65 (describing the standard as "demanding" and "rigorous" and a "significant barrier" and demanding "clear evidence" from the

_____

[33] Unlike the Fourteenth Amendment, the Fifth Amendment does not contain an equal protection clause, but it contains an equal protection component.  <u>Wayte</u>, 470 U.S. at 609 n.9.  Regardless, the Supreme Court's equal protection approach is the same.  <u>Id.</u>

defendant).   The burden is on the defendant to present clear evidence; "making ... a *prima facie* showing of selective prosecution is a difficult task" -- "few parties have succeeded in shifting the burden of proof to the government." Greene, 697 F.2d at 1235.

To succeed on a selective prosecution claim, the defendant must satisfy a two-pronged test: first, the defendant must show that the prosecution had a discriminatory effect and, second, the defendant must establish that the prosecution was motivated by a discriminatory purpose. Armstrong, 517 U.S. at 463-65.  To make a *prima facie* showing of discriminatory effect, "in a race case," for example, Armstrong instructs, "the claimant must show that similarly situated individuals of different races were not prosecuted." Id. at 465.  There must be some symmetry among comparators. See, e.g., United States v. Bass, 536 U.S. 862, 863-64 (2002)("raw statistics regarding overall charges say nothing about charges brought against similarly situated individuals").

Isolating first the threshold -- discriminatory effect -- component, the defendant must proffer individuals similarly situated to the defendant save for the alleged protected characteristic; individuals that could have been, but were not, prosecuted.  After all, ordinary equal protection principles apply, and such violations are anchored to claims that some

improper selection has taken place; that is, disparate treatment -- singularly prosecuting the defendant with the protected characteristic -- notwithstanding others' similar conduct and characteristics. See Armstrong, 517 U.S. at 467. In configuring the universe or pool of comparators, the focus remains the comparators' conduct and characteristics compared to the defendant's, in light of factors material to a reasonable prosecutor's decision to prosecute. If the conduct or characteristics of a proffered comparator "present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them[,]" then the comparator may be considered similarly situated to the defendant for equal protection purposes. See United States v. Venable, 666 F.3d 893, 900-01 (4th Cir. 2012)(citing United States v. Olvis, 97 F.3d 739, 744 (4th Cir. 1996)).

Mindful that "legitimate prosecutorial factors" are themselves blunt instruments in the task of defining the realm of charged criminal conduct, the Court must strike a balance. On the one hand, the Court may not insist on precision or complete identity of comparators and the accused questioning the asymmetry of treatment; to do so would yield too cramped a configuration rendering the effects-showing by defendants *per se* impossible. On the other hand, the Court must ensure that the pool of similarly

situated offenders is sufficiently narrowly tailored to account
for the constellation of factors that permissibly informs
prosecutorial discretion.    To be sure, some selectivity in
enforcement of the federal criminal laws is mandatory given the
reality that "with limited law enforcement resources, the
Government is unable to prosecute every crime that is committed."
See United States v. Brantley, 803 F.3d 1265, 1271 (11th Cir.
2015).    To achieve the requisite balance, then, courts compare
relatively similar culpable conduct, that is, "the same basic
alleged crime committed in substantially same manner" and consider
the characteristics of the comparators and the accused in light of
whether prosecution would achieve the same enforcement priorities,
such as deterrence value.    See United States v. Smith, 231 F.3d
800, 810 (11th Cir. 2000).

Isolating the second -- discriminatory purpose -- component,
the defendant must show that the government prosecuted him "because
of, not merely in spite of" the unjustifiable factor or arbitrary
classification such as race or the desire to prevent exercise of
his constitutional rights.    See Wayte v. United States, 470 U.S.
598, 610 (1985)("[D]iscriminatory purpose ... implies more than
... intent as awareness of consequences. It implies that the
decisionmaker ... selected or reaffirmed a particular course of
action at least in part because of, not merely in spite of, its

adverse effects upon an identifiable group.")(internal citations, quotations omitted).   If the defendant satisfies this tall-order *prima facie* effects-and-purpose test, "then the burden shifts to the government to demonstrate a legitimate basis for selecting the defendant for prosecution."   United States v. Hoover, 727 F.2d 387, 389 (5th Cir. 1984)(citing Greene, 697 F.2d at 1235)).[34]

*C.*

*Vindictive Prosecution*

"To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" United States v. Goodwin, 457 U.S. 368, 372 (1982)(quoting Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)).  A prosecutor's use of the charging process solely as a penalty for exercising a constitutional or statutory right, such as pursuing a post-conviction appeal, violates due process.   United States v. Saltzman, 537 F.3d 353, 359 (5th Cir. 2008)(citation omitted); North Carolina v. Pearce, 395 U.S. 711, 725 (1969)(the Due Process

---

[34] The standard applicable to a request by a defendant seeking discovery from the government in aid of a selective prosecution claim is "correspondingly rigorous." See Armstrong, 517 U.S. at 463, 465-66, 468 (observing that Rule 16 of the Federal Rules of Criminal Procedure is inapplicable to selective prosecution claims, which are distinct from defenses to the substantive charges).   The Court already determined that the defendants discharged their discovery burden and granted a limited evidentiary hearing in aid of their selective and vindictive prosecution claims.  See Order and Reasons dtd. 10/8/20.

Clause of the Fourteenth Amendment "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial."). Prosecutorial vindictiveness must be proved by the defendant by a preponderance of the evidence. Saltzman, 537 F.3d at 359. The defendant may do so in one of two ways: (1) present objective evidence that a prosecutor's actions were designed to punish him or her for asserting his or her legal rights, which is proof of actual vindictiveness; or (2) show sufficient facts to give rise to a presumption of vindictiveness, which may be overcome by objective evidence justifying the prosecutor's actions. Id. (because a presumption of vindictiveness may apply even absent proof of improper motive, such a presumption only applies "where there exists a realistic likelihood of vindictiveness.").[35] Success on either course is rare, particularly in the pre-trial context. See Goodwin, 457 U.S. at 381 ("There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting[:] the prosecutor's assessment of the proper extent of prosecution may not have crystallized[; t]hus, a change in the charging decision

---

[35] A presumption of vindictiveness may arise, for example, if a defendant is re-indicted, post-conviction, especially if the prosecutor increases the number or severity of the charges after the defendant appealed his conviction. See Blackledge v. Perry, 417 U.S. 21, 27-29 (1974).

made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.").

Most courts decline to endorse a categorical rule against presuming vindictiveness in the pretrial setting; indeed, most courts indulge the possibility (at least in theory) that a presumption of vindictiveness may apply to prosecutorial conduct pretrial. However, in practice, the peculiarities and systemic realities of the pretrial context are relevant to (and often dispositive of) vindictiveness claims. Cf. United States v. Brown, 298 F.3d 392, 404-05 (5th Cir. 2002)(citing United States v. Krezdorn, 718 F.2d 1360, 1364 (5th Cir. 1983)(en banc)). Consider, for example, the reality of the criminal justice system's wholesale acceptance of the plea-bargaining process. It is settled that the constitution tolerates a prosecutor's use of its charging discretion to attempt to persuade the defendant to forego his future trial right and his right to plead not guilty. See Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). Thus, in Bordenkircher, where the prosecutor made good on its threat to add an additional charge if the defendant did not plead guilty to the existing charge, the Supreme Court held this was a permissible (and not vindictive) act of prosecutorial discretion because there was no "punishment or retaliation." Id. at 363 ("in the give-and-take of plea bargaining, there is no such element of punishment or

retaliation so long as the accused is free to accept or reject the prosecution's offer."). In so holding, the Supreme Court thus distinguished between an impermissible attempt to punish the past exercise of appeal rights (as in Blackledge) and the permissible attempt to persuade the defendant not to exercise his future trial right. See id. at 363; see also Goodwin, 457 U.S. at 376 (observing that the Pearce and Blackledge decisions "reflect a recognition by the Court of the institutional bias inherent in the judicial system against the retrial of issues that have already been decided[;] the same institutional pressure ... might also subconsciously motivate a vindictive prosecutorial or judicial response to a defendant's exercise of his right to obtain a retrial of a decided question.").

In evaluating a claim of vindictiveness, a threshold consideration is whether the prosecution seeks to punish a defendant for the conduct constituting the crime allegedly committed or, rather, to punish him for exercising a protected right. Insofar as Bordenkircher stands for the proposition that there is no protected right not to cooperate, a defendant claiming that the prosecution filed additional charges due to a failure to cooperate cannot prevail on a vindictive prosecution claim. See, e.g., United States v. Long, 823 F.2d 1209 (7th Cir. 1987)(per curiam). In Long, the Seventh Circuit rejected a defendant's claim

43

of vindictive prosecution based upon drug charges filed after the defendant refused to cooperate in a police officer bribery investigation.  The Seventh Circuit observed that the due process protection against vindictive prosecution "kicks in only when the government acts in response to the defendant's exercise of a protected right."  Id. at 1211.  The Seventh Circuit explained:

> This realization sinks both of [the defendant's] claims of prosecutorial vindictiveness, because of Roberts v. United States, 445 U.S. 552[] (1980)[, which] holds that a district court may properly consider, when imposing sentence, a defendant's refusal to cooperate.  The Court found that, far from having a right not to cooperate, every citizen has a duty to cooperate and report criminal activity, a duty grounded in the responsibilities of community life.  [The defendant] claims that he was treated adversely because he refused to cooperate; Roberts says the government may penalize such a refusal, and so under Goodwin and Bordenkircher there is no due process violation.

Id. (finding that "there could be prosecutorial vindictiveness only if his refusal resulted in treatment harsher than would have occurred if the government had not sought his assistance."); accord United States v. Williams, 47 F.3d 658, 662 (4th Cir. 1995)("If it is constitutionally permissible to use the threat of more severe punishment to encourage a guilty plea, certainly it is legitimate to use the same tactics to encourage a defendant to cooperate with the authorities in the criminal investigation and prosecution of another.")

Further confining the scope of vindictiveness presumptions in the pretrial context, the Supreme Court has held that no presumption of vindictiveness arises merely because additional charges are filed after a defendant requests a trial by jury.  See Goodwin, 457 U.S. at 383.  It follows that "[t]he mere fact that a defendant has made pre-trial motions is not sufficient to raise a presumption of prosecutorial vindictiveness."  See United States v. Barner, 441 F.3d 1310, 1319 (11th Cir. 2006)(citing Goodwin, 457 U.S. at 381).  That pretrial motion practice is an expected and inherent part of the criminal justice system's process, the Supreme Court has observed, is insufficient standing alone to give rise to a presumption of vindictiveness:

> [A] defendant before trial is expected to invoke procedural rights that inevitably impose some "burden" on the prosecutor.  Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; to plead an affirmative defense; to obtain access to government files; to be tried by a jury.  It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter.  The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

Goodwin, 457 U.S. at 381.  Even when a defendant specifically alleges prosecutorial misconduct by pretrial motion, such a motion is not so unusual that a vindictiveness presumption is warranted. See Barner, 441 F.3d at 1320 ("Since [the defendant] did not

prevail on this [prosecutorial misconduct] motion, the government had no obvious reason for vindictive retribution.").

Thus, where the prosecution files new or additional charges after an initial indictment but before trial, a defendant must generally prove actual vindictiveness, which can be achieved only by showing "objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do." Goodwin, 457 U.S. at 384.  As the case literature demonstrates, such a showing generally cannot be made by a defendant claiming, without more, that additional charges were filed before trial after he or she declined to cooperate, or after filing pretrial motions challenging the indictment.  Such ordinary events or occurrences inherent in the nature of the criminal justice system do not generally offend due process.[36]

## II.

The Court previously determined that dismissal of the indictment for selective or vindictive prosecution was premature;

---

[36] Without the benefit of a presumption, defendants must resort to proving actual vindictiveness, which requires objective evidence that the addition of charges was designed to punish the exercise of protected rights.  At the risk of underscoring the tautology inherent in the framing of the vindictiveness test, evidence of actual vindictiveness is notoriously difficult to marshal considering the reality that motives are multifaceted and difficult to prove.

however, the defendants discharged their burden sufficient to warrant limited discovery in aid of their claims. See Order and Reasons dtd. 10/8/20. Following an evidentiary hearing and additional briefing, the Court now takes up the defendants' selective prosecution claim. Have the defendants proved that the government singled out Jason Williams and Nicole Burdett for tax fraud investigation and prosecution because it was motivated by a desire to interfere with Mr. Williams' right to hold or run for public office? That the government made its decision to prosecute in good faith and in the normal course remains the starting line presumption and continues unless rebutted by clear evidence to the contrary. Although the defendants have presented evidence to satisfy their burden as to the discriminatory effect component of their claim, there is insufficient evidence of governmental discriminatory purpose in pursuing these tax fraud charges. Critically absent from the record is evidence clearly establishing that, in charging the defendants with tax fraud, the prosecution acted out of a desire to prevent Mr. Williams from exercising his First Amendment right to hold or run for public office. Even if the defendants managed to dispel the presumption of regularity by proving discriminatory intent, there is evidence in the record supporting legitimate prosecutorial motivations for pursuing the present indictment, which independently dooms the selective prosecution claims.

A.  The Discriminatory Effects Showing

In support of the disparate treatment (effect) prong of
Armstrong, not much has changed since the defendants submitted
some evidence showing different treatment of purportedly similarly
situated persons entitling them to limited discovery.  The
proffered universe of comparators is Timothy's other Schedule C
tax return clients.[37]  The government continues to dispute whether
the Timothy clients have been shown to be relevantly similarly
situated to Mr. Williams and Ms. Burdett, but the substance of the
government's objection to the defendants' selective prosecution
submission is more properly and concretely considered not in this
threshold "effect" showing, but, rather, in analyzing the evidence
of bad faith versus legitimate government intent.  True, at some
level of abstraction, Mr. Williams and Ms. Burdett (and Mr.

---

[37] In offering Schedule C comparators, Mr. Williams and Ms. Burdett
focus on the tax fraud conduct (26 U.S.C. § 7206(2)) to the
exclusion of the additional charges that they face (31 U.S.C. §§
5331, 5332).  The government does not dispute the defendants'
submission that no one in the Eastern District of Louisiana has
been charged with these Title 31 violations at least in the past
50 years.  The Court neither glosses over nor ignores that there
are certain characteristics of the universe of Timothy clients
that are absent from the record, which hinders the Court's task in
determining whether they are sufficiently relevant comparators in
material respects for prosecution purposes.  Since its
unsuccessful investigation of C.D., the government had elected not
to investigate any Henry Timothy client.  Insofar as there is some
missing information, then, it is not within the control of the
defendants.  Indeed, it is within the power of the Executive branch
and the Court thus proceeds to consider whether the selection
process was infected by unconstitutional motives.

Timothy, who has been charged by bill of information relative to his own tax returns) are dissimilar in terms of race, gender, and public official status.  But the defendants proffer the IRS Scheme Development Center's spreadsheet -- which is the data source that ultimately prompted agents to select Mr. Williams to interview as a witness -- as the concrete source identifying other taxpayers utilizing Mr. Henry Timothy to prepare their tax returns; tax returns that share the criminally-significant (or -- at least according to the very IRS agents involved in this case -- investigation-worthy) characteristic of aggressive Schedule C deductions.  As for the protected characteristic involved here, it appears undisputed that no other Henry Timothy client was either a sitting public official or a candidate for office.

From the government's document production, the defendants proffer an analysis of the tax returns filed by Mr. Timothy on behalf of his many clients from 2013 through 2016.  According to the data on the IRS-generated spreadsheet, Mr. Timothy treated Mr. Williams the same way he (Timothy) treated each of his approximately 1,500 Schedule C clients.   Mr. Williams and the rest of Timothy's Schedule C clients are small business owners who hired Timothy to prepare their taxes and Timothy took aggressive Schedule C deductions for all of them.[38]  Yet Mr. Williams, a black

---

[38] This fact, it is submitted, undermines Timothy's changed story (and the prosecution's theory) that Timothy took aggressive

49

sitting public official and (at the time of the investigation) declared candidate for a different public office, and his law partner Ms. Burdett, are the only Timothy clients being prosecuted for tax fraud.

Attaching as Exhibit O to their original motion to dismiss a 38-page spreadsheet, the defendants proffer these aggregate numbers for comparison's sake: from 2013 through 2016, Timothy's clients reported a total of $71,982,007 in Schedule C income. With Timothy as tax preparer, the clients deducted a total of $62,146,980 from these returns, leaving $9,835,027 in taxable income. This objective evidence shows that aggressive deductions were taken on behalf of Timothy's clients, which the defendants contend indicates that the government has blindly accepted Timothy's changed story that he made aggressive deductions for Mr. Williams because Ms. Burdett pressured him to do so.

The defendants offer this chart for comparison and in support of their discriminatory effect theory:

---

deductions for Mr. Williams only because Ms. Burdett or Mr. Williams pressured him to do so by telling him to reach some sort of bottom line.  Implied in this submission is the suggestion that the government failed to investigate Mr. Timothy's potential culpability across the board for decisions he made on his clients' returns in its single-minded pursuit of an investigation and charges against Mr. Williams.  A classic defense strategy to challenge substantive charges: pointing out failures or shoddy aspects of an investigation.

| Name | Business | SchC: Gross Income | SchC: Deductions | SchC: Profit/Loss |
|------|----------|--------------------|------------------|-------------------|
| J.BROW. | Construction service | $985,614 | $978,170 | $7,444 |
| H.LA. | Seafood processing | $867,596 | $827,159 | $40,437 |
| C. DOU. | Home health | $798,891 | $771,211 | $27,680 |
| H. CO. | Restaurant & lounge | $617,891 | $590,430 | $27,461 |
| WILLIAMS | Attorney | $578,569 | $493,334 | $85,225 |
| L.KI. | Auto body and powder | $435,705 | $421,470 | $14,235 |
| DUP. | Renovations | $371,912 | $345,145 | $26,767 |

This chart exemplifies the high across-the-board Schedule C deductions for Timothy clients.  Yet the government confirms that it has not investigated any of them, save C.D., whom it declined to prosecute.

During the evidentiary hearing, defense expert Certified Public Accountant Harold Asher testified, adding relevant context concerning the data of all tax returns filed by Henry Timothy as tax preparer from 2013 through 2016.  Mr. Asher generally testified consistently with his sworn declaration.  He extracted information from the spreadsheet and compared it to information included in the IRS's statistical tables.  Mr. Asher made certain observations relevant to the defendants' effects-prong showing:

- From his review of the IRS spreadsheet of all tax returns filed by Mr. Timothy between 2013 and 2016, it appears that

Mr. Timothy took excessive deductions for almost all of his (more than 1,000) Schedule C clients.

- Based on the IRS statistical tables, Mr. Asher would expect Mr. Timothy's Schedule C clients with gross revenues of more than $100,000 to report 27-30% of their gross revenue as net taxable income, but Mr. Timothy's Schedule C clients with gross revenues of more than $100,000 reported an average of 8.44% of their gross revenue as net taxable income.  Asher Decl. ¶ 16.
- Based on the IRS statistical tables, Mr. Asher would expect Mr. Timothy's Schedule C clients with gross revenues of more than $200,000 to report 27-30% of their gross revenue as net taxable income, but Mr. Timothy's Schedule C clients with gross revenues of more than $200,000 reported an average of 5.81% of their gross revenue as net taxable income.  Asher Decl. ¶ 17.

From this deviation in net taxable income for Mr. Timothy's Schedule C clients, Mr. Asher "suspect[s] that Mr. Timothy may have been taking excessive deductions across the board for most or all of his Schedule C clients, and perhaps others."  Asher Decl. ¶ 18.  More generally, Mr. Asher opined that tax preparers (and not the clients) generally used discretion in how to categorize services and expenses.  "You give the raw data to the tax preparer, and the tax preparer decided whether [and] where one cho[oses] to report the expenses."  Tr. p. 141-42.  If Mr. Asher prepared the tax returns, he as the tax preparer "would only put the expenses that me, with my training and experience, know are allowable and deductible...[tax] preparers [must] determine the propriety of...expenses" included on the return.  Tr. p.160 ("I don't know what the investigator did in this case, but I would wonder why if the...personal nature is so transparent why those items ever got

on a tax return because me, as tax preparer, face massive penalties, criminal and civil, for putting [blatantly personal] items on the tax return."). As a forensic fraud examiner, Mr. Asher testified that there were "hundreds, if not over a thousand" Timothy clients that he "would be interested in looking deeper into their returns." Tr. p. 144-45. A few that Asher selected were analyzed in some detail.

For its part, the government elicited testimony confirming that, out of all of Timothy's clients, Jason Williams was the only attorney, indeed, the only "professional." When asked by counsel for the government, Mr. Asher confirmed that he did not recall comparing Mr. Williams' returns to any other attorneys, or any medical doctors, CPAs, or other professionals. Tr. p. 163-64. Among the Timothy clients more closely scrutinized by Mr. Asher were truckers, contractors, fisherman, and security and police detail.[39]

In some detail, the defendants proffered similarly situated Timothy client, C.D., who was investigated for tax irregularities but not charged. Because C.D. was investigated, more information

---

[39] Given that the differences among the Timothy clients more relevantly bear on the issue of whether the prosecution's motive or purpose was legitimate or discriminatory, the Court returns to the government's arguments and observations regarding distinguishing features of Timothy comparators when addressing the discriminatory purpose or legitimate motive aspect of the selective prosecution calculus.

is known about her.  During the four years that Timothy prepared
the taxes for C.D.'s home health company, C.D. paid $35,000 on
$3,537,277 in income.  The government submits that "SA Marable
declined prosecution on C.D." for several reasons including that
the tax harm was "*de minimis* for criminal tax proceedings"; the
government concluded that the tax harm "did not meet prosecution
guidelines."[40]  Prosecution was declined, the defendants point out,
despite the fact that the IRS found that many of C.D.'s deductions
from the business's gross earnings were for personal expenses,
that C.D. "regularly withdraws cash, issues a check to herself, or
transfers money from the business account into her personal account
on a bi-weekly basis," and that the "business account does contain
personal expenses such as [C.D.'s] children's tuition for school."

The only other Timothy client interviewed by the government
was J.B., who was a former contractor employee of Mr. Williams.
Stating that Timothy was solely responsible for determining which
deductions to take, J.B. admitted -- after being shown the
deductions during his interview with the government -- that $27,700
in improper deductions were included on his tax return.  The
government did not challenge J.B.'s assertion that Timothy took
the deductions (for supplies, meals, entertainment, utilities,

---

[40]  The government's characterization that SA Marable herself
"declined prosecution" belies any prosecution-versus-enforcement
dichotomy in the selective or vindictive prosecution realm.  Or at
least the issue was not briefed by the parties.

uniforms, and membership fees) without J.B.'s participation or advance express consent.  J.B.'s situation is like the defendants' yet, the defendants submit, the government persists with its prosecution theory directed only at Mr. Williams and Ms. Burdett and supported only by Timothy's changed story (that Ms. Burdett pressured him to take deductions).

Summing up its parts, the totality of this discriminatory effects evidence is rather compelling.[41]   The IRS Scheme Development Center spreadsheet, extracted data, plus the analysis identified by the defendants and their expert CPA supports the defendants' selective prosecution theory in its aggregate suggestion that all of Timothy's clients took aggressive

---

[41] How does this discriminatory-effects evidence measure up to the case literature?  Cf. United States v. Hoover, 727 F.2d 387 (5th Cir. 1984)(first part of the substantive selective prosecution test met where Hoover was one of three air traffic controllers prosecuted out of over 300 whom failed to report to work in the Houston area in violation of a federal statute prohibiting U.S. government employees from participating in a strike against the government).  In Hoover, all of those who potentially could have been prosecuted fell into a readily discernible category as those who were prosecuted: air traffic controllers in the Houston area who failed to report to work on a particular day.  Here, although there might be more differences relevant to informing prosecutorial discretion among the class of Timothy clients, the record indicates that the government had some discretion in pursuing a case against Timothy as tax preparer and that SA Marable identified a number of Timothy clients with "false items" on the returns prepared by Timothy.  Yet the government has pursued only two Timothy clients out of more than a thousand for which aggressive Schedule C deductions were made.

deductions (with Timothy, the tax preparer, as the common denominator); yet, only Jason Williams and Nicole Burdett are being prosecuted.  Given the circumstances and prosecution theory, considering Exhibit O and the pool of Timothy clients whom are not being investigated nor prosecuted, the Court previously found that the defendants submitted "some evidence" supporting Armstrong's effect component sufficient to warrant development during a limited evidentiary hearing.  The undisputed objective data, much of it compiled by the IRS and indicating that hundreds of Henry Timothy's Schedule C clients took excessive deductions, remains relatively uncontested by the government.

This is hardly flimsy evidence of disparate treatment. Timothy had more than one thousand Schedule C clients during the relevant time frame.  Timothy's clients reported an average of 5.81% (for those with gross revenues exceeding $200,000) or 8.44% (for those with gross revenues exceeding $100,000) of their gross revenue as net taxable income compared to the much higher national average of 27% to 30%.  Many of Timothy's clients took deductions similar to Mr. Williams or higher: for example, C.D. reported $3,537,277 in revenue from 2013 to 2016 and paid taxes on only $91,000.  Construction company owner J.B. reported $1,986,744 in revenue for 2013 and paid taxes on only $62,035.  And contractor R. reported $1,306,912 in revenue from 2013 to 2016 and paid taxes on only $8,633.  Yet the government has chosen to prosecute Mr.

Williams on the theory (supported by Mr. Timothy's changed story) that Timothy was pressured by his clients to take aggressive deductions.

The Court remains mindful that the government has identified some distinguishing features among Timothy client-comparators, which the Court addresses later in the context of whether such distinguishing features could reasonably inform prosecutorial motive.[42]   However, when considering the objective evidence comparing Timothy's Schedule C clients somewhat in isolation from the remaining equal protection calculus, the Court is not required to indulge the possibility of coincidences. The defendants have convincingly identified similarly situated comparators -- other return preparers or Timothy clients who routinely prepared returns containing allegedly "false items" or Schedule C deductions much more aggressive than the national averages -- who are outside of the protected class that could have been prosecuted, but were not.[43]

---

[42] The qualitative "differences" among Timothy clients that government identifies are less directed to crimes that could be charged than characteristics it insists inform its discretion and enforcement priorities; these differences are more relevant to the government's burden to show legitimate enforcement priorities informed their motivation and will be addressed below.

[43] This conclusion is informed by evidence elicited at the evidentiary hearing, including that IRS SA Marable apparently had some discretion in focusing her investigation into tax preparer Henry Timothy.  SA Marable could have pursued an investigation and recommend charges concerning Mr. Timothy's conduct as tax preparer

Regardless of whether the Court explicitly finds or merely assumes that the prosecution's conduct -- in selecting two Timothy clients for investigation and prosecution out of more than one thousand with aggressive Schedule C deductions that are much higher than the statistical averages suggest is ordinary -- demonstrates a discriminatory effect, this is insufficient standing alone to show an equal protection violation.  The effect or disparity is of no moment absent improper motive, for some selectivity is constitutionally tolerable considering not all tax crimes may realistically be prosecuted.  Now, the Court turns to consider whether the defendants have carried their burden on the second equal protection showing: discriminatory intent.

B.  The Discriminatory Intent Showing

That the defendants have shown others similarly situated could have been, but were not, prosecuted for tax fraud does not

---

or she could focus on his fraudulent conduct in preparing his own returns.  That she opted for the latter course does not eliminate Timothy's potential culpability or exposure relative to the former.  To be sure, it would be utterly unreasonable to suggest that Timothy's charged fraudulent conduct (or capacity) relative to his own tax returns would be mutually exclusive of any fraudulent conduct relative to his preparation of those paying him to prepare returns. Indeed, SA Marable testified that she selected more than one Timothy client to interview as a witness in her investigation of Timothy and she generally selected prospective interviewees with apparently "false items" on their returns...prepared by Timothy.  The Court need not indulge any specter of coincidence in the face of the record of discriminatory effect submitted by the defendant (and in large part generated by the IRS).

suffice to discharge the presumption of regularity afforded prosecutorial discretion. Still the Court presumes that the government made its decision to prosecute in good faith absent clear proof of the second prong of the selective prosecution test, that is, "that the discriminatory selection of him for prosecution is invidious or in bad faith, in that it rests on such impermissible considerations such as race, religion, or *the desire to prevent* his exercise of his constitutional rights." See United States v. Greene, 697 F.2d 1229, 1234 (5th Cir. 1983)(emphasis added); United States v. Hoover, 727 F.2d 387, 389 (5th Cir. 1984); United States v. Webster, 162 F.3d 308, 334 (5th Cir. 1998)(citations omitted). "[T]o dispel the presumption [of prosecutorial good faith], a criminal defendant must present clear evidence to the contrary." Armstrong, 517 U.S. at 465 (citation omitted). The Court underscores that "'[d]iscriminatory purpose' implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Wayte v. United States, 470 U.S. 598, 610 (1985)(citation omitted). The defendants must carry a "very heavy burden to show invidious purpose before the burden shifts to the government to prove the basis for its prosecution was legitimate." Hoover, 727 F.2d at 392 (citing Greene, 697 F.2d at 1235).

Here, the defendants submit that the record shows that the decision to prosecute Jason Williams (and derivatively, Nicole Burdett) was made because he is a public official who was then running for (and now has won) the seat of district attorney. But carefully scrutinizing the case literature's definition of the nature of the right (or the invoked impermissible consideration) is critical to determining whether the underlying motive is, in fact, unconstitutional. Here, the case literature underscores that prosecution may not rest on the desire to prevent the exercise of constitutional rights.[44] Has clear evidence been presented to support the theory that the decision to prosecute Jason Williams was based on a *desire to prevent* him from exercising his right to hold and run for public office? No. Or that he is a black person? No. The evidence in the record does not clearly demonstrate an individual agent's desire or complicit institutional motive to prevent Mr. Williams from continuing to serve as city councilman or a desire to prevent him from running for the office of or

---

[44] Perhaps there is some gray area spanning the oversimplification offered by the defendants (that a prosecution informed by one's public official status offends equal protection) and literal adherence to what the case literature defines as impermissible (a desire to prevent the exercise of a right, here the right to hold or run for public office). But it is settled that political prominence and media attention may be constitutionally permissible ingredients for a prosecutor to consider in selecting an individual for prosecution. See infra at p. 74. This reality combined with the ample permissible factors informing a prosecutor's broad discretion compels application of the stricter formulation embraced by the case literature.

serving as District Attorney. Instead, it is undisputed that an IRS agent unaware of Jason Williams' political prominence, ambitions, and continuing public service took a legitimate look at Mr. Williams' tax returns before attempting to interview him as a witness; and she found ostensibly "false items" on his returns, which she characterized as "egregious." This legitimate first-look at Mr. Williams' taxes was what prompted an IRS supervisory agent to task another IRS agent to look into Mr. Williams taxes. In the course of advancing through the various bureaucratic steps attendant to moving from preliminary investigation to grand jury investigation to prosecution, no government agent suggested that Mr. Williams' public official status or political ambitions status, let alone a government desire or agenda to prevent him from holding or running for office, motivated the progression of the investigation. Rather, the bases for escalating the investigation and ultimately deciding to prosecute elucidated during the evidentiary hearing included Mr. Williams' profession as attorney (indicating to the prosecution an awareness of his obligations of the tax laws and thereby ostensibly supporting the willfulness element of the tax fraud crimes charged), the asserted perceived flagrancy of the nature and number of personal expenses deducted from his tax liability, as well as his reported earnings, lifestyle, and history of tax liens.

As indicated in the background summary of the evidence elicited during the October 22 hearing, the IRS's interest in Jason Williams started with SA Marable and her investigation of Henry Timothy after investigating C.D.  When SA Marable and her secondary, SA Lopez-Martinez, attempted to interview Williams in connection with the Timothy investigation, neither agent knew that Williams was a public official, nor that he had declared his intent to run for Orleans Parish DA.  There is no dispute, then, that when SA Marable pulled Williams' tax returns, she did so as part of IRS customary practice: before interviewing potential witnesses who are clients of a tax preparer-target, a case agent in the field pulls and reviews the witness' tax returns to verify their information with the intention of determining who made the decisions to include items on the return.  Given this customary review of witness tax returns, and considering that SA Marable did not know that Williams was a public official or running for public office, SA Marable did not and could not have selected Mr. Williams out of a desire to prevent him from exercising his constitutional rights to hold and run for public office.  There is likewise no dispute that SA Marable's review of Williams' tax returns -- again, unfettered by any knowledge that he was a public official if that alone would suffice to constitute an improper motive -- prompted her to characterize them as potentially containing "false items" and as "egregious."  Indeed, she made similar observations with

respect to other Timothy clients whom she selected for interviews in the Timothy investigation.  So far, no evidence of malintent.

After the failed interview attempt, when SA Marable and SA Martinez-Lopez learned that Mr. Williams was a city councilman, they informed their respective supervisors.  As is agency custom. When SA Martinez-Lopez advised SSA Gregoire that she learned that a potential witness in an investigation of a tax preparer was a public official whose tax returns had been characterized by the case agent as "egregious," SSA Gregoire testified that she asked veteran IRS Special Agent Tim Moore, who typically handles IRS investigations into public officials given his assignment to the FBI public corruption squad, to look into Williams' taxes.  SSA Gregoire did so without knowledge that the FBI had underway an investigation into Mr. Williams for non-tax matters.  SSA Gregoire testified that the IRS was obliged to look into Williams' taxes not because he was a public official or running for DA, but because it came to her attention that an agent in the field described his returns as "egregious."

The defendants submit that the decision to look further into Mr. Williams, but not the other Timothy clients whom SA Marable considered to have returns containing false items, demonstrates bad faith or singling out Mr. Williams for his public official status.   But there is no direct evidence that any individual

agent, or the IRS (or DOJ) as an institution, selected Mr. Williams

to the exclusion of other Timothy clients out of a desire to

interfere with or prevent the exercise of his constitutional

rights.[45]   Notably, to the contrary, SSA Gregoire was not advised

that SA Marable had identified other Timothy clients whose tax

returns were "egregious" or contained false items.   So, it cannot

be that SSA Gregoire wittingly selected Mr. Williams for further

investigation while electing not to pursue or examine the "false

items" or "egregious returns" of other similarly situated Timothy

---

[45] Illustrating the government's true motive in turning its investigatory sights on Mr. Williams, the defendants submit, are two newspaper articles.  First, the October 2018 newspaper article announcing Mr. Williams's candidacy for district attorney; this article was part of the grand jury authorization request prepared by SA Moore. Like SA Lopez-Martinez, SA Moore offered a benign or at least bureaucratic motivation for inclusion of the article when he testified that he was obliged to keep his supervisors informed when investigatory targets are public figures.   The second article from August 2020 reporting remarks by then-Attorney General Barr that were critical of so-called local reformist district attorneys.   However concerning, this suggestion of institutional disdain stands alone unanchored to any evidence that the agents or prosecutors in this case considered this (at most) loose policy directive or (at worst) Executive Branch vendetta.  If the Attorney General's bias or disdain was executive policy, there is no evidence of its consideration in informing this prosecution or any complicity with government actors featured in this case.   To be sure, these media reports may be considered circumstantial evidence of malintent. Even when considered together with the other indirect evidence indicative of malintent (such as the timing of the indictment and the prosecution's failure to adhere to its own internal policy concerning election-year prosecutions), however, and viewing the evidence in the light of the deference owed, this evidence tends to indicate a government preference to pursue a politically prominent attorney rather than a desire to prevent the exercise of constitutional rights, as discussed infra at p. 70-74.

clients.[46]   That Mr. Williams' allegedly "egregious" tax returns
came to the attention of a supervisory special agent because of an
ordinary IRS policy to keep supervisors advised of contact with
public officials does not transform the decision to look further
at Mr. Williams' tax returns from one based on an obligation to
look into an agents' report of "false items" to one based on a
desire to prevent him from serving as a public official or running
for public office.

To be sure, the defendants have persuaded the Court that it
is curious and troubling that, to date, the government has failed
to or opted not to investigate either Timothy's conduct in
preparing his clients' returns or his other clients' conduct in
the preparation of their returns.[47]   Indeed, the government's
failure or choice is at its peril considering it will be fair game
for the defense to challenge the incompleteness of the
investigation and Timothy's altogether manifest credibility

---

[46] SA Marable testified that she selected other potential Timothy
clients to interview after her initial review of their returns
suggested that they contained false items.  But she could not
recall which other Timothy clients she had intended to interview
and those interviews never occurred; she was forced into an
indirect method of investigation at least in part due to the lack
of cooperation of Timothy clients as witnesses.
[47] No doubt the defendants will probe at trial whether this failure
or ostensible willful blindness to an apparent pattern of
widespread fraud (or coincidence of Timothy client outliers)
revealed by the IRS spreadsheet and supported by some Timothy
statements and conduct undermines the prosecution theory on the
substantive charges against Mr. Williams and Ms. Burdett.

issues.   But the evidence presented does not clearly demonstrate that the Court must intrude upon the government's discretion (in the face of potential tax fraud by Timothy as to many Schedule C clients and/or by many Schedule C clients) to pursue charges only against (i) Timothy respecting his own taxes rather than against Timothy as tax preparer; and (ii) Mr. Williams and Ms. Burdett. SA Moore's testimony that he is only concerned with proving the elements of the crime against Williams and Burdett could, in the context of the discriminatory effect evidence, suggest an unprofessional tunnel-vision.   But in the absence of some proof of complicity of malintent, the government's failure even to look into whom might bear criminal culpability for the ostensibly excessive tax deductions taken by other Schedule C Timothy clients is simply fodder to defend against the tax fraud charges at trial. Possibly an exemplar of innocence.   Whether the government's failure to investigate the circumstances of Timothy's other clients' "egregious" tax returns is indicative of a shoddy, short-sighted investigation will surely be placed at issue by the defense.   But the government has wide latitude to determine which cases to prosecute and this Court may not interfere with the exercise of that discretion, absent a showing that the Williams/Burdett prosecution is being pursued for an invidious motive that clearly offends the constitutional guarantee of equal protection.

There is simply no evidence indicating that any IRS agent (or any person in the chain of command escalating Williams from witness to target to indicted defendant) selected Jason Williams for further investigation or prosecution because they harbored the desire to prevent Williams from exercising his constitutional rights.  In the absence of direct evidence, defendants focus on some indirect evidence from which it fairly may be inferred that the government indeed considered Mr. Williams' status as a public official as the investigation progressed from taking a look into "false items" to a full-blown investigation and then prosecution: the (now former) U.S. Attorney General's remarks concerning his generalized distaste for "reformist" District Attorneys; the law enforcement agents' and prosecution attorneys' failure (or decision not) to investigate more of Timothy's clients' tax returns to determine whether Timothy as tax preparer (and/or other clients) bear criminal responsibility for the aggressive business expense deductions taken; SSA Gregoire's acquaintance with Jason Williams and his ex-wife; and the timing of the indictment in contravention of DOJ policy to avoid interfering with elections.[48]   Insofar as

---

[48] As a reminder, the DOJ's policy on "Election Year Sensitivities" provides:

> [P]olitics must play no role in the decisions of federal investigators   or   prosecutors   regarding   any investigations  or  criminal  charges.   Law  enforcement officers  and  prosecutors  may  never  select  the  timing  of investigative  steps  or  criminal  charges  for  the  purpose of  affecting  any  election,  or  for  the  purpose  of  giving

any of these factors or their cumulation illustrate irregularities in process manifesting suspicious intent, the oblique nature of this collective evidence still falls short of clearly demonstrating an individual agent, prosecuting attorney, or institutional desire to prevent Jason Williams from being a public official or running for office.  The evidence is insufficient to show that the U.S. Attorney's Office for the Western District of Louisiana singled out Jason Williams and Nicole Burdett for prosecution for the purpose of preventing Jason Williams from exercising his constitutional rights.[49]

The Court has considered the vast record generated thus far; the defendants fall short of marshaling clear evidence in support of their claim that this tax fraud prosecution was motivated by an insidious intent to prevent Jason Williams from exercising his constitutional rights.  In deciding to prosecute Jason Williams, the government's investigatory and prosecutorial conduct may have progressed as a result of his public official status and may have incidentally interfered with his duties as city councilman or in his campaign for District Attorney, but the defendants have not shown that the government acted out of a desire to prevent Mr.

---

an advantage of disadvantage to any candidate or political party.

[49] This is especially so, considering the genesis of the IRS investigation; no matter how dubious and concerning the Court finds the years-long and continuing FBI investigation.

Williams from exercising his rights; in other words, the evidence suggests that this prosecution has been pursued in spite of, but not because of, Jason Williams' is a sitting public official who campaigned as a reformist District Attorney candidate.[50]

Put differently, if the indirect evidence put forth sufficed to clearly show prosecutorial malintent, then politically prominent individuals and those running for public office ostensibly would be immune from prosecution for tax law violations. The case literature makes clear that that is not the case. See, e.g., Hoover, 727 F.2d at 390 (noting that "union participation by federal employees is a protected activity, as is leadership of a union" but also observing that Hoover's status as an officer does not shield him from prosecution). Because the record here also supports the finding that legitimate prosecutorial bases for prosecution exist...a finding that reinforces the conclusion that the defendants have not clearly demonstrated discriminatory motive among the constellation of constitutionally permissible motives identified by the case literature and in the record here...the Court turns to consider this component of the selective prosecution analysis on which the prosecution bears the burden of proof.

---

[50] Insofar as Nicole Burdett's selective prosecution theory is derivative of Jason Williams', hers is likewise doomed by the lack of clear evidence supporting improper motive.

C.  A Legitimate Basis for Prosecution

Even if the defendants proved discriminatory effect and purpose, the burden would then shift to the government to demonstrate a legitimate basis for selecting Jason Williams for prosecution.  Hoover, 727 F.2d at 389 (citing Greene, 697 F.2d at 1235).  "Such factors as the strength of the case, the prosecution's general deterrence value, the government's enforcement priorities, and the case's relationship to the government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." Wayte v. United States, 470 U.S. 598, 607 (1985).

Insofar as the defendants' discriminatory purpose showing is reasonably segregable from the prosecution's legitimate basis for prosecution showing (rather than just a different party bearing the burden of proving good or bad faith), the Court finds that the evidence in the record establishes that the government has identified plausible nondiscriminatory factors that informed its discretion for selecting Jason Williams for prosecution.  The government's practical and nondiscriminatory reasons for its decision to prosecute only Mr. Williams and Ms. Burdett are well within the wide range of factors that permissibly inform prosecutorial selection.

"Due to limited resources of the government," the Fifth Circuit has realistically observed, "there will always be some tax evaders and tax protestors who elude prosecution by the government." United States v. Tibbetts, 646 F.2d 193, 195-96 (5th Cir. 1981). Some selectivity in prosecution is constitutionally tolerable; for example, the prosecution may consider characteristics of offenders such as professional status as attorney and political prominence -- these are not protected classifications. Deterrence value is a permissible consideration in selecting among candidates for prosecution; seeking to secure general compliance with the tax laws by prosecuting those who garner media attention is thus permissible. See, e.g., Wayte, 470 U.S. at 613 (observing that "prosecuting visible nonregistrants" with the Selective Service was a compelling policy and "an effective way to promote general deterrence, especially since failing to proceed against publicly known offenders would encourage others to violate the law"). Indeed, prosecuting offenders that will garner media attention and prosecuting offenses that the government considers flagrant generally belie invidiousness because such decisions fall within nondiscriminatory standards for prosecution. See, e.g., Greene, 697 F.2d at 1235 (citing with approval the Eighth Circuit's holding that potential media attention may be a legitimate basis for selection for prosecution given the potential deterrent effect on others and

given that the government lacks the means to investigate every suspected violation of the tax laws).  The case literature confirms that selecting only some suspected tax evaders does not, standing alone, impermissibly infringe upon First Amendment rights.  See, e.g., United States v. Johnson, 577 F.2d 1304, 1309 (5th Cir. 1978)(decision to prosecute known tax reporting violations may be informed by such factors as "the flagrancy of the violation, the amount involved, the special status of the taxpayer... as a CPA or attorney, the availability of limited investigative personnel, and other factors unique to a given case" and noting "a legitimate [government] interest in punishing flagrant violators and deterring violations by others."); United States v. Catlett, 584 F.2d 864, 868 (8th Cir. 1978)(insofar as a decision to prosecute rests upon the amount of publicity one's protests receive, not upon the exercise of one's first amendment right to free speech[, s]uch a decision is not based upon an impermissible ground but rather serves a legitimate governmental interest in promoting public tax compliance with the tax laws.").

That political prominence is typically inseparable from the exercise of First Amendment rights does not render invidiously discriminatory the government's deterrence-motivated decision to prosecute politically prominent individuals.  See United States v. Hastings, 126 F.3d 310, 314-15 (4th Cir. 1997)("[A] person's public renown may be properly considered among other factors when deciding

72

whether to pursue criminal sanctions for a violation of the law.");
see also United States v. Ojala, 544 F.2d 940, 945 (8th Cir.
1976)(citation omitted)(That "[t]he government lacks the means to
investigate and prosecute every suspected violation of the tax
laws" renders it unsurprising that it chooses to prosecute "those
cases in which the violations of the tax laws appear most
flagrant.").[51]

---

[51] Ojala was an attorney and former Minnesota state representative,
who vigorously opposed the Vietnam war; he campaigned for elective
office on an anti-war platform, served as a draft resistance
counselor, and introduced anti-war resolutions.  It was during
this period of anti-war activity that he decided not to file his
state and federal income tax returns. Id.  When he was indicted
for failing to timely file income tax returns, Ojala claimed he
was a victim of unconstitutional selective prosecution, targeted
because he had exercised his First Amendment rights to protest the
Vietnam war.  The district court denied Ojala's claim after a
hearing, and the Eighth Circuit observed that Ojala made a strong
showing that he was singled out for prosecution while other
similarly situated individuals were not indicted.  He thus
satisfied the effects prong of the selective prosecution test.
Id. at 943.  However, the Eighth Circuit determined that Ojala
failed to demonstrate that the decision to prosecute was made in
reprisal for his outspoken opposition to the war, as opposed to
because Ojala's conduct was "flagrant" and thus within
nondiscriminatory standards. Id. at 944 ("We find that initiating
an investigation and prosecution because [a prominent public
figure announced his purposeful refusal to comply with filing
requirements because of his political views] falls well within the
degree of prosecutorial discretion[.]").  The Eighth Circuit also
observed that it had previously upheld, in United States v.
Swanson, a selective program of investigation and prosecution of
attorneys, accountants, and other professionals who customarily
gave tax advice to others and who should have been knowledgeable
about their tax responsibilities. Id. at 944-45 (and citing United
States v. Wiley, 503 F.2d 106, 107 (8th Cir. 1974)).

Where the government defends its selection of a defendant for prosecution with concrete, nondiscriminatory reasons later supported by evidence adduced at trial, the government's specific and legitimate explanations generally suffice to defeat a selective prosecution claim.  Consider, for example, United States v. Saade, 652 F.2d 1126, 1135-36 (1st Cir. 1981).  There, the First Circuit affirmed the district court's denial of the defendant's motion to dismiss for selective prosecution, observing:

> Assuming the prosecution also concluded, as asserted on appeal, that the [defendants'] political prominence would fortify the potential deterrent effect, we find nothing evil in this calculation.... Although the deterrence rationale can always be invoked to justify selective prosecution, its general applicability does not undermine its legitimacy in the absence of evidence that controverts the Government's asserted interest in deterrence of the criminal conduct at issue.

Id. at 1137 n.14 (internal citations omitted).  The case literature thus underscores that the prosecution sensibly selects for prosecution individuals who will receive media attention and "political prominence is not an impermissible consideration" in the prosecution selection process.  Ojala, 544 F.2d at 944 (citing United States v. Peskin, 527 F.2d 71, 86 (7th Cir. 1975)).

The question presented here is whether the decision to prosecute Jason Williams, a sitting councilman running for district attorney, was made in reprisal for his status as a sitting public official or out of a desire to prevent him from running and

serving as a reformist DA candidacy, as the defendants contend, or whether the decision was informed by the agents' and prosecutor's determination that the charged offenses were flagrant in their inclusion of many personal expenses and that Williams had a history of tax liens and was an attorney whom the prosecution might be able to prove should be aware of his tax obligations, as the government contends, and so was within nondiscriminatory standards.

More than once, the government has indicated that it must consider how it will carry its steep burden in proving the "willfulness" *mens rea* element of the tax fraud crimes charged. That it must prove a violation of a known legal duty, the government submits, legitimately informs its discretion to pursue such cases against professionals, especially attorneys. In questioning defense expert, Harold Asher, regarding the similarities or differences among Timothy clients and Mr. Williams, the government focused on Mr. Williams' profession, as an attorney running his own law firm, and suggested that this is a distinguishing characteristic between Mr. Williams and other Timothy clients that informed its prosecution decision. The government noted that Mr. Williams is an attorney who on his law firm's website indicates that his firm handles tax evasion matters; the government also suggested that it distinguishes Mr. Williams from other Timothy clients on the basis that Mr. Williams took a

tax class in law school.  These considerations, the government submits, serve as legitimate factors guiding its discretion in choosing to prosecute Mr. Williams instead of, say, Timothy's trucker or fisherman clients, who may be less sophisticated in terms of business tax obligation acumen.  Part and parcel of the government's prosecution theory is that Jason Williams, an attorney who has indicated that he would represent clients in tax evasion cases is, in counsel for the government's words, "intelligent enough to review his returns an understand them."[52] Of course, the Court makes no determination on this assertion other than to underscore that it is the prosecution's burden at trial to prove each element of the charged crimes beyond a reasonable doubt; whether Mr. Williams did, in fact, review his returns and understand them rather than rely on Mr. Timothy to determine which deductions to claim may very well be an issue presented to the jury to resolve.[53]  But the Court cannot discount the government's

---

[52] Selecting for prosecution individuals like attorneys learned in the law (or professionals like tax preparers learned in the tax law) would be crucial to discharging the government's burden to prove willfulness beyond a reasonable doubt at trial.

[53] The defense expert testified that when a tax return has been prepared by a tax preparer, the client "generally depend[s] on me to make those determinations" meaning that Mr. Asher does not generally give returns he prepares to his clients and ask them to review them:  "we generally don't, we give them the return and tell them to file it."  Tr. p. 162.  Of course, which version of Mr. Timothy's narrative will be presented to and believed by the jury at trial on the issue of Mr. Williams' and Ms. Burdett's participation in the preparation of Williams' returns will be an issue for the jury at trial.

submission that proving willfulness is a tall-order that legitimately may inform its decision in selecting more sophisticated targets for prosecution.

The Court finds that the multiplicity of factors informing prosecutorial discretion insulates the government's selection here.  The prosecution may legitimately consider characteristics of offenders that will assist it in discharging its burden at trial and in achieving deterrence.  Although it is deeply troubling that the FBI has for years and continues to investigate Mr. Williams, notwithstanding at least some indication that there is no evidence supporting pursuit of any charges, the record here suggests that the IRS investigation began unencumbered by any clear bad faith motive that otherwise might be driving the FBI to pursue an investigation that "isn't going anywhere."

Certain evidence probative of prosecutorial motivation supports the presumption of regularity and defies judicial intrusion.  Even if the defendants clearly had demonstrated a prosecution motivated in part by his political prominence, they have not shown a government desire to prevent Jason Williams from exercising his constitutional rights; and there is evidence supporting legitimate prosecutorial motivation that additionally spells defeat for the defendants' selective prosecution claims on this record.

III.

Finally, the Court takes up the defendants' claim that the decision to prosecute them for tax fraud is vindictive in violation of their constitutional right to due process.  Prosecutorial discretion is restrained by the due process clause, which prohibits the government from using its charging discretion to punish a defendant in retaliation for the defendant's exercise of a protected statutory or constitutional right.  Identifying the contours of a constitutionally protected right is hindered in this pre-trial setting.  Ultimately, the same evidence that fails to demonstrate undue selectivity likewise fails the vindictiveness test, which requires presentation of objective evidence showing it is more likely than not that the defendants are being prosecuted to punish them for asserting protected legal rights.

*A.*

The Court observes that Jason Williams' challenge seems best characterized as one for selective prosecution while Nicole Burdett's more neatly fits an attempt to claim vindictive prosecution.  Jason Williams' first vindictive prosecution theory is that he is being punished with criminal tax charges simply because he failed to meet with SA Marable, in contravention of his right to refuse to speak to her.  The evidence elicited during the hearing does not support a claim for vindictiveness or that he was

indicted in reprisal for his failure to meet with SA Marable. There is scant case literature to support a successful vindictive prosecution theory predicated on the initiation of charges, rather than the augmenting of charges following the exercise of a protected right. Even indulging the proffered novel theory, there is no direct evidence indicating that the tax fraud charges were instituted in reprisal for his failure to meet with SA Marable; the evidentiary shortcomings on the issue of malintent that fail to support Mr. Williams' selective prosecution claim likewise doom the vindictive prosecution claim. At least on this record.

Insofar as Mr. Williams' vindictive prosecution claim could be alternatively predicated on the theory that the government filed tax fraud charges against him in reprisal for campaigning as a reformist district attorney candidate, this theory also fails under the rather strict governing conceptions of vindictiveness. Regardless of whether then-Attorney General's remarks in 2019 or 2020, denouncing "reformist" district attorneys, could be considered DOJ policy or agenda, there is no evidence in the record manifesting any individual or institutional complicity in any such political agenda by the agents, prosecutors, or bureaucrats involved in this case.

*B.*

Turning to Ms. Burdett's vindictiveness theory, whether considering her claim predicated is on the charges brought in Criminal Action Number 20-55 or on the more recent charges filed in Criminal Action Number 20-139, there can be no presumption of vindictiveness under <u>Bordenkircher</u> and <u>Goodwin</u>. That the constitution tolerates a prosecutor's use of its charging discretion to attempt to persuade the defendant to forego her future trial right and her right to plead not guilty is dispositive of Ms. Burdett's attempt to invoke a presumption of vindictiveness insofar as she contends that the government is pursuing charges against her in both indictments to punish her for failing to cooperate against Jason Williams. See <u>Bordenkircher</u>, 434 U.S. at 364. <u>Bordenkircher</u> and its progeny's conception of due process endorses such conduct by the prosecutor as a permissible attempt to persuade a defendant not to exercise her future trial right.

Although the government suggests that it technically did not engage in plea negotiations with Ms. Burdett, by letter dated December 2, 2019 (before both indictments were returned), the government wrote to Ms. Burdett's counsel:

> As you will recall, I gave you a deadline of November 27, 2019, to let me know if your client would come in and provide a proffer to the government. We wanted to speak to her before making a decision as to whether or not we would proceed with her as a target in the Jason

> Williams investigation and wanted to give her the
> opportunity to cooperate in order to lessen her
> culpability and possibly avoid being charged.    In
> addition, as I mentioned to you, I can only obtain her
> personal tax returns, once a case is officially opened
> on her.   Once the case is open and her returns are
> obtained, she could possibly face additional criminal as
> well as civil exposure.
>
> I am assuming that you have explained all of this in
> detail to her and I would appreciate a response in
> writing so that we can ensure that she was made aware of
> this offer and that she has officially rejected it.

A request for a proffer session or cooperation may not rise to the level of plea negotiations *per se*, but it is a preliminary part of the plea-bargaining process.   Nevertheless, although the case literature confirms that the government is precluded from retaliating against an individual by threatening or bringing additional charges to penalize the defendant's exercise of her constitutional rights, Ms. Burdett has failed to identify what the case literature requires: a protected right in the pretrial context and that the government filed the initial or, more likely, the most recent charges, out of a desire to prevent her exercise of the protected right.

Bordenkircher and Goodwin permit what the prosecution did here: in the context of pretrial and preindictment discussions, a prosecutor may threaten a defendant with charges or more severe penalties and may carry out those threats if the defendant declines to cooperate in an investigation of another person.   Because Nicole

Burdett was free to decline the government's demand for cooperation (and indeed she did so decline), it was constitutionally permissible for the prosecutor, in the course of encouraging an individual to cooperate, to make good on the threat of more severe punishment or additional charges.[54]  Unless a defendant shows that she was treated worse than she would have been had there been no cooperation overture or plea bargain offered, there is no due process violation sounding in vindictive prosecution.  Ms. Burdett has not shown that she was treated worse than she otherwise would have been had the government not made the offer to cooperate.  See Long, 823 F.2d at 1211 ("there could be prosecutorial vindictiveness only if his refusal [to cooperate] resulted in treatment harsher than would have occurred if the government had not sought his assistance."); see also Williams, 47 F.3d at 662 ("If it is constitutionally permissible to use the threat of more severe punishment to encourage a guilty plea, certainly it is

---

[54] In the December 2019 letter, counsel for the government informed Ms. Burdett's attorney of the consequences of her choice not to cooperate; the case literature reinforces that a presentation of alternatives is constitutionally tolerable.  Ms. Burdett opted not to cooperate and was indicted (as threatened) both in this case with Jason Williams as the primary target, 20-55, and pertaining to her own personal tax conduct, 20-139.  To be sure, the realities of the plea bargaining process and the countenanced "threats" permitted as part of the process are often unpalatable and appear incompatible with other constitutional guarantees such as the constitutional presumption of innocence, but nonetheless are constitutionally permissible realities indulged by our adversarial criminal justice system.

legitimate to use the same tactics to encourage a defendant to cooperate with the authorities in the criminal investigation and prosecution of another.").

Insofar as Ms. Burdett's theory of vindictive motive is predicated on the government's decision to threaten to and to ultimately indict her again, after she filed pretrial motions to dismiss the June 2020 indictment, the vindictiveness theory fares no better under the case literature's cramped conception of protected rights in the pretrial context.  Given the expected realities of pretrial motion practice in our adversary criminal justice system, there can be no presumption of vindictiveness merely because charges were filed or augmented after a defendant filed contested pretrial motions.  See Barner, 441 F.3d at 1319 ("[t]he mere fact that a defendant has made pre-trial motions [even motions suggesting prosecutorial misconduct] is not sufficient to raise a presumption of prosecutorial vindictiveness."); Goodwin, 457 U.S. at 381-82 ("It is unrealistic to assume that a prosecutor's probable response to [a defendant filing pretrial motions asserting procedural rights] is to seek to penalize and to deter [given that t]he invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.").

In the absence of a presumption of vindictiveness, Ms. Burdett must prove actual vindictiveness, which can be achieved only by showing "objectively that the prosecutor's charging decision was motivated by a desire to punish h[er] for doing something that the law plainly allowed h[er] to do." Goodwin, 457 U.S. at 384.  As the case literature demonstrates, such a showing generally cannot be made by a defendant claiming, without more, that additional charges were filed before trial, after she declined to cooperate, or after or close in time to filing pretrial motions challenging the indictment.  Without objective evidence of punitive motivation towards Ms. Burdett, such ordinary events or occurrences inherent in the nature of the criminal justice system generally are not attributable to vindictiveness, harassment, or reprisal and thus do not generally offend due process.[55]

***

Ultimately, the evidence in the record falls short of what the case literature strictly requires to rebut the generous presumption of regularity owed to prosecutorial prerogative due to separation of powers doctrine.  Regardless, much of the evidence

---

[55] Many of the prosecutorial tactics identified and challenged by Ms. Burdett (particularly the agents' timing and actions in involving her close and some ill family members); however disdainful, this conduct does not rise to the level of indicia of reprisal under the binding case literature.

developed in aid of the selective and vindictive prosecution claims
indeed may be probative of the issue or innocence or guilt at
trial.   Nothing in this Order and Reasons should be read to
undercut the constitutional presumption of innocence, which both
Jason Williams and Nicole Burdett fully enjoy unless or until the
government proves (and a jury finds) beyond a reasonable doubt
that each are guilty of the elements of the charged crimes.

For the foregoing reasons, the defendants' renewed motions to
dismiss are DENIED.

New Orleans, Louisiana, January 8, 2021


_____
MARTIN L. C. FELDMAN

UNITED STATES DISTRICT JUDGE